UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
——————————————————————————————

ANDREW SMITH,

                                    Plaintiff,

v.                                                                 9:17-cv-0244
                                                                   (TJM/TWD)

DR. RUSSELL FRICKE,

                                    Defendant.

——————————————————————————————

APPEARANCES:                                     OF COUNSEL:

ANDREW SMITH
Plaintiff, *pro se*
646 Second Avenue
Troy, NY 12182

THUILLEZ, FORD LAW FIRM                KAREN BUTLER, ESQ.
Counsel for Defendant
20 Corporate Woods Boulevard
3rd Floor
Albany, NY 12211

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**ORDER AND REPORT-RECOMMENDATION**</u>

## I.      INTRODUCTION

        Plaintiff Andrew Smith commenced this *pro se* civil rights action under 42 U.S.C. § 1983

asserting claims arising out of his confinement at the Rensselaer County Correctional Facility

("RCCF").[1]  (Dkt. No. 1.)  Only Plaintiff's claim that Defendant Dr. Fricke was deliberately

indifferent to his prostate condition survived *sua sponte* review conducted pursuant to 28 U.S.C.

———————————————

[1]  The parties also refer to the RCCF as the Rensselaer County Jail ("RCJ" and "jail").  The
Court will do the same.

§ 1915(e).  (Dkt. No. 4.)  Dr. Fricke has now moved for summary judgment pursuant to Rule 56

of the Federal Rules of Civil Procedure.  (Dkt. No. 51.)  Plaintiff has filed a response.  (Dkt. No.

54.)  Dr. Fricke has filed a reply.  (Dkt. No. 56.)  For reasons explained below, the Court

recommends that Dr. Fricke's summary judgment motion be denied.

## II.    BACKGROUND

In this civil right action, Plaintiff claims that while he was an inmate in the RCCF, Dr.

Fricke denied him proper and adequate medical care for his prostate condition.  (*See generally*

Dkt. No. 1.[2])  Construed liberally, Plaintiff alleges Dr. Fricke failed to treat Plaintiff's prostate

cancer and/or that Dr. Fricke's actions or omissions prevented Plaintiff from being timely

diagnosed and treated.  (Dkt. No. 1 at 7-8.[3])

### A.    Plaintiff's Confinement in DOCCS and the RCCF

By his own admission, Plaintiff has "spent a lifetime" in state custody and at the RCCF.

(Dkt. No. 54 at ¶ 5.)  Relevant to this action, Plaintiff was convicted in 2001 of burglary in the

second degree, a Class C felony, and sentenced up to eleven years of imprisonment followed by

---

[2]  As noted on initial review, Plaintiff does not provide any dates in his complaint.  (Dkt. No. 4 at
4 n.3.)  By Decision and Order entered July 16, 2018, Plaintiff's complaint against Dr. Russell
Fricke in a separate action filed in this District, entitled *Andrew M. Smith v. Dr. Russell Fricke*,
No. 9:17-CV-1090 (BKS/CFH) (hereafter, "*Smith II*"), was dismissed in its entirety, without
prejudice, for failure to state a claim upon which relief may be granted.  (*Smith II*, Dkt. No. 30.)
Because the District Court dismissed *Smith II* pursuant to Rule 12(b)(6) of the Federal Rules of
Civil Procedure, it did not reach Dr. Fricke's alternative request, and Magistrate Judge
Hummel's alternative recommendation, that in the interest of judicial economy, *Smith II* should
be consolidated with the case at bar pursuant to Rule 42(a) of the Federal Rules of Civil
Procedure.  (*See Smith II*, Dkt. No. 28 at 9-10.)
[3]  Page references to documents identified by docket number are to the numbers assigned by the
CM/ECF docketing system maintained by the Clerk's Office.  Paragraph numbers are used
where documents identified by the CM/ECF docket number contain consecutively numbered
paragraphs.

five years of supervised release.  (Dkt. No. 51-5 at ¶¶ 4, 8.[4])  It appears Plaintiff was released in September of 2009.  *Id.* at ¶ 4.  Beginning in 2011, Plaintiff was returned to the RCCF, and also to DOCCS custody, several times for parole violations.  *Id.*  Specifically, Plaintiff was incarcerated at the RCCF from June 2012, through June 2013, from February 2014 through October 2014, from October 2015, through December 2015, and October 2016, through February 2017.  (Dkt. No. 52-1 at 148.)

### B.    Plaintiff's Claim of Deliberate Indifference

While confined at the RCCF, Plaintiff "complained of abdominal and rectal pains and periodic bleeding," for which he was prescribed medication.  (Dkt. No. 1 at 5.)  Plaintiff "was told [he] was constipated" but believed he had a more serious condition.  *Id.*  Dr. Fricke chastised Plaintiff for suggesting that his medical needs were not being met and told Plaintiff that he was simply trying to blame Dr. Fricke for his cancer.  *Id.*  Plaintiff claims Dr. Fricke "stalled and stalled while hoping parole would rid him of this problem me."  *Id.*  After "a lengthy period of time," Plaintiff was evaluated by an outside specialist who advised him that his prostate-specific antigen ("PSA") level was extremely elevated and his prostate was enlarged.  *Id.* at 7.  Due to Dr. Fricke's alleged mistreatment, Plaintiff arrived in DOCCS custody with an elevated PSA level. *Id.*  According to Plaintiff, Dr. Fricke's "only concern was saving this jail as much money as possible.  My illness matured while in the custody of the R.C.J. and if properly attended to in early stages, I would not be worse off as I am now!"  *Id.* at 8.  In response to a request to review

---

[4]  *See* http://nysdoccslookup.doccs.ny.gov (DIN 01A2229) (last visited July 29, 2019). According to the public website maintained by DOCCS, Plaintiff (DIN 01A2229) was returned to DOCCS custody on December 24, 2015; Plaintiff was released on April 27, 2016, upon the maximum expiration of his sentence.  *Id.*

his medical records, Plaintiff was told that he was not allowed "to physically possess his records." *Id.* at 5.

### C.    Plaintiff's Medical Records

According to certified medical records submitted by Dr. Fricke and not specifically opposed by Plaintiff, Plaintiff was treated for various medical conditions while incarcerated at the RCCF and various DOCCS facilities.  (*See generally* Dkt. Nos. 52-1; 52-2; 52-3.)

In March of 2011, Plaintiff visited gastroenterologist, Dr. Frederick Braunstein, for constipation.  (Dkt. No. 52-1 at 146.)  Dr. Braunstein added prostate cancer, among other conditions, to his diagnosis list for Plaintiff.  *Id.*  The encounter note indicates Dr. Braunstein also discussed the prostate cancer diagnosis, along with chemotherapy and Proscar,[5] with Plaintiff.  *Id.*

Later in 2011, Plaintiff visited an urologist, Dr. Oscar Almonte, three times for treatment of his elevated PSA level.  (Dkt. No. 52-3 at 7-17.)  Plaintiff related a history of prostate infections but no personal or family history of prostate cancer.  *Id.* at 7.  Dr. Almonte diagnosed Plaintiff with elevated PSA, benign prostatic hypertrophy ("BPH"),[6] and chronic prostatis.[7]  *Id.* at 8.  Over the course of these visits, Dr. Almonte prescribed Cipro,[8] and Plaintiff's PSA level

---

[5]  Proscar, also known as Finasteride, is used to treat an enlarged prostate, among other conditions.  *See* https://medlineplus.gov/druginfo/meds/a698016.html (last visited July 25, 2019); *see also* Dkt. No. 51-8 at 4 n.1.

[6]  Benign prostatic hypertrophy ("BPH") refers to an enlarged prostate.  Although common in older men, an enlarged prostate can also share symptoms with prostate cancer.  *See* https://medlineplus.gov/enlargedprostatebph.html (last visited July 25, 2019); *see also* Dkt. No. 51-8 at 4 n.1.

[7]  Chronic prostatis refers to recurrent prostate infections.  (Dkt. No. 52-3 at 7.)

[8]  Cipro is a common brand name for ciproflaxin, an antibiotic that can be used to treat prostate infections, among other conditions.  *See* https://medlineplus.gov/druginfo/meds/a688016.html (last visited July 25, 2019).

decreased from 29.9 ng/mL to 13.1 ng/mL.[9]  *Id.* at 9.  When he discussed the treatment with Dr.

Almonte, Plaintiff indicated that he wanted to continue the Cipro treatment.  *Id.* at 7.  Dr.

Almonte noted Plaintiff was already taking several other medications related to pain,

constipation, and other conditions, including Proscar.  *Id.*; Dkt. No. 52-1 at 310-19.  Plaintiff was

released from the RCCF before his fourth appointment with Dr. Almonte, which was set to occur

in December of 2011.  (Dkt. No. 52-3 at 28.)  Nothing in the record indicates that Plaintiff sought

treatment for his prostate condition following his release from the RCCF in 2011.  *See id.* at 4.

 In 2012, Plaintiff returned to the RCCF and requested multiple medical appointments

related to chest pain, fatigue, and other conditions.  (Dkt. No. 52-1 at 177-91.)  Relevant to his

prostate, Plaintiff requested a prescription for Proscar and notified the medical staff of his

"prostate enlargement."  *Id.* at 187, 190.  He was again prescribed medication for pain and

constipation.  *Id.* at 220.  Although he was "seen in medical" regarding his prostate concerns, it

is not clear from the record if he was prescribed Proscar at this time.  *Id.* at 187.

 In 2013, Plaintiff complained on at least three occasions of "periodic rectal bleeding" and

pain with urination.  *Id.* at 171-75.  He also complained his "enlarged prostate" caused him to

"have to get up 4 to 5 times in a night."  *Id.* at 176.  Plaintiff was prescribed Proscar.  *Id.* at 214.

On March 26, 2013, Dr. Fricke evaluated Plaintiff and noted his various medical conditions:

> 1. Chronic constipation/goes weeks at a time [without] a [bowel movement] then gets mucus and blood that takes long time to stop.  Says he was scoped some [years] ago but remembers no details
> 2. [Bilateral] knee pain ([history of] arthritis)
> 3. [Elevated] PSA on Proscar (as high as Low 30's . . . No [biopsy] ever done but Proscar [decreased] PSA to [around] 10 . . . had prostatis which [increased] PSA to 29 while on Proscar . . .

---

[9]  A normal PSA level is considered to be 4.0 ng/mL.  *See* https://medlineplus.gov/ency/article/003346.htm (last visited July 25, 2019).

> 4.  12 cm Mass in Liver thought to be a hemangioma . . .

*Id.* at 136.  Dr. Fricke performed a rectal exam on Plaintiff and indicated his findings as:

> The prostate feels suspicious to me and should have been biopsied.
> There is no indication of prostatis.

*Id.*; *see* Dkt. No. 51-9 at ¶ 33.  Dr. Fricke additionally noted, "The prostate is not exceptionally large but feels irregular."  (Dkt. No. 52-1 at 136.)  At that time, Dr. Fricke requested a urology consultation for Plaintiff, referring him back to Dr. Almonte.  *Id.* at 142.  As the reason for the consult, Dr. Fricke stated:

> Extreme elev[ation] of PSA; firm irreg[ular] prostate on [digital rectal exam.]  On Proscar but no [history] of previous [biopsy].

*Id.*  Dr. Fricke also ordered a PSA test.  *Id.* at 197.  On March 28, 2013, Plaintiff's PSA level was recorded at 11.36 ng/mL.  *Id.*  On April 4, 2013, Plaintiff again saw Dr. Fricke for constipation and his prostate.  *Id.* at 151.  Dr. Fricke prescribed Plaintiff Cipro for his prostate condition, noting:

> This is likely irrelevant . . . there is no evidence for infec[tion,] prostatis but he had this situation once before and is convinced.

*Id.*  Dr. Fricke also made a note to discuss Plaintiff's condition with Dr. Braunstein.  *Id.*  Upon following up with Dr. Braunstein's office, it appears Dr. Fricke noted, via a handwritten note placed on top of Dr. Braunstein's March 3, 2011, encounter letter, that Dr. Braunstein was "now deceased," and a "colonoscopy <u>not</u> <u>done.</u>"  *Id.* at 147.  A notation also appears to indicate Plaintiff's 2011 diagnosis of prostate cancer.  *Id.*

The next day, on April 5, 2013, Dr. Fricke consulted with radiologist, Dr. Hendricks,[10] and gastroenterologist, Dr. Robinson,[11] about Plaintiff's condition. *Id.* at 152. They "decided a contrasted CT would provide the most information," potentially revealing the "bowel wall structure . . . or prostatic obstruction." *Id.* Dr. Fricke referred Plaintiff to Samaritan Hospital for the CT scan. *Id.* at 141. On the referral form, Dr. Fricke indicated two diagnoses for Plaintiff: constipation and "non-operable prostate ca[ncer]." *Id.* A few days later, on April 9, 2013, Dr. Fricke recorded that the CT scan was negative "[with] respect to stool impaction, voluminous content, [or] bowel distension." *Id.*

Plaintiff visited Dr. Almonte on April 29, 2013. *Id.* at 143. At this appointment, Plaintiff "denie[d] any voiding difficulty" but reported dysuria[12] and nocturia.[13] *Id.* His PSA level was recorded as 13.1 ng/mL. *Id.* Plaintiff's medical history indicated elevated PSA, BPH, and chronic prostatis. *Id.* Dr. Almonte ordered a new PSA test and noted:

> Patient did not [follow up] for about 2 years and thus his PSA needs to be re taken and I will request for one at this time together with % Free PSA. If it is quite elevated again then to try him once more on taking antibiotics and if it does not decrease then he needs [a prostate biopsy].

*Id.* at 145. Dr. Almonte requested to see Plaintiff again on May 29, 2013. (Dkt. No. 51-7 at ¶ 38.) However, this appointment was rescheduled by the RCCF's Health Service Administrator ("HSA"), "because, for safety reasons, an inmate cannot have advance knowledge that he will be

---

[10] Dr. Fricke's notes do not give a first name for Dr. Hendricks. (*See* Dkt. No. 52-1 at 152.)
[11] Dr. Fricke's notes do not give a first name for Dr. Robinson. (*See* Dkt. No. 51-2 at 152.) However, the Court presumes, based on other notes that appear to have been made contemporaneously, that Dr. Fricke is referring to Dr. William T. Robinson, a colleague of Dr. Braunstein's at Upstate Gastroenterology Associates, P.C. *See id.* at 146-47, 151.
[12] Dysuria refers to painful urination. *See* https://medlineplus.gov/ency/article/003145.htm (last visited July 25, 2019).
[13] Nocturia refers to urinating more at night. *See* https://medlineplus.gov/ency/article/003141.htm (last visited July 25, 2019).

transported from the facility on a specific date." *Id.* Plaintiff was released from the RCCF on June 17, 2013, before his follow-up appointment with Dr. Almonte had been rescheduled. *Id.*[14]; *see* Dkt. No. 52-1 at 148. Following his release, Plaintiff missed a follow-up appointment with Dr. Almonte. (Dkt. No. 52-3 at 30.)

Plaintiff returned to the RCCF on February 12, 2014, where he remained, except for a brief period of release, until October 17, 2014. *Id.* at 148; Dkt. No. 51-9 at ¶ 43. Upon intake, Plaintiff reported a history of problems with his vision, heart blockage, hypertension, liver disease, Hepatitis, kidney disease, trouble voiding, and back pain. (Dkt. No. 52-1 at 3.) Shortly thereafter, Plaintiff was treated for alcohol withdrawal and referred to the facility's Chronic Disease Clinic. *Id.* at 7-10. At the clinic, Plaintiff was assessed to have "stable" Hepatitis C, chronic obstructive pulmonary disease ("COPD"), and constipation. *Id.* at 10. He was prescribed medication for COPD and constipation. *Id.* Over the next several months, Plaintiff was regularly prescribed medication for COPD, constipation, pain, and other ailments. *See id.* at 19-27.

On June 4, 2014, Dr. Fricke evaluated Plaintiff. *Id.* at 13. Dr. Fricke noted Plaintiff had "milky white ring in periphery of the iris" and "skin lesions." *Id.* He assessed Plaintiff as having "stable/inactive" Hepatitis C, COPD, constipation, and potentially sarcoidosis.[15] *Id.* Dr. Fricke also evaluated Plaintiff on June 11, June 18, and August 13, 2014. *See id.* at 14-16. During these appointments, Dr. Fricke addressed Plaintiff's concerns with his skin, respiration, constipation, and pain. *Id.* Other than one prescription for Cipro in May of 2014, Plaintiff's

---

[14] Dr. Fricke states he has "no supervisory role as relates to the HSA at RCCF or the transfer of inmate. The visit was not scheduled before [Plaintiff] left RCCF on 6/17/13." (Dkt. No. 51-7 at 38.)

[15] Sarcoidosis is a disease that can produce skin inflammation. *See* https://medlineplus.gov/sarcoidosis.html (last visited July 25, 2019).

medical records from this time indicate that he neither complained of nor received treatment for his prostate condition. *See id.* at 19-27; *see also id.* at 163-67.

On October 17, 2014, Plaintiff was transferred to DOCCS custody, identified as DIN 01A2229. *Id.* at 148; Dkt. No. 52-2 at 25. The intake record does not indicate any prostate condition or a prescription for any prostate medication. (Dkt. No. 52-2 at 25.) Plaintiff's medical history was reported to include Hepatitis C, latent tuberculosis, a stroke, COPD/asthma, and vision problems. *Id.* On October 21, 2014, while at Downstate Correctional Facility, Plaintiff received a PSA test, which revealed that his PSA level had risen to 64.72 ng/mL. *Id.* at 81. A month later, a doctor at Bare Hill Correctional Facility ("Bare Hill") referred Plaintiff to a urologist for a prostate evaluation. *Id.* at 112. The referring physician, Dr. Brian Connolly, noted the rise in Plaintiff's PSA level and found Plaintiff to have a "large prostate on exam." *Id.* Dr. Connolly further noted Plaintiff was previously on Proscar but had taken his "last dose 1.5 [years] ago." *Id.* An appointment was scheduled for January 15, 2015. *Id.* When Plaintiff returned from this appointment, a member of the medical staff at Bare Hill indicated Plaintiff would need a prostate biopsy. *Id.* at 60.

On March 3, 2015, while still incarcerated at Bare Hill, Plaintiff received a prostate biopsy. *Id.* at 120. The biopsy revealed "prostatic adenocarcinoma," or prostate cancer, with a Gleason score of 9.[16] *Id.* at 77. Following his diagnosis, Plaintiff underwent a bone scan and followed up with the urologist. *Id.* at 95. In June of 2015, Plaintiff visited a radiation oncologist, Dr. Anurag Chandra, at Albany Medical Center. *Id.* at 87. Dr. Chandra noted

---

[16] A Gleason score reflects how likely an individual's prostate cancer is to advance and spread. A higher Gleason score means the cancer is faster growing and more aggressive. A Gleason score of 9 or higher refers to a "high-grade cancer." *See* https://medlineplus.gov/ency/patientinstructions/000920.htm (last visited July 25, 2019).

Plaintiff had "been diagnosed with high risk/very high risk" prostate cancer and had "already started hormone therapy." *Id.* The medical staff at Bare Hill had also prescribed Casodex.[17] *Id.* at 39. Dr. Chandra recommended radiation therapy and ordered a CT scan "for staging purposes." *Id.* at 88.

For several months after his radiation oncology consultation, Plaintiff refused additional medical treatment for his prostate condition. *See id.* at 151-52. Although the staff at Bare Hill repeatedly advised him of "how life-threatening his condition is," Plaintiff "refused" to be transported to appointments for a CT scan and radiation therapy. *Id.* During his deposition, Plaintiff explained he "refused" treatment because he did not want to go through the "mental and physical abuse" of being transported to the treatment facility "all chained up" from approximately 7am until 8pm for a fifteen minute appointment. (Dkt. No. 51-6 at 72-73.)

Plaintiff returned to the RCCF on October 19, 2015. (Dkt. No. 52-1 at 148.) Later that month, Dr. Fricke noted Plaintiff's prostate cancer diagnosis, referred him to Dr. Chandra for a follow-up evaluation and CT scan, and ordered Casodex and Lupron[18] for Plaintiff. *Id.* at 39-41. Plaintiff received a CT scan on December 7, 2015. *Id.* at 76. Plaintiff left RCCF on December 25, 2015, and returned to DOCCS custody. *Id.* at 148; *see id.* at 117.

On January 25, 2016, while at Ulster Correctional Facility, Plaintiff had a follow-up radiation oncology appointment with Dr. Chandra. *Id.* at 134. At this appointment, Plaintiff "finally agreed to treatment" with Dr. Chandra. *Id.* Dr. Chandra provided further insight into Plaintiff's condition:

---

[17] Casodex is a brand name for bicalutamide, a medication used to treat prostate cancer. *See* https://medlineplus.gov/druginfo/meds/a697047.html (last visited July 25, 2019).
[18] Lupron is a brand name for leuprolide, hormone therapy injections used to treat prostate cancer. *See* https://medlineplus.gov/druginfo/meds/a685040.html (last visited July 25, 2019).

> Previously he had a bone scan in April 2015 that showed no
> evidence of metastatic disease. He had a CT scan of the pelvis
> dated December 7, 2015, that showed moderate to severe disc
> disease with vacuum-discs at L3 to S1 and prostate measuring 4.3
> cm [and] no pelvic lymphadenopathy.
>
> The patient received his hormone therapy in December 27, 2015.
> His PSA dropped to 0.08. He has been having pain in his lower
> back this whole time. This did not improve with hormone therapy
> but as noted, he does have degenerative disc disease in his lower
> back. The pain is likely from that.

*Id.* Dr. Chandra again recommended radiation therapy. *Id.* Plaintiff underwent 44 radiation

treatments between February 11, 2016, and April 15, 2016, while in DOCCS custody.[19] *Id.* at

133.

**D.    Affidavit of Russell A. Fricke, M.D.**

Dr. Fricke graduated from the University of Miami School of Medicine in 1987. (Dkt.

No. 51-7 at ¶ 4.[20]) Thereafter, he completed a residency in Family Medicine at St. Clare's

Hospital in Schenectady, New York. *Id.* He then entered private practice and later served as the

Commissioner of Public Health for Schenectady County. *Id.* at ¶ 5.

In 2013, Dr. Fricke began part-time employment as the jail physician at the RCCF, a

position that he continues to hold. *Id.* at ¶ 6.[21] In this role, Dr. Fricke typically spends one day

---

[19]  Although it is unclear if the radiation treatment was successful, Plaintiff testified at his
deposition on November 14, 2018, that he had not seen Dr. Chandra since April of 2016. (Dkt.
No. 51-6 at 14.) Upon his release from DOCCS custody, Plaintiff was prescribed a medication
intended "to keep things at bay." *Id.* at 12. As of Plaintiff's deposition, he had run out of his
medication and had not visited a primary care doctor for a refill or follow-up evaluation, as
advised by Dr. Chandra. *Id.* at 13-14. Dr. Fricke raised Plaintiff's failure to mitigate damages as
an affirmative defense in his answer, but he has not moved for summary judgment on that
ground. (*See* Dkt. No. 11 at ¶ 12; *see generally* Dkt. Nos. 51-10; 56.)
[20]  Dr. Fricke's affidavit is based on his review of Plaintiff's medical records and his own
personal knowledge. All opinions set forth by Dr. Fricke are stated to a reasonable degree of
medical certainty. (Dkt. No. 51-7 at ¶¶ 2-3.)
[21]  This employment was undertaken pursuant to a professional services agreement between Dr.
Fricke and Correctional Medical Care ("CMC"), the company retained by the County to provide

per week, for a total of eight hours each week, at the jail. *Id.* at ¶ 9. While at the jail, he diagnoses and treats inmates who have requested medical care and have been referred to him by the HSA. *Id.* at ¶¶ 8, 12. He also is available for telephone consultations with the RCCF's nurses, nurse practitioners, and physician assistants 24 hours per day, 365 days per year. *Id.* at ¶ 8. However, Dr. Fricke does not oversee the provision of all medical care at the RCCF. *Id.*

Dr. Fricke has reviewed Plaintiff's medical records maintained by CMC during his incarceration at the RCJ. *Id.* at ¶ 14. Dr. Fricke confirms he treated Plaintiff during his incarceration there from February 12, 2014, to August 11, 2014, and then for a period August 14, 2014, through October 17, 2014. *Id.* at ¶ 16. He also saw Plaintiff during periods of incarceration in RCCF in 2013, after March 1, 2013. *Id.* However, Dr. Fricke states, "It is my understanding that any claims arising from the periods of incarceration in 2011-2013 are barred by the Statute of Limitations." (Dkt. No. 51-7 at ¶ 17.)

Dr. Fricke avers, "I am aware that [Plaintiff] was diagnosed with prostate cancer in March 2015 after he was transferred from RCCF to serve a sentence in [DOCCS]. *Id.* at ¶ 15. He opines:

> According to the records [Dkt. No. 52-2 at 73], [Plaintiff] was diagnosed with prostate cancer in March 2015, five months after leaving RCCF.
>
> It is my understanding that this cancer has not metastasized to his bones or other organs. However, even if this cancer had metastasized beyond the prostate it would be impossible to state with any degree of medical certainty that the cells that caused the cancer to spread would not have done so if [Plaintiff's] cancer had been diagnosed during the period of February to October 2014 as opposed to any other time, or that diagnosis during that time would have changed the treatment or altered the outcome. This is

---

medical care at the jail. (Dkt. No. 51-7 at ¶ 6.) CMC, which at some point was restructured and became "CBH Medical" in New York state, provides 24-hour nursing services at the jail. *Id.* at ¶ 10. The mid-level practitioners work approximately 24-30 hours per week at the jail. *Id.*

completely speculative.

*Id.* at ¶¶ 58, 59.  Dr. Fricke further notes Plaintiff has been incarcerated in the RCCF from time to time since his diagnosis of prostate cancer and the jail has continued his treatment with appropriate referrals to cancer specialists at Albany Medical Center.  *Id.* at ¶ 60.  Dr. Fricke maintains that his treatment of Plaintiff was "reasonable" and "appropriate."  *Id.* at ¶¶ 55, 60.

      **E.**      **Affidavit of Dr. Richard B. Toll, M.D.**

Dr. Toll, a licensed physician in the State of New York who has been board certified in Internal Medicine since 1979, has also submitted an affidavit in support of Defendant's motion for summary judgment.  (Dkt. No. 51-8 at ¶¶ 1, 3.[22])  From 1979 until April 2016, Dr. Toll practiced Internal Medicine in the Capital District of New York.  *Id.* at ¶ 2.  As such, he is familiar with the standards of care of the prevention, diagnosis, and treatment of adult diseases. *Id.*

Dr. Toll notes Plaintiff was incarcerated at the RCCF from June 8, 2012, through June 17, 2013.  *Id.* at ¶1 8.  He states, "It is my understanding that any claims against Dr. Fricke based on the RCCF incarceration for the period of 6/08/12 through 6/17/13 are time barred. *Id.* at ¶ 18.

Dr. Toll notes Plaintiff returned to RCCF on February 12, 2014, and was there until August 11, 2014.  *Id.* at ¶ 19.  Plaintiff was released for a very short time and returned on August 14, 2014, and remained at the RCCF until he was transferred to DOCCS on October 17, 2014. *Id.*

---

[22]  Dr. Toll's affidavit is based on his review of Plaintiff's complaint, Defendant's answer, Defendant's demand for interrogatories, Plaintiff's responses to demands for interrogatories, Plaintiff's medical records from the RCCF, DOCCS, and Troy Urological Associates, and Plaintiff's deposition transcript.  (Dkt. No. 51-8 *Id.* at ¶ 4-5.)

After reviewing Plaintiff's medical records, Dr. Toll opines:

> Certainly when [Plaintiff] was reincarcerated in 2014 it was reasonable to believe that his prostatitis/BPH had resolved to the point where [Plaintiff] had no further problems, especially since this problem had been extensively explored only a year earlier and he voiced no complaints in 2014 relating to his urinary tract.

> In 2014 [Plaintiff] was concerned with several problems, including chronic constipation and arthritic pain. He voiced no complaints of urinary symptoms. Although [Plaintiff] submitted multiple requests for treatment, not one request in 2014 related to his urinary tract.

> It is my opinion, within a reasonable degree of medical certainly (sic), that there was no deviation from the standard of care for a primary care provider by Dr. Fricke in his care and treatment of [Plaintiff], much less any deliberate indifference to [Plaintiff's] medical needs.

> A rectal exam on this particular patient would be difficult and not likely to provide useful information due to [Plaintiff's] extremely large body habitus.

> There was no medical indication for Dr. Fricke to have done any "routine" prostate exams on [Plaintiff] in 2014.

> In 2013, Dr. Fricke did order a PSA level to be checked and when that came back high, he appropriately referred [Plaintiff] to a urologist. The urologist diagnosed prostatitis and prescribed Proscar, which brought the PSA level down. It should be noted, with regard to [Plaintiff's] complaints about Proscar being a "bad drug," that Proscar can have some side effects, as any medication can, but that the Proscar was prescribed by Dr. Almonte, not Dr. Fricke, and Proscar was an appropriate drug to prescribe for [Plaintiff's] prostatic enlargement and prior obstructive symptoms.

> When [Plaintiff] was returned to the [RCCF] in February 2014, there is nothing indicated on the 2/12/14 Intake Form indicating that [Plaintiff] had any condition with his prostate.

> [Plaintiff] had several visits with Dr. Fricke during this incarceration and Dr. Fricke made comprehensive notes indicating what [Plaintiff's] complaints/problems were and addressed them.

[Plaintiff] complained of back pain, constipation and rectal bleeding, all of which were addressed by Dr. Fricke.

Also, it appears that [Plaintiff] was a difficult patient to treat because he did not appear to respond or have any relief from many of the treatments that Dr. Fricke administered.

Additionally, in August 2014, [Plaintiff] was offered a rectal exam due to his continued complaint of constipation, but he declined the exam.

At no point during this incarceration in 2014 did [Plaintiff] mention anything to Dr. Frick about a prostate condition or any symptoms that would have prompted Dr. Fricke to order a PSA level.

Plaintiff was incarcerated in RCCF in 2014 for the period 2/12/14 to 8/11/14 and from 8/14/14 to 10/17/14, a period of about eight months.  He was diagnosed with prostate cancer while an inmate in [DOCCS] on 3/10/15, almost five months after leaving RCCF.[23]

*Id*. at ¶¶ 31-42, 44.

Ultimately, Dr. Toll opines:

It is my opinion, within a reasonable degree of medical certainty, that it is mere speculation that an earlier diagnosis of [Plaintiff's] prostate cancer would have made any difference in the treatment or prognosis because the cancer was localized to the prostate and had not spread.

*Id*. at ¶ 45.

## III.  PLAINTIFF'S FAILURE TO COMPLY WITH L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status

"does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for

summary judgment."  *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003).  While

---

[23]  Dr. Toll notes that Plaintiff's "claim that he has Stage 4 cancer is incorrect.  Stage 4 would mean metastatic cancer.  [Plaintiff] does not have metastatic cancer.  The Gleason Score, a system for grading the aggressiveness of cancer, is 9 and the grade is 4.  [Plaintiff's] cancer is localized to the prostate gland."  (Dkt. No. 51-8 at ¶ 43.)

Plaintiff has responded to Defendants' motion for summary judgment, he has failed to do so in the manner required under L.R. 7.1(a)(3).[24]  (Dkt. No. 54; *see also* Dkt. No. 56.)

Where a party has failed to respond to the movant's statement of material facts as required by L.R. 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record,[25] and (2) the nonmovant if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[26]  *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Although this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on a court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion, *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002), the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment

---

[24]  L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's statement of material facts.  Under the rule, the response "shall mirror the movant's statement of material facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises."  Plaintiff's response to Defendant's summary judgment motion consists of a three-page letter signed by Plaintiff.  (Dkt. No. 54.)  The letter does not contain a single citation to record evidence, nor was it notarized, or sworn to under penalty of perjury.  *Id.*

[25]  Under L.R. 7.1(a)(3), "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  *But see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts].  It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[26]  Plaintiff was provided with the requisite notification.  (Dkt. No. 53.)  The Court notes, however, Defendant's submissions do not adhere strictly to the Local Rules.  (*See* Dkt. Nos. 51-1, 51-9.)

motions, and to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and quotation marks omitted).

In light of this circumstance and in deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record.

## IV.    APPLICABLE LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 273 (citations omitted). The nonmoving party must do more than "rest upon the mere allegations . . . of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible

evidence.") (citation and internal quotation marks omitted).  A verified complaint is to be treated as an affidavit.[27]  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff."  426 F.3d at 554 (emphasis in original).  To defeat summary judgment, nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation."  *Id.* (citation and internal quotation marks omitted).  Rather "[a]t the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful."  *Id.* (citation and internal quotation marks omitted).  Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest."  *Burgos v. Hopkins*, 14

---

[27]  The Court finds Plaintiff's complaint in this case was properly verified under 28 U.S.C. § 1746.  (Dkt. No. 1 at 10.)  *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (use of the language "under penalty of perjury" substantially complies with § 1746).

F.3d 787, 790 (2d Cir. 1994).  However, "a *pro se* party's 'bald assertion,' unsupported by

evidence, is not sufficient to overcome a motion for summary judgment."  *Cole v. Artuz*, No. 93

Civ. 5981 (WHP)(JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999[28]) (citing *Carey v.*

*Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## V.    DISCUSSION

### A.    Legal Standard for Deliberate Indifference

The appropriate legal standard for a deliberate indifference claim depends on the nature

of the plaintiff's confinement.  *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).  Inmates

who are convicted and incarcerated pursuant to their sentence of conviction are protected from

cruel and unusual punishment by the Eighth Amendment, while pretrial detainees are protected

under the Due Process Clause of the Fourteenth Amendment.  *Id.*  Until recently, this has been a

distinction without an analytical difference because the Second Circuit instructed "[c]laims for

deliberate indifference to a serious medical condition or other serious threat to the health or

safety of a person in custody should be analyzed under the same standard irrespective of whether

they are brought under the Eighth or Fourteenth Amendment."  *Caiozzo v. Koreman*, 581 F.3d

63, 72 (2d Cir. 2009).  However, in *Darnell*, the Second Circuit overturned *Caiozzo*, and

established a slightly different second element to the Fourteenth Amendment standard.  *Id.*[29]

---

[28]  The Court will provide Plaintiff with copies of all unpublished decisions cited herein in
accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009)
(per curiam).
[29]  Although *Darnell* involved a challenge to conditions of confinement, district courts in this
Circuit have held that its reasoning should also be applied to pretrial detainees' claims of
deliberate indifference to serious medical needs.  *See Villafane v. Sposato*, No. 16-CV-3674
(JFB)(AKT), 2017 WL 4179855, at *19 (E.D.N.Y. Aug. 22, 2017) (collecting cases); *see also*
*Lloyd v. City of New York*, 246 F. Supp. 3d 704, 718 (S.D.N.Y. Mar. 31, 2017) ("The reasoning
of *Darnell* applies equally to claims of deliberate indifference to serious medical needs under the
Fourteenth Amendment.").

The *Darnell* court reasoned, "[u]nlike a violation of the Cruel and Unusual Punishments Clause [of the Eighth Amendment], an official can violate the Due Process Clause of the Fourteenth Amendment without meting out any punishment, which means that the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Id.*

Under either the Eighth or the Fourteenth Amendment, a plaintiff's claim for deliberate indifference to a serious medical need is analyzed under a two-prong test. *Darnell*, 849 F.3d at 18.[30]  First, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  Determining whether a deprivation is sufficiently serious also involves two inquiries.  *Id.*  The first question is whether the plaintiff was actually deprived of adequate medical care.  *Id.*  Prison officials who act "reasonably" in response to the inmate's health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care."  *Id.* (citing *Farmer*, 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious."  *Id.* at 280.  The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff.  *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)).  If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is

---

[30]  The *Darnell* court held that under both the Eighth and the Fourteenth Amendments, the inmate must still establish the first element - an "objective deprivation," showing that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to the inmate's health, including the "risk of serious damage to 'physical and mental soundness.'" *Id.* (quoting *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972)).  There is no static test for such a determination.

"sufficiently serious." *Id*. (citing *Smith*, 316 F.3d at 185-86).  However, where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower.  *Id*.

Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation marks and alterations omitted); *see also Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain").  Thus, the Court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id*. at 280.

As to the second element of the test, "after *Darnell*, 'deliberate indifference' is now 'defined objectively,' and the 'Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of serious harm.'" *Lloyd v. City of New York*, 246 F. Supp. 3d 704, 719 (S.D.N.Y. Mar. 31, 2017) (quoting *Darnell*, 849 F.3d at 35).  Thus, a pretrial detainee suing for deliberate indifference under the Fourteenth Amendment "is required to show only that the prison official acted with objective recklessness, or that the defendant 'knew or should have known' that 'an excessive risk to health or safety' would result." *Grimmett v. Corizon Med. Assocs. of N.Y.*, No. 15-CV-7351 (JPO)(SN), 2017 WL 2274485, at *4 (S.D.N.Y. May 24, 2017) (quoting *Darnell*, 849 F.3d at 35).  Even after *Darnell*, it remains the case that "something more

than negligence is needed to elevate a claim of medical misconduct to a constitutional tort." *Davis v. McCready*, 283 F. Supp. 3d 108, 121 (S.D.N.Y. 2017).

In *Davis*, the court stated that post-*Darnell*, courts are now required to evaluate whether the risk associated with the negligent conduct would "reasonably be expected to be excessive." *Id*. at 122. This standard applies when the defendant is a medical care provider, and the analysis involves determining whether "a reasonable medical provider would expect the conduct to result in excessive risk, as opposed to some lower baseline level of risk associated with any negligent conduct." *Id*.; *see also Febus v. Somody*, No. 3:18-CV-640, 2019 WL 1763093, at *3 (D. Conn. Apr. 22, 2019) (discussing *Darnell* standard with respect to medical care); *Lombardo v. Freebern*, No. 16-CV-7146, 2019 WL 1129490, at *14 n.15 (S.D.N.Y. Mar. 12, 2019) (noting the extension of *Darnell*'s holding to claims of deficient medical treatment) (citations omitted).

In contrast to satisfy the "*mens rea*" element under the Eighth Amendment, the plaintiff must demonstrate that defendants had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . . the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id*.; *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." Salahuddin, 467 F.3d at 280 (citing Farmer, 511 U.S. at 839-40).

Therefore, "the defendant's belief that his conduct posed no risk of serious harm 'need not be sound so long as it is sincere,' and 'even if objectively unreasonable, a defendant's mental state may be nonculpable.'" *Wright v. Genovese*, 694 F. Supp. 2d 137, 154-55 (N.D.N.Y. 2010) (Kahn, D.J.) (quoting *Salahuddin*, 467 F.3d at 281).

Here, Dr. Fricke argues, without citation, that "[b]ecause [P]laintiff was incarcerated due to parole violation (sic) at the time of the incidents . . . his claims are analyzed under the Eighth Amendment." (Dkt. No. 51-10 at 10.[31]) While it is true Plaintiff had previously been convicted of a crime, it is not clear from the record whether Plaintiff had been given a parole revocation hearing or whether a disposition had been reached regarding the host of parole violations. Furthermore, although the Second Circuit has not directly addressed how *Darnell* affects a parolee's claim, district courts in this circuit have applied the Fourteenth Amendment standard to claims brought by parolees after *Darnell*. *See Hill v. Cty. of Montgomery*, No. 9:14-CV-933 (BKS/DJS), 2018 WL 2417839, at *2 (N.D.N.Y. May 29, 2018); *see also Jackson v. Sullivan Cty.*, No. 16 Civ. 3673 (JCM), 2018 WL 1582506, at *3 (S.D.N.Y. Mar. 27, 2018); *Horace v. Gibbs*, No. 14-CV-655S, 2017 WL 4344435, at *6 (W.D.N.Y. Sept. 29, 2017).

Accordingly, for purposes of this report-recommendation, the Court assumes, based on Judge Sannes' decision in *Hill*, that the *Darnell*, Fourteenth Amendment pre-trial detainee standard applies to Plaintiff's deliberate indifference claim against Dr. Fricke.

---

[31] The Court notes, however, Defendant's reply memorandum of law cites to *Darnell* and *Lloyd*, *supra*, and defines "subjective recklessness" as "whether the [charged] official 'knew, or should have known' that his or her conduct 'posed an excessive risk to health or safety.'" (Dkt. No. 56 at 8.)

**B.     Analysis**

Plaintiff claims Dr. Fricke "disregard[ed] the serious nature of [Plaintiff's] growing health problem."  (Dkt. No. 54 at ¶ 6.)  Construed liberally, Plaintiff's claim alleges Dr. Fricke failed to diagnose, and subsequently treat, Plaintiff's prostate cancer, attempting instead to "pass the buck" by sending Plaintiff into DOCCS custody with a serious condition in order to "save" the jail money.  (Dkt. No. 1 at 8.)

Dr. Fricke contends summary judgment is warranted because he has established, as a matter of law, that he did not know, nor should have known, that his conduct posed an excessive risk to Plaintiff's health or safety.  (Dkt. No. 51-10 at 12.)  Dr. Fricke argues that the "jail medical record and the expert affidavits belie any claim that the medical attention rendered was so woefully inadequate as to amount to no treatment at all."  *Id.*  Specifically, Dr. Fricke maintains, by his own affidavit and Dr. Toll's affidavit, that the medical care he provided Plaintiff was "reasonable" and devoid of any "deviation from the standard of care for a primary care provider."  (Dkt. Nos. 51-7 at ¶ 55; 51-8 at ¶¶ 31, 33.)  He further contends summary judgment is warranted because Plaintiff "cannot establish the *mens rea* element of deliberate indifference."  (Dkt. No. 51-10 at 14.)  In short, Dr. Fricke argues "at no point during this incarceration [from February 2014 until October 2014] did Plaintiff mention anything to Dr. Fricke about a prostate condition or any symptoms that would have promoted Dr. Fricke to order a PSA level."  *Id.*  He continues:

> The evidence presented by Dr. Fricke establishes that Dr. Fricke was never advised or told by the plaintiff, on the multiple times he saw the plaintiff and in the plaintiff's multiple requests for medical care, that he was suffering symptoms of any problem with his prostate or urinary tract during the relevant eight months the plaintiff was in Rensselaer County Jail in 2014.

*Id.*

Upon a thorough review of the medical records submitted by Dr. Fricke, the Court finds genuine issue of material facts exists, precluding summary judgment. The parties do not dispute Plaintiff was diagnosed with prostate cancer in March of 2015 while in DOCCS custody. (Dkt. Nos. 51-6 at 18; 51-7 at ¶ 58.) However, Plaintiff's medical records, in no fewer than three places, indicate Dr. Fricke either may have diagnosed Plaintiff with prostate cancer or may have had knowledge that Plaintiff had already been diagnosed with prostate cancer while in RCCF custody. (Dkt. No. 52-1 at 141, 147, 159.) Indeed, these records suggest that Plaintiff had been diagnosed with prostate cancer as early as March of 2011 and no later than April of 2013. *Id.*

First, on March 3, 2011, Dr. Braunstein's encounter note indicated he had diagnosed Plaintiff with prostate cancer and discussed "chemotherapy and Proscar" with Plaintiff. *Id.* at 147. Then, on April 5, 2013, Dr. Fricke indicated a diagnosis of "non-operable prostate ca[ncer]" and referred Plaintiff for a CT scan to address "severe constipation" and "prostate ca[ncer]." *Id.* at 141, 159. Although Dr. Fricke noted on April 9, 2013, that the CT scan "was neg[ative with] respect to stool impaction, voluminous content, [and] bowel distension," Plaintiff's records do not address what the CT scan revealed, if anything, about Plaintiff's prostate. *Id.* at 152.

Thus, on this record, the Court finds genuine issue of material facts to exist regarding Dr. Fricke's knowledge of Plaintiff's prostate cancer. This issue goes to the heart of Plaintiff's claim, infecting both prongs of the aforementioned analysis. If Dr. Fricke knew of or in fact diagnosed Plaintiff's prostate cancer, then the treatment provided, or not provided, by Dr. Fricke could rise to the level of a sufficiently serious deprivation, thereby satisfying the objective prong. Likewise, if Dr. Fricke knew of or in fact diagnosed Plaintiff with prostate cancer but failed to treat Plaintiff such that he had to be re-diagnosed in DOCCS custody in 2015, then Dr. Fricke's

mental state could possibly nudge this case out of the realm of negligence or malpractice and into deliberate indifference.  *See Whitfield v. O'Connell*, 402 F. App'x 563, 566 (2d Cir. 2010) (suggesting that a case becomes more than malpractice where there is a deliberate failure to diagnose).

Furthermore, the indications in the medical records of an earlier diagnosis directly contradict the affidavits submitted by Dr. Fricke and Dr. Toll.  Both doctors testified that, upon review of Plaintiff's medical records, they found Plaintiff to have been diagnosed in March of 2015.  (Dkt. Nos. 51-7 at ¶ 58; 51-8 at ¶ 44.)  Neither doctor acknowledged or attempted to explain any indication of an earlier diagnosis, despite record indications to the contrary.  (*See generally* Dkt. Nos. 51-7; 51-8.)

On a summary judgment motion, a court may not "weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."  *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996).  "The weighing of the evidence and the determination as to which version of the events to accept are matters for the jury."  *Id.* at 856; *see also Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (on a summary judgment motion "the court should not weigh evidence or assess the credibility of witnesses. . . . These determinations are within the sole province of the jury.").  Thus, where, as here, the reasonableness of medical care or the defendant's mental state are not clear from the undisputed record, summary judgment on a claim involving deliberate indifference is not appropriate.  *See Hart v. Blanchette*, 149 F. App'x 45, 47 (2d Cir. 2005) (finding "the determination of the difference between negligence and deliberate indifference" to be a question for the jury); *see also Hinton v. Patnaude*, 162 F.R.D. 435, 438-39 (N.D.N.Y. 1995).

Therefore, the Court finds that the decision concerning Dr. Fricke's mental state and the reasonableness of his care, which necessarily involves the weighing of competing evidence, belongs to the jury. For this reason, the Court recommends denying Dr. Fricke's motion for summary judgment.

### C.    Statute of Limitations

Plaintiff commenced this action on March 2, 2017. (Dkt. No. 1.[32]) Dr. Fricke argues that any allegations against him for medical care during incarceration which predate March 3, 2014, are time barred. (Dkt. No. 51-10 at 9.) Specifically, Defendant contends there can be no viable § 1983 action for the RCJ incarceration for the period of June 8, 2012, through June 17, 2013. *Id.* Construed liberally, Plaintiff alleges Dr. Fricke "denied" Plaintiff access to medical records. (Dkt. No. 1 at 5.) Plaintiff claims Dr. Fricke was "well aware" and "did nothing to help [Plaintiff] in the early stages[,] only misled and cover up his motions and told [Plaintiff he] hadn't the education to make self-diagnosis." *Id.* at 8. Plaintiff contends that when he "proved" his ailments, he was "promptly rushed out of this jail to another to conveniently pass the buck so to speak." *Id.* Plaintiff claims that Dr. Fricke's "only concern" was "saving" RCCF as "much money as possible" and that his "illness matured while in the custody" of RCCF. *Id.* Similarly, in his opposition submission, construed liberally, Plaintiff argues he was denied access to his medical information, *i.e.*, all "records" were "withheld" from him. (Dkt. No. 54 at ¶¶ 1, 8.) Plaintiff claims Dr. Fricke told him he "didn't' have cancer and wasn't smart enough to make self-diagnosis." *Id.* Plaintiff contends Dr. Fricke "knew more about the serious nature of [his]

---

[32]  The Court notes Plaintiff's complaint was filed on March 2, 2014, not March 3, 2014, as indicated in Defendant's submissions. (Dkt. Nos. 1, 51-10 at 9.)

heath than [Plaintiff] did" and Dr. Fricke "chose" to "hold back and disregard the serious nature of [Plaintiff's] growing health problems" and did not treat Plaintiff for cancer at RCJ. *Id*. at ¶ 6.

Claims arising under 42 U.S.C. § 1983 are governed by state statutes of limitations. *Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985). In New York, such claims are governed by the general three-year limitations period governing personal injury claims. *Owens v. Okure*, 488 U.S. 235, 251 (1989). Accrual of the claim, however, is a question of federal law. *Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997).

Under federal law, a claim arising under 42 U.S.C. § 1983 generally "accrues" when the plaintiff "knows or has reason to know of the injury which is the basis of his action." *Pearl v. City of Long Island Beach*, 296 F.3d 76, 80 (2d Cir. 2002). "The crucial time for accrual purposes is when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action." *Singleton v. City of New York*, 632 F.2d 185, 192 (2d Cir. 1980).

Although the doctrine is not mentioned in Defendant's motion papers, the Court finds the timeliness of Plaintiff's claim against Dr. Fricke cannot be determined on this record without consideration of the "concept of fraudulent concealment of a cause of action." *Pearl v. City of Long Branch*, 296 F.3d 76, 80 (2d Cir. 2002). Under the doctrine of equitable tolling, "when a defendant fraudulently conceals the wrong, the time [limit of the statute of limitations] does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action." *Pinaud v. Cty. of Suffolk*, 52 F.3d 1139, 1157 (2d Cir. 1995) (brackets in original); *accord Daniel v. Safir*, 175 F. Supp. 2d 474, 480 (E.D.N.Y. 2001) ("A plaintiff seeking equitable tolling of a limitations period must demonstrate that defendants engaged in a fraud which precluded him from discovering the harms he suffered or the

information he needed to file a complaint.").  To benefit from the doctrine of equitable tolling based on fraudulent concealment, the "plaintiff must submit non-conclusory evidence of conspiracy or other fraudulent wrongdoing *which precludes his possible discovery of harms that he suffered*."  *Pinaud*, 52 F.3d at 1157 (emphasis in original).

"To invoke the doctrine of fraudulent concealment properly [for purposes of seeking an equitable tolling of the statute of limitations], a plaintiff must establish three elements, including (1) wrongful concealment by defendants [of their actions] (2) which prevented plaintiff's discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing the discovery of the claim."  *Richard v. LeClaire*, No. 9:15-CV-00006 (BKS/TWD), 2017 WL 4349381, at *2 (N.D.N.Y. Sept. 29, 2017) (quoting *N.Y. Dist. Council of Carpenters Pension Fund v. Forede*, 939 F. Supp. 2d 268, 278 (S.D.N.Y. 2013)).

Here, Dr. Fricke has not presented any evidence regarding the alleged fraudulent concealment in this case, nor has he discussed relevant case law.  Accordingly, the Court recommends that Defendant's motion for summary judgment dismissing Plaintiff's claims against Dr. Fricke which predate March 3, 2014, as time-barred be denied, based upon the existence of disputed issues of fact surrounding when Plaintiff had reason to know of his injury and whether Dr. Fricke should be precluded under the fraudulent concealment doctrine from asserting a defense based on the statute of limitations.

## VI.    CONCLUSION

Based on the foregoing, the Court recommends that Dr. Fricke's motion for summary judgment be denied and that this matter proceed to trial.  In so recommending, the Court expresses no opinion on the merits of Plaintiff's claim against Dr. Fricke, only that genuine issue of material facts exist which preclude summary judgment.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 51) be

**DENIED**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-

Recommendation, along with copies of the unpublished decisions cited herein in accordance

with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

written objections to the foregoing report.[33]  Such objections shall be filed with the Clerk of the

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C.

§ 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated:  August 7, 2019
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[33]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New
York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York, New
York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary judgment
and dismissing the amended complaint, and United States
Magistrate Judge James C. Francis IV having issued a report
and recommendation, dated August 20, 1999, recommending
that the motion be granted, and upon review of that report and
recommendation together with plaintiff's letter to this Court,
dated August 28, 1999, stating that plaintiff does "not contest
the dismissal of this action", it is

ORDERED that the attached report and recommendation of
United States Magistrate Judge James C. Francis IV, dated
August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary
judgment is granted, and the amended complaint is dismissed;
and it is further

ORDERED that the Clerk of the Court shall enter judgment
accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42 U.S.C.
§ 1983. Mr. Cole alleges that the defendant Richard Pflueger,
a corrections officer, violated his First Amendment rights
by refusing to allow him to attend religious services. The
defendant now moves for summary judgment pursuant to
Rule 56 of the Federal Rules of Civil Procedure. For the
reasons set forth below, I recommend that the defendant's
motion be granted.

*Background*

During the relevant time period, Mr. Cole was an inmate
in the custody the New York State Department of
Correctional Services ("DOCS"), incarcerated at the Green
Haven Correctional Facility. (First Amended Complaint
("Am.Compl.") ¶ 3). From June 21, 1993 to July 15, 1993, the
plaintiff was in keeplock because of an altercation with prison
guards. (Am.Compl.¶¶ 17–25). An inmate in keeplock is
confined to his cell for twenty-three hours a day with one hour
for recreation. (Affidavit of Anthony Annucci dated Dec. 1,
1994 ¶ 5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶ 3).
Permission is granted unless prison officials determine that
the inmate's presence at the service would create a threat to
the safety of employees or other inmates. (Schneider Aff. ¶
3). The standard procedure at Green Haven is for the captain's
office to review all requests by inmates in keeplock to attend
religious services. (Schneider Aff. ¶ 3). Written approval is
provided to the inmate if authorization is granted. (Affidavit
of Richard Pflueger dated April 26, 1999 ("Pflueger Aff.")
¶ 5). The inmate must then present the appropriate form to
the gate officer before being released to attend the services.
(Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request
to attend the Muslim services on July 2, 1993. (Request
to Attend Scheduled Religious Services by Keep–Locked
Inmate dated June 28, 1993 ("Request to Attend Services"),

attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*
Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3

(S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se′* s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

**B.** *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wideranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not

permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

[1]     In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

2017 WL 2274485

KeyCite Yellow Flag - Negative Treatment
Distinguished by Singletary v. Russo, E.D.N.Y., February 22, 2019

2017 WL 2274485
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Paul GRIMMETT, Plaintiff,
v.
CORIZON MEDICAL ASSOCIATES OF NEW
YORK; Allan Matthew, DDS; Dr. Sharma,
MD, Site Medical Director of New York
City Department of Correctional Services,
Manhattan Detention Center, Defendants.

15-CV-7351 (JPO) (SN)
|
Signed 05/24/2017

**Attorneys and Law Firms**

Paul Grimmett, Beacon, NY, pro se.

Austa Starr Devlin, David Rosen, Heidell, Pittoni, Murphy
& Bach, LLP, New York, NY, Daniel Gerard May, Heidell,
Pittoni, Murphy & Bach, LLP, White Plains, NY, for
Defendants.

OPINION AND ORDER

J. PAUL OETKEN, United States District Judge

 **\*1**  Plaintiff Paul Grimmett, proceeding *pro se*, brings this
action pursuant to 42 U.S.C. § 1983, alleging that he was
denied dental care while incarcerated at Manhattan Detention
Center ("MDC"). Specifically, he alleges that Allan Matthew,
D.D.S., and Dr. Sharma, M.D., the MDC Site Medical
Director, were deliberately indifferent to Grimmett's serious
dental condition and related ear pain and hearing loss in
violation of the Eighth and Fourteenth Amendments to the
United States Constitution. He further alleges municipal
liability under § 1983 on the part of Corizon Medical
Associates of New York ("Corizon"). Grimmett also raises
state medical malpractice and negligence claims against
all Defendants. Defendants move to dismiss Grimmett's
second amended complaint ("SAC") pursuant to Federal Rule
of Civil Procedure 12(b)(6). For the reasons that follow,
Defendants' motion is granted in part and denied in part.

**I. Background**

**A. Procedural History**
Grimmett filed this lawsuit in September 2015. (Dkt. No. 2.)
He filed a first amended complaint ("FAC") in April 2016
and named as defendants the City of New York, Corizon,
Dr. Matthew, Dr. Sharma, and Acting MDC Warden Cooper.
(Dkt. No. 38.) On August 12, 2016, the Honorable Analisa
Torres dismissed the FAC, but granted Grimmett leave to file
a second amended complaint against Dr. Matthew and Dr.
Sharma. (Dkt. No. 56.)

On November 18, 2016, Grimmett filed his SAC against
Defendants Corizon, Dr. Matthew, and Dr. Sharma. (Dkt. No.
61.) The SAC asserts claims under § 1983 for deliberate
indifference to Grimmett's serious medical needs in violation
of the Eighth and Fourteenth Amendments, along with state
medical malpractice and negligence claims. Defendants have
moved to dismiss the SAC pursuant to Rule 12(b)(6). (Dkt.
No. 73.) The motion is fully submitted. The case was
reassigned to the undersigned on April 5, 2017.

**B. Plaintiff's Claims** [1]

[1]      The following facts are taken from Grimmett's SAC and
         opposition brief and are accepted as true for purposes
         of this motion. *See, e.g.,* Gill v. Mooney, 824 F.2d 192,
         195 (2d Cir. 1987) (considering facts alleged in affidavit
         submitted by *pro se* plaintiff in opposition to motion to
         dismiss); Flores v. N.Y.C. Human Res. Admin., No. 10
         Civ. 2407, 2011 WL 3611340, at *1 n.1 (S.D.N.Y. Aug.
         16, 2011) ("Because of [plaintiff's] *pro se* status, ... the
         Court may consider factual allegations [plaintiff] makes
         in her opposition papers, in addition to the allegations
         in the complaint...."). Grimmett has also attached several
         exhibits to the SAC, which were filed under seal because
         they contain Grimmett's medical and other confidential
         personal information. (Dkt. No. 64.) The Court has
         considered these exhibits to the extent that they are
         referenced in or integral to the SAC. *See* Sira v. Morton,
         380 F.3d 57, 67 (2d Cir. 2004).

Grimmett was first incarcerated at MDC in June 2013.
(SAC ¶¶ 2, 9, 11.) On July 2, 2013, Grimmett had a
dental appointment with Dr. Matthew. (*Id.* ¶ 27.) During
this appointment, Grimmett told Dr. Matthew that, before he
was arrested, his personal dentist had recommended "a full
mouth extraction" of all his teeth due to preexisting dental
problems. (*Id.* ¶¶ 8, 28.) Grimmett alleges that, at the time
of this appointment, he had "swollen gums that were already

Case 9:17-cv-00244-BKS-TWD   Document 58   Filed 08/07/19   Page 35 of 111

Grimmett v. Corizon Medical Associates of New York, Not Reported in Fed. Supp. (2017)

2017 WL 2274485

infected," along with "dental caries and badly decayed teeth," and that Dr. Matthew saw these conditions. (Dkt. No. 83 at 36.) Dr. Matthew examined Grimmett's mouth and told him he "would put [him down] for all of the necessary work that needs to be done." (SAC ¶ 29; *see also* Dkt. No. 83 at 35; SAC Ex. G at 56.) Grimmett alleges that Dr. Matthew intentionally omitted the real facts of Grimmett's condition from Grimmett's medical records so that Dr. Matthew could avoid providing further treatment. (Dkt. No. 83 at 36.) The medical records from the initial visit do not mention infection or the need for extraction, though they do indicate "swollen gums" and some "bone loss." (SAC Ex. G at 56.) Grimmett alleges that Dr. Matthew never scheduled the follow-up treatment he promised. (SAC ¶ 147.)

**\*2** After the initial appointment, Grimmett sent "numerous" dental slips to Dr. Matthew and to the dental department but received no response for approximately three months. (*Id.* ¶ 30.)

On October 5, 2013, Grimmett went to the infirmary because he was in "agonizing pain from an abscess in [his] mouth." (*Id.* ¶¶ 31-32.) A nurse directed him to Dr. Sharma. (*Id.* ¶ 34.) When Grimmett asked for amoxicillin and ibuprofen to help control the pain and treat the infection, Dr. Sharma told him that there was no one available to administer any medication. (*Id.* ¶¶ 35-36.) Grimmett then asked Dr. Sharma to examine his mouth, but the doctor refused. (*Id.* ¶ 37.) Grimmett described his condition to Dr. Sharma, who replied that he would have to report to sick call to be seen. (*Id.* ¶ 38.) Grimmett alleges that, despite the doctor's representations to the contrary, Dr. Sharma in fact had "all the keys to the cabinet to provide 'emergency medication.' " (Dkt. No. 83 at 47.)

Two days later, on October 7, 2013, Grimmett went to sick call and explained to a physician assistant ("PA") that his mouth was in "agonizing pain" and that he could not "hear anything out of [his] left ear." (SAC ¶¶ 39-40.) He explained that he had been experiencing that level of pain for the past two days. (*Id.* ¶ 46.) The PA told Grimmett that he had a tooth abscess, prescribed him medication for the pain and infection, and generated dental and ENT referrals. (*Id.* ¶¶ 42-44; *id.* Ex. G at 59.)

Grimmett went back to sick call the next day because he had not received his pain medication (SAC ¶¶ 47-48), and again on October 11 because the ibuprofen and penicillin were not helping his toothache (*id.* ¶¶ 49, 52). He was prescribed a

new regimen of medications, which included Augmentin and Tylenol with codeine. (*Id.* ¶¶ 53-55; *id.* Ex. G at 61-62.)

On October 24, 2013, Mariane Molfetas, D.D.S., a non-party to this lawsuit, extracted two of Grimmett's teeth. (SAC ¶ 64; *id.* Ex. G at 70.) On December 13, 2013, a hearing aid for Grimmett was approved (SAC ¶ 68; *id.* Ex. G(2) at 7), and he received the hearing aid on January 21, 2014 (SAC ¶ 73; *id.* Ex. G(2) at 11-13). Grimmett was then transferred to Downstate Reception Center, where a nurse told him that he could have a full extraction once he got to his "primary facility." (SAC ¶¶ 75, 78.) On September 12, 2014, after Grimmett was transferred to Auburn Correctional Facility, where he would stay for at least six months, an oral surgeon extracted his lower teeth. (*Id.* ¶¶ 82, 83, 90-93.) A month later, after Grimmett had completed a course of amoxicillin for an infection in his upper gums, his upper teeth were removed. (*Id.* ¶¶ 94-95.) As of May 2015, Grimmett was being fitted for dentures. (*Id.* ¶¶ 103-04.)

## II. Legal Standard

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter ... to state a claim to relief that is plausible on its face." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

**\*3** When evaluating whether a complaint meets these requirements, courts "must accept as true all of the factual allegations contained in the complaint," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007) (quoting *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 n.1 (2002)), and "draw all inferences in the light most favorable to the non-moving party[ ]," *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007). Additionally, a complaint "filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

## III. Discussion

### A. Deliberate Indifference to Serious Medical Needs

Grimmett v. Corizon Medical Associates of New York, Not Reported in Fed. Supp. (2017)

Case 9:17-cv-00244-BKS-TWD  Document 58  Filed 08/07/19  Page 36 of 111

2017 WL 2274485

Grimmett brings claims for deliberate indifference to his serious medical needs under the Eighth Amendment, which applies to convicted prisoners, and the Fourteenth Amendment, which applies to pretrial detainees under state custody. *See Darnell v. Pineiro*, 849 F.3d 17, 21 n.3, 29 (2d Cir. 2017). Under either provision, a plaintiff must satisfy a two-prong test to make out such a claim. First, "the alleged deprivation of adequate medical care must be 'sufficiently serious.' " *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)). Second, the defendant must have acted with deliberate indifference, or a "sufficiently culpable state of mind." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)). The Court addresses each prong in turn.

### 1. Serious Deprivation of Adequate Medical Care

For a medical condition to be sufficiently serious under the first prong, it must be " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance*, 143 F.3d at 702 (quoting *Hathaway*, 37 F.3d at 66); *see also Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.' " (quoting *Chance*, 143 F.3d at 702)). In the specific context of dental care, the Second Circuit has held that "[a] cognizable claim regarding inadequate dental care, like one involving medical care, can be based on various factors, such as the pain suffered by the plaintiff, the deterioration of the teeth due to a lack of treatment, or the inability to engage in normal activities." *Chance*, 143 F.3d at 703 (citations omitted); *see also id.* (finding a serious medical condition where plaintiff "alleged that, as the result of the defendants' actions, he suffered extreme pain, his teeth deteriorated, and he has been unable to eat properly"). When an inmate alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," a court should focus on "the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (quoting *Chance*, 143 F.3d at 702). Thus, even though "[p]risoners are not entitled to a 'perfect plan for dental care,' " *Alster v. Goord*, 745 F. Supp. 2d 317, 333 (S.D.N.Y. 2010) (quoting *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)), tooth decay and cavities may qualify as serious medical conditions, *see Harrison*, 219 F.3d at 137.

**\*4** Here, Grimmett alleges that he suffered from "swollen gums" that were "infected," along with obvious tooth decay and bone loss (Dkt. No. 83 at 36)—dental conditions "that tend[ ] to cause acute infections, debilitating pain and tooth loss if left untreated." *Harrison*, 219 F.3d at 137; *see id.* ("Because a tooth cavity will degenerate with increasingly serious implications if neglected over sufficient time, it presents a 'serious medical need' within the meaning of our case law."). He further alleges that the delay in appropriate dental care exacerbated his injuries or increased the risk of future harm. *See Smith*, 316 F.3d at 185-86. Specifically, Grimmett alleges that the delay in care "allowed the infection in [his] gums to fester and develop into a full blown painfully agonizing oral abscess" (Dkt. No. 83 at 37), and resulted in hearing loss (*id.* at 34, 40).

Accordingly, Grimmett has satisfied the first prong: "the alleged deprivation of adequate medical care," by both Dr. Matthew and Dr. Sharma, is "sufficiently serious." *Spavone*, 719 F.3d at 138.

### 2. State of Mind

Under the second prong of the deliberate indifference standard, a plaintiff must show that a defendant acted with a sufficiently culpable state of mind. Until recently, the analysis under this prong was identical whether the claim was brought under the Eighth Amendment or the Fourteenth Amendment. *See Darnell*, 849 F.3d at 33. In February 2017, however, following the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), and while the parties were briefing the instant motion, the Second Circuit held that the analysis differs depending on whether the inmate is a convicted prisoner or a pretrial detainee. *Darnell*, 849 F.3d at 35.[2] In particular, under the Eighth Amendment, deliberate indifference is equivalent to recklessness "according to a more exacting subjective standard akin to that used in the criminal context, which would require proof of ... subjective awareness" on the part of the defendant. *Id.* at 32 (citing *Farmer v. Brennan*, 511 U.S. 825, 836-37 (1994)). Deliberate indifference under the Eighth Amendment, therefore, means that a prison official "appreciate[d] the risk to which a prisoner was subjected." *Id.* at 35. In contrast, after *Darnell*, a plaintiff suing under the Fourteenth Amendment is required to show only that the prison official acted with objective

Case 9:17-cv-00244-BKS-TWD   Document 58   Filed 08/07/19   Page 37 of 111

Grimmett v. Corizon Medical Associates of New York, Not Reported in Fed. Supp. (2017)

2017 WL 2274485

recklessness, or that the defendant "knew, or should have known" that "an excessive risk to health or safety" would result. *Id.*; *see also Lloyd v. City of New York*, No. 14 Civ. 9968, 2017 WL 1207838, at *9 (S.D.N.Y. Mar. 31, 2017). As before, however, more than negligence is required to hold a defendant liable for violating either constitutional provision. *Darnell*, 849 F.3d at 36.

2    "Although *Darnell* involved a challenge to conditions of confinement, the holding of the decision is broad enough to extend to medical deliberate-indifference claims." *Feliciano v. Anderson*, No. 15 Civ. 4106, 2017 WL 1189747, at *13 (S.D.N.Y. Mar. 30, 2017); *see Darnell*, 849 F.3d at 33 n.9 ("[D]eliberate indifference means the same thing for each type of claim under the Fourteenth Amendment.").

It is unclear from the SAC whether Grimmett was a pretrial detainee or a convicted prisoner during the relevant time period. Under either the Eighth or Fourteenth Amendment, however, Grimmett has made out a claim against Dr. Matthew but has failed to state a claim against Dr. Sharma.

***Dr. Matthew.*** According to Grimmett, Dr. Matthew deliberately refused to provide treatment for three months, despite the fact that Grimmett sent "numerous dental slips to [Dr. Matthew] and to the dental department." (SAC ¶ 30.) Although the three-month delay on its own may not be enough to allege deliberate indifference, Grimmett has included additional allegations—beyond those recited in the FAC—to sufficiently plead that Dr. Matthew also acted "with a sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 280. In particular, Grimmett alleges that Dr. Matthew "omit[ted] the real facts of plaintiff's condition [from his medical records] so that he would not have to address plaintiff's serious dental condition" (Dkt. No. 83 at 36), and that Dr. Matthew "omitted [information] that would have placed plaintiff at a level to receive required treatment" (*id.* at 38; *see also* SAC ¶ 147 ("Plaintiff was never scheduled for a follow up by [Dr. Matthew].... [F]urthermore, when plaintiff wrote to [Dr. Matthew], plaintiff never received a response....")). Grimmett therefore has alleged facts that, even under the subjective recklessness standard of the Eighth Amendment, plausibly plead that Dr. Matthew was deliberately indifferent to Grimmett's serious medical needs. Accordingly, Defendants' motion to dismiss Grimmett's claim against Dr. Matthew is denied.

***5   *Dr. Sharma.*** Grimmett alleges that Dr. Sharma was deliberately indifferent when Grimmett reported to sick call on October 5, 2013, in agonizing pain from an abscess in his mouth (SAC ¶¶ 31-38), and that Dr. Sharma refused to examine Grimmett's mouth or prescribe any medication, despite the fact that Dr. Sharma had "all of the keys to the cabinet" (Dkt. No. 83 at 47). Dr. Sharma instead told Grimmett that there was nothing he could do, and that Grimmett should sign up for sick call. (SAC ¶ 38; Dkt. No. 83 at 43-44.) Indeed, Grimmett went to sick call two days later, where he was seen by a PA who prescribed him medication for the pain and infection and generated dental and ENT referrals. (SAC ¶¶ 39, 42, 44, 48; *id.* Ex. G at 58-59.) This two-day delay in treatment on its own is insufficient to plead recklessness, and Grimmett's allegations that Dr. Sharma "knew, or should have known" that "an excessive risk to health or safety" would result, *Darnell*, 849 F.3d at 35, are conclusory. *See Feliciano*, 2017 WL 1189747, at *13 ("Instead of seeing [plaintiff] immediately, [the defendant doctor] instructed him to rinse out his eye with cold water and to sign up for sick call in the morning. Although [plaintiff] did not receive immediate medical care, this fact is insufficient to establish that [the doctor] knew, or should have known, that the brief delay put [plaintiff's] health in jeopardy." (citation omitted)). Furthermore, although Grimmett may have preferred to be seen by a doctor rather than a PA during sick call (SAC ¶ 143; Dkt. No. 83 at 47-48), "mere disagreement over the proper treatment does not create a constitutional claim," *Chance*, 143 F.3d at 703. At the most, therefore, Grimmett has alleged that Dr. Sharma was negligent. Because negligence alone is insufficient to make out a deliberate indifference claim even under the Fourteenth Amendment, *see Darnell*, 849 F.3d at 36, Grimmett's § 1983 claim against Dr. Sharma is dismissed.

## B. Municipal Liability Against Corizon Medical Associates [3]

3    The SAC includes claims against Corizon, despite the fact that Judge Torres granted Grimmett leave to replead his claims only against Dr. Matthew and Dr. Sharma. The Court could dismiss these claims on this ground alone. *See Palm Beach Strategic Income, LP v. Salzman*, 457 Fed.Appx. 40, 43 (2d Cir. 2012) (summary order) ("District courts in this Circuit have routinely dismissed claims in amended complaints where the court granted leave to amend for a limited purpose and the plaintiff filed an amended complaint exceeding the scope of the permission granted."); *see also Pagan v. N.Y. State Div. of Parole*, No. 98 Civ. 5840, 2002 WL 398682, at *3 (S.D.N.Y. Mar. 13, 2002) (dismissing with prejudice new claims in an amended complaint that were outside the

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 38 of 111

Grimmett v. Corizon Medical Associates of New York, Not Reported in Fed. Supp. (2017)

2017 WL 2274485

scope of the court's order granting the *pro se* plaintiff leave to amend). However, given Grimmett's *pro se* status, the Court declines to dismiss these claims solely because they exceed the scope of the leave granted. *See Ong v. Park Manor (Middletown Park) Rehab. & Healthcare Ctr.*, No. 12 Civ. 974, 2015 WL 5729969, at *22 (S.D.N.Y. Sept. 30, 2015) ("Given Plaintiff's pro se status, and the Court's obligation to liberally construe pro se pleadings, the Court is hesitant to dismiss Plaintiff's [amended complaints] on this ground."); *see also Moriates v. City of New York*, No. 13 Civ. 4845, 2016 WL 3566656, at *2-3 (E.D.N.Y. June 24, 2016) ("For *pro se* litigants, broad leave to replead is generally appropriate, since they lack the legal acumen and experience to differentiate successful claims from unsuccessful ones.").

Corizon, although a private entity, is treated as a municipal actor for purposes of this lawsuit. *See Bess v. City of New York*, No. 11 Civ. 7604, 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013) ("In providing medical care in prisons, Corizon performs a role traditionally within the exclusive prerogative of the state and therefore, in this context, is the functional equivalent of the municipality."). "It is axiomatic that municipalities cannot be held liable pursuant to § 1983 on a *respondeat superior* theory." *Betts v. Shearman*, No. 12 Civ. 3195, 2013 WL 311124, at *15 (S.D.N.Y. Jan. 24, 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). "[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2009) (quotations and citation omitted). There are four ways a plaintiff can allege a policy or custom:

> (1) the existence of a formal policy officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly

> train or supervise their subordinates, amounting to "deliberate indifference" to the rights of those who come in contact with the municipal employees.

**\*6** *Betts v. Rodriquez*, No. 15 Civ. 3836, 2016 WL 7192088, at *5 (S.D.N.Y. Dec. 12, 2016) (quoting *Guzman v. United States*, No. 11 Civ. 5834, 2013 WL 5018553, at *3-4 (S.D.N.Y. Sept. 13, 2013)).

As in the FAC, Grimmett alleges in the SAC that Corizon "had an unwritten policy of avoiding high costs in detainee's medical bills," and that this policy is why Dr. Matthew and Dr. Sharma delayed Grimmett's access to a dentist for approximately three months. (*See* FAC ¶ 56; SAC ¶ 146.) "To state there is a policy," however, "does not make it so," and Grimmett has alleged no facts from which the Court can plausibly infer that Corizon had such an unwritten policy. *Shearman*, 2013 WL 311124, at *16; *see also Zherka v. City of New York*, 459 Fed.Appx. 10, 12 (2d Cir. 2012) (summary order) ("It has long been well-settled that 'the mere assertion that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.'" (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995))). In addition, the SAC lacks allegations that would allow the Court to infer that any such policy was the cause of Grimmett's alleged constitutional injuries. Although Grimmett alleges that Corizon's contract with the New York City Department of Correctional Services was terminated "due to a pattern of violations of detainee's Civil and Constitutional rights" (SAC ¶ 148; Dkt. No. 83 at 50), there is no indication that the termination was due to a policy of avoiding costs. The two press clippings that are attached to and referenced in the SAC concern the inadequate treatment that one MDC inmate received and problems with Corizon employee background checks, respectively, but do not support Grimmett's contention that the company had an unwritten cost-cutting policy. (Dkt. No. 83 at 49-50; SAC Ex. I.)

Grimmett also alleges that Dr. Matthew and Dr. Sharma were "final decision makers" and were therefore granted municipal policymaking authority. (Dkt. No. 83 at 35, 48.) Even if Dr. Matthew and Dr. Sharma were "final decision makers" with respect to Grimmett's care, which is what Grimmett appears to allege, that allegation is insufficient to plead that they were final *policymakers* with regard to Corizon's billing policies.

2017 WL 2274485

In particular, allegations that Dr. Matthew and Dr. Sharma chose a treatment plan for Grimmett that would keep costs down is not enough to plausibly plead that they possessed final authority to establish pricing policy. *See Hurdle v. Bd. of Educ. of City of N.Y.*, 113 Fed.Appx. 423, 427 (2d Cir. 2004) (summary order) ("Even if [the defendant] was the *decisionmaker* with regard to [the plaintiff's] transfer, that does not establish that she had the authority to set the policy authorizing involuntary employee transfers."). Accordingly, even accepting Grimmett's factual allegations as true and liberally construing his pleadings, the Court concludes that Grimmett has failed to plausibly allege the existence of a policy or custom. Accordingly, his § 1983 claim against Corizon is dismissed.

### C. State Law Claims
**\*7** Liberally construed, the SAC also asserts claims against Defendants under New York law for medical malpractice and negligence. (SAC ¶ 145; Dkt. No. 83 at 51.) Defendants do not contest that the Court has supplemental jurisdiction over Grimmett's state law claims under 28 U.S.C. § 1367; instead, they request that the Court decline to exercise supplemental

jurisdiction on the ground that Grimmett has failed to state a federal claim under § 1983. (Dkt. No. 77 at 16; Dkt. No. 86 ¶ 23.) However, because the Court has not dismissed all of Grimmett's federal claims, it will retain supplemental jurisdiction over his state law claims. *See, e.g., Rodriguez v. Cnty. of Westchester*, No. 15 Civ. 9626, 2017 WL 118027, at \*11 (S.D.N.Y. Jan. 11, 2017). Defendants have not moved to dismiss Grimmett's medical malpractice or negligence claims on their merits. Accordingly, Defendants' motion to dismiss Grimmett's state law claims on jurisdictional grounds is denied.

### IV. Conclusion
For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. The Clerk of Court is directed to terminate the motion at Docket No. 73.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2017 WL 2274485

---

**End of Document**
© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 1763093
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Fortunato K. FEBUS, Plaintiff,

v.

Officer Robert SOMODY et al., Defendants.

No. 3:18-cv-00640 (JAM)
|
Signed 04/22/2019

**Attorneys and Law Firms**

Fortunato K. Febus, Bronx, NY, pro se.

### INITIAL REVIEW ORDER

Jeffrey Alker Meyer, United States District Judge

**\*1** Plaintiff Fortunato K. Febus was a prisoner in the custody of a correctional facility in New York when he filed this complaint *pro se* and *in forma pauperis* under 42 U.S.C. § 1983. Febus alleges in principal part that police officers used excessive force on him, falsely arrested him, and were deliberately indifferent to his safety and medical care. For the reasons stated below, I will allow some of Febus's claims to proceed and for his complaint to be served on some of the named defendants.

### BACKGROUND

The following allegations from Febus's complaint are assumed to be true solely for purposes of this initial ruling. On July 3, 2016, at approximately 10:20 p.m., plaintiff Fortunato Febus and his attorney were at the Crabshell Restaurant and Bar in Stamford, Connecticut. Doc. #1 at 2. Defendant Officer Robert Somody, who was wearing his police uniform, approached Febus and asked him whether he was Mr. Febus. *Ibid.* Febus acknowledged his identity, and Somody directed Febus to follow him. *Ibid.* Febus became confused. *Id.* at 2-3. Somody began to ask Febus questions, but Febus could not hear him due to the volume of the music playing in the restaurant. *Id.* at 3. Febus requested that Somody speak to his attorney who was purchasing food in another part of the restaurant at the time. *Ibid.*

Somody then grabbed Febus by the shirt, pulled him to his feet and directed him to the front of the restaurant. *Ibid.* Febus noticed his attorney, pointed to him, and requested that Somody speak to him. *Ibid.*

Somody then grabbed Febus's arm and tried to twist it behind his back. *Ibid.* Febus pulled his arm away and asked why he was being subjected to "this kind of treatment." *Ibid.* Somody did not respond. Instead, he grabbed Febus's arm, twisted it behind his back again, and used his foot to sweep Febus off his feet and onto the ground. *Ibid.* Febus broke five of his ribs during his fall to the ground. *Ibid.* Somody fell on top of him, pinned him to the ground, and put him in a chokehold. *Ibid.*

Defendant Officer Joseph Rainone then arrived at the scene to assist Somody. *Id.* While Somody was choking Febus, Rainone grabbed Febus's arm, which was pinned under his body, and twisted it. *Ibid.* Febus complained that he could not breathe. *Ibid.* Rainone and Somody then re-positioned themselves and grabbed both of Febus's arms and pulled them over his head in a twisting motion. *Ibid.* In doing so, they tore both of his rotator cuffs. *Ibid.*

Seven police cars full of Stamford officers arrived at the scene, and the officers began to punch and kick Febus and bash his head into the ground to subdue him. *Id.* at 3-4. This use of force caused him to suffer a concussion; ear, neck, and back injuries; a hernia; difficulty breathing; and torn cartilage in his right knee. *Id.* at 4.

After being handcuffed, Febus was placed in a police car and transported to the Stamford Police Department. *Ibid.* Upon his arrival at the station, it became clear to police officials that Febus required immediate medical attention. *Ibid.* Officials arranged for an ambulance to transport him to Stamford Hospital for treatment. *Ibid.*

**\*2** At a hearing on July 5, 2016, a judge found probable cause to arrest Febus on charges of breach of peace in the second degree and interference with a police officer. *Ibid.* An officer from the Stamford Police Department attended the hearing but did not inform the judge that Febus was in the custody of the Stamford Police Department and confined at Stamford Hospital for treatment of his injuries. *Ibid.*

On July 6, 2016, an officer from the Stamford Police Department spoke to Febus's doctors to convince them that Febus needed to be returned to the police station. *Ibid.* The

doctors indicated that his injuries precluded his release from the hospital. *Ibid.*

But then on July 7, 2016, Sergeant Doe spoke to Febus's doctors. *Ibid.* Sergeant Doe removed Febus from the hospital against the orders of the doctors and transported him back to the police station. *Ibid.* Febus's injuries prevented him from completing intake at the police station, and before he was finished being processed at the station, the officers had to return him to the hospital to receive medication to manage his pain. *Id.* at 4-5.

On July 8, 2016, Febus appeared in Connecticut Superior Court and was arraigned on charges of breach of peace and interfering with an officer. *Id.* at 5. Febus states that he pleaded guilty to the criminal offenses with which he had been charged, and a judge sentenced him to an unconditional discharge. *Ibid.*

### DISCUSSION

Pursuant to 28 U.S.C. § 1915A, the court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010). [1]

[1] Febus's claims against all officers in their official capacities are dismissed because the Eleventh Amendment bars claims for money damages against state officials in their official capacities. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 169 (1985). I will therefore limit my review to Febus's claims brought against officer defendants in their individual capacities. Moreover, I will limit my review for present purposes to federal law claims. That is because the core purpose of an initial review order under 28 U.S.C. § 1915A is to make an initial screening determination of whether the lawsuit may proceed at all in federal court and should be served upon any of the named defendants. If there are no facially plausible federal law claims against any of the named defendants, then the court would decline to exercise supplemental jurisdiction over any state law

claims pursuant to 28 U.S.C. § 1367. On the other hand, if there are any viable federal law claims that remain, then the validity of any accompanying state law claims may be appropriately addressed in the usual course by way of a motion to dismiss or motion for summary judgment. More generally, the court's determination for purposes of an initial review order under 28 U.S.C. § 1915A that any claim may proceed against a defendant is without prejudice to the right of any defendant to seek dismissal of any claims by way of a motion to dismiss or motion for summary judgment in the event that the Court has overlooked a controlling legal principle or if there are additional facts that would warrant dismissal of a claim.

**\*3** In recent years, the Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a *pro se* complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g., Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

Febus alleges that defendants violated his rights under the Fourth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution as well as under the Connecticut State Constitution. *See* Doc. #1 at 1. He seeks monetary damages for relief.

### *Excessive force*

Febus claims that he was subject to the use of excessive force. The Fourth Amendment to the U.S. Constitution (as applicable to the States through the Fourteenth Amendment) protects the right of the people to be free from unreasonable searches or seizures, and the Fourth Amendment is violated if the police use excessive force on a free person in the course of an arrest or other law enforcement action. *See Graham v. Connor*, 490 U.S. 386 (1989). When evaluating whether a particular use of force was unreasonable under the Fourth Amendment, courts consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Whether law enforcement officers' use of force is "excessive" must be judged by "whether the officers' actions are objectively reasonable in light of the facts

and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (internal quotation marks omitted).

Febus alleges that Somody and Rainone used excessive force against him during his arrest when they, *inter alia*, tore both his rotator cuffs and broke five of his ribs. Febus has adequately alleged a claim of excessive force against Somody and Rainone. He alleges in essence that they severely assaulted him without provocation and for no valid law enforcement reason. I will therefore allow the Fourth Amendment excessive force claim to proceed against both Somody and Rainone in their individual capacities.

### False arrest
Febus also alleges a Fourth Amendment claim for unlawful seizure or false arrest. I will dismiss this claim because Febus acknowledges that he entered a plea of guilty to two of the charges against him, Doc. #1 at 6, and therefore he cannot show a favorable termination of all the charges for which he was arrested as is required to sustain a claim for false arrest. *See Miles v. City of Hartford*, 445 F. App'x 379, 383 (2d Cir. 2011); *Miller v. Stallworth*, 2018 WL 3974730, at *4 (D. Conn. 2018).

### Deliberate indifference to safety and serious medical needs
Febus claims that he was subject to police indifference to his serious medical needs following his assault by the police. The Due Process Clause of the Fourteenth Amendment protects the rights of pre-trial detainees against deliberate indifference to their safety or serious medical needs. A plaintiff must show: (1) that the conditions objectively "posed an unreasonable risk of serious damage to his health;" and (2) that the officer subjectively "acted intentionally to impose the alleged condition, or recklessly failed to act with the reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the officer knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell v. Pineiro*, 849 F.3d 17, 30, 35 (2d Cir. 2017); *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (denial of medical care violates due process rights of a pretrial detainee).

*4  Febus alleges that Sergeant Doe removed him from Stamford Hospital against the advice of his hospital physicians and transported him back to the station. Febus was unable to complete the booking process due to the severity of his injuries, and officers transported him back to the hospital to receive treatment for pain. Febus has adequately

alleged that Sergeant Doe was deliberately indifferent to his safety and medical needs by removing him from the hospital against the orders and advice of his treating physicians. I will therefore allow the Fourteenth Amendment due process claim for deliberate indifference to Febus's safety and serious medical needs to proceed against Sergeant Doe in his individual capacity.

### Right to counsel
Febus claims that his constitutional right to counsel was violated when Somody ignored his request to speak to his lawyer who was present at the Crabshell Restaurant and Bar. The Sixth Amendment to the U.S. Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." The right to counsel, however, is offense-specific and does not attach until a prosecution has commenced. *See McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). Because Febus does not allege that any prosecution had commenced against him at the time of his encounter with Somody, I will dismiss Febus's Sixth Amendment right to counsel claim.

### Eighth Amendment
Febus alleges that his rights were violated under the Eighth Amendment. But because Febus was not a convicted prisoner at the time of the events at issue, he has not plausibly alleged any claim under the Eighth Amendment for cruel and unusual punishment. *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *Darnell*, 849 F.3d at 29.

### Timely arraignment
Febus alleges that he was denied his right to a timely arraignment because an unnamed police officer "appeared before the Judge for the purpose of obtaining a Probable Cause finding [and] suppressed the fact that plaintiff was already in custody, and this prevented the Court from either demanding that plaintiff be transported to appear before the Court, or that the Judge be allowed to appear at Stamford Hospital so that plaintiff may receive a timely arraignment at his bedside." Doc. #1 at 7. Because Febus does not allege facts to show that any named defendant was responsible for his lack of timely arraignment, I will not permit Febus's claim for denial of timely arraignment to proceed against any of the named defendants. *See Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) ("It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter*

*alia*, the defendant's personal involvement in the alleged constitutional deprivation.").

### Claims against the City of Stamford and Stamford Police Department

Febus claims that the City of Stamford failed to "oversee" each defendant by failing to hire qualified officers and by failing to adequately train them. Doc. #1 at 6. He further alleges that Stamford created a policy and/or custom that allowed the constitutional deprivations against him to occur. *Ibid.*

It is well established that § 1983 does not impose *respondeat superior* liability against a municipality for the unconstitutional conduct of its employees. Instead, a municipality may be liable under § 1983 only if a constitutional violation occurred because of the act of a policymaking official or because of a municipal policy, practice, or custom. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Mitchell v. City of New York*, 841 F.3d 72, 80 (2d Cir. 2016). For pleading purposes, a policy or custom may not be inferred simply from the fact that individual police officers have engaged in wrongdoing, and a complaint may not rely solely on wholly conclusory allegations that the constitutional violation was the result of some municipal practice or policy. *See generally Adams v. City of New Haven*, 2015 WL 1566177 (D. Conn. 2015)

 **\*5** Febus alleges only in conclusory terms that the violations of his rights were the product of municipal policies involving the hiring of unqualified police officers and failure to train them. Doc. #1 at 6. Because Febus does not allege facts to show the existence of any municipal practice, policy, or custom that caused police officers to violate his rights, I will dismiss his claim against the City of Stamford without prejudice. *See McCray v. Patrolman N.A. Caparco*, 2019 WL 409430, at \*3 (2d Cir. 2019) (affirming dismissal of conclusory *Monell* failure-to-train claim); *Allen v. Antal*, 665 F. App'x 9, 14 (2d Cir. 2016) (affirming dismissal of conclusory *Monell* claim); *Adams*, 2015 WL 1566177 (dismissing conclusory *Monell* claim).

I will also dismiss all claims against the Stamford Police Department because a municipal police department is not an independent legal entity and is not subject to suit under section 1983. *See Rose v. City of Waterbury*, 2013 WL 1187049, at \*9 (D. Conn. 2013).

### CONCLUSION

Plaintiff's excessive force claims may proceed against defendants Somody and Rainone in their individual capacities. Plaintiff's deliberate indifference claim may proceed against Sergeant Doe in his individual capacity. All remaining claims are DISMISSED pursuant to 28 U.S.C. §§ 1915A(b)(1) and (b)(2) but without prejudice to plaintiff's option to re-plead these claims by way of an amended complaint to be filed on or before **May 22, 2019**.

The Court enters the following orders:

(1) **The Clerk shall** verify the current work addresses of defendants Officer Robert Somody and Officer Joseph Rainone with the Stamford Office of Legal Affairs and mail a waiver of service of process request packet, containing the Complaint, Amended Complaint, and this Order, to each defendant at the address provided within **twenty-one (21) days** of this Order, and report to the Court on the status of those waiver requests on the thirty-fifth day after mailing. If any defendant fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshals Service on the defendant in his or her individual capacity and the defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(2) Plaintiff's individual-capacity claim against "Sergeant Doe" may proceed but plaintiff is advised that he must take steps to identify the real name of "Sergeant Doe" and then file an amended complaint that names him as a defendant. Failure to promptly do so may result in preclusion of any law suit against "Sergeant Doe" if the statute of limitations (which is 3 years for civil rights claims under 42 U.S.C. § 1983) elapses prior to filing an amended complaint.

(3) **The Clerk shall** send plaintiff a copy of this Order.

(4) **The Clerk shall** send a courtesy copy of the Complaint, Amended Complaint, and this Order to the Connecticut Attorney General and the Department of Correction Office of Legal Affairs.

(5) The defendants shall file their response to the complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the waiver forms are sent. If they choose to file an answer, they shall admit or deny the allegations and

respond to the cognizable claim recited above. They also may include all additional defenses permitted by the Federal Rules.

(6) Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within **seven months (210 days)** from the date of this order. Discovery requests need not be filed with the Court.

(7) All motions for summary judgment shall be filed within **eight months (240 days)** from the date of this order.

**\*6** (8) Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(9) If plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that plaintiff MUST notify the Court. Failure to do so can result in the dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated. Plaintiff should write

PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If plaintiff has more than one pending case, he should indicate all case numbers in the notification of change of address. Plaintiff should also notify the defendant or the attorney for the defendant of his new address.

(10) Plaintiff shall utilize the Prisoner Efiling Program when filing documents with the Court. Plaintiff is advised that the Program may be used only to file documents with the Court. As local court rules provide that discovery requests are not filed with the Court, discovery requests must be served on defendants' counsel by regular mail.

**SO ORDERED** this 22nd day of April 2019 at New Haven, Connecticut.

**All Citations**

Slip Copy, 2019 WL 1763093

---

End of Document                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 1129490
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Scott LOMBARDO, Plaintiff,

v.

Joseph FREEBERN; Mark Schaarschmidt;
Edwin Garcia; Eunice Acero; Tina Rivera; Nadine
Leonte; Suzanne Gladitsch; Christina Petito-
Thorn; Christian Anyene; Lisa Rodriguez; Shrayas
Baxi; Shonlonda Rollins; Mr. Flores, Defendants.

No. 16-CV-7146 (KMK)
|
Signed 03/11/2019
|
Filed 03/12/2019

**Attorneys and Law Firms**

Scott Lombardo, New Hampton, NY, Pro Se Plaintiff.

Benjamin Daniel Liebowitz, Esq., Gillian Breuer Lepore,
Esq., Michael Edward Peeples, Esq., New York State Office
of the Attorney General, New York, NY, Counsel for
Defendants.

OPINION & ORDER

KENNETH M. KARAS, UNITED STATES DISTRICT
JUDGE

**\*1** Pro se Plaintiff Scott Lombardo ("Plaintiff") filed the
operative Amended Complaint, pursuant to 42 U.S.C. § 1983,
against Joseph Freebern ("Freebern"), Executive Director
of Mid-Hudson Forensic Psychiatric Center ("MHFPC");
Mark Schaarschmidt ("Schaarschmidt"), Head Chaplain
of MHFPC; Edwin Garcia ("Garcia"), Security Hospital
Treatment Assistant ("SHTA") at MHFPC; Eunice Acero
("Acero"), Head of the Kitchen at MHFPC; Tina Rivera
("Rivera"), Head Cook and Supervisor at MHFPC; Nadine
Leonte ("Leonte"), Social Worker at MHFPC; Suzanne
Gladitsch ("Gladitsch"), New York State Office of Mental
Health ("OMH"); Christina Petito-Thorn ("Petito-Thorn"),
Supervisor SHTA at MHFPC; Christian Anyene ("Anyene"),
Social Worker at MHFPC; Lisa Rodriguez ("Rodriguez"),
Senior SHTA at MHFPC; Shrayas Baxi ("Dr. Baxi"),
Psychiatrist at MHFPC; Shonlonda Rollins ("Rollins"),

SHTA at MHFPC; and Mr. Flores ("Flores"), Senior SHTA at
MHFPC (collectively, "Defendants"). (*See* Am. Compl. (Dkt.
No. 59).)[1] Plaintiff alleges that Defendants violated his rights
under the First, Eighth, and Fourteenth Amendments to the
United States Constitution when they denied him grape juice
for the Sabbath, access to various religious books and articles,
and the right to attend one Passover service and one Eid ul-
Fitr feast. (*See id.* at 1.)[2]

[1]   The Amended Complaint sues all Defendants in their
      individual capacities only. (*See* Am. Compl. 1 n.1.)

[2]   The "Facts" section of the Amended Complaint is
      organized in numbered paragraphs. The "Preliminary
      Statement, "Causes of Action" and "Relief" sections
      do not follow the paragraph numbering from the Facts
      section. The citations to these sections reference the page
      numbers printed on the bottom of the Complaint.

Before the Court is Defendants' Motion To Dismiss the
Amended Complaint pursuant to Federal Rule of Civil
Procedure 12(b)(6) (the "Motion"). (*See* Not. of Mot. To
Dismiss (Dkt. No. 65); Defs.' Mem. of Law in Supp. of Mot.
To Dismiss ("Defs.' Mem.") (Dkt. No. 66).) For the following
reasons, Defendants' Motion is granted.

I. Background

A. Factual Background

1. Plaintiff's Original Complaint

Plaintiff is a patient at MHFPC, a New York State facility
that "provides comprehensive evaluation, treatment, and
rehabilitation, pursuant to court order, for offenders who
have been found not guilty by reason of mental defect or
incompetent to stand trial." (Mar. 30, 2018 Op. & Order on
Defs.' Mot. To Dismiss ("Opinion") 3 (Dkt. No. 54).) Plaintiff
is committed pursuant to New York Criminal Procedure
Law ("CPL") § 330.20, which provides for commitment
of an individual adjudicated "not responsible" for criminal
conduct "by reason of mental disease or defect." (*Id.* (quoting
CPL § 330.20).) Plaintiff filed his original Complaint on
September 12, 2016, bringing fifteen causes of action against
thirteen defendants. (Compl. 11–13 (Dkt. No. 2).) The Court
assumes familiarity with the facts of this case as described
in the Court's March 30, 2018 Opinion and Order dismissing
Plaintiff's original Complaint. (*See* Opinion 3–11.)

**\*2**  In Plaintiff's original Complaint, the First and Second Causes of Action involved Plaintiff's alleged lack of access to grape juice for the Sabbath, and included claims under the First and Fourteenth Amendments and the New York Mental Hygiene Law ("Mental Hygiene Law") § 33.02 against Rivera, Acero, Gladitsch, and Freebern. (Compl. 11.)[3] The Third, Fourth, Seventh, Eighth, and Ninth Causes of Action involved alleged denial of access to Plaintiff's religious books and articles, and included claims under the First, Eighth, and Fourteenth Amendments and Mental Hygiene Law § 33.02 against Petito-Thorn, Dr. Baxi, Freebern, and Anyene. (Id. at 11–12.) The Fifth and Sixth Causes of Action involved Plaintiff's alleged lack of access to his spiritual advisor, Rabbi Joel Schwab ("Rabbi Schwab"), and included claims under the First, Eighth, and Fourteenth Amendments and Mental Hygiene Law § 33.02 against Leonte. (Id.) The Tenth and Twelfth Causes of Action involved the alleged exclusion of Plaintiff from the Passover Seder, and included claims under the First, Eighth, and Fourteenth Amendments and Mental Hygiene Law § 33.02 against Rollins and Rodriguez. (Id. at 12–13.) The Tenth Cause of Action also involved the alleged denial of access to medication and shaving, and included claims under the First, Eighth, and Fourteenth Amendments and Mental Hygiene Law § 33.02 against Rollins. (Id. at 12.) The Eleventh Cause of Action involved Plaintiff's alleged receipt of an "X," allegedly a disciplinary mark, and corresponding denial of privileges, and included claims under the Eighth and Fourteenth Amendments and Mental Hygiene Law § 33.02 against Garcia. (Id.) The Thirteenth Cause of Action involved the allegedly defective and untimely delivery of the Hanukkah menorah, and included claims under the First, Eighth, and Fourteenth Amendments and Mental Hygiene Law § 33.02 against Flores. (Id. at 13.) The Fourteenth Cause of Action involved Plaintiff's alleged unjustified medication increase, and included claims under the Eighth and Fourteenth Amendments and Mental Hygiene Law § 33.02 against Dr. Baxi. (Id.) The Fifteenth Cause of Action involved the alleged violation of Plaintiff's right to practice religion, and included claims under the First and Fourteenth Amendments and Mental Hygiene Law § 33.02 against Freebern and Schaarschmidt. (Id.) Plaintiff requested compensatory damages of $ 276,000 and punitive damages of $ 13,000,000, or $ 1,000,000 per Defendant. (Id. at 13–14.) Plaintiff also requested: (1) "an [i]njunction that all patients at MHFOC choose a religious service, and can't cross over to other services unless the service is an All-Faith service, or unless the patient appeals to the head chaplain to change faiths," in "accordance with DOC[C]S Directive 4202"; (2) "an [i]njunction that if any patient is denied any religious service, that a full report [be issued] as to why and who authorized, and the justification of the denial of service"; (3) "an [i]njunction that if patients have special ritualistic religious items, such as Tifillin, etc. or books, regardless of hard-bound or soft-bound, that a safe place be made for articles and books, and access be granted as needed for said items"; and (4) "an [i]njunction that all special holiday items, such as Hanukkah [m]enorah or Christmas [t]ree, be inspected annually, or as needed per use, before and after each use, and that a replacement in good working condition be promptly made." (Compl. 13–14 & n.30.)

[3]   Like the Amended Complaint, the "Facts" section of the original Complaint is organized in numbered paragraphs, while the "Preliminary Statement, "Causes of Action" and "Relief" sections do not follow the paragraph numbering from the Facts section. The citations to these sections reference the page numbers printed on the bottom of the Complaint.

## 2. Dismissal of Plaintiff's Original Complaint

On March 30, 2018, the Court granted Defendants' Motion To Dismiss the original Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (See generally Opinion.) At the outset, the Court dismissed all of Plaintiff's claims under Mental Hygiene Law § 33.02 on the basis that it is a regulatory statute and "does not confer a private right of action." (Id. at 17–18.)

The Court then addressed Plaintiff's claims under the First Amendment. On Plaintiff's claim that he was denied grape juice and offered cranberry juice as an alternative on Fridays and Saturdays in connection with his observation of the Sabbath, the Court found that Defendants, citing budgetary constraints, had a "legitimate penological interest[ ] to no longer provide Plaintiff grape juice" and that Plaintiff "ha[d] not satisfied his burden to show the existence of obvious, easy alternatives to provide Plaintiff grape juice," noting that despite the deprivation, Plaintiff remained "generally free to practice Judaism." (Id. at 22–24 (alteration and quotation marks omitted).) The Court also dismissed Plaintiff's claim that he was denied access to religious items, including having his hard-cover Siddur book replaced with a different soft-cover prayer book and having his access to his Tifillin and prayer shawl temporarily withheld. On this claim, the Court similarly concluded that Defendants, who claimed the items were temporarily restricted after Plaintiff was transferred to a new ward and placed on "close observation status" after he

2019 WL 1129490

allegedly made threats, had "proffered a valid explanation" based on its penological interest in facility security that justified the deprivations, and that Plaintiff "failed to rebut" this explanation. (*Id.* at 24–25.) On Plaintiff's claim based on the interruption of a single conversation with Rabbi Schwab, the facility's Jewish Chaplain, the Court found that "[t]he singular interruption was at best a de minimus burden on Plaintiff's Free Exercise rights, and fails to state a claim." (*Id.* at 26.) On Plaintiff's claim based on delivery of a broken menorah during Hanukah, the Court ruled that Plaintiff failed to allege that this substantially burdened his religious beliefs, and that the allegations at most demonstrate "mere negligence" by Defendants, which "alone will not carry a § 1983 action." (*Id.* at 26–28.)

 **\*3** Regarding denial of Plaintiff's attendance at the Passover Seder, the Court found that Plaintiff "plausibly alleged that Passover was central or important to his faith such that missing even one service could constitute a substantial burden." (*Id.* at 29 (quotation marks omitted).) However, Defendants argued that Plaintiff had been "too agitated" to attend based on his earlier refusal to take his medication and his allegedly threatening a staff member, and the Court found that Defendants acted pursuant to the legitimate penological interest of keeping Plaintiff, as well as other patients and staff at the facility, safe. (*See id.*) The Court also observed that Plaintiff had an alternative means of exercising the burdened right, as evidenced by the fact that he conducted his own Passover Seder in his room the next day. (*See id.* at 30.) The Court therefore found Plaintiff failed to state a claim based on prevention of his attendance at the Passover Seder. Regarding Plaintiff's claim that he was denied attendance at the Eid ul-Fitr Feast, the Court found that Plaintiff failed to allege personal involvement by Defendants Freebern and Schaarschmidt and dismissed the claim. (*Id.* at 30–33.)

Next, the Court dismissed Plaintiff's claims, raised for the first time in his opposition papers, that all the alleged conduct violates the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). (*See id.* at 33–35.) The Court dismissed Plaintiff's RLUIPA claims for money damages because "RLUIPA does not authorize claims for monetary damages against state officers," and his claims for injunctive relief because the underlying "Free Exercise violations he alleged ... are dismissed on the merits without prejudice and do not specifically allege claims under RLUIPA." (*Id.* at 35 & n.19 (citation and quotation marks omitted).)

The Court also dismissed all claims brought under the Eighth Amendment on the basis that Plaintiff "was not a convicted prisoner." (*Id.* at 35.) However, because Plaintiff was "involuntarily committed" at the time of the alleged conduct, the Court analyzed his deliberate indifference claim as a conditions of confinement claim under the Due Process Clause of the Fourteenth Amendment. (*Id.* at 36.) The Court then construed Plaintiff's Complaint as alleging Fourteenth Amendment claims based on three events: "(1) Rollins not allowing Plaintiff to shave and withholding medication; (2) Garcia giving Plaintiff an 'X'; and (3) Dr. Baxi subsequently increasing Plaintiff's medication." (*Id.* at 39.) As to the first event, the Court found that one-time denial of a shave "does not amount to a constitutional violation," and that Plaintiff did not plead "any facts suggesting that Rollins did not allow him to take his medicine," but rather that Plaintiff refused to take his medication until he received a shave. (*Id.* at 40.) With respect to the second event, the Court found that being given an X, and "thus causing Plaintiff to lose his privilege level," did not deprive Plaintiff of a constitutionally-protected liberty interest and therefore failed to state a claim. (*Id.* at 41.) As to the third event, the Court ruled that "Plaintiff's disagreement with Dr. Baxi regarding the increase of his medication" does not amount to "a substantial departure from accepted professional judgment, practice, or standards" as required to state a deliberate indifference claim. (*Id.* at 42–43.) Plaintiff's Complaint was thus dismissed in its entirety without prejudice to file an amended complaint.

## 3. Plaintiff's Amended Complaint

On April 27, 2018, Plaintiff filed an Amended Complaint attempting to cure the deficiencies in his prior Complaint. (*See* Am. Compl.) Plaintiff's Amended Complaint brings fourteen causes of action against the same thirteen defendants. Plaintiff alleges largely the same claims as his original Complaint, except that Plaintiff now brings his claims against Defendants only in their individual capacities, (*see id.* at 1 n.1), has withdrawn his claims under the New York State Mental Hygiene Law, and has added a cause of action that states, "[t]he actions of all [D]efendants violated Plaintiff's right to practice his religion without harassment under the Eighth and Fourteenth Amendments," (*id.* at 14). Plaintiff requests the same monetary and injunctive relief. (*See id.* at 14–15).[4]

---

[4]     Plaintiff includes an Appendix to his Amended Complaint that provides a detailed breakdown of the days

Plaintiff was deprived of access to his religious books and corresponding damages. (*See* Am. Compl. Appendix A ("App'x A").) In the Appendix, Plaintiff appears to seek $ 10,000 for each day that he was deprived of his Tanach, but his Amended Complaint seeks only $ 1,000 per day for the same deprivation. (*Compare* Am. Compl. 15 *with* App'x A.) Because the Court grants Defendants' Motion To Dismiss the Amended Complaint, it is not necessary to determine which amount Plaintiff sought to recover for his claims.

**\*4** The Amended Complaint includes several additional assertions clarifying Plaintiff's allegations, while retaining all factual allegations from the original Complaint. In connection with his claim that he was denied grape juice, Plaintiff now adds that "[w]ine, or grape juice, is a mandatory ritual to begin and end the Sabbath," and that "[R]abbi Schwab ... told Plaintiff that to say the blessing ... requires wine or grape juice, and not cranberry or other type of juice." (Am. Compl. ¶ 3.) Plaintiff also states that "Plaintiff's relative[s] live in the State of Nevada, which to send grape juice or other provisions would bring a burden to them," and that although he has friends in New York State they "are under no obligation to provide grape juice to Plaintiff." (*Id.* ¶ 9.) Plaintiff also "disagrees" with Defendants' proffered legitimate penological objective justifying the substitution of cranberry juice for grape juice due to budgetary constraints on the basis that Plaintiff's access to grape juice has since been restored, noting that "[i]f grape juice can be afforded now, it could have been afforded then." (*Id.* ¶ 11 n.12.)

Regarding his claim that he was denied access to his religious books and items, Plaintiff now adds that he "reads his books as required by Jewish laws and traditions, and wear[s] his Tifillin and prayer shawl regularly." (*Id.* ¶ 14.) Plaintiff also asserts that Dr. Baxi was "in direct violation of Plaintiff's Civil Rights to practice his religion in the least restrictive environment" when Dr. Baxi told Plaintiff he could not have his religious items returned to him until he "get[s] off Close Observation status" after being transferred to a more restrictive ward of the facility. (*Id.* ¶ 22.)

With respect to the interruption of his conversation with Rabbi Schwab, Plaintiff adds that "it was possible to have Plaintiff called out to the hallway to speak to [R]abbi Schwab," and that "Plaintiff was experiencing emotional distress because of everything that was happening." (*Id.* ¶ 19 n.17.) Regarding his claim that the facility provided a broken menorah for Hanukah, Plaintiff adds that the menorah "was a plug-in type, which is in violation of hospital policy as well as a safety concern," and that in previous years a battery-operated

menorah was provided that "always worked properly." (*Id.* ¶ 26.) Plaintiff also notes that "[a] broken Menorah with a plug could also start a fire which is ... an act of negligence on the part of [D]efendants." (*Id.* ¶ 26 n.22.)

In connection with his claim based on receiving an "X" for threatening a staff member, Plaintiff now adds that he "never threatened Defendant Garcia, but believes Garcia was being malicious." (*Id.* ¶ 44.) Plaintiff also adds the allegation that "[u]pon information and belief, ... Defendant Mark Schaarschmidt made a policy restricting who can and can't go to religious feasts" in connection with the denial of his attendance at the Eid ul-Fitr Feast. (*Id.* ¶ 52.) Finally, Plaintiff asserts that as someone "involuntarily committed to State custody," he has "a constitutionally-protected right to practice his religion without harassment by [D]efendants mentioned herein." (*Id.* ¶ 53.)

### B. Procedural Background

Plaintiff filed the original Complaint on September 12, 2016. (*See* Compl.) The same day, Plaintiff requested to proceed in forma pauperis, (*see* Dkt. No. 1), which the Court granted on November 29, 2016, (*see* Dkt. No. 3). On June 6, 2017, with leave of the Court, Defendants moved to dismiss the original Complaint. (*See* Defs.' Mot. To Dismiss the Original Compl. ("Defs.' Orig. Mot.") (Dkt. No. 37); Defs.' Mem. of Law in Support of Mot. To Dismiss the Original Compl. ("Defs.' Orig. Mem.") (Dkt. No. 38).) On July 7, 2017, Plaintiff filed an Opposition with accompanying exhibits. (*See* Pl.'s Mem. of Law in Opp'n to Defs.' Mot. To Dismiss the Original Compl. ("Pl.'s Orig. Mem.") (Dkt. No. 43).)[5] On July 21, 2017, Defendants filed a Reply. (*See* Defs.' Reply in Further Supp. of Mot. To Dismiss the Original Compl. ("Def.s' Orig. Reply") (Dkt. No. 46).)

---

[5]      On June 23, 2017, Plaintiff sought an extension of time to file papers opposing the Motion. (*See* Dkt. No. 40.) The Court granted the request. (*See* Dkt. No. 41.)

---

**\*5** On March 30, 2018, the Court issued an Opinion and Order dismissing Plaintiff's Complaint in its entirety without prejudice. (*See* Opinion.) On April 27, 2018, Plaintiff filed an Amended Complaint. (*See* Am. Compl.) On May 14, 2018, Defendants filed a letter seeking leave to file a Motion To Dismiss and requesting a premotion conference. (*See* Dkt. No. 60.) On May 23, 2018, Plaintiff filed a letter in opposition. (*See* Dkt. No. 63.) The Court concluded that briefing on the Motion To Dismiss was appropriate, and set a briefing schedule. (*See* Dkt. No. 62.)

On June 25, 2018, Defendants filed the instant Motion To Dismiss and accompanying Memorandum of Law. (*See* Not. of Mot. To Dismiss; Defs.' Mem.) On July 25, 2018, Plaintiff filed a Memorandum of Law in Opposition to Defendants' Motion. (Mem. of Law in Opp'n to Defs.' Mot. To Dismiss ("Pl.'s Mem") (Dkt. No. 72).) [6] On August 16, 2018, Defendants filed a Reply. (Defs.' Reply Mem. of Law in Further Supp. of Mot. To. Dismiss ("Defs.' Reply") (Dkt. No. 69).)

[6]     Plaintiff's timely filed his Opposition on July 25, 2018, but only odd numbered pages were included due to a filing error. (*See* Dkt. No. 68.) Plaintiff filed a complete version of his submission on December 28, 2018, which the Court will consider in deciding Defendants' Motion. (*See* Pl.'s Mem.)

## II. Discussion

### A. Standard of Review

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his [or her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, alteration, and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not

'show[n]'—'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations....") (quotation marks omitted)); *Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 176 (2d Cir. 2013) ("In reviewing a dismissal pursuant to Rule 12(b)(6), we ... accept all factual allegations in the complaint as true....") (alteration and quotation marks omitted). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court ... draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).

**\*6** Where, as here, a plaintiff proceeds pro se, the Court must "construe[ ] [his complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted); *see also Farzan v. Wells Fargo Bank, N.A.*, No. 12-CV-1217, 2013 WL 6231615, at *12 (S.D.N.Y. Dec. 2, 2013) (same), *aff'd sub nom. Farzan v. Genesis 10*, 619 F. App'x 15 (2d Cir. 2015). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted).

## B. Analysis

### 1. First Amendment Free Exercise Claims

#### a. Applicable Law

Defendants argue that the Amended Complaint still fails to state a Free Exercise claim under the First Amendment. (*See* Defs.' Mem. 6–14.) The Free Exercise Clause of the First Amendment is an "unflinching pledge to allow our citizenry to explore ... religious beliefs in accordance with the dictates of their conscience." *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause," *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003), which includes the right to participate in religious services, *see Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993). [7] A prisoner's First Amendment rights, however, are "[b]alanced against ... the interests of prison officials charged with complex duties arising from the administration of the penal system." *Ford*, 352 F.3d at 588 (quotation marks omitted); *see also Weathers v. Rock*, No. 12-CV-1301, 2014 WL 4810309, at *4 (N.D.N.Y. Sept. 23, 2014) (explaining that the right of inmates to freely exercise a chosen religion "is not limitless, and may be subject to restrictions relating to legitimate penological concerns"). Accordingly, a prisoner's Free Exercise claims are "judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Ford*, 352 F.3d at 588 (quotation marks omitted).

[7]  "No party has suggested that the analysis for a free exercise claim by an involuntarily committed individual is different from the analysis applied to prisoners' free exercise claims. Accordingly, the free exercise analysis applied in the prison context will apply here." *Lombardo*, 2008 WL 2543573, at *6 n.6.

"To be entitled to protection under the free exercise clause of the First Amendment, a prisoner must make a threshold showing that the disputed conduct substantially burdened his sincerely held religious beliefs." *Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015) (alteration and quotation marks omitted); *see also Salahuddin v. Goord*, 467 F.3d 263, 274–75 (2d Cir. 2006) ("The prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious

beliefs."). [8] In determining whether a belief is "sincere," "an individual ... need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford*, 352 F.3d at 588 (citation, alteration and quotation marks omitted). The relevant inquiry is not whether, as an objective matter, the belief is "accurate or logical." *Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir. 1996).

[8]  The Second Circuit has acknowledged that "[i]t has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014) (quotation marks omitted). The Second Circuit chose not to confront this question—or rather, not to alter the previous assumption that the substantial burden test is a threshold question. *Id.* at 220–21. This Court has already chosen to follow the analysis in *Holland* and thus will proceed under the assumption that the substantial burden test is still valid. *See Gilliam v. Baez*, No. 15-CV-6631, 2017 WL 476733, at *4 n.5 (S.D.N.Y. Feb. 2, 2017).

**\*7** A substantial burden exists "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *McEachin v. McGuinnis*, 357 F.3d 197, 202 n.4 (2d Cir. 2004) (citations, alterations and quotation marks omitted); *see also Gilliam v. Baez*, No. 15-CV-6631, 2017 WL 476733, at *5 (S.D.N.Y. Feb. 2, 2017) (same). The Second Circuit has further specified that "[t]he relevant question in determining whether [the plaintiff's] religious beliefs were substantially burdened is whether participation in the [religious activity], in particular, is considered central or important to [the plaintiff's religious] practice." *Ford*, 352 F.3d at 593–94. Once the plaintiff satisfies this burden, the defendants then "bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct," although "the burden remains with the prisoner to show that these articulated concerns are irrational." *Salahuddin*, 467 F.3d at 275 (alterations and quotation marks omitted).

Defendants do not contest the sincerity of Plaintiff's religious beliefs. The Court, therefore, will assume for the purpose of resolving the instant Motion that Plaintiff's religious beliefs are sincerely held.

The Court turns, then, to whether Plaintiff's Amended Complaint has adequately alleged that his ability to exercise

his religious beliefs was substantially burdened. Construing his submissions liberally, Plaintiff alleges six ways his Free Exercise of his religion was burdened: (1) he was deprived of grape juice; (2) he was denied access to his religious books and items; (3) his conversation with Rabbi Schwab was interrupted; (4) the menorah was broken; (5) he was unable to attend the Passover Seder; and (6) he was barred from attending the Eid ul-Fitr feast, even though non-members of the Jewish faith were allegedly allowed to attend the Passover Seder. (*See generally* Am. Compl.) For the reasons that follow, the Court concludes that Plaintiff's Amended Complaint fails to cure the deficiencies of his initial Complaint. Therefore, none of Plaintiff's allegations states a claim for violation of the Free Exercise Clause.

### b. Denial of Grape Juice

Defendants argue that Plaintiff being provided cranberry instead of grape juice for his religious practices fails to state a claim against Rivera, Acero, Gladitsch, or Freebern for violation of Plaintiff's Free Exercise rights. (Defs.' Mem. 7–9.) [9] The Court dismissed this claim in the original Complaint on the basis that "Defendants have satisfied 'the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct,' " namely, that MHFPC "switched food vendors ... to save money and grape juice was no longer available." (Opinion 21–22 (quoting *Salahuddin*, 467 F.3d at 275).) The Court made this determination by applying the factors the Supreme Court outlined in *Turner v. Safley*, 482 U.S. 78 (1987):

> whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

*Holland*, 758 F.3d at 222–23 (quotation marks omitted). The rule requiring a legitimate penological interest is equally applicable to individual actions of prison personnel as it is to generally-applied policies or regulations. *See Salahuddin*, 467 F.3d at 274 n.4 ("An individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same way as a prison regulation denying such exercise.").

[9]     Plaintiff's allegation that Gladitsch forwarded Plaintiff's concerns regarding the lack of grape juice to the clinical director fails to sufficiently allege Gladitsch's personal involvement, and the claim against her in the Amended Complaint is therefore dismissed for the same reasons the Court dismissed this claim in its March 30, 2018 Opinion. (*See* Opinion 21 n.13). *See also Phillip v. Schriro*, No. 12-CV-8349, 2014 WL 4184816, at *5 (S.D.N.Y. Aug. 22, 2014) ("A supervisory official is not deemed to have been personally involved solely by virtue of having received a letter or complaint from a prisoner and having referred it to the appropriate department for investigation."); *Rush v. Fischer*, 923 F. Supp. 2d 545, 552 (S.D.N.Y. 2013) (concluding that the allegation that the defendants "received multiple letters from [the plaintiff] and referred the matter to others ... alone is insufficient to constitute the[ir] personal involvement"), *aff'd sub nom Rush v. Canfield*, 649 F. App'x 70 (2d Cir. 2016); *Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) ("The general rule is that if an official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter."); *see also Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (concluding at the summary judgment stage that the plaintiff's letters to the DOCCS Commissioner, one of which he referred to a subordinate for decision and the other of which he responded to "by informing [the plaintiff] that [the subordinate] had rendered a decision," were insufficient to "demonstrate the requisite personal involvement" of the Commissioner). This is because supervisors "receive large numbers of letters from inmates and they delegate subordinates to handle them. If courts found personal involvement every time a supervisor forwarded a complaint to a subordinate, the [personal involvement] requirement would lose all meaning." *Mateo v. Fischer*, 682 F. Supp. 2d 423, 430 (S.D.N.Y. 2010) (citations and quotation marks omitted).

**\*8**  In its Opinion, the Court found that budget constraints "are legitimate penological interests to no longer provide Plaintiff grape juice that satisfies the first and third *Turner*

2019 WL 1129490

factors," and noted that "MHFPC's choice of food vendor and allocation of resources is entitled to substantial deference, even if Plaintiff himself doubts how much more grape juice costs than cranberry juice." (Opinion 22.) Further, the Court found that "[t]he second factor—the availability of alternative means of exercising the right to free exercise of religion— also supports the provision of cranberry over grape juice," noting that this factor "is not to be narrowly construed as pertaining to particular practices, such as having ... grape juice." (*Id.* at 23 (quoting *Henry v. Schriro*, No. 10-CV-7573, 2011 WL 3370394, at *3 (S.D.N.Y. Aug. 2, 2011)).) Finally, with regard to the fourth factor, "the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests," the Court found that "Plaintiff has not satisfied his burden to show the existence of obvious, easy alternatives to provide Plaintiff grape juice ... such as deliveries from his family, friends, or his community, but instead merely points out that the alternatives suggested in *Henry* would not work under his circumstances." (*Id.* at 23–24 (alteration, citation, and quotation marks omitted).)

Plaintiff's Amended Complaint alleges no new facts that would warrant a different result. Plaintiff's allegations are substantively the same as the original Complaint. However, Plaintiff has added the assertion that wine or grape juice is "a mandatory ritual to begin and end the Sabbath," and that Rabbi Schwab told Plaintiff that "to say the blessing over wine requires wine or grape juice, and not cranberry or other type of juice." (Am. Compl. ¶ 3.) Plaintiff also now asserts that "Plaintiff's relative[s] live in the State of Nevada, which to send grape juice or other provisions would bring a burden to them," and that "Plaintiff ha[s] friends in New York State that are under no obligation to provide grape juice to Plaintiff." (*Id.* ¶ 9.) Finally, Plaintiff's Amended Complaint states that he "disagrees" with Defendants' position that cranberry juice was substituted for budgetary reasons, stating that Plaintiff's access to grape juice was restored on April 24, 2015 and that "[i]f grape juice can be afforded now, it could have been afforded then." (*Id.* ¶ 11 n.12.)

Plaintiff has failed to add sufficient facts to state a First Amendment claim for the substitution of cranberry juice for grape juice. Plaintiff's new assertion that Rabbi Schwab told him that grape juice is required for the Sabbath does not fundamentally change the facts that were before the Court when it issued its Opinion dismissing Plaintiff's original Complaint. Even assuming Rabbi Schwab told Plaintiff that cranberry juice is not an acceptable substitute, the law views

Plaintiff's right to free exercise of his religion "sensibly and expansively," *Thornburgh v. Abbott*, 490 U.S. 401, 417 (1989), and it is "not to be narrowly construed as pertaining to particular practices, such as having ... grape juice," *Henry*, 2011 WL 3370394, at *3. While it is true that "[w]hether a particular practice is religiously mandated is surely relevant to resolving whether a particular burden is substantial," *Ford*, 352 F.3d at 593, the Court's Opinion dismissing Plaintiff's claim "assum[ed] Plaintiff ha[d] made a threshold showing" that the substitution of cranberry juice substantially burdened his beliefs but found that Defendants had nonetheless satisfied their obligation to identify "legitimate penological interests that justify the impinging conduct," (Opinion 21–22). The Court also addressed Plaintiff's skepticism of Defendants' proffered justification, which he referenced in his Opposition to Defendants' original Motion To Dismiss, (Pl.'s Orig. Mem. 5), stating that "MHFPC's choice of food vendor and allocation of resources is entitled to substantial deference, even if Plaintiff himself doubts how much more grape juice costs than cranberry juice," (Opinion 22). Plaintiff's new allegations therefore fail to rebut Defendants' identification of legitimate penological interests justifying the infringement on Plaintiff's right to practice his religion.

**\*9** Finally, Plaintiff's assertions that it would unduly burden his family members to send him grape juice and that his local friends are under no obligation to provide him with grape juice, which he also raised in his Opposition to Defendants' original Motion To Dismiss, (Pl.'s Orig. Mem. 5), do not satisfy his burden to show "[t]he existence of obvious, easy alternatives," *Thornburgh*, 490 U.S. at 418, but instead "merely point[ ] out that the alternatives suggested in *Henry*[, 2011 WL 3370394, at *3,] would not work under his circumstances," (Opinion 23–24). Plaintiff fails to identify any easy alternatives that MHFPC could have implemented without sacrificing legitimate penological interests. Therefore, Plaintiff's claim based on denial of access to grape juice for the Sabbath is dismissed.

### c. Denial of Access to Religious Items

Defendants argue that Plaintiff's claims against Petito-Thorn, Baxi, Freebern, and Anyene for violation of his Free Exercise rights by restricting his access to certain religious books and articles should also be dismissed. (Defs.' Mem. 9–11.) In dismissing these claims in the original Complaint, the Court assumed Plaintiff had made a threshold showing that the conduct substantially burdened his sincerely held religious

2019 WL 1129490

beliefs, but found that Defendants satisfied their burden to identify a legitimate penological interest—specifically, preserving Plaintiff's safety and the safety of staff and other MHFPC patients—and that Plaintiff failed to rebut Defendants' valid explanation. (*See* Opinion 24–25.)

Plaintiff adds two new allegations in his Amended Complaint relating to denial of his access to religious books and items. Plaintiff now asserts that "Plaintiff reads his book as required by Jewish laws and traditions, and wear[s] his Tiffillin and prayer shawl regularly," (Am. Compl. ¶ 14), and alleges that by telling Plaintiff his religious items would not be returned until he got off "Close Observation status" after his transfer to a different ward, Dr. Baxi was "in direct violation of Plaintiff's Civil Rights to practice his religion in the least restrictive environment," (*id.* ¶ 22).

Plaintiff's newly included statement that he uses the religious items "as required by Jewish laws and traditions" goes to whether the denial substantially burdened Plaintiff's religious beliefs. However, as discussed, in dismissing Plaintiff's claims in the original Complaint the Court assumed Plaintiff's claim made a threshold showing that Defendants substantially burdened his sincere religious beliefs, but found Defendants proffered a legitimate penological interest that justified the deprivation, which remained unrebutted. Plaintiff's Amended Complaint does not include facts that rebut the legitimacy of the justification, identify alternatives of facilitating the exercise of Plaintiff's right, or otherwise alter the assessment the Court made under the *Turner* factors in its Opinion. Further, Plaintiff's allegation that Dr. Baxi was "in direct violation of Plaintiff's Civil Rights to practice his religion in the least restrictive environment," (*id.*), is a legal conclusion, and the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555 (quotation marks omitted); *see also Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." (quotation marks omitted)). Because Plaintiff alleges no new facts that rebut Defendants' identified legitimate penological interest, his claim based on denial of access to his religious books and items is dismissed.

### d. Interruption of Plaintiff's Conversation with Rabbi Schwab

**\*10** Defendants argue that Plaintiff has still failed to sufficiently allege that Leonte violated Plaintiff's Free Exercise rights by interrupting his conversation with Rabbi Schwab. (Defs.' Mem. 11.) The Court dismissed this claim in Plaintiff's original Complaint on the basis that "[t]he singular interruption was at best a de minimus burden on Plaintiff's Free Exercise rights, and fails to state a claim." (Opinion 11.) Plaintiff's only new assertion in support of this claim is that when Plaintiff's conversation with Rabbi Schwab was interrupted and he was told by Defendant Leonte, "[t]his is group time," is that "[t]he group was watching 'Law and Order' which is geared for CPL [§] 730 patients," while Plaintiff "is a CPL § 330.20." (Am. Compl. ¶ 19 n.17.) Plaintiff goes on to say that "it was possible to have Plaintiff called out to the hallway to speak to [R]abbi Schwab," and that Plaintiff "was experiencing emotional distress because of everything that was happening." (*Id.*) However, whether Plaintiff was asked to watch a television show not geared for his particular patient group, and whether a conversation with Rabbi Schwab would have helped Plaintiff with his emotional distress, are not relevant to whether Plaintiff's religious beliefs were substantially burdened. Furthermore, Plaintiff raised this argument in his Opposition to Defendants' original Motion To Dismiss, (*see* Pl.'s Orig. Mem. 3), and the Court nonetheless dismissed Plaintiff's claim, (*see* Opinion 26). Thus, the Court dismisses this claim. [10]

[10]   With respect to this and several other claims, Plaintiff asserts that Defendants' arguments are barred by the "one motion rule." (Pl.'s Mem. 5 (citing *Vinar v. Litman*, 972 N.Y.S.2d 704 (App. Div. 2013)); *see also id.* at 6, 11.) The caselaw cited by Plaintiff holds that "successive motions for summary judgment should not be entertained, absent a showing of newly discovered evidence or other sufficient cause." *Vinar*, 972 N.Y.S.2d at 706 (citation and quotation marks omitted). Because there are no summary judgment motions at issue, Plaintiff's arguments are inapplicable. Moreover, Defendants have filed only one motion to dismiss for each of Plaintiff's two complaints.

### e. Broken Menorah

Defendants argue that Plaintiff still fails to state a First Amendment claim against Flores for his alleged delivery of a broken menorah to the ward. (Defs.' Mem. 13–14.) The Court dismissed this claim in the original Complaint because Plaintiff "d[id] not explain how the state of the menorah put substantial pressure on him to modify his

2019 WL 1129490

behavior and to violate his beliefs," nor allege that a "properly functioning menorah is considered central or important to his religious practices." (Opinion 26 (citations and quotation marks omitted).) The Court concluded that "[a]s alleged, the broken menorah represents the type of 'inconvenience[] so trivial that [it is] most properly ignored.' " (*Id.* (quoting *McEachin*, 357 F.3d at 203 n.6).) Furthermore, the Court reasoned that any denial of Free Exercise rights was "not intentional or malicious, but appear[s] to at most be the result of negligence by prison officials," and therefore fails to form the basis of a claim under the First Amendment. (*Id.* at 27 (quoting *Tafari v. Annets*, No. 06-CV-11360, 2008 WL 2413995, at *16 (S.D.N.Y. June 12, 2008)), *adopted by* 2008 WL 4449372 (S.D.N.Y. Oct. 2, 2008), *aff'd sub nom.*, 363 F. App'x 80 (2d Cir. 2010).)

Plaintiff includes two new allegations in his Amended Complaint relating to the broken menorah. Plaintiff alleges that "[t]he menorah was a plug-in type, which is in violation of hospital policy as well as a safety concern," and that in previous years "Plaintiff's ward always received a battery-operated [m]enorah which always worked properly." (Am. Compl. ¶ 26.) Plaintiff also states that "[a] broken [m]enorah with a plug could also start a fire which is also an act of negligence on the part of [D]efendants." (*Id.* ¶ 26 n.22.) Neither of these new allegations relates to the Plaintiff's ability to practice his religion. Furthermore, Plaintiff not only fails to rebut the Court's conclusion that Flores was at most negligent; Plaintiff specifically alleges that Flores's conduct was negligent, rather than intentional or malicious as required to state a First Amendment claim. (*Id.*; *see also* Pl.'s Mem. 3 (alleging "neglect by [D]efendants Rollins, Freebern, Schaarschmidt, and Flores").) Finally, Plaintiff raised his argument regarding the unsafe condition of the plug-in Menorah in his Opposition to Defendants' original Motion To Dismiss, (*see* Pl.'s Orig. Mem. 4), and the Court dismissed Plaintiff's claim, (Opinion 27–28). Plaintiff therefore has failed to state a claim based on the delivery of a broken Menorah, and this claim is dismissed.

### f. Denial of Attendance at the Passover Seder

**\*11**  Defendants argue that Plaintiff has failed to allege that Rodriguez and Rollins substantially burdened Plaintiff's religion by causing him to miss the Passover Seder. (Defs.' Mem. 11–13.) [11] In its March 30, 2018 Opinion, the Court, "construing Plaintiff's submissions liberally and drawing all reasonable inferences from the factual allegations in

Plaintiff's favor," found that Plaintiff had "plausibly alleged that Passover was 'central or important to' his faith such that missing even one service could constitute a substantial burden." (Opinion 29 (quoting *Ford*, 352 F.3d at 593–94).) However, the Court found that Defendants met their burden of identifying a legitimate penological interest—the safety of Plaintiff and of other patients and staff—that justified the impinging conduct. (*See id.*) Defendants argued that Defendant Rodriguez "felt Plaintiff was 'too agitated' after Plaintiff had been demanding to shave, refused to take his medication, and received an 'X' for allegedly threatening a staff member." (*Id.*) Furthermore, the Court found that Plaintiff had indicated that he had an alternative means of exercising the right because "he conducted his own Passover Seder in his room the next day." (*Id.* at 30.)

[11]  As explained in the Court's Opinion, (*see* Opinion 28 n.18), Plaintiff's claim against Rollins should be dismissed because Plaintiff has not alleged that Rollins was personally involved in making the decision that Plaintiff would not attend Passover Seder, *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) ("It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation."). Rather, Plaintiff has alleged that Rollins refused to let Plaintiff shave and allegedly denied him his medication. (Compl. ¶¶ 38–41.) Those claims are addressed below. In his Opposition, Plaintiff does argue that Rollins "made a conscious decision to thwart Plaintiff from shaving and going to the Seder." (Pl.'s Mem. 7.) However, Plaintiff's attendance at the Seder was not conditional on his receiving a shave, but on taking his medicine, (*see id.*), which Plaintiff admits he initially refused to do, (*see* Am. Compl. ¶ 40). Plaintiff asserts that he ultimately did take his medication, but that Rodriguez, and not Rollins, still prevented him from attending the Seder because he was "too agitated." (*Id.* ¶¶ 45–46.)

The only allegation that Plaintiff adds with respect to the prevention of his attendance at the Passover Seder is that he denies ever threatening Defendant Garcia, which resulted in receiving an "X" and a corresponding loss of certain unspecified privileges. Specifically, Plaintiff now alleges that he "never threatened Defendant Garcia, but believes Garcia was being malicious." (Am. Compl. ¶ 44.) Construing Plaintiff's Amended Complaint liberally, the Court reads this newly included statement as alleging that Garcia fabricated the threat he says Plaintiff made for a malicious purpose. However, Plaintiff does not allege that the malicious purpose

was to prevent Plaintiff from attending the Passover Seder, but merely that Garcia was generally "being malicious." Plaintiff also does not allege that Garcia was involved in the decision not to allow Plaintiff to attend the Passover Seder, nor that the loss of his privilege level deprived him of any constitutionally-protected liberty interests. Finally, Plaintiff raised this argument in his Opposition to Defendants' original Motion To Dismiss, (*see* Pl.'s Orig. Mem. 2–3), and the Court nevertheless dismissed Plaintiff's claim. Plaintiff has therefore included no new allegations in his Amended Complaint to rebut Defendants' proffered safety justification for preventing Plaintiff from attending the Seder. The Court therefore dismisses this claim.

### g. Claim Regarding Who Could Attend
### the Eid ul-Fitr and Passover Feasts

Defendants argue that any claims against Freebern and Schaarschmidt regarding the Eid ul-Fitr Feast should be dismissed because Plaintiff has failed to allege any burden on his religious beliefs. (Defs.' Mem. 14.) The Court originally dismissed these claims for failure to sufficiently allege personal involvement. (Opinion 32–33.) In an attempt to cure this deficiency, Plaintiff now alleges that "[u]pon information and belief, the head chaplain of MHFPC ... Defendant Mark Schaarschmidt made a policy restricting who can and can't go to religious feasts." (Am. Compl. ¶ 52.) [12]

[12]   Plaintiff alleges no new facts with respect to Freebern's personal involvement.

 **\*12**  The personal involvement of a defendant may be demonstrated where "the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). However, "[c]onclusory allegations that there was such a policy or custom, without identifying or alleging supporting facts, is insufficient to state a claim." *Maynard v. City of New York*, No. 13-CV-3412, 2013 WL 6667681, at \*4 (S.D.N.Y. Dec. 17, 2013); *see also Lindsey v. Butler*, 43 F. Supp. 3d 317, 329 (S.D.N.Y. 2014), *modified in part on reconsideration*, No. 11-CV-9102, 2014 WL 5757448 (S.D.N.Y. Nov. 5, 2014) ("Conclusory accusations regarding a defendant's personal involvement in the alleged violation, standing alone, are not sufficient."); *Burgis v. Dep't of Sanitation*, No. 13-CV-1011, 2014 WL 1303447, at \*6 (S.D.N.Y. Mar. 31, 2014) ("Courts have repeatedly held that including boilerplate

language alleging the existence of a policy, without factual allegations to support it, is not enough at the pleading stage."); *Hobbs v. Police Officers of N.Y.C.*, No. 10-CV-5717, 2014 WL 502030, at \*8 (S.D.N.Y. Feb. 6, 2014) (report and recommendation) (holding that the plaintiff's "bare allegations" that the defendants "created, enacted, ... put into effect[,] and maintained an illegal policy" were insufficient to establish personal involvement (alteration omitted)); *Koehl v. Bernstein*, No. 10-CV-3808, 2011 WL 2436817, at \*19 (S.D.N.Y. June 17, 2011) ("[C]onclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement."), *adopted by* 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011); *Pravda v. City of Albany*, 956 F. Supp. 174, 182 (N.D.N.Y. 1997) (finding the plaintiff's "conclusory allegations that [the] [d]efendants ... were responsible for setting County policy" were "insufficient to establish the personal involvement of the[ ] individual [d]efendants").

Plaintiff's newly added allegation that Schaarschmidt "made a policy restricting who can and can't go to religious feasts," (Am. Compl. ¶ 52), is wholly conclusory, offering no additional facts demonstrating the existence of such a policy or that Schaarschmidt had any involvement in its creation or maintenance, and therefore "cannot sustain a claim of personal involvement" in the constitutional violation, *Koehl*, 2011 WL 2436817, at \*19 (collecting cases). Additionally, because Plaintiff adds no new allegations regarding Freebern's personal involvement in creating or maintaining such a policy, Plaintiff's claim against Freebern fails for the same reasons that it was dismissed in the Court's March 30, 2018 Opinion. (*See* Opinion 31–33.)

In his Opposition, Plaintiff points to a Department of Corrections and Community Supervision ("DOCCS") policy, Directive 4202, arguing that it requires an individual "to be registered to a specific religion to attend services in that prayer group." (Pl.'s Mem. 6.) Plaintiff is mistaken. DOCCS Directive 4202 states, "[o]rdinarily an inmate may attend only the religious program of his or her designated religion as noted in facility records. However, it is acceptable for those who desire to learn more about the religious practices of another faith to request permission to attend up to three classes/services per year from the Chaplain of that faith group." (DOCCS Dir. 4202 § VI(B)(3).) Even assuming arguendo that such a policy applies to MHFPC, the policy itself does not authorize disparate treatment of individuals who practice different religions, nor does it necessarily bar individuals from attending services of another religion under

all circumstances. More importantly, Plaintiff has nowhere alleged that Schaarschmidt or Freebern established it.

To the extent Plaintiff argues that Schaarschmidt or Freebern instituted a policy in *violation* of Directive 4202, he has alleged no facts in support of his contention. Rather, he states that he "sent a letter to Defendant Freebern with a copy to Defendant Schaarschmidt" indicating that Directive 4202 was not being followed. (Pl.'s Mem. 6.) However, Plaintiff made the same argument in his opposition to Defendants' original Motion To Dismiss, (*see* Pl.'s Orig. Mem. 8–9,) and the Court nevertheless found Plaintiff failed to establish personal involvement, (*see* Opinion 31 ("The allegation that Freebern and Schaarschmidt received Plaintiff's letter complaining of unconstitutional conduct, without more, does not plausibly allege that they were informed of the violation through a report or appeal and failed to remedy the wrong.")). *See Houston v. Schriro*, No. 11-CV-7374, 2014 WL 6694468, at *14 (S.D.N.Y. Nov. 26, 2014) ("[I]gnoring a prisoner's letter or complaint is insufficient to render an official personally liable."); *Mateo v. Fischer*, 682 F. Supp. 2d 423, 430 (S.D.N.Y. 2010) (noting that "[c]ourts in this circuit have said that the receipt of letters or grievances, by itself, does not amount to personal involvement" and listing cases).

**\*13** The Court finds that Plaintiff's Amended Complaint still fails to sufficiently allege the personal involvement of Freebern and Schaarschmidt. Plaintiff's claims based on prevention of his attendance at the Eid ul-Fitr feast are therefore dismissed.

## 2. Eighth and Fourteenth Amendment Claims

Defendants argue Plaintiff has failed to state an Eighth Amendment claim for cruel or unusual punishment because he was not a convicted prisoner. (Defs.' Mem. 15.) The Court agreed in its March 30, 2018 Opinion, finding that "[t]he Eighth Amendment applies only to 'punishment,' and as 'an insanity acquittee ... was not convicted, he may not be punished.' " (Opinion 35 (quoting *Lombardo*, 2008 WL 2543573, at *9*).) However, the Court also noted that "[i]ndividuals involuntarily committed to state custody, such as Plaintiff, have constitutionally-protected liberty interests in adequate food, shelter, clothing, medical care, and conditions of reasonable care and safety," (*id.* (quoting *Vallen v. Plan*, No. 15-CV-703, 2016 WL 482026, at *3 (E.D.N.Y. Feb. 4, 2016))), and therefore analyzed Plaintiff's deliberate indifference claims "under the Due Process Clause of the

Fourteenth Amendment rather than under the Cruel and Unusual Punishments Clause of the Eighth Amendment," (*id.* at 36). As the Court observed, "Plaintiff's rights under the Due Process Clause are 'at least as great as the Eighth Amendment protections available to a convicted prisoner.' " (*Id.* (quoting *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017)).) [13]

[13]    Until recently, "[c]laims for deliberate indifference to a ... serious threat to the health or safety of a person in custody [were] analyzed under the same standard irrespective of whether they [we]re brought under the Eighth or Fourteenth Amendment." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009). However, the Second Circuit's recent decision in *Darnell*, 849 F.3d 17, overruled *Caiozzo* "to the extent that it determined that the standard for deliberate indifference is the same under the Fourteenth Amendment as it is under the Eighth Amendment." *Id.* at 35.

### a. Applicable Law

To state a Due Process claim relating to conditions of confinement, Plaintiff must plausibly allege "both an objective element—that the prison officials' transgression was 'sufficiently serious'—and a [mens rea] element—that the officials acted, or omitted to act, with a 'sufficiently culpable state of mind,' i.e., with 'deliberate indifference to inmate health or safety.' " *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (italics omitted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). [14] "To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). Thus, prison officials violate the Constitution when they deprive an inmate of his "basic human needs" such as food, clothing, medical care, and safe and sanitary living conditions. *Id.* (quotation marks omitted). "[T]here is no static test to determine whether a deprivation is sufficiently serious; the conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (alteration and quotation marks omitted). The Court must consider the "severity and duration, on a case-by-case basis." *Darnell*, 849 F.3d at 30. Moreover, conditions of confinement may be aggregated to rise to the level of a constitutional violation, but "only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (noting that "low cell temperature at night combined with a

failure to issue blankets" may establish an Eighth Amendment violation).

14     In *Darnell*, the Second Circuit indicated that this prong should be referred to the "mens rea prong," rather than the "subjective prong," to prevent confusion. *See Darnell*, 849 F.3d at 29 (italics omitted).

**\*14** For claims specifically alleging deliberate indifference to medical needs, "the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone v. N.Y.S. Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quotation marks omitted). Analyzing this objective requirement involves two inquiries. "The first ... is whether the prisoner was actually deprived of adequate medical care." *Salahuddin*, 467 F.3d at 279. The second "asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the [c]ourt to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* at 280. "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit has presented the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)); *see also Morales v. Fischer*, 46 F. Supp. 3d 239, 247 (W.D.N.Y. 2014) (same). Generally, the condition must be " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Grimmett v. Corizon Med. Assocs. of N.Y.*, No. 15-CV-7351, 2017 WL 2274485, at \*3 (S.D.N.Y. May 24, 2017) (quoting *Chance*, 143 F.3d at 702).

The second requirement is the mens rea prong. "Prior to the Second Circuit's decision in *Darnell*, 849 F.3d 17, the second element—whether the defendant acted with a sufficiently culpable state of mind—was evaluated subjectively." *Ryan v. Cty. of Nassau*, No. 12-CV-5343, 2018 WL 354684, at \*3 (E.D.N.Y. Jan. 10, 2018). However, in *Darnell*, in light of the Supreme Court's decision in *Kingsley v. Henderickson*, 135 S. Ct. 2466 (2015), the Second Circuit held that when a claim arises under the Fourteenth Amendment, "the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care ... even though the

defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35; *see also Ryan*, 2018 WL 354684, at \*3 (same); *Charles v. County of Orange*, No. 16-CV-5527, 2017 WL 4402576, at \*10 (S.D.N.Y. Sept. 29, 2017) (same). "In other words, the second element of a deliberate indifference claim under the Fourteenth Amendment 'is defined objectively,' and a plaintiff is not required to show subjective awareness by the defendant that '[his] acts (or omissions) have subjected the pre-trial detainee to a substantial risk of harm.' " *Ryan*, 2018 WL 354684, at \*3 (quoting *Darnell*, 849 F.3d at 35). [15] Despite the slightly lower standard articulated in *Darnell*, which is akin to objective recklessness, "any § 1983 claim for a violation of due process requires proof of a mens rea greater than mere negligence." *Smith v. Outlaw*, No. 15-CV-9961, 2017 WL 4417699, at \*3 (S.D.N.Y. Sept. 30, 2017) (quoting *Darnell*, 849 F.3d at 36) (italics omitted); *see also Ryan*, 2018 WL 354684, at \*3 (same); *Grimmett*, 2017 WL 2274485, at \*4 (same). A detainee must prove that an official acted intentionally or recklessly, and not merely negligently. *Darnell*, 849 F.3d at 36.

15     While *Darnell* involved claims of unconstitutional conditions of confinement, several courts in the Second Circuit have extended *Darnell*'s holding to claims of deficient medical treatment. *See, e.g., Ryan*, 2018 WL 354684, at \*3 & n.1 (extending *Darnell* to claims of deficient medical treatment); *Smith v. Outlaw*, No. 15-CV-9961, 2017 WL 4417699, at \*3 (S.D.N.Y. Sept. 30, 2017) (same); *Grimett*, 2017 WL 2274485, at \*4 n.2 (same); *see also Charles*, 2017 WL 4402576, at \*10 ("This standard for deliberate indifference applies to any underlying violation of the due process clause, such as for maintaining unconstitutional conditions of confinement or failing to provide adequate medical care to a person in state custody, 'because deliberate indifference means the same thing for each type of claim under the Fourteenth Amendment.' " (quoting *Darnell*, 849 F.3d at 33 n.9)).

**\*15** The Court construes Plaintiff's Amended Complaint as alleging due process violations based on three events: (1) Rollins not allowing Plaintiff to shave and withholding medication; (2) Garcia giving Plaintiff an "X"; and (3) Dr. Baxi subsequently increasing Plaintiff's medication. The Court will address each in turn.

### b. Rollins Denying Plaintiff a
### Shave and Withholding Medication

Defendants argue that Rollins preventing Plaintiff from shaving on one occasion does not amount to a constitutional violation, and that Plaintiff failed to allege that anyone prevented him from taking his medication. (Defs.' Mem. 17.) The Court previously dismissed Plaintiff's claim based on denial of a shave on one occasion on the basis that "Plaintiff has failed to satisfy the objective prong, because he has not alleged a deprivation of his 'basic human needs' from being denied a shave on one occasion." (Opinion 40 (quoting *Walker*, 717 F.3d at 125).) The Court dismissed Plaintiff's claim based on withholding his medication because Plaintiff did not allege that Rollins did not allow him to take his medication; "[r]ather, Plaintiff stated he refused his medication until he shaved" and "that he was given his normal medication at around 9:35." (*Id.* (quotation marks omitted).)

Plaintiff has added no new allegations to his Amended Complaint pertaining to this claim. Therefore, the Court dismisses this claim for the same reasons it was previously dismissed. (*Id.* at 40.)

### c. Garcia Giving Plaintiff an "X"

Defendants argue that Plaintiff's Due Process claim against Garcia should be dismissed because Plaintiff has not alleged a deprivation of any constitutionally protected interest. (Defs.' Mem. 17–18.) The Court agreed with this argument in its Opinion, finding that "Plaintiff has not alleged that the loss of his 'privilege level' deprived him of any constitutionally-protected liberty interests," nor that the loss "posed an unreasonable risk of serious damage to his health." (Opinion 41.) Plaintiff's only new allegation with respect to this claim is that "Plaintiff never threatened Defendant Garcia, but believes Garcia was being malicious." (Am. Compl. ¶ 44.) In his Opposition, Plaintiff also argues that his actual statement to Garcia was not a threat, and that Garcia maliciously misconstrued it as one. (*See* Pl.'s Mem. 8.) However, Plaintiff's belief that Garcia acted with malice does not make the underlying conduct a constitutional violation. *See Paul v. Davis*, 424 U.S. 693, 699 (1976) (noting that not "every legally cognizable injury which may have been inflicted by a state official acting under 'color of law' establishes a violation of the Fourteenth Amendment," but rather, "only those acts which deprived a person of some right

secured by the Constitution or laws of the United States" state a constitutional claim). Even assuming Plaintiff did not in fact threaten Garcia and that Garcia still gave Plaintiff an "X," Plaintiff still has not established that the loss of his privilege level infringes on a "constitutionally-protected liberty interest[ ] in adequate food, shelter, clothing, medical care, [or] conditions of reasonable care and safety" that would give rise to a substantive due process claim. *Vallen*, 2016 WL 482026, at *3–4.

Plaintiff arguably also asserts a procedural due process claim for failure to provide him with constitutionally sufficient process before reducing his privileges. "Procedural due process requirements only impose constraints on state governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the Fourteenth Amendment." *Barna v. Hogan*, 964 F. Supp. 52, 57 (D. Conn. 1997) (citing *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)); *see also Williams v. Temple*, 349 F. App'x 594, 595 (2d Cir. 2009) ("[A] prisoner has the right to procedural due process before the deprivation of a liberty interest."); *Zimmerman v. Burge*, No. 06-CV-176, 2008 WL 850677, at *2 (N.D.N.Y. Mar. 28, 2008) (noting that a prisoner "cannot state a claim for procedural due process without first establishing that he has been denied a liberty or property interest"). In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court held that the Constitution "did not require that [disciplinary restrictions] within a prison be preceded by procedural due process protections unless the confinement subjected the prisoner to 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Colon v. Howard*, 215 F.3d 227, 230 (2d Cir. 2000) (quoting *Sandin*, 515 U.S. at 484); *see also Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) ("A prisoner's liberty interest is implicated by prison discipline ... only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.").

**\*16** Although determination of "whether a plaintiff's confinement satisfies the 'atypical and significant hardship' requirement involves factual determinations," *Tellier v. Fields*, 280 F.3d 69, 80 (2d Cir. 2000), Plaintiff has not alleged *any* confinement or other specific deprivation of a protected liberty interest as a result of receiving an "X." Plaintiff explains in his Amended Complaint that "[a]n 'X' is a loss of privileges of the current level that a person is on. There are three levels of privileges[:] entry, silver, and gold levels." (Am. Compl. ¶ 44 n.29.) But Plaintiff does not specify what type of privileges correspond to each

privilege level, or indicate which level he was reduced to by receiving an "X"; nor does he allege that the "X" impacted any constitutionally-protected right beyond the First Amendment right already discussed above. Although " 'there is no bright-line rule regarding the length or type of sanction' that meets the *Sandin* standard," *Alvarado v. Kerrigan*, 152 F. Supp. 2d 350, 354 (S.D.N.Y. 2001) (quoting *Colon*, 215 F.3d at 231–32), Plaintiff cannot state a procedural due process claim without alleging some specific deprivation of his liberty that departs from "the ordinary incidents of prison life," *Colon*, 215 F.3d at 230. *See Williams v. Temple*, 349 F. App'x 594, 595 (2d Cir. 2009) (finding summary judgment in favor of the defendant appropriate where there was "no indication" that the plaintiff's "placement on limited privilege—which lasted from approximately April 13, 2005, to May 25, 2005 —rose to the level of an 'atypical and significant hardship' " (quoting *Palmer v. Richards*, 364 F.3d 60, 64–65 (2d Cir. 2004)); *see also Thompson v. LaClair*, No. 08-CV-37, 2009 WL 2762164, at *5 (N.D.N.Y. Aug. 25, 2009) ("Courts considering inmate claims regarding denial of participation in or access to prison programs or privileges under *Sandin* have uniformly concluded that inmates do not enjoy a protected liberty interest in such aspects of prison life." (collecting cases)); *Alvarado*, 152 F. Supp. 2d at 354 (noting that "the Second Circuit recently suggested that confinement for a period of less than 101 days would not constitute an atypical and significant hardship" (citing *Colon*, 215 F.3d at 231–32)). Therefore, Plaintiff's due process claim is dismissed.

#### d. Dr. Baxi Increasing Plaintiff's Medication

Defendants argue that Plaintiff's disagreement with Dr. Baxi regarding the increase of his medication should be dismissed because it does not rise to the level of a constitutional violation. (Defs.' Mem. 18–19.) The Court dismissed this claim from the original Complaint on the basis that "Plaintiff's claims boil down to nothing more than a dispute with Dr. Baxi over the treatment he has received," and that "such disagreement regarding the particularities of his treatment is insufficient to state a claim." (Opinion 42.) *See Chance*, 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."); *Vallen*, 2016 WL 482026, at *3–4 ("[The] [p]laintiff's allegations [regarding change in medicine dosage] make clear that while he may have disagreed with the course of treatment, [the] [d]efendants were not deliberately indifferent to [the] [p]laintiff's medical needs."); *Nelson v. Deming*, 140 F. Supp. 3d 248, 262

(W.D.N.Y. 2015) (dismissing deliberate indifference claim because the "[p]laintiff's disagreement with th[e] course of treatment does not amount to deliberate indifference by [the] [d]efendants"); *Washington v. Westchester Cty. Dep't of Corr.*, No. 13-CV-5322, 2014 WL 1778410, at *6 (S.D.N.Y. Apr. 25, 2014) ("[I]t is well-settled that the ultimate decision of whether or not to administer a treatment or medication is a medical judgment that, without more, does not amount to deliberate indifference."); *Idowu v. Middleton*, No. 12-CV-1238, 2013 WL 4780042, at *9 (S.D.N.Y. Aug. 5, 2013) ("[The] [p]laintiff's disagreement with [a defendant]'s diagnostic technique and medical judgment cannot provide the basis for a deliberate indifference claim under the Eighth Amendment."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) ("[D]isagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a [§] 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.").

Plaintiff includes only one new allegation with respect to this claim, namely that "Defendant Dr. Baxi took Plaintiff to court on November 5, 2015 for medication over objection. Prior to that, Plaintiff told Dr. Baxi that his family has a history of diabetes, which is a long-term side-effect of Zyprexa." (Am. Compl. ¶ 47 n.30.) However, as explained in the Court's Opinion, to the extent Plaintiff seeks to challenge the New York State Court order authorizing changes to Plaintiff's medication over his objection, that claim is barred by the *Rooker-Feldman* doctrine. (*See* Opinion 41 n.23). *See also Capers v. Kirby Forensic Psychiatric Ctr.*, No. 13-CV-6953, 2016 WL 817452, at *3 (S.D.N.Y. Feb. 25, 2016) ("[W]here, as here, a plaintiff challenges a state court judgment authorizing medication over objection, the action is barred by the *Rooker-Feldman* doctrine."); *Meyers v. Health & Hosp. Corp.*, No. 13-CV-1258, 2014 WL 4160796, at *3 (E.D.N.Y. Mar. 28, 2014) (finding *Rooker-Feldman* doctrine barred review of state court order granting defendants' request to involuntarily medicate plaintiff over plaintiff's objections), *adopted by* 2014 WL 4161975 (E.D.N.Y. Aug. 19, 2014). The *Rooker-Feldman* doctrine precludes federal district courts from exercising subject matter jurisdiction over "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284

Lombardo v. Freebern, Slip Copy (2019)

2019 WL 1129490

(2005). This doctrine would therefore bar any claim Plaintiff might bring here to challenge the legality of the state court order. To the extent Plaintiff raises his state court litigation against Dr. Baxi and his family's history of diabetes as evidence of a constitutional violation, Plaintiff raised the same arguments in his Opposition to Defendants' original Motion To Dismiss, (*see* Pl.'s Orig. Mem. 9), and the Court nevertheless found that Plaintiff "failed to plead a 'substantial departure from accepted professional judgment, practice, or standards,'" (Opinion 42). Therefore, for the same reasons set forth in the Court's March 30, 2018 Opinion, this claim is dismissed as to all Defendants. [16]

[16]     Because the Court has dismissed all of Plaintiff's claims, the Court declines to address the issue of Defendants' qualified immunity at this time. (Defs.' Mem. 22–24.) Additionally, to the extent Plaintiff seeks to renew his RLUIPA claims, which are not included in the Amended Complaint but are mentioned in passing in Plaintiff's Opposition, (*see* Pl.'s Mem. 11), he asserts no new facts that would change the Court's prior ruling dismissing these claims because "RLUIPA does not authorize claims for monetary damages against state officers," and, with respect to his claims for injunctive relief, because his

Free Exercise claims were dismissed on the merits, (*see* Opinion 35 & n.19). Plaintiff's RLUIPA claims are therefore dismissed.

III. Conclusion

**\*17**   For the foregoing reasons, Defendants' Motion To Dismiss is granted. Because this is the second adjudication of Plaintiff's claims on the merits and he has failed to state a claim, the dismissal is with prejudice. Even pro se plaintiffs are not entitled to file an amended complaint if the complaint "contains substantive problems such that an amended pleading would be futile." *Lastra v. Barnes & Noble Bookstore*, No. 11-CV-2173, 2012 WL 12876, at \*9 (S.D.N.Y. Jan. 3, 2012), *aff'd*, 523 F. App'x 32 (2d Cir. 2013). Because the Court finds that further amendment would be futile, Plaintiff's claims are dismissed with prejudice.

SO ORDERED.

**All Citations**

Slip Copy, 2019 WL 1129490

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 61 of 111

Hill v. County of Montgomery, Not Reported in Fed. Supp. (2018)

2018 WL 2417839

2018 WL 2417839
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Perry HILL, both individually and on behalf
of a class of others similarly situated, Plaintiff,

v.

COUNTY OF MONTGOMERY, Michael
Amato, and Michael Franko, Defendants.

9:14-cv-00933 (BKS/DJS)
|
Signed 05/29/2018

**Attorneys and Law Firms**

For Plaintiff: Law Offices of Elmer Robert Keach, III, P.C., Elmer Robert Keach, III, Maria K. Dyson, One Pine West Plaza, Suite 109, Albany, NY 12205, Migliaccio & Rathod LLP, Nicholas A. Migliaccio, Jason S. Rathod, 412 H Street NE, Suite 302, Washington, DC 20002.

For Defendants: Goldberg Segalla LLP, Jonathan M. Bernstein, 8 Southwoods Boulevard, Suite 300, Albany, NY 12211.

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, United States District Judge

**I. INTRODUCTION**

 **\*1** Plaintiff Perry Hill brings this proposed class action under 42 U.S.C. § 1983 against Defendants County of Montgomery, Michael Amato, and Michael Franko. (Dkt. No. 1). In the Complaint, Hill advances a conditions of confinement claim, alleging that Defendants failed to provide adequate food and nutrition in violation of the Eighth Amendment while he was detained at the Montgomery County Jail ("MCJ") in Fultonville, New York. (Id.). Presently before the Court are: (1) Hill's supplemental briefing concerning whether he was a pretrial detainee or convicted prisoner at MCJ; (2) Hill's supplemental briefing concerning whether he has standing to bring a claim for declaratory and injunctive relief; (3) Hill's motion for leave to amend the Complaint under Rule 15; and (4) proposed intervenor James Rogers' motion for leave to intervene, under Rule 24, as a named plaintiff and class representative. (Dkt. Nos. 73, 106, 107). Defendants oppose these motions. (Dkt.

Nos. 88, 113). For the reasons that follow, the Court concludes that Hill was a pretrial detainee at MCJ, dismisses Hill's claim for declaratory and injunctive relief as he lacks Article III standing, and grants in part and denies in part the motions to amend and intervene. [1]

[1]   As described below, the Court will consider Hill's pending motion for class certification (Dkt. No. 106) following Hill's response to this Order.

**II. PROCEDURAL HISTORY**

On July 25, 2014, Hill filed the Complaint in this action. (Dkt. No. 1). On February 27, 2017, after conducting significant discovery, Hill moved for class certification. (Dkt. No. 73). It was unclear from his papers, however, whether Hill, who was held at MCJ in connection with a probation violation, was a pretrial detainee or a convicted prisoner. Hill v. County of Montgomery, No. 14-cv-933, 2017 WL 9249663, at \*4– 5, \*9 (N.D.N.Y. Sept. 29, 2017). [2] Plaintiff's status governs whether his conditions of confinement claim is analyzed under the Eighth Amendment's cruel and unusual punishment clause [3] or the Fourteenth Amendment's due process clause, which require slightly different showings. [4] Further, the Court found that, because Hill had been released from MCJ before filing this action, his claim for injunctive relief was in all likelihood moot and he did not have standing to seek such relief on behalf of the purported class. Id. at \*9. The Court therefore denied Plaintiff's motion for class certification without prejudice to renewal upon briefing these issues. Id. The Court addresses Hill's briefing on these two issues before turning to the motion to amend and intervene.

[2]   Lexis citation unavailable.

[3]   The Eighth Amendment's prohibition of cruel and unusual punishment has been incorporated against the states through the Fourteenth Amendment. See Robinson v. California, 370 U.S. 660, 666–67, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

[4]   The Court previously explained:
      Under both the Eighth and Fourteenth Amendments, a plaintiff must establish an objective element and a subjective element for a § 1983 conditions of confinement claim. Under both amendments, "to establish an objective deprivation, 'the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health.' " Darnell, 849 F.3d at 30 (quoting Walker v. Schult, 717 F.3d 119, 126

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 62 of 111

Hill v. County of Montgomery, Not Reported in Fed. Supp. (2018)

2018 WL 2417839

2d Cir. 2013) ). The Constitution requires "that prisoners be served 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it' [and] under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983). "[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.' " *Walker*, 717 F.3d at 125 (quoting *Wilson v. Seiter*, 501 U.S. 294, 304, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) ).

The subjective element requirement, however, differs between the two amendments. Under the Eighth Amendment, a defendant " 'cannot be found liable ... for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Darnell*, 849 F.3d at 32 (quoting *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ). The mens rea requirement for pretrial detainees under the Fourteenth Amendment, on the other hand, is defined objectively. *Darnell*, 849 F.3d at 35. A pretrial detainee must prove "that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 29, 35.

*Hill*, 2017 WL 9249663, at *5.

## III. BACKGROUND

**\*2** The Court assumes familiarity with the factual background of this case, as set forth in its September 29, 2017 Decision. *Hill*, 2017 WL 9249663, at *1–3.

## IV. ADDITIONAL BRIEFING

### A. Pretrial Detainee or Convicted Prisoner

Hill explains in his memorandum of law that before his release from MCJ he did not receive a "hearing to determine whether he had violated his probation," and that "it was eventually determined that the Plaintiff was not even on probation, but that there was a clerical error regarding the end date of his probation," and he "was released from custody that same day." (Dkt. No. 107, at 6). He maintains that his status at MCJ was that of pretrial detainee and that he seeks to advance his conditions of confinement claims under the Fourteenth Amendment.

Whether to classify an individual detained for a suspected probation violation as a pretrial detainee or a convicted prisoner is an "unresolved and difficult question." *Harry v. Suarez*, No. 10-cv-6756, 2012 WL 2053533, at *2 n.3, 2012 U.S. Dist. LEXIS 79551 (S.D.N.Y. June 4, 2012); *see also Palmer v. Marion County*, 327 F.3d 588, 592–93 (7th Cir. 2003) ("[T]he confusion about the constitutional predicate for Palmer's claims arises from the uncertainty as to whether a detainee awaiting a hearing on a probation violation can be 'punished' under the Eighth Amendment.").

Given Hill's assertion that the alleged probation violation occurred after his term of probation expired, and thus was not actionable or based on a conviction or sentence, his claims are governed by the Fourteenth Amendment. "[T]he state does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." *Ingraham v. Wright*, 430 U.S. 651, 671 n.40, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). "The Eighth Amendment's protection does not apply 'until after conviction and sentence.' " *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (quoting *Graham v. Connor*, 490 U.S. 386, 392 n.6, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ); *see also Bell v. Wolfish*, 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ("[U]nder the Due Process Clause, a [pretrial] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."). Moreover, even if Hill's probation had not expired prior to the alleged violation, because he had not yet had a hearing or been found guilty of the violation, his status is more akin to that of a pretrial detainee. *See Chrisco v. Hayes*, No. 17-cv-72, 2017 WL 5404191, at *4, 2017 U.S. Dist. LEXIS 187935 (D. Colo. Nov. 14, 2017) (explaining that "pretrial detainees include incarcerated individuals awaiting trial on pending criminal charges and individuals awaiting adjudication on pending accusations that they have violated the terms of their probation or parole" but that the plaintiff "[i]nasmuch as he had been found guilty of a probation violation ... was no longer a pretrial detainee"); *Weishaar v. County of Napa*, No. 14-cv-1352, 2016 WL 7242122, at *7, 2016 U.S. Dist. LEXIS 173833 (N.D. Cal. Dec. 15, 2016) (viewing the plaintiff's claims as those of a detainee arising

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 63 of 111

Hill v. County of Montgomery, Not Reported in Fed. Supp. (2018)

2018 WL 2417839

the Fourteenth Amendment where "there was only an allegation that [the plaintiff] violated his terms of probation"); *Ard v. Rushing*, No. 13-cv-249, 2014 WL 12489978, at *2 n.3 (S.D. Miss. Feb. 10, 2014) (concluding that because the plaintiff "was in custody awaiting a probation revocation hearing ... she was essentially a pretrial detainee"); [5] *but see Ford v. Grand Traverse County*, No. 04-cv-682, 2005 WL 2572025, at *1 n.1 (W.D. Mich. Oct. 12, 2005) [6] ("The Eighth Amendment and not the Fourteenth Amendment is the appropriate reference because Plaintiff was imprisoned in connection with a convicted offense (i.e., she was held for a suspected probation violation) and was not a pretrial detainee.").

[5]     Lexis citation unavailable.

[6]     Lexis citation unavailable.

**B. Mootness—Declaratory and Injunctive Relief**

 **\*3**  In response to the Court's request for further briefing as to whether Hill's claims for injunctive relief are moot because he was released from MCJ prior to filing the Complaint, Hill "acknowledges that he likely does not have standing to bring a claim for injunctive relief given that he was not detained at the [MCJ] at the time the Complaint was filed." (Dkt. No. 107, at 16). His release prior to filing is likewise fatal to his claim for declaratory relief. [7]

[7]     During oral argument, Plaintiff's counsel maintained that Hill's release did not impact his standing to pursue a declaratory judgment claim. The Court invited further briefing on this issue but Plaintiff has not cited any case law to support this proposition.

"It is well established that '[t]he Case or Controversy Clause of Article III, Section 2 of the United States Constitution limits the subject matter jurisdiction of the federal courts such that the parties must continue to have a personal stake in the outcome of the lawsuit.' " *Tanasi v. New All. Bank*, 786 F.3d 195, 198 (2d Cir. 2015) (alteration in original) (quoting *United States v. Wiltshire*, 772 F.3d 976, 978 (2d Cir. 2014) ). "That is, '[w]hen the issues in dispute between the parties are no longer live, a case becomes moot.' " *Id.* (alteration in original) (quoting *Lillback ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 84 (2d Cir. 2005) ). "In this circuit, an inmate's transfer from a prison facility generally moots claims for *declaratory and injunctive* relief against officials of that facility." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (emphasis added).

Hill filed the Complaint on July 25, 2014. (Dkt. No. 1). He was released from MCJ in March 2014, several months prior to filing the Complaint. (Dkt. No. 1, ¶ 3). Consequently, the Court lacks Article III jurisdiction over Hill's claims for declaratory and injunctive relief, and they are dismissed as moot.

**V. PROPOSED AMENDED COMPLAINT**

The proposed amended complaint adds the following allegation: "From June 2014 until February 2015, Mr. Rogers was detained at the Montgomery County Jail. Mr. Rogers spent approximately four months as a pre-trial detainee and four months as a convicted detainee." (Dkt. No. 126-2, ¶ 4). It further alleges that Rogers "was approximately 195 pounds upon his admission to the jail. Mr. Rogers lost approximately 15 pounds during his eight-month admission to the jail. Mr. Rogers weight loss was also substantial given he is 6'1, and is an extremely thin man." (*Id.* ¶ 34).

The proposed amended complaint defines a primary class and two subclasses. The primary class consists of:

> All detainees who have been or will be placed into the custody of the Montgomery County Jail and were detained for at least two consecutive weeks. The class period commences on July 24, 2011, and extends to the date on which Montgomery County is enjoined from, or otherwise ceases, enforcing its policy, practice and custom of refusing to provide an appropriate amount of nutritional sustenance to all detainees admitted to the Montgomery County Jail. Specifically excluded from the class are Defendant and any and all of its respective affiliates, legal representatives, heirs, successors, employees or assignees.

(*Id.* ¶ 9). It defines the Pre-Trial Detainee Sub-Class as: "All members of the Primary Class but who were housed as a Pre-Trial Detainee, in that they had not yet been convicted of their charges." (*Id.*). It defines the Post-Trial Detainee Sub-Class

Case 9:17-cv-00244-BKS-TWD Document 58 Filed 08/07/19 Page 64 of 111

Hill v. County of Montgomery, Not Reported in Fed. Supp. (2018)

2018 WL 2417839

as: "All members of the Primary Class, but who were housed as a Post-Trial Detainee, in that they had been convicted of their charges, either by a plea or jury trial." (*Id.*).

## VI. MOTION TO INTERVENE

### A. Standard of Review

**\*4** Federal Rule of Civil Procedure 24 provides for intervention as of right or by permission of the court. Rule 24(a), which governs intervention as of right, provides:

On timely motion, the court must permit anyone to intervene who:

(1) is given an unconditional right to intervene by a federal statute; or

(2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a). Rule 24(b) governs permissive intervention and states: "On timely motion, the court may permit anyone to intervene who: (A) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b).

The Second Circuit has explained that before a court grants "intervention as of right or by permission, 'an applicant must (1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action.' " *Floyd v. City of New York*, 770 F.3d 1051, 1057 (2d Cir. 2014) (quoting *"R" Best Produce, Inc. v. Shulman-Rabin Mktg. Corp.*, 467 F.3d 238, 240 (2d Cir. 2006) ). The Circuit has "underscored that a '[f]ailure to satisfy any one of these four requirements is a sufficient ground to deny the application.' " *Id.* (quoting *"R" Best Produce*, 467 F.3d at 241). "While accepting 'as true the non-conclusory allegations of the motion[,]' courts applying Rule 24 'must be mindful that each intervention case is highly fact specific and tends to resist comparison to prior cases.' " *Kamdem-Ouaffo v. Pepsico, Inc.*, 314 F.R.D. 130, 134 (S.D.N.Y. 2016) (alteration in original) (quoting *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Ams.*, 262 F.R.D. 348, 352 (S.D.N.Y. 2009) ).

### B. Analysis of Factors

Rogers seeks intervention as of right under Rule 24(a) on the grounds that Hill cannot adequately represent: (1) the class claim for injunctive and declaratory relief; or (2) an Eighth Amendment conditions of confinement claim on behalf of convicted prisoners. (Dkt. No. 107, at 13). Further, Rogers notes that, because he was both a pretrial detainee and a convicted prisoner at MCJ, he can represent both classes. Defendants do not dispute that Rogers' motion to intervene is timely, nor do they contest that Rogers' interest—as a convicted prisoner—is not adequately protected by Hill's representation as Hill may only represent the interests of pretrial detainees. Accordingly, the Court turns to Rogers' purported interest and whether it would be impaired by the disposition of this case.

"[F]or an interest to be 'cognizable' under Rule 24, it must be 'direct, substantial, and legally protectable.' " *Floyd v. City of New York*, 770 F.3d 1051, 1060 (2d Cir. 2014) (quoting *Bridgeport Guardians, Inc. v. Delmonte*, 602 F.3d 469, 473 (2d Cir. 2010) ). Defendants argue that there is evidence that Rogers "admits he was not regularly eating what was given to him" and that he traded meals on multiple occasions while incarcerated at MCJ. (Dkt. No. 113-16, at 23–24). However, "[a]n interest that is otherwise sufficient under Rule 24(a)(2) does not become insufficient because the court deems the claim to be legally or factually weak." *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 130 (2d Cir. 2001). In this case, it is the adequacy of the meals Rogers received as an inmate at MCJ that he seeks to contest through this action. The Court therefore concludes that he has shown a cognizable interest in this action. Further, where, as here, "a proposed intervenor's interests are otherwise unrepresented in an action, the standard for intervention is no more burdensome than the standing requirement." *Brennan*, 260 F.3d at 131. For the same reason, Rogers has sufficiently shown that "the interest may be impaired by the disposition of the action." *New York News, Inc. v. Kheel*, 972 F.2d 482, 485 (2d Cir. 1992). Thus, Rogers has shown he is entitled to intervene as of right in this action.

### C. Futility

**\*5** Defendants argue that Rogers cannot intervene in this action because (1) he does not have standing to pursue a claim for injunctive or declaratory relief; and (2) he did not exhaust his administrative remedies. "Indeed, though not mentioned in the rule itself, 'futility is a proper basis for denying a motion to intervene.' " *Plumbers' & Pipefitters' Local No.*

Hill v. County of Montgomery, Not Reported in Fed. Supp. (2018)
Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 65 of 111

2018 WL 2417839

*562 Supplemental Plan & Tr. v. J.P. Morgan Acceptance Corp. I*, No. 08-cv-1713, 2011 WL 6182090, at *1, 2011 U.S. Dist. LEXIS 152695 (E.D.N.Y. Dec. 13, 2011) (quoting *In re Merrill Lynch & Co., Inc. Research Reports Secs. Litig.*, Nos. 02-1484, 02-8472, 2008 WL 2594819, *5, 2008 U.S. Dist. LEXIS 53923 (S.D.N.Y. Jun. 26, 2008) ); *see, e.g., United States v. Glens Falls Newspapers, Inc.*, 160 F.3d 853, 856 (2d Cir. 1998) (upholding district court's denial of motion to intervene on futility grounds). "In determining whether the proposed intervention is futile, the court must view the application 'on the tendered pleadings—that is, whether those pleadings allege a legally sufficient claim or defense and not whether the applicant is likely to prevail on the merits.' " *In re Merrill Lynch*, 2008 WL 2594819, at *5, 2008 U.S. Dist. LEXIS 53923 (quoting *Williams & Humbert, Ltd. v. W. & H. Trade Marks, Ltd.*, 840 F.2d 72, 75 (D.C. Cir. 1988) ).

**1. Standing—Injunctive and Declaratory Relief**

Rogers seeks to intervene as a class representative and named plaintiff in order to advance a claim for injunctive and declaratory relief. Although Rogers is no longer incarcerated at MCJ, he argues that because he was incarcerated at the time the Complaint was filed, the relation-back doctrine preserves his (otherwise moot) claim for injunctive relief. (Dkt. No. 107, at 16).

"Although the relation back doctrine is typically applied in the context of Rule 15, which governs a party's amended pleadings, some courts have interpreted Rule 24 to 'provide that an intervenor's claim may relate back to the case's original complaint *for purposes of the statute of limitations.*' " *ACORN v. County of Nassau*, 270 F.R.D. 123, 125–26 (E.D.N.Y. 2010) (emphasis added) (quoting *Chen-Oster v. Goldman, Sachs & Co.*, 251 F.Supp.3d 579, 590 (S.D.N.Y. 2017) ); *see also American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974) (holding that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action"). "[T]he usual case" requires "a live controversy at the time of the filing of the complaint and the class certification." *Amador v. Andrews*, 655 F.3d 89, 100 (2d Cir. 2011) (citing *Sosna v. Iowa*, 419 U.S. 393, 398, 402, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) ). However, as Rogers correctly notes, "the relation-back doctrine 'has unique application in the class action context, preserving the claims of some named plaintiff for class

certification purposes that might well be moot if asserted only as individual claims.' " (Dkt. No. 107, at 16 (quoting *Amador*, 655 F.3d at 100) ). Indeed, "[s]ome claims are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires." *County of Riverside v. McLaughlin*, 500 U.S. 44, 52, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 399, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) ). "In such cases, the 'relation back' doctrine is properly invoked to preserve the merits of the case for judicial resolution." *Id.*

The parties appear to agree that the claims in this case, which involve pretrial detainees or inmates housed for varying, and often short, periods of time, qualify as "inherently transitory." *See, e.g., Butler v. Suffolk County*, 289 F.R.D. 80, 91 (E.D.N.Y. 2013) (finding that the claims, which involved inmates who "were pretrial detainees or men serving sentences of one year or less" at the time the complaint was filed, were "inherently transitory," and concluding that the relation-back doctrine prevented those claims from being rendered moot when the inmates were released). This does not end the inquiry, however, because unlike *Butler* and *Amador*, where the named plaintiffs' claims became moot *after* the complaints were filed, *see id.* at 91; *Amador*, 655 F.3d at 101 ("All thirteen appellants were in DOCS custody when they commenced the action."), Hill was not in custody at the time he filed the Complaint and his claim for injunctive relief was moot at the time of filing, thus the Court lacked jurisdiction over that claim at the outset. Indeed, the Second Circuit has held that the "Rule 15(c) 'relation back' doctrine does not permit members of a putative class, who are not named parties, to intervene in the class action as named parties in order to revive claims that were dismissed from the class complaint for want of jurisdiction." *Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 111 (2d Cir. 2013). Although Rogers was at all times a member of the putative class, he was not a named plaintiff, thus, his "ability to join the suit is foreclosed by the 'long recognized' rule that 'if jurisdiction is lacking at the commencement of a suit, it cannot be aided by the intervention of a plaintiff with a sufficient claim.' " *Id.* (quoting *Disability Advocates, Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 160 (2d Cir. 2012) ). Thus, the relation back doctrine does not aid Rogers' claim and he must demonstrate standing to pursue a claim for declaratory and injunctive relief. [8] *See Town of Chester, N.Y. v. Laroe Estates, Inc.*, —— U.S. ——, 137 S.Ct. 1645, 1650–51, 198 L.Ed.2d 64 (2017) ("[A]n intervenor

Case 9:17-cv-00244-BKS-TWD   Document 58   Filed 08/07/19   Page 66 of 111

Hill v. County of Montgomery, Not Reported in Fed. Supp. (2018)

2018 WL 2417839

of right must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing."); *Los Angeles v. Lyons,* 461 U.S. 95, 105–106, and n.7, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (ruling that a plaintiff who has standing to seek damages must also demonstrate standing to pursue injunctive relief).

8    The cases Hill and Rogers cite in support of their contention that the viability of Rogers' claim should be determined based on the date the original complaint was filed, are inapposite or pre-date *IndyMac MBS, Inc.*[8] *See, e.g., In re Direxion Shares ETF Tr.,* 279 F.R.D. 221, 237 (S.D.N.Y. 2012); *In re Initial Pub. Offering Sec. Litig.,* Nos. 01-cv-9741, 01-cv-10899, 2004 WL 3015304, 2004 U.S. Dist. LEXIS 26000 (S.D.N.Y. Dec. 27, 2004); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.,* 894 F.Supp.2d 144, 156 (D. Mass. 2012); *In re Elscint, Ltd. Sec. Litig.,* 674 F.Supp. 374, 378 (D. Mass. 1987); *Rose v. Ark. Valley Envtl. & Util. Auth.,* 562 F.Supp. 1180, 1192 (W.D. Mo. 1983). The only case Hill and Rogers cite that was issued after *IndyMac MBS, Inc.* addresses the issue of whether a named plaintiff has standing to assert claims relating to products he did not purchase—a different issue than the one presented here, where a proposed intervenor seeks to revive claims that were moot ab initio. *Kacocha v. Nestle Purina Petcare Co.,* No. 15-cv-5489, 2016 WL 4367991, at *10, 2016 U.S. Dist. LEXIS 107097 (S.D.N.Y. Aug. 12, 2016).

*6  "As the Second Circuit has made clear, an intervenor's standing is determined as of the date the motion to intervene was filed." *Chen-Oster v. Goldman, Sachs & Co.,* 251 F.Supp.3d 579, 589 (S.D.N.Y. 2017) (citing *Comer v. Cisneros,* 37 F.3d 775, 801 (2d Cir. 1994) ("[T]he intervenors certainly had standing at the time they filed their motions to intervene."); *Robidoux v. Celani,* 987 F.2d 931, 938 (2d Cir. 1993) ("[T]he original plaintiff at the time the complaint was filed, and each intervenor at the time of her motion to intervene, was suffering ... injury capable of being redressed by declaratory or injunctive relief.") ). Because Rogers was no longer incarcerated at MCJ as of November 21, 2017, the date he moved to intervene, any claim for injunctive or declaratory relief is moot and he lacks standing to pursue these claims. *See Chen-Oster,* 251 F.Supp.3d at 590 (rejecting the plaintiffs' argument in putative class action that under the relation-back doctrine the intervenors' "standing should be evaluated at the time of the filing of the original complaint," explaining that relation-back doctrine did "not apply to standing" and measuring "each intervenor's standing from the date of

her motion to intervene"). Accordingly, Rogers' motion to intervene to seek declaratory and injunctive relief is denied.

**2. PLRA Exhaustion of Administrative Remedies**

Rogers may, of course, bring a conditions of confinement claim for damages. *Salahuddin,* 467 F.3d at 272 (observing that although the plaintiff's transfer from prison facility moots his declaratory and injunctive relief claims against officials of that facility, his "right to seek damages is not affected"). Defendants argue that the motion to intervene and amend should, however, be denied under the Prison Litigation Reform Act of 1995 ("PLRA") (codified as amended at 42 U.S.C. § 1997e) because he failed to exhaust his administrative remedies. (Dkt. No. 113-16, at 14–15). Rogers argues that, because he was no longer incarcerated at the time he moved to intervene, he was not subject to the PLRA's exhaustion requirements.

The PLRA "requires prisoners to exhaust prison grievance procedures before filing suit." *Jones v. Bock,* 549 U.S. 199, 202, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (citing 28 U.S.C. § 1915A; 42 U.S.C. § 1997e(a) ). The PLRA's exhaustion provision provides: "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Thus, the PLRA "*requires* exhaustion of available administrative remedies *before* inmate-plaintiffs may bring their federal claims to court *at all.*" *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir. 2001) (quoting *Nussle v. Willette,* 224 F.3d 95, 99 (2d Cir. 2000), *rev'd sub nom. Porter v. Nussle,* 532 U.S. 1065, 121 S.Ct. 2213, 150 L.Ed.2d 207 (2002) ).

Rogers was held at MCJ from June 2014 to February 2015. Thus he was a prisoner at MCJ on July 25, 2014, the date this action was filed, but was not a prisoner on November 21, 2017, the date Hill filed the motion to amend the complaint and he filed the motion to intervene. It is settled that "litigants ... who file prison condition actions after release from confinement are no longer 'prisoners' for purposes of § 1997e(a) and, therefore, need not satisfy the exhaustion requirements." *Greig v. Goord,* 169 F.3d 165, 167 (2d Cir. 1999). The issue is, therefore, whether the relevant date for PLRA purposes is the date Plaintiff filed the Complaint or the date Rogers sought to intervene as a plaintiff in this action. The Court concludes that it is the date Rogers becomes a

Hill v. County of Montgomery, Not Reported in Fed. Supp. (2018)

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 67 of 111

2018 WL 2417839

party to this action that dictates when he filed suit for PLRA purposes. *See Zimmerman v. Schaeffer*, 654 F.Supp.2d 226, 258 (M.D. Pa. 2009) (finding that the relevant date was the date the amended complaint was filed adding Sassaman as a party and holding that, because "at the time he joined the lawsuit, Sassaman was no longer a prisoner subject to the PLRA," he was "not subject to the exhaustion requirement of the PLRA"); *see also Johannes v. Washington*, No. 14-cv-11691, 2016 WL 1253266, at *13, 2016 U.S. Dist. LEXIS 43165 (E.D. Mich. Mar. 31, 2016) ("Defendants have not cited any case applying the doctrine to hold that plaintiffs *added* to a lawsuit must exhaust their administrative remedies prior to the filing of the original complaint."); *Anderson v. Shelby Cty. Gov't*, No. 03-cv-2650, 2009 WL 3241676, at *5 n.5, 2009 U.S. Dist. LEXIS 90452 (W.D. Tenn. Sept. 30, 2009) ("All other plaintiffs, including plaintiff Butler, were former inmates *at the time they became parties to the litigation*, and thus the PLRA's exhaustion requirement does not apply to them."); *Rahim v. Sheahan*, No. 99-cv-0395, 2001 WL 1263493, at *6, 2001 U.S. Dist. LEXIS 17214 (N.D. Ill. Oct. 19, 2001) ("Since [certain plaintiffs] were not 'prisoners' at the time they joined the Fourth Amended Complaint, the exhaustion requirement does not apply to them."). Accordingly, Rogers' motion to intervene is granted to the extent he seeks to assert a conditions of confinement claim for damages. [9]

[9]    In any event, "failure to exhaust is an affirmative defense under the PLRA," therefore "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones*, 549 U.S. at 216, 127 S.Ct. 910.

## VII. MOTION TO AMEND

### A. Standard of Review

**\*7** Rule 15 governs amendments and instructs that "[t]he court should freely give leave when justice so requires." *Fed. R. Civ. P. 15(a)(2)*. A court may, however, deny "[l]eave ... if the amendment would be futile." *Krys v. Pigott*, 749 F.3d 117, 134 (2d Cir. 2014). "A proposed amendment to a complaint is futile when 'it could not withstand a motion to dismiss.' " *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 164–65 (2d Cir. 2015) (quoting *Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ). "In assessing whether the proposed complaint states a claim, [courts must] consider 'the proposed amendment[s] ... along with the remainder of the complaint,' accept as true all non-conclusory factual allegations therein, and draw all reasonable inferences in plaintiff's favor to determine whether the allegations plausibly give rise to

an entitlement to relief." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012) (second alteration in original) (citation omitted) (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 323 n.3 (2d Cir. 2010) ).

### B. Analysis

For the reasons discussed above, the motion to amend is denied to the extent it contains a claim for declaratory and injunctive relief. It is, however, granted for purposes of: (1) adding Rogers as a Plaintiff with a Fourteenth Amendment and Eighth Amendment conditions of confinement claim, reflecting his status as both a pretrial detainee and convicted prisoner at MCJ; and (2) clarifying Hill's status as a pretrial detainee; and (3) clarifying that Plaintiffs seek certification under *Fed. R. Civ. P. 23(b)(3) and 23(c)(4)*. [10] Plaintiffs shall revise the proposed amended complaint accordingly and file it within 14 days of the date of this order.

[10]    While Hill need not establish *Rule 23(b)(3)* predominance in the case as a whole, he must establish *Rule 23(b)(3)* predominance with respect to liability. *See Augustin v. Jablonsky (In re Nassau Cnty. Strip Search Cases)*, 461 F.3d 219, 227 (2d Cir. 2006) ("[W]e hold that a court may employ[ *Rule 23(c)(4)* ] to certify a class as to liability regardless of whether the claim as a whole satisfies *Rule 23(b)(3)*'s predominance requirement."). Hill has not addressed this issue; Defendants assert that Hill has conceded he cannot satisfy *Rule 23(b)(3)*. (Dkt. No. 125 at 3.) To the extent Plaintiffs seek certification under *Rules 23(b)(3) and 23(c)(4)*, they must address this issue.

Hill has indicated that he may seek to intervene a "putative class member who is presently incarcerated and who also exhausted ... administrative remedies if given a modest period of time." (Dkt. No. 126, at 4.) Defendants object to any further delay in this action, which has been pending for nearly 4 years. (Dkt. No. 127, at 2.) Indeed, the Court shares Defendants' concern regarding the "[e]xtensive time and expense" that has gone into the litigation of this action. (*Id.*) However, as the intervention of a presently incarcerated putative class member as a named plaintiff may enable Hill to pursue a claim for declaratory and injunctive relief, the Court will provide Hill a short period of time, until June 12, 2018, to file a motion to amend and intervene.

## VIII. CONCLUSION

For these reasons, it is

Case 9:17-cv-00244-BKS-TWD Document 58 Filed 08/07/19 Page 68 of 111

Hill v. County of Montgomery, Not Reported in Fed. Supp. (2018)

2018 WL 2417839

**ORDERED** that the claim for injunctive and declaratory relief is **DISMISSED without prejudice**; and it is further

**ORDERED** that Hill's motion for leave to file an amended complaint and Rogers' motion to intervene as a named plaintiff (Dkt. No. 106) are **GRANTED** for purposes of: (1) adding Rogers as a Plaintiff with a Fourteenth Amendment and Eighth Amendment conditions of confinement damages claim, reflecting his status as both a pretrial detainee and convicted prisoner at MCJ; and (2) clarifying Hill's status as a pretrial detainee; and (3) clarifying that Plaintiffs seek certification under Fed. R. Civ. P. 23(b)(3) and 23(c)(4); and it is further

**\*8 ORDERED** that Hill's motion for leave to file an amended complaint and Rogers' motion to intervene (Dkt. No. 106) are otherwise **DENIED**; and it is further

**ORDERED** that Hill may, by June 12, 2018, file: either (1) an amended complaint, as discussed *supra*; or (2) a second motion to amend and to intervene for purposes of adding

a plaintiff with standing to pursue a claim for injunctive and declaratory relief. If such a motion is filed, the Court will consider it, along with any response by Defendants, which must be filed by June 19, 2018, together with the pending motion for class certification. If Hill elects not to file such a motion, the Court will consider the motion for class certification based on the amended complaint and any further briefing; and it is further

**ORDERED** that if Plaintiffs seek certification under Fed. R. Civ. P. 23(b)(3) and 23(c)(4), Plaintiffs must file a letter brief addressing the requirements in Rule 23(b)(3), by June 19, 2018, and Defendants may file a letter brief in response by June 26, 2018.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 2417839

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 69 of 111

Jackson v. Sullivan County, Not Reported in Fed. Supp. (2018)
2018 WL 1582506

2018 WL 1582506
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Russell JACKSON, Plaintiff,
v.
SULLIVAN COUNTY, Defendant.

16 Civ. 3673 (JCM)
|
Signed 03/27/2018

**Attorneys and Law Firms**

Russell Jackson, Hurleyville, NY, pro se.

Michael Davidoff, Drew, Davidoff & Edwards Law Offices, LLP, Monticello, NY, for Defendant.

### OPINION AND ORDER

JUDITH C. McCARTHY, United States Magistrate Judge

*\*1* Plaintiff Russell Jackson, proceeding *pro se*, commenced this action pursuant to 42 U.S.C. § 1983 alleging that while detained at the Sullivan County Jail he was denied adequate prison conditions and medical care in violation of his constitutional rights. (Docket No. 2 ("Complaint")). The Honorable Nelson S. Román *sua sponte* dismissed the case against the Sullivan County Jail and directed the Clerk of the Court "to amend the caption of this action to replace the Sullivan County Jail with Sullivan County." (Docket No. 6 at 2). On March 10, 2017, Defendant Sullivan County moved pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings dismissing all claims contained in the Complaint.[1] (Docket Nos. 24–30). Plaintiff filed no opposition.[2] For the following reasons, Defendant's motion to dismiss is granted in its entirety.

---

[1] This action is before the undersigned for all purposes on consent of the parties, pursuant to 28 U.S.C. § 636(c). (Docket No. 17).

[2] Plaintiff's opposition was due on February 28, 2017. The Court scheduled a telephone conference for March 31, 2017, in part, to ascertain whether Plaintiff intended to file a written response and to allow Plaintiff an opportunity to orally oppose Defendant's motion. Plaintiff did not appear for the telephone conference,

nor did he request an extension of time to file any opposition. Thus, the Court deemed the motion fully submitted without opposition.

### I. BACKGROUND

For purposes of resolving the instant motion, the Court accepts as true the facts set forth in Plaintiff's Complaint. Based on a liberal reading of the Complaint, Plaintiff seems to allege that, in March 2016, he suffered blisters, sores, headaches, and itching as a result of "mold infested showers" at the Sullivan County Jail. (Docket No. 2 at §§ II, III). These symptoms affected his sleep, mood, temperament and comfort. (*Id.* at § II(D)). Plaintiff acknowledges that he spoke to a doctor and was examined by a nurse during "the first time" that he "went to medical." (*Id.*). He "received antibiotic ointment[,] A&D ointment and lotion." (*Id.* at § III). Plaintiff states that he filed a grievance in the jail, that he "went through all steps and process of the grievance," that his "last step was to appeal the decision," and that he does "not agree with there [sic] remedy." (*Id.* at § IV(E)(3)). Plaintiff also maintains that he was treated "unfair[ly]." (*Id.* at § V). He seeks payment as compensation for his "distress" and "suffering." (*Id.*)

### II. LEGAL STANDARD

Under Rule 12(c) of the Federal Rules of Civil Procedure, "a party may move for judgment on the pleadings."[3] Fed. R. Civ. P. 12(c). A court deciding a motion to dismiss must first accept all of the factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party.[4] *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007))); *LaFaro v. N.Y. Cardiothoracic Grp., PLLC,* 570 F.3d 471, 475 (2d Cir. 2009) ("On a motion to dismiss or for judgment on the pleadings we must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." (internal quotation marks omitted)). The facts alleged must be more than legal conclusions. *Iqbal,* 556 U.S. at 678–79 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Accordingly, the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action[.]" *Twombly,* 550 U.S. at 555.

---

[3] In support of its motion, Defendant submits several affidavits, (Docket Nos. 25–29), which contain

Case 9:17-cv-00244-BKS-TWD   Document 58   Filed 08/07/19   Page 70 of 111

Jackson v. Sullivan County, Not Reported in Fed. Supp. (2018)

2018 WL 1582506

information outside of the pleadings, and asks the Court to convert its motion into a motion for summary judgment if necessary, (Docket No. 35 at 2–3). In addition, Defendant served a notice pursuant to Local Civil Rule 12.1 on the Plaintiff, alerting Plaintiff of its request to treat the motion as a motion for summary judgment and further warning Plaintiff that failure to respond could result in dismissal of the case without a trial. (Docket No. 30). Despite Defendant's warning, Plaintiff did not file a response. Nevertheless, it is unnecessary to convert the motion to dismiss into a motion for summary judgment because the Complaint can be dismissed on the pleadings. Thus, the Court will not consider Defendant's affidavits.

4    Although Defendant moved to dismiss pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, "the Court applies the same standard applicable to a Rule 12(b)(6) motion to dismiss." Rodriguez v. Warden, Metro. Corr. Facility, No. 13 Civ. 3643 (PAC)(SN), 2015 WL 857817, at *6 (S.D.N.Y. Feb. 27, 2015) (citing Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010)).

**\*2** The court must then determine whether the allegations, accepted as true, "plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678 (citing Twombly, 550 U.S. at 556). Determining whether a complaint states a plausible claim to relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. " '[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,' a complaint is insufficient under Fed. R. Civ. P. 8(a) because it has merely 'alleged' but not 'show[n]' that the pleader is entitled to relief.' " 9 Recordings Ltd. v. Sony Music Entm't, 165 F. Supp. 3d 156, 160 (S.D.N.Y. 2016) (quoting Iqbal, 556 U.S. at 679). If a plaintiff has "not nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." Twombly, 550 U.S. at 570.

Pro se complaints should be liberally construed and "held to less stringent standards than those drafted by lawyers, even following Twombly and Iqbal." James v. Correct Care Solutions, No. 13-cv-0019 (NSR), 2013 WL 5730176, at *2 (S.D.N.Y. Oct. 21, 2013) (quoting Thomas v. Westchester Cty., No. 12-CV-6718 (CS), 2013 WL 3357171, at *2 (S.D.N.Y. July 3, 2013)); [5] see also Erickson v. Pardus, 551 U.S. 89, 94 (2007); Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (noting that pro se complaints require "special solicitude" and

therefore the court should interpret the complaint to raise the strongest claims). "However, even pro se plaintiffs asserting civil rights claims cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a 'right to relief above the speculative level.' " Jackson v. N.Y.S. Dep't of Labor, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (quoting Twombly, 550 U.S. at 555).

5    In accordance with Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009) and Local Civil Rule 7.2 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, a copy of this case and any others cited herein, only available by electronic database, accompany this Opinion and Order and shall be simultaneously delivered to Plaintiff, who is proceeding pro se.

The Court may consider the allegations set forth in the "complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). In the instant case, Plaintiff refers to a grievance he filed as part of the jail's internal grievance procedure. Although he did not include the grievance as an exhibit to his Complaint, Plaintiff filed a copy with the Court on December 13, 2016. (Docket No. 23). It is clear that Plaintiff was aware of Defendant's response because he signed the decision to deny his grievance and indicated that he did not accept it. (Id.). Accordingly, this Court "will consider the grievance as incorporated by reference into Plaintiff's complaint in deciding the motion to dismiss." James, 2013 WL 5730176, at *3; Whittle v. Ulloa, No. 15 CV 8875 (VB), 2016 WL 7351895, at *1 n.3 (S.D.N.Y. Dec. 19, 2016); see also Ellison v. Evans, No. 13 Civ. 885(KBF), 2013 WL 5863545, at *1 n.5 (S.D.N.Y. Oct. 31, 2013), aff'd sub nom. Fuller v. Evans, 586 Fed.Appx. 825 (2d Cir. 2014). The Court, however, will not consider other materials presented outside of the pleadings. Supra note 3; see also Chambers v. Time Warner, Inc., 282 F.3d 147, 154 (2d Cir. 2002); Rodriguez, 2015 WL 857817, at *7.

## III. DISCUSSION

### A. Failure to Exhaust Administrative Remedies

Defendant argues that Plaintiff's Complaint must be dismissed because Plaintiff failed to exhaust his administrative remedies, as required under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). (Docket No. 35 at 11). "Failure to exhaust administrative remedies is an affirmative defense under the PLRA, not

Jackson v. Sullivan County, Not Reported in Fed. Supp. (2018)

2018 WL 1582506

a pleading requirement." *Williams v. Correction Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). The defendant bears the burden of proof and inmate plaintiffs "need not plead exhaustion with particularity." *McCoy v. Goord*, 255 F. Supp. 2d 233, 248 (S.D.N.Y. 2003). "The Court may only grant a motion to dismiss based on failure to exhaust if non-exhaustion is clear from the face of the complaint." *Rodriguez*, 2015 WL 857817, at *3 (citing *Lewis v. City of New York*, No. 12 CV 5850 (CM), 2013 WL 3833001, at *3 (S.D.N.Y. July 23, 2013)).

 **\*3** Here, Plaintiff's failure to exhaust is not clear from the face of the Complaint. Rather, Plaintiff states in his Complaint that he filed a grievance and "went through all the steps." (Docket No. 2 at § IV(D), (E)(3)). In addition, Plaintiff provided the Court with a copy of the Informal Grievance Form, dated April 29, 2016, which appears to indicate that the responding officer agreed to "notify DPW and medical about the situation." [6] (Docket No. 23). Therefore, Defendant's motion for judgment on the pleadings for failure to exhaust is denied without prejudice.

[6]    Defendant contends that Plaintiff never filed a "formal" grievance and, thus, he has not exhausted his administrative remedies. (*See* Docket No. 26 at ¶ 5). Because this argument is based on information outside of the pleadings, the Court will not consider it at this time. *See supra* note 3.

**B. Sufficiency of the Complaint**

Plaintiff commenced this action using a "Prisoner Complaint" form, which indicates that he seeks relief pursuant to 42 U.S.C. § 1983. (Docket No. 2 at 1). Plaintiff's Complaint does not name any individuals as defendants; rather, Sullivan County is the only defendant in this action. (*See* Docket No. 2 at 1 (naming Sullivan County Jail as the sole defendant); Docket No. 6 at 3 (substituting Sullivan County for Sullivan County Jail)). Municipalities are not liable under 42 U.S.C. § 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). Thus, "[t]o prevail against a municipality on a § 1983 claim, a plaintiff must demonstrate both an injury to a constitutionally protected right and that the injury was caused by a policy or custom of the municipality or by a municipal official responsible for establishing final policy." *Hartline v. Gallo*, 546 F.3d 95, 103 (2d Cir. 2008) (internal quotation marks omitted). As set forth below, Plaintiff has failed to adequately allege (1) a violation of a constitutionally-protected right and

(2) the existence of a municipal policy or custom causing such a violation.

**1. Deprivation of a Constitutional Right**

A prerequisite to municipal liability is "an underlying constitutional violation by a state actor." *De Michele v. City of New York*, No. 09 Civ. 9334(PGG), 2012 WL 4354763, at *19 (S.D.N.Y. Sept. 24, 2012). Without this, the Court cannot find municipal liability. *Claudio v. Sawyer*, 675 F. Supp. 2d 403, 409–10 (S.D.N.Y. 2009) (citing *Segal v. New York City*, 459 F.3d 207, 219 (2d Cir. 2006)). Here, Plaintiff's claim read broadly is based on the condition of the showers at the Sullivan County Jail and the medical treatment he received. Plaintiff alleges that he suffered blisters, headaches and itching as a result of mold in the showers and that the jail gave him antibiotic ointment, A&D ointment and lotion. (Docket No. 2 at §§ II, III). Plaintiff does not cite any constitutional provision on which his claim is based.

The applicable legal standard for evaluating Plaintiff's claim depends, in part, on whether Plaintiff's confinement in the Sullivan County Jail was as a pretrial detainee or a convicted prisoner. "A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight[h] Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). On the face of the Complaint, it is unclear whether Plaintiff's confinement was as a pretrial detainee or a convicted prisoner. [7] The Court therefore assumes for purposes of this motion that Plaintiff was a pretrial detainee during the events giving rise to his claims, as a pretrial detainee's rights are greater than a convicted prisoner's since "[p]retrial detainees have not been convicted of a crime and thus 'may not be punished in any manner—neither cruelly and unusually nor otherwise.'" *Darnell*, 849 F.3d at 29 (quoting *Iqbal v. Hasty*, 490 F.3d 143, 168 (2d Cir. 2007)).

[7]    Defendant submitted an affidavit signed by the administrator for the Sullivan County Jail stating that Plaintiff "was incarcerated as a result of being charged with a parole violation." (Docket No. 26 at ¶ 2). As far as this Court is aware, the Second Circuit has not directly addressed whether a parolee detained on an alleged parole violation should be treated as a pretrial detainee or a convicted prisoner for purposes of a Section 1983 condition-of-confinement claim. Regardless, the Court cannot consider evidence outside the pleadings,

Case 9:17-cv-00244-BKS-TWD   Document 58   Filed 08/07/19   Page 72 of 111

Jackson v. Sullivan County, Not Reported in Fed. Supp. (2018)

2018 WL 1582506

including the affidavits submitted by Defendant, for purposes of this motion. *See supra* note 3.

**\*4** "A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." *Id.* This requires a detainee to satisfy a two-prong test. First, the detainee must show "that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process." *Id.* Second, the detainee must show "that the officer acted with at least deliberate indifference to the challenged conditions." *Id.*

To establish an objective deprivation under the first prong, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Id.* at 30 (quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013)). "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.' " *Id.* (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)).

To establish deliberate indifference under the second prong, "the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. Importantly, "[a] detainee must prove that an official acted intentionally or recklessly, and not merely negligently." *Id.* at 36. Below, the Court applies the two-prong test to Plaintiff's complaints regarding (i) the shower conditions and (ii) the medical treatment he received.

**i. Shower Conditions**

The Court first analyzes whether Plaintiff's complaints regarding shower conditions adequately allege an objective deprivation of Plaintiff's due process rights, as required under the first prong of the two-prong test. Although exposure to unsanitary conditions "can rise to the level of an objective deprivation," *Darnell*, 849 F.3d at 30, "there are many exposures of inmates to unsanitary conditions that do not amount to a constitutional violation." *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015). The Second Circuit has explained that "unsanitary conditions of confinement must be assessed according to two components, severity and

duration, on a case-by-case basis." *Darnell*, 849 F.3d at 30 (citing *Willey*, 801 F.3d at 66–68). Here, the sole allegation in Plaintiff's complaint regarding unsanitary conditions is that the showers were "mold infested." (Docket No. 2 at § III). Plaintiff's Complaint alleges no facts whatsoever regarding the severity or duration of his exposure to the allegedly unsanitary conditions. The presence of mold in a shower for a limited duration, without more, does not violate contemporary standards of decency or establish an objectively unreasonable risk of serious damage to future health or safety. Therefore, Plaintiff's complaints regarding shower conditions do not satisfy the first prong.

Moreover, assuming *arguendo* that Plaintiff has adequately alleged an objective deprivation of his due process rights as a result of the shower conditions, he has failed to adequately allege that an official acted with deliberate indifference regarding the challenged conditions, as required under the second prong of the two-prong test. Plaintiff's Complaint contains no allegation suggesting that officials intentionally subjected Plaintiff to mold in the showers. Nor does the Complaint contain any allegation suggesting that officials recklessly failed to act with reasonable care to mitigate the risk that the condition posed to Plaintiff even though they knew, or should have known, that the condition posed an excessive risk to his health or safety.

**\*5** Furthermore, the grievance form that Plaintiff allegedly filed is dated April 29, 2016. (*See* Docket No. 23). The form states that the responding officer "will notify DPW [the Department of Public Works] and medical about the situation." (*Id.*) The Court takes judicial notice that April 29, 2016 was a Friday and that, according to public records, Plaintiff was transferred to Collins Correctional Facility on May 2, 2016, the following Monday. [8] The fact that Plaintiff left the Sullivan County Jail the next business day after he allegedly filed his grievance undercuts any claim that jail officials acted with deliberate indifference regarding the challenged conditions, especially considering the relatively low urgency of mold in the showers.

[8]    The Court obtained Plaintiff's transfer date from the inmate lookup service on the official website of the New York State Department of Corrections and Community Supervision ("DOCCS") using Plaintiff's Identification Number, 13A1674. "Courts in this district have taken judicial notice of information obtained from online inmate tracking services." *Narvaez v. City of New York*, No. 16 Civ. 1980 (GBD), 2017 WL 1535386, at *5 n.6

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 73 of 111

Jackson v. Sullivan County, Not Reported in Fed. Supp. (2018)

2018 WL 1582506

(S.D.N.Y. Apr. 17, 2017) (quoting *Tavares v. New York City Health & Hosps. Corp.*, No. 13-cv-3148 (PKC) (MHD), 2015 WL 158863, at *3 (S.D.N.Y. Jan. 13, 2015)). The information from the DOCCS website is consistent with the assertion in the jail administrator's affidavit—on which the Court does not rely for purposes of this motion—that Plaintiff remained an inmate at the Sullivan County Jail "until May 2, 2016." (Docket No. 26 at ¶ 2).

**ii. Medical Treatment**

Similarly, Plaintiff's complaints regarding the medical treatment he received fail to satisfy either prong of the two-prong test. Under the first prong, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006); *Byrd v. City of New York*, No. 17 Civ. 2166 (AJP), 2018 WL 259316, at *7 (S.D.N.Y. Jan. 2, 2018); *see also Isaac v. City of New York*, No. 17 Civ. 1021 (PGG), 2018 WL 1322196, at *4 (S.D.N.Y. Mar. 13, 2018) (finding that the plaintiff had "not set forth sufficient facts to demonstrate that the alleged delay in care was 'sufficiently serious' ").

Here, Plaintiff has failed to allege facts demonstrating that he was denied adequate medical care. Rather, as noted above, Plaintiff alleges that he "went to medical," was examined by a nurse, spoke to a doctor and "received antibiotic ointment[,] A&D ointment and lotion." (Docket No. 2 at §§ II(D), III); *see Salahuddin*, 467 F.3d at 279 (" '[P]rison officials who act reasonably [in response to an inmate-health risk] cannot be found liable....' ") (alterations in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 845 (1994)). In any event, "[p]rison officials and medical officers have wide discretion in treating prisoners...." *McNulty v. Yaneka*, No. 11-CV-8320 (ER), 2013 WL 684448, at *7 (S.D.N.Y. Feb. 25, 2013). "Accordingly, the determinations made by medical providers concerning the treatment of patients are given a presumption of correctness." *Id.* (internal quotation marks omitted).

Moreover, even if Plaintiff had alleged that he was denied adequate medical care, Plaintiff has failed to allege facts demonstrating that the deprivation was sufficiently serious, because there was no indication that a "condition of urgency" existed. *See Hill*, 657 F.3d at 122 ("The objective component requires that 'the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists.' " (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996))). "A skin rash is generally insufficient to meet the objective requirement of a sufficiently grave and serious

condition giving rise to a deliberate indifference claim." *Purdie v. City of New York*, No. 10 Civ. 5802(PKC), 2011 WL 1044133, at *3 (S.D.N.Y. Mar. 15, 2011) (collecting cases). Consequently, Plaintiff's complaints regarding the medical care he received do not satisfy the first prong.

**\*6** Furthermore, Plaintiff's allegations fail to satisfy the second prong because the Complaint contains no allegations suggesting that the medical providers at the jail acted with deliberate indifference to Plaintiff's medical needs. The fact that Plaintiff may be disappointed in the level of treatment he received does not constitute deliberate indifference. *See Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."). Indeed, "something more than negligence is needed to elevate a claim of medical misconduct to a constitutional tort." *Davis v. McCready*, No. 14-cv-6405-GHW, 2017 WL 4803918, at *9 (S.D.N.Y. Oct. 23, 2017) (citing *Darnell*, 849 F.3d at 36). Here, Plaintiff has not even alleged facts demonstrating that the medical providers at the jail acted negligently. *Cf. Sankara v. City of New York*, No. 15-CV-6928 (VSB), 2018 WL 1033236, at *5 (S.D.N.Y. Feb. 22, 2018) ("Plaintiff has, at most, alleged that [the defendant] was negligent, but negligence alone is insufficient to make out a deliberate indifference claim."). Plaintiff's complaints regarding the medical care he received therefore fail to satisfy the second prong. As a result, Plaintiff has failed to adequately allege a deprivation of his constitutional rights.

**2. Official Custom or Policy**

Even if Plaintiff had adequately alleged a deprivation of his constitutional rights, dismissal would be appropriate because Plaintiff has failed to allege an official custom or policy, as required to state a claim against Defendant. To hold a municipality liable for its employee's constitutional violation, a plaintiff must show that "an official policy or custom" was "the cause of the deprivation." *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985). Furthermore, a plaintiff must "show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer" and must specifically demonstrate "a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights." *Id.* (internal quotation marks omitted); *see also Thomas v. Roach*, 165 F.3d 137, 145 (2d Cir. 1999) ("[Municipal] liability cannot result from a theory of respondeat superior.").

2018 WL 1582506

A plaintiff may satisfy the "policy or custom" element "by alleging the existence of (1) a formal policy; (2) actions taken or decisions made by final municipal policymakers that caused the violation of plaintiff's rights; (3) a practice so persistent and widespread that it constitutes a 'custom or usage' and implies the constructive knowledge of policymakers; or (4) a failure to properly train or supervise municipal employees that amounts to 'deliberate indifference to the rights of those with whom municipal employees will come into contact.' " *Johnson v. City of New York*, No. 1:15-CV-8195-GHW, 2017 WL 2312924, at *19 (S.D.N.Y. May 26, 2017) (citations omitted); *see also De Michele*, 2012 WL 4354763, at *20. Notably, "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) (internal quotation marks omitted). Therefore, a municipality is only liable for a single instance of unconstitutional conduct when that instance was carried out in furtherance of a "municipality-wide custom, practice, or procedure." *De Michele*, 2012 WL 4354763, at *20. Here, Plaintiff has failed to allege any facts from which the Court could conclude that Defendant had a policy, custom or practice that gave rise to an alleged violation of Plaintiff's constitutional rights. Accordingly, the Court will dismiss Plaintiff's Section 1983 claim.

## IV. LEAVE TO AMEND

The Second Circuit encourages district courts to allow a *pro se* plaintiff at least one opportunity to amend his complaint before dismissing his claims with prejudice "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). Here, Plaintiff has neither requested leave to amend nor opposed Defendant's motion to dismiss. Moreover, based on the deficiencies identified above, the Court is doubtful that Plaintiff can allege facts sufficient to state a valid claim. Nevertheless, because Plaintiff is *pro se* and the Court cannot rule out the possibility that, with further factual enhancement of his claims, Plaintiff could allege constitutional violations regarding his conditions of confinement and his medical treatment, the Court grants Plaintiff leave to file an amended complaint to correct the deficiencies identified herein. Any amended complaint must be filed by April 30, 2018. Absent leave of the Court, failure to file an amended complaint by that date will result in dismissal with prejudice.

## V. CONCLUSION

*7 For the foregoing reasons, Defendant's motion to dismiss is granted and Plaintiff's Complaint is dismissed with leave to file an amended complaint by April 30, 2018. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v United States*, 369 U.S. 438, 444–45 (1962). The Clerk of Court is respectfully requested to terminate the pending motion (Docket No. 24), mail a copy of this Opinion and Order to the *pro se* Plaintiff at his address of record, and close the case.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1582506

---

    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 75 of 111

Horace v. Gibbs, Not Reported in Fed. Supp. (2017)

2017 WL 4344435

2017 WL 4344435
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

John L. HORACE, Plaintiff,

v.

Kevin GIBBS, Field Parole Officer, and Dawn
Anderson, Senior Parole Officer, Defendants.

14-CV-655S
|
Signed 09/29/2017

**Attorneys and Law Firms**

John L. Horace, Albion, NY, pro se.

Kim S. Murphy, NYS Attorney General's Office, Buffalo, NY, for Defendants.

**DECISION AND ORDER**

WILLIAM M. SKRETNY, United States District Judge

**I. INTRODUCTION**

*1 In this action, *pro se* Plaintiff John L. Horace alleges under 42 U.S.C. § 1983 that Defendants Kevin Gibbs and Dawn Anderson, two state parole officers employed by the New York State Department of Corrections and Community Supervision, violated his Eighth and Fourteenth Amendment rights when they used excessive force and were deliberately indifferent to his medical needs while arresting him for a parole violation on December 3, 2013.

Now before this Court is Defendants' motion to dismiss Horace's claims. (Docket No. 27.) For the reasons that follow, Defendants' motion is granted in part and denied in part.

**II. BACKGOUND**

The following facts, drawn from Horace's complaint, are assumed true for purposes of assessing Defendants' motion to dismiss. *See* ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

At 12:30 p. m. on December 3, 2013, Defendants and other officers arrived at Horace's house to arrest him for violating the conditions of his parole and to search his residence. (Complaint ("Compl."), Docket No. 1, Section VI ¶ 14.) Upon entering the house, Gibbs informed Horace that he violated parole by driving a car without Gibb's permission. (Compl. Section VI ¶ 14.) Gibbs then handcuffed Horace behind his back "so tightly there w[as] hardly any space between [P]laintiff's wrist and the handcuffs" and ordered him to sit in a chair. (Compl. Section VI ¶ 14.)

At 12:40 p.m., Horace complained to Gibbs that his handcuffs were too tight and were causing him pain. (Compl. Section VI ¶ 14.) He asked Gibbs to loosen the handcuffs because his hands were swelling and the pain was getting worse. (Compl. Section VI ¶ 14.) Gibbs refused to loosen the handcuffs, and then he and Anderson searched Horace's residence while Horace waited in the chair. (Compl. Section VI ¶ 15.) During the search, Horace "call[ed] out" and told Gibbs and Anderson that he was diabetic, that he felt dizzy, and that his handcuffs were hurting his wrists. (Compl. Section VI ¶ 16.) Defendants ignored Horace until approximately 1:00 p.m., when they told him they would be downstairs shortly. (Compl. Section VI ¶¶ 16, 17.) Horace was upset and worried that the tight handcuffs were causing him to have low blood sugar, that he could fall off his chair, and that he could pass out from high blood pressure. (Compl. Section VI ¶ 17.)

At 1:15 p.m., Defendants escorted Horace to their squad car and put him in the back seat. (Compl. Section VI ¶ 19.) Horace claims that front seat of the car was pushed back so that it was close to the back seat, which forced him into a position that put pressure on his herniated disks in his lower back and caused pain in his right knee. (Compl. Section VI ¶¶ 19, 20.) Defendants then took Horace to their offices. (Compl. Section VI ¶ 20.)

At about 2:05 p.m., Gibbs transported Horace from the Division of Parole offices to the Monroe County jail. (Compl. Section VI ¶ 21.) By this time, Horace's wrists were swollen, his fingers were numb, he was unable to move his wrists and fingers, and the handcuffs were embedded into his skin, causing a permanent mark on his left hand. (Compl. Section VI ¶ 21.)

*2 At about 2:25 p.m., Gibbs and Horace arrived at the Monroe County jail, where a Monroe County Sheriff Deputy "had a hard time removing the handcuffs" because of Horace's swollen wrists. (Compl. Section VI ¶ 21.)

**Horace v. Gibbs, Not Reported in Fed. Supp. (2017)**

2017 WL 4344435

Later that evening, medical staff at Monroe County jail kept Horace under observation and gave him insulin for low blood sugar. (Compl. Section VI ¶ 22.)

Horace alleges that he sustained several injuries during the course of his arrest. He claims that the handcuffs "cut into his skin," embedded themselves into his wrists, and caused his wrists to swell to twice their normal size. (Compl. Section III at 2; VI ¶ 21.) He further contends that the handcuffs left "deep indentation[s] ... on both wrists" and a "permanent scar" on his left wrist. (Compl. Section III at 2.)

Horace also claims that Gibbs aggravated his pre-existing conditions in his back (herniated discs) and knee (previous surgery) when he forced him to sit in "an uncomfortable position" in the squad car while being transported, which put "tremendous pressure" on his back and right knee. (Compl. Section III at 2, VI ¶ 20.)

Finally, Horace alleges emotional anguish and distress due to his fear that his blood sugar was getting low and his circulation was being cut-off, which could aggravate his diabetes. (Compl. Section III at 2.)

### III. DISCUSSION

Cognizant of the distinct disadvantage that *pro se* litigants face, federal courts routinely read their submissions liberally, and interpret them to raise the strongest arguments that they suggest. See Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 596, 30 L.Ed. 2d 652 (1972); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). This is especially important when reviewing pro se complaints alleging civil rights violations. See Weinstein v. Albright, 261 F.3d 127, 132 (2d Cir. 2001). Because Plaintiff is proceeding *pro se*, this Court has considered his submissions and arguments accordingly.

Horace asserts that Defendants used excessive force against him and were deliberately indifferent to his serious medical needs, in violation of his Fourth [1] and Fourteenth Amendment rights. (Compl., Section II ¶ 7.) Defendants seek dismissal of both claims for failure to state a claim upon which relief can be granted under Rule 12 (b)(6) of the Federal Rules of Civil Procedure. (Docket No. 27.)

[1]     As noted, Horace identifies the Eighth Amendment as the source of his excessive force claim. In fact, Horace's claim properly arises under the Fourth Amendment, because the excessive force is alleged to have occurred during a parolee's arrest for a parole violation. See Cox v. Fischer, No. 14-CV-1862 (RA), 2017 WL 1215091, at *4 (S.D.N.Y. Mar. 31, 2017) (noting that "a parolee's claim that he was subjected to excessive force in the course of an arrest for a violation arises under the Fourth Amendment, not the Eighth Amendment"). This Court will therefore consider Horace's excessive force claim under the Fourth Amendment.

### A. Rule 12 (b)(6)

Rule 12 (b)(6) allows dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12 (b)(6). Federal pleading standards are generally not stringent: Rule 8 requires only a short and plain statement of a claim. Fed. R. Civ. P. 8 (a)(2). But the plain statement must "possess enough heft to show that the pleader is entitled to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557, 127 S. Ct. 1955, 167 L.Ed. 2d 929 (2007).

**\*3** When determining whether a complaint states a claim, the court must construe it liberally, accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor. ATSI Commc'ns, 493 F.3d at 98. Legal conclusions, however, are not afforded the same presumption of truthfulness. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L.Ed. 2d 868 (2009) ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). Labels, conclusions, or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Facial plausibility exists when the facts alleged allow for a reasonable inference that the defendant is liable for the misconduct charged. Iqbal, 556 U.S. at 678. The plausibility standard is not, however, a probability requirement: the pleading must show, not merely allege, that the pleader is entitled to relief. Id. at 1950; Fed. R. Civ. P. 8 (a)(2). Well-pleaded allegations in the complaint must nudge the claim "across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

A two-pronged approach is thus used to examine the sufficiency of a complaint, which includes "any documents

Case 9:17-cv-00244-BKS-TWD   Document 58   Filed 08/07/19   Page 77 of 111

Horace v. Gibbs, Not Reported in Fed. Supp. (2017)

2017 WL 4344435

that are either incorporated into the complaint by reference or attached to the complaint as exhibits." Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004). This examination is context specific and requires that the court draw on its judicial experience and common sense. Iqbal, 556 U.S. at 679. First, statements that are not entitled to the presumption of truth, such as conclusory allegations, labels, and legal conclusions, are identified and stripped away. See id. Second, well-pleaded, non-conclusory factual allegations are presumed true and examined to determine whether they "plausibly give rise to an entitlement to relief." Id. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint fails to state a claim. Id.

## B. 42 U.S.C. § 1983

Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. See 42 U.S.C. § 1983. To properly plead a cause of action under § 1983, a plaintiff's complaint must include allegations that the challenged conduct "(1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." Whalen v. County of Fulton, 126 F.3d 400, 405 (2d Cir. 1997); Hubbard v. J.C. Penney Dep't Store, 05-CV-6042, 2005 WL 1490304, at *1 (W.D.N.Y. June 14, 2005).

Personal involvement in the deprivation of a federal constitutional right is the *sine qua non* of liability under § 1983. See Haygood v. City of New York, 64 F. Supp. 2d 275, 280 (S.D.N.Y. 1999). Thus, personal involvement by defendants in cases alleging constitutional deprivations is a prerequisite to an award of damages under § 1983. See McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977); Richardson v. Coughlin, 101 F. Supp. 2d 127, 129 (W.D.N.Y. 2000); Pritchett v. Artuz, No. 99 Civ. 3957 (SAS), 2000 WL 4157, at *5 (S.D.N.Y. Jan. 3, 2000).

**\*4** The Second Circuit construes personal involvement in this context to mean "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996); see also Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994). Personal involvement need not be active participation. It can be found "when an official has actual or constructive notice of

unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act." See Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989). Thus, personal involvement can be established by showing that

> (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to others' rights by failing to act on information indicating that constitutional acts were occurring.

Liner v. Goord, 582 F. Supp. 2d 431, 433 (W.D.N.Y. 2008) (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)); Hayut v. State Univ. of New York, 352 F.3d 733, 753 (2d Cir. 2003).

On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution. See Graham v. Connor, 490 U.S. 386, 393-94,109 S. Ct. 1865, 104 L.Ed. 2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n.3, 99 S. Ct. 2689, 61 L.Ed. 2d 433 (1979)). Accordingly, as a threshold matter in reviewing claims brought pursuant to § 1983, it is necessary to precisely identify the constitutional violations alleged. See Baker, 443 U.S. at 140. Here, Horace asserts claims under the Fourth and Fourteenth Amendments.

## C. Fourth Amendment Excessive Force Claim

Although Horace identifies the Eighth Amendment as the source of his excessive force claim, it in fact arises under the Fourth Amendment, because the excessive force is alleged to have occurred during a parolee's arrest for a parole

Horace v. Gibbs, Not Reported in Fed. Supp. (2017)

2017 WL 4344435

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 78 of 111

violation. See Cox v. Fischer, No. 14-CV-1862 (RA), 2017 WL 1215091, at *4 (S.D.N.Y. Mar. 31, 2017) (noting that "a parolee's claim that he was subjected to excessive force in the course of an arrest for a violation arises under the Fourth Amendment, not the Eighth Amendment"); see also Rushion v. NYS Div. of Parole, No. 13-CV-4277 (RRM), 2016 WL 5255812, at *4 (E.D.N.Y. Sept. 21, 2016) ("Allegations by a parolee that he was subjected to excessive force while being arrested by his parole officer for a parole violation are analyzed under the Fourth Amendment."); Rivera v. Madan, No. 10-CV-4136 (PGG), 2013 WL 4860116, at *8 (S.D.N.Y. Sept. 12, 2013).

The Fourth Amendment is applicable to the States by way of the Fourteenth Amendment. Minnesota v. Dickerson, 508 U.S. 366, 372, 113 S. Ct. 2130, 2135, 124 L.Ed. 2d 334 (1993). The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable ... seizures." U.S. Const. amend. IV. Fourth Amendment excessive force claims are analyzed under a standard of objective reasonableness. Graham, 490 U.S. at 394. Law enforcement officers' application of force is excessive, and thus violation of the Fourth Amendment, if it is objectively unreasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Roberites v. Huff, No. 11-CV-521S, 2013 WL 5416943, at *3 (W.D.N.Y. Sept. 26, 2013) (quoting Graham, 490 U.S. at 397). In determining whether an officer's actions were reasonable, the actions "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight ... 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers' ... violates the Fourth Amendment." Graham, 490 U.S. at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).

*5 "Law enforcement officers' use of force in an arrest is excessive in violation of the Fourth Amendment if it is 'objectively unreasonable in light of the facts and circumstances confronting them, without regard to the officers' underlying intent or motivation.' " Mayes v. Vill. of Hoosick Falls, 162 F. Supp. 3d 67, 88 (N.D.N.Y. 2016) (quoting Papineau v. Parmley, 465 F.3d 46, 61 (2d Cir. 2006)). When the use of handcuffs gives rise to a Fourth Amendment claim, the reasonableness of force is measured in light of (1) whether the handcuffs were unreasonably tight; (2) whether the defendants ignored pleas that the handcuffs were too tight; and (3) the degree of injury to the wrists. Roberites, 2013

WL 5416943, at *3; Mayes, 162 F. Supp. 3d at 88 (collecting case). This standard reflects the balance between overly tight handcuffing and the need to use some degree of physical coercion to maintain custody and prevent an arrestee's hands from slipping out of the handcuffs. Usavage v. Port Auth. of New York & New Jersey, 932 F. Supp. 2d 575, 592 (S.D.N.Y. 2013); Esmont v. City of New York, 371 F. Supp. 2d 202, 214–15 (E.D.N.Y. 2005). "This inquiry must reflect the totality of the circumstances, including any facts that bear on whether use of an unusual degree of force may have been justified." Roberites, 2013 WL 5416943, at *3.

The injury requirement is "particularly important." Sachs v. Cantwell, No. 10 Civ. 1663 (JPO), 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012). "Courts have found that handcuffing can give rise to a § 1983 excessive force claim where plaintiff suffers an injury as a result." Gonzalez v. City of New York, No. 98 Civ. 3084, 2000 WL 516682, at *4 (E.D.N.Y. Mar. 7, 2000); Sachs, 2012 WL 3822220, at *14 ("While the application of tight handcuffs alone can give rise to a cause of action under § 1983, 'the plaintiffs must suffer some form of injury from the tight handcuffs in order for such a claim to be actionable.' ") (quoting Vogeler v. Colbath, No. 04 Civ. 6071, 2005 WL 2482549, at *9 (S.D.N.Y. Oct. 6, 2005)). "[I]f the application of handcuffs was merely uncomfortable or caused pain, that is generally insufficient to constitute excessive force." Gonzalez, 2000 WL 516682, at *4. The injuries need not be "severe or permanent," Vogeler v. Colbath, No. 04 Civ. 6071, 2005 WL 2482549, at *9 (S.D.N.Y. Oct. 6, 2005), but must be more than merely "de minimis," Washpon v. Parr, 561 F. Supp. 2d 394, 407 (S.D.N.Y. 2008). See also Mesa v. City of New York, No. 09 Civ. 10464 (JPO), 2013 WL 31002, at *18 (S.D.N.Y. Jan. 3, 2013) ("[W]hile a sustained injury that requires doctors' visits is not a necessary element of a successful excessive force claim, where a plaintiff suffers from de minimis injury, it is more difficult to establish that the force used was excessive in nature." (citations omitted)). The most common injuries found to satisfy the injury requirement in handcuff cases are scarring and nerve damage. Roberites, 2013 WL 5416943, at *4; see, e.g., Washpon, 561 F. Supp. 2d at 407 (scarring); Esmont, 371 F. Supp. 2d at 214–15 (nerve damage); Simpson v. Saroff, 741 F. Supp. 1073, 1078 (S.D.N.Y. 1990) (scarring).

Here, assuming the truth of Horace's allegations, as required at this stage, this Court finds that he sufficiently states a Fourth Amendment excessive force claim.

Horace v. Gibbs, Not Reported in Fed. Supp. (2017)

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 79 of 111

2017 WL 4344435

First, he alleges that his handcuffs were unreasonably tight. He alleges that Gibbs applied the handcuffs "so tightly there w[as] hardly any space between [P]laintiff's wrist and the handcuffs." (Compl. Section VI ¶ 14.) He further alleges that the handcuffs were so tight that they caused indentations in his wrists, caused his wrists and fingers to go numb, and caused his wrists to swell to twice their normal size. (Compl. Section VI ¶¶ 14, 21.)

Second, Horace alleges that Defendants ignored his pleas that the handcuffs were too tight. He alleges that he asked Gibbs to loosen the handcuffs because his hands were swelling and because the pain was getting worse, but Gibbs refused. (Compl. Section VI ¶¶ 14, 15.) He further alleges that during the search of his residence, he "call[ed] out" and told Gibbs and Anderson that he was diabetic, that he felt dizzy, and that his handcuffs were hurting his wrists. (Compl. Section VI ¶ 16.) Defendants ignored that plea as well. (Compl. Section VI ¶¶ 16, 17.)

**\*6** Finally, Horace alleges that he suffered more than discomfort or *de minimis* injuries. He alleges that the handcuffs "cut into his skin," embedded themselves into his wrists, and left "deep indentation[s] ... on both wrists" and a "permanent scar" on his left wrist. (Compl. Section III at 2; VI ¶ 21; Compl. Section III at 2.)

Accordingly, because Horace adequately alleges that his handcuffs were unreasonably tight, that his pleas were ignored, and that he suffered permanent injury, Defendants' motion to dismiss Horace's Fourth Amendment excessive force claim is denied.

### D. Fourteenth Amendment Deliberate Indifference Claim

A pre-trial detainee's claim of deliberate indifference to serious medical needs is governed by the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment, which is the source of the same right for convicted prisoners. Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017); Thomas v. Nassau County Corr. Ctr., 288 F. Supp. 2d 333, 337 (E.D.N.Y. 2003). This is because "pretrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." Darnell, 849 F.3d at 29 (citation and internal quotation marks omitted).

To sustain a Fourteenth Amendment deliberate indifference claim, a plaintiff must allege deliberate indifference to a "sufficiently serious" medical need. Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L.Ed. 2d 811 (1994). A medical need is "serious" if "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." Harrison v. Barkley, 219 F.3d 132, 136–37 (2d Cir. 2000) (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)). Chance sets forth several factors relevant to this inquiry, including whether the plaintiff has "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." 143 F.3d at 702.

Here, Horace fails to allege a plausible claim for deliberate indifference to a serious medical need. Horace's distress related to his diabetes, low blood sugar, and high blood pressure is not a sufficiently serious medical condition, and in any case, Horace concedes that he was given insulin at the Monroe County jail. (Compl. Section VI ¶ 22.) Similarly, Horace's claims that he was seated in an uncomfortable position that aggravated his pre-existing back and knee conditions are not actionable. (Compl. Section III at 2, VI ¶ 20.) Finally, the temporary injuries Horace allegedly received from the handcuffs—pain, swelling, cuts—are likewise not sufficiently serious because they lack permanence and do not amount to conditions that may produce death, degeneration, or lasting extreme pain. See White v. Schriro, 16 Civ. 6769 (PAE)(JCF), 2017 WL 3268202, at \*3 (S.D.N.Y. July 31, 2017) (quoting Johnson v. Wright, 412 F.3d 398, 403 (2d Cir. 2005), in turn quoting Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998)).

Accordingly, Defendants' motion to dismiss Horace's Fourteenth Amendment deliberate indifference claim is granted.

### IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. Horace's Fourth Amendment excessive force claim will proceed, but his Fourteenth Amendment deliberate indifference claim is dismissed.

### V. ORDERS

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 80 of 111
**Horace v. Gibbs, Not Reported in Fed. Supp. (2017)**
2017 WL 4344435

 **\*7**  IT HEREBY IS ORDERED, that Defendants' Motion to Dismiss (Docket No. 27) is GRANTED in part and DENIED in part, consistent with the foregoing decision.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4344435

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00244-BKS-TWD     Document 58     Filed 08/07/19     Page 81 of 111

Richard v. Leclaire, Not Reported in Fed. Supp. (2017)

2017 WL 4349381

2017 WL 4349381
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

John Willis RICHARD, Plaintiff,

v.

Lucien J. LECLAIRE, et al., Defendants.

9:15-CV-00006 (BKS/TWD)
|
Signed 09/29/2017

**Attorneys and Law Firms**

John Willis Richard, 91-A-0169, Eastern NY Correctional
Facility, Box 338, Napanoch, New York 12458, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Ryan W. Hickey, Esq., Assistant Attorney
General, The Capitol, Albany, New York 12224, Counsel for
Defendants.

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, United States District Court Judge

## I. Introduction

**\*1** Plaintiff pro se John Willis Richard brought this
action under 42 U.S.C. §§ 1983, 1985(3), and 1986 against
Defendants Lucien J. Leclaire, Deputy Commissioner of
the Department of Correctional Services and Community
Supervision ("DOCCS") in the State of New York;
Captain Timothy McCarthy, Auburn Correctional Facility
("Auburn"); Lieutenant Daniel Oleksiw, Auburn; Lieutenant
Michael P. Brown, Auburn; Lieutenant Burns, Auburn;
Sergeant Anthony P. Volpe, Auburn; Corrections Officer
("C.O.") Gary C. Gibson, Auburn; C.O. Michael Woodard,
Auburn; Lieutenant Wayne Jordan, Sullivan Correctional
Facility ("Sullivan"); Lieutenant Garry Sipple, Sullivan;
Dennis Giglio, Deputy Superintendent of Security, Sullivan
Correctional Facility; C.O. Joseph Daddezio, Sullivan;
Sergeant Paul Mace, Sullivan; and C.O. Jeremy McGaw,
Upstate Correctional Facility ("Upstate"). (Dkt. Nos. 1, 46,
52, 53). [1]

<sup>1</sup>

1 | The summonses were returned unexecuted as to
Defendants Burns and Giglio. (Dkt. No. 37). There has
been no appearance by these defendants; they are not
parties to the motion to dismiss. (Dkt. No. 46).

The Complaint alleges, *inter alia*, that Defendants took action
in violation of Plaintiff's constitutionally protected rights in
response to his refusal to remove designs shaved into his
beard. (Dkt. No. 1). By Decision and Order filed October
22, 2015, the Court granted Plaintiff's in forma pauperis
application, dismissed certain claims and defendants, and
found that the remaining claims survived a *sua sponte* review
and required a response. (Dkt. No. 10). The claims remaining
after initial review are: (1) Fourteenth Amendment due
process claims against Defendants Brown, Jordan, and Giglio,
arising out of disciplinary hearings and appeals; (2) First
Amendment retaliation claims against Defendants Gibson,
Volpe, Woodard, McCarthy, Burns, and Brown involving the
issuance of a false inmate misbehavior report ("IMR") and
the rigging of the disciplinary hearing on the IMR; (3) a
Fourteenth Amendment due process vagueness claim against
Leclaire regarding DOCCS Directive 4914; (4) Fourteenth
Amendment equal protection claims against Defendants
Gibson, Volpe, Woodard, Burns, McCarthy, Brown, McGaw,
Jordan, Daddezio, Sipple, Mace, and Giglio; and (5) various
conspiracy claims against Gibson, Volpe, Woodard, Burns,
McCarthy, Oleksiw, Brown, Jordan, Sipple, Daddezio, Mace,
and Giglio. (Dkt. No. 10 at 39).

On November 15, 2016, eleven of the Defendants moved to
dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on the grounds
that (i) Plaintiff's claims are barred, in part, by the statute of
limitations; (ii) Plaintiff fails to state a procedural due process
claim because he contested disciplinary hearings and did not
identify a protected liberty interest; and (iii) Plaintiff fails
to state a conspiracy claim and, in the alternative, that any
conspiracy claims are barred by the intracorporate conspiracy
doctrine. (Dkt. No. 46-1).

This matter was referred to United States Magistrate Judge
Thérèse Wiley Dancks who, on July 10, 2017, issued an Order
and Report-Recommendation ("R & R") recommending
that Defendant's motion to dismiss be granted on the
basis that several of Plaintiff's claims are barred by the
statute of limitations—specifically, Plaintiff's (1) Fourteenth
Amendment procedural due process claims against Brown;
(2) First Amendment retaliation claim against Defendants
Gibson, Volpe, Woodard, McCarthy, and Brown [2]; (3)
Fourteenth Amendment equal protection claim against
Defendants Gibson, Volpe, Woodard, McCarthy, Brown,

Case 9:17-cv-00244-BKS-TWD   Document 58   Filed 08/07/19   Page 82 of 111

Richard v. Leclaire, Not Reported in Fed. Supp. (2017)

2017 WL 4349381

and McGaw; and (4) conspiracy claim against Defendants Gibson, Volpe, Woodard, McCarthy, Oleksiw, and Brown. (Dkt. No. 61 at 39).[3] The R & R recommends that Plaintiff's Fourteenth Amendment due process claim against Defendant Jordan be dismissed on the ground that Plaintiff fails to adequately state a claim for violation of his procedural due process rights. (*Id.* at 35). Finally, the R & R recommends that Plaintiff's conspiracy claims be dismissed under the intracorporate conspiracy doctrine, to the extent that the conspiracy claims against Defendants Gibson, Volpe, Woodard, McCarthy, Oleksiw, and Brown are not also barred by the statute of limitations. (*Id.* at 38).

[2]   The R & R inadvertently refers to Defendant Brown as "Brooks" in two instances, but otherwise correctly refers to him as Defendant Brown. (Dkt. No. 61 at 32–33).

[3]   As the R & R notes, "summonses were returned unexecuted as to Defendants Burns and Giglio. There has been no appearance on behalf of Burns and Giglio, and they are not parties to the motion to dismiss." (Dkt. No. 10 at 2 n.1 (internal citations omitted)).

**\*2** Plaintiff filed an 83-page objection to the Report-Recommendation on September 14, 2017. (Dkt. No. 66). Plaintiff's primary objections are that the R & R: (i) improperly determined that his claims are barred by the statute of limitations, because the fraudulent concealment doctrine renders all of his claims timely (*id.* at 2); (ii) inappropriately applied "employment discrimination Title VII laws of a continuing [sic] violation doctrine to a prison setting" (*id.* at 26); (iii) improperly "denied [him] the benefits of res judicata and collateral estoppel on the merits foundated [sic] in the complaint" (*id.* at 29); (iv) improperly applied the intracorporate conspiracy doctrine in determining that some of his claims are time-barred; and (v) failed to consider his requests for certification of interlocutory appellate review of three issues (*id.* at 26, 77–78, 79). Further, Plaintiff argues that he should be permitted to amend his complaint to state a new claim for First Amendment retaliation due to the fact that Magistrate Judge Dancks took judicial notice of the 2013 revision to Directive 4914. (*Id.* at 58–72).

For the reasons set forth below, the R & R is adopted in its entirety.

## II. Standard of Review

This court reviews *de novo* those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen v. Astrue,* 2 F.Supp.3d 223, 228-29 (N.D.N.Y. 2012); Fed. R. Civ. P. 72(b) advisory committee's note to 1983 amendment. Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Id.*

## III. Discussion

### A. Fraudulent Concealment Doctrine

Plaintiff objects to the R & R on the basis that the Magistrate Judge failed to consider Plaintiff's argument that the doctrine of fraudulent concealment "makes all claims in suit timely." (Dkt. No. 66 at 2).

"[T]he doctrine of fraudulent concealment prevents a party from fraudulently concealing wrongdoing until after the tolling of the statute of limitations." *Aiken v. Nixon,* 236 F.Supp.2d 211, 240 (N.D.N.Y. 2002). "To invoke the doctrine of fraudulent concealment properly [for purposes of seeking an equitable tolling of the statute of limitations], a plaintiff must establish three elements, including: (1) wrongful concealment by defendants [of their actions] (2) which prevented plaintiff's discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing the discovery of the claim." *N.Y. Dist. Council of Carpenters Pension Fund v. Forde,* 939 F.Supp.2d 268, 278 (S.D.N.Y.2013). "The relevant question is not the intention underlying defendants' conduct, but rather whether a reasonable plaintiff in the circumstances would have been aware of the existence of a cause of action." *Veltri v. Bldg. Serv. 32b-J Pension Fund,* 393 F.3d 318, 323 (2d Cir. 2004).

The claims for which the R & R recommends dismissal on the basis of the statute of limitations are all grounded in the issuance of Inmate Misbehavior Reports ("IMRs"), and the subsequent adjudication and administrative approval of disciplinary actions. (*See* Dkt. No. 1, ¶¶ 87, 89, 93, 101, 192–198, 221–24, 226–228, 288; Dkt. No. 1-2 at 7, 15, 19–27, 33, 35, 41–45, 47, 62, 72–76, 109, 111, 114–44). Plaintiff does not allege that Defendants undertook any disciplinary actions, which constitute the basis of the alleged harms against him, in secret or without his knowledge. Nor does he allege that Defendants successfully conspired to mislead Plaintiff into believing that he did not have a cause of action, or that he was otherwise not on notice of a potential claim after an IMR was issued or the disciplinary hearing occurred. *See Pinaud*

Case 9:17-cv-00244-BKS-TWD   Document 58   Filed 08/07/19   Page 83 of 111

Richard v. Leclaire, Not Reported in Fed. Supp. (2017)

2017 WL 4349381

*v. County of Suffolk*, 52 F.3d 1139, 1157 (2d Cir. 1995) ("To take advantage of [the] doctrine [of fraudulent concealment], however, a plaintiff must submit non-conclusory evidence of a conspiracy or other fraudulent wrong *which precluded his discovery of the harms that he suffered.*"); *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988) (fraudulent concealment tolls the statute of limitations only where plaintiff "remained in ignorance of [his] cause of action"). Indeed, Plaintiff acknowledges that he was contemporaneously aware of each IMR, disciplinary hearing, or administrative approval that allegedly constituted a violation of his rights. (*See* Dkt. No. 1 at ¶¶ 87, 89, 93, 101, 192–98, 221–24, 226–28, 288). The doctrine of fraudulent concealment is therefore inapplicable.

**\*3** After reviewing this issue *de novo*, the Court agrees with Magistrate Judge Dancks' determination that Plaintiff's (1) Fourteenth Amendment procedural due process claims against Brown; (2) First Amendment retaliation claim against Defendants Gibson, Volpe, Woodard, McCarthy, and Brown; (3) Fourteenth Amendment equal protection claim against Defendants Gibson, Volpe, Woodard, McCarthy, Brown, and McGaw; and (4) conspiracy claim against Defendants Gibson, Volpe, Woodard, McCarthy, Oleksiw, and Brown are barred by the statute of limitations.

### B. Continuing Violation Doctrine

Plaintiff objects to the R & R on the basis that it improperly applies "employment discrimination Title VII laws of a continuating [sic] violation doctrine to a prison setting" in determining that Plaintiff's Fourteenth Amendment equal protection claims are barred by the statute of limitations. (Dkt. No. 66 at 26–28).

"Under Title VII's continuing violation doctrine, 'if a plaintiff has experienced a continuous practice and policy of discrimination, ... the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.' " *Washington v. County of Rockland*, 373 F.3d 310, 317 (2d Cir. 2004) (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001)). "[T]he continuing-violation doctrine has been applied, both by the Second Circuit and by courts in other jurisdictions, to a variety of non-Title VII claims," including Eighth Amendment deliberate indifference and racial discrimination claims and claims brought under § 1983 in a prison context. *Remigio v. Kelly*, No. 04-cv-1877, 2005 WL 1950138, at \*7, 2005 U.S. Dist. LEXIS 16789, at \*22 (S.D.N.Y. Aug. 2, 2005); *see also Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009) (Eighth Amendment deliberate indifference claim); *Washington*, 373 F.3d at 317 (racial discrimination claim under § 1983). The Second Circuit has generally reasoned by analogy to Title VII cases when applying the continuing violation doctrine to circumstances other than employment discrimination cases. *See Washington*, 373 F.3d at 317 (conducting continuing violation analysis of § 1983 claim, but finding that doctrine did not toll the statute of limitations because claims accrued when defendant undertook discrete act of initiating disciplinary proceeding). Regardless of the context, however, "federal courts look unfavorably on continuing violation arguments, and have applied the theory only under 'compelling circumstances,' such as where the unlawful conduct takes place over a period of time, making it difficult to pinpoint the exact day the violation occurred." *Yip v. Bd. of Trs.*, No. 03-CV-00959C (SR), 2004 WL 2202594, at \*4, 2004 U.S. Dist. LEXIS 28366, at \*14 (W.D.N.Y. Sep. 29, 2004).

Here, Plaintiff has alleged discriminatory actions by Defendants Gibson, Volpe, Woodard, McCarthy, and Brown specifically in connection with the January 28, 2011 IMR and subsequent disciplinary proceedings. (Dkt. No. 1-2 at 41). Similarly, Plaintiff alleges that Defendant McGaw discriminatorily filed an IMR against him at Upstate for refusing McGaw's direct order to remove the design shaved into Plaintiff's beard. (*Id.* at 111–12). Both allegations describe conduct that is "discrete in its nature" and "wholly separable" from other allegations of discrimination. *Washington*, 373 F.3d at 319. In other words, Plaintiff's allegations do not describe "a continuous or ongoing policy or practice" of discrimination necessary to demonstrate the kind of compelling circumstances that justify tolling of the statute of limitations by the continuing violation doctrine. *Id.* "That the continuing violation doctrine can apply ... does not mean it must." *Shomo*, 579 F.3d at 182.

**\*4** After reviewing this issue *de novo*, the Court concludes that Magistrate Judge Dancks properly considered the continuing violation doctrine and agrees with Magistrate Judge Dancks' determination that it does not render Plaintiff's claims timely and that Plaintiff's Fourteenth Amendment equal protection claims against Gibson, Volpe, Woodard, McCarthy, Brown, and McGaw should be dismissed.

### C. Collateral Estoppel

Plaintiff seems to object to the R & R on the basis that it fails to consider that, because prior prison disciplinary proceedings determined that his beard was in compliance

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 84 of 111

Richard v. Leclaire, Not Reported in Fed. Supp. (2017)

2017 WL 4349381

with Directive 4914, Defendants should be estopped from "making any motion in its defense or affirmative defense like the motion to dismiss 12(b)(6) as to the present motion on any litigation grounds for that matter." (Dkt. No. 66 at 34). Plaintiff's objections are meritless.

In order for a plaintiff to "bar a defendant from litigating an issue on collateral estoppel grounds: (1) the issues in both proceedings must be identical, (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits." *Faulkner v. Nat'l Geographic Enters.*, 409 F.3d 26, 37 (2d Cir. 2005). Assuming, *arguendo*, that the doctrine of collateral estoppel may apply to prison disciplinary proceedings,[4] none of the issues raised by Plaintiff's claims for First Amendment retaliation, Fourteenth Amendment due process violations, Fourteenth Amendment equal protection violations, and conspiracy to deprive Plaintiff of his constitutionally protected rights were addressed or determined in his prison disciplinary proceeding. The doctrine of collateral estoppel is therefore inapplicable.

[4] See *Colon v. Coughlin*, 58 F.3d 865, 869 (2d Cir. 1995) (noting that "there is a substantial question as to whether, under New York Law, collateral estoppel should ever apply to fact issues determined in a prison disciplinary hearing and reviewed for substantial evidence in an Article 78 proceeding, given the 'procedural laxity' of such prison hearings and the limited nature of substantial-evidence review").

### D. Intracorporate Conspiracy Doctrine

Plaintiff objects to the R & R's application of the "intracorporate conspiracy doctrine in a prison context" as it is "strictly a business ... doctrine." (Dkt. No. 66 at 80). Plaintiff argues that the R & R "uses the intracorporate conspiracy doctrine to evade Plaintiff's claims against Defendants to favor them in the face of prior Northern District rejections of the doctrine in a prison setting." (*Id.*). The cases Plaintiff offers in support, however, acknowledge the appropriateness of applying the doctrine in a prison setting. See, e.g., *Benitez v. Hamm*, No. 9:04-CV-1159 (NAM/GHL), 2009 WL 3486379, at *18–19, 2009 U.S. Dist. LEXIS 97495, at *68–71 (N.D.N.Y. Sept. 30, 2009) (Lowe, Mag. J.) ("I will assume that the [intracorporate conspiracy] doctrine applies in § 1983 cases."); *Orafan v. Goord*, 411 F.Supp.2d 153,

164–65 (N.D.N.Y. 2006) (Magnuson, J.) ("The intracorporate conspiracy doctrine applies to individual defendants of a correctional institution."), *vacated and remanded on other grounds sub nom. Orafan v. Rashid*, 249 Fed.Appx. 217 (2d Cir. 2007); *Medina v. Hunt*, No. 9:05-CV-1460 (DNH/GHL), 2008 WL 4426748, at *8, 2008 U.S. Dist. LEXIS 120759, at *54 (N.D.N.Y. Sep. 2, 2008) (Lowe, Mag. J.) (applying intracorporate conspiracy doctrine analysis to prison context). Further, in each of these cases, the defendants were alleged to have been "pursuing personal interests wholly separate and apart from the entity." *Orafan*, 411 F.Supp.2d at 165 (citation and internal quotation marks omitted). In such situations, the intracorporate conspiracy doctrine does not bar conspiracy claims, and defendants may be found liable for their conduct. *Id.*

**\*5** Plaintiff has failed to allege any nonconclusory facts that raise a plausible claim that Defendants at either Auburn or Sullivan were pursuing interests that were wholly separate from DOCCS and their employment by DOCCS. Having reviewed this issue *de novo*, the Court agrees with Magistrate Judge Dancks' recommendation that Plaintiff's conspiracy claims should be dismissed under the intracorporate conspiracy doctrine, to the extent that the claims against Defendants Gibson, Volpe, Woodard, McCarthy, Oleksiw, and Brown are not already time-barred by the statute of limitations as discussed in Section III.A, *supra*. See *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008) (affirming dismissal of § 1985 claim against police officers, police department, and the village under intracorporate conspiracy doctrine).

### E. Request for Certification of Interlocutory Appeal

Plaintiff objects to the R & R on the basis that it fails to consider his request to certify an order to the Second Circuit Court of Appeals so that he may obtain a decision relating to application of the continuing violation and intracorporate conspiracy doctrines to his case. (Dkt. No. 66 at 26, 79).

Pursuant to 28 U.S.C. § 1292(b), a district court may certify an order for interlocutory appeal where "such order involves a controlling question of law as to where there is substantial ground for difference of opinion and ... an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). "[L]eave to appeal from interlocutory orders should be granted only in exceptional circumstances [that] ... overcome the general aversion to piecemeal litigation and justify departing from the basic policy of postponing appellate

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 85 of 111

Richard v. LeClaire, Not Reported in Fed. Supp. (2017)

2017 WL 4349381

review until after the entry of final judgment." *Picard v. Estate of Madoff*, 464 B.R. 578, 582–83 (S.D.N.Y. 2011) (citation and internal quotation marks omitted). "Interlocutory appeals are strongly disfavored in federal practice. Movants cannot invoke the appellate process as a vehicle to provide early review of difficult rulings in hard cases. Only exceptional circumstances will justify a departure from the basic policy of avoiding appellate review until a final decision on the merits." *Glatt v. Fox Searchlight Pictures, Inc.*, No. 11 Civ. 6784 (WHP), 2013 WL 5405696, at *2, 2013 U.S. Dist. LEXIS 139594, at *3 (S.D.N.Y. Sept. 17, 2013) (quoting *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F.Supp.2d 241, 282 (S.D.N.Y. 2010)).

Plaintiff fails to demonstrate any "controlling question of law as to where there is substantial ground for difference of opinion." There are no "exceptional circumstances" that warrant certification of an order for interlocutory appeal, and Plaintiff's request is accordingly denied.

### F. New Claim for First Amendment Retaliation

Plaintiff asserts that, because Magistrate Judge Dancks's took judicial notice in the R & R that Directive 4914 was amended to prohibit beard "[p]atterns, designs, or braids" on March 1, 2013 (Dkt. No. 61 at 4 n.4), he is entitled to assert a new claim that Defendants retaliated against him by "informing 'DOCS/Albany' about the beard designs" in violation of his First Amendment rights. (Dkt. No. 66 at 58). This is not an objection to the R & R. In any event, Plaintiff's arguments are meritless.

To survive a motion to dismiss, "a plaintiff asserting First Amendment retaliation claims must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). "In order to establish a causal connection at the pleading stage, the 'allegations must be 'sufficient to support the inference that the speech played a substantial part in the adverse action.' " *Morey v. Somers Cent. Sch. Dist.*, 2007 WL 867203, at *11, 2007 U.S. Dist. LEXIS 20265, at *36 (S.D.N.Y. Mar. 21, 2007) (quoting *David v. Goord*, 320 F.3d 346, 354 (2d Cir. 2003)). In determining whether circumstantial facts indicate that a "causal connection exists between the plaintiff's protected activity and a prison official's actions,

a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." *Baskerville v. Blot*, 224 F.Supp.2d 723, 732–33 (S.D.N.Y. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

**\*6** Plaintiff alleges that Defendants at Sullivan, motivated by Plaintiff's grievances related to his refusal to shave designs out of his beard, "retaliated by informing 'DOCS/Albany' about the beard designs" and that their action resulted in the March 1, 2013 amendment to Directive 4914. (Dkt. No. 66 at 63). Grievances are protected conduct under the First Amendment. *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) (finding that the plaintiff "has sufficiently alleged ... participation in protected activity: the use of the prison grievance system"). Plaintiff alleges that he suffered an adverse action when DOCCS amended Directive 4914 in March 2013. (Dkt. No. 66 at 64). Plaintiff asserts that there is a causal connection between his grievances and the amendment of Directive 4914, arguing: "How else would the dir. 4914 change/be 'amended' to include bar to beard designs if [Defendants] did not report it to Albany/DOCS?" (*Id.* at 64). Even assuming that this Directive could constitute an adverse action, the amendment of a DOCCS directive more than a year after the last protected conduct fails to allege a causal connection between the protected conduct and the Directive. Indeed, there are no allegations that allow a plausible inference that any particular Defendant actually urged the amendment of Directive 4914 following Plaintiff's grievances.

### IV. Conclusion

Accordingly, it is hereby

**ORDERED** that the Report and Recommendation (Dkt. No. 61) is **ADOPTED** in its entirety for the reasons stated therein; and it is further

**ORDERED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 46) pursuant to Rule 12(b)(6) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that the motion to dismiss is granted as to and that the following claims are **DISMISSED WITH**

2017 WL 4349381

**PREJUDICE**: (1) Fourteenth Amendment procedural due process claims against Defendants Brown and Jordan; (2) First Amendment retaliation claim against Defendants Gibson, Volpe, Woodard, McCarthy, and Brown; (3) Fourteenth Amendment equal protection claim against Defendants Gibson, Volpe, Woodard, McCarthy, Brown, and McGaw; (4) conspiracy claim against Defendants Gibson, Volpe, Woodard, McCarthy, Oleksiw, and Brown under §§ 1983, 1985(3), and 1986; and (5) conspiracy claim against Defendants Jordan, Mace, Daddezio, and Sipple brought under §§ 1983, 1985(3), and 1986; and it is further

**ORDERED** that the motion to dismiss is **DENIED** as to the Fourteenth Amendment due process vagueness claim against Defendant Leclaire; [5] and it is hereby

[5] Plaintiff's equal protection claim against Defendants Jordan, Sipple, Daddezio, Mace, and Giglio remains.

**ORDERED** that Defendants Brown, Gibson, Volpe, Woodard, McCarthy, McGaw, Oleksiw be **DISMISSED** from this action; and it is further

**ORDERED** that the Clerk of the Court serve a copy of this Decision and Order on the plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4349381

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

KeyCite Yellow Flag - Negative Treatment

Distinguished by Sankara v. City of New York, S.D.N.Y., February 22, 2018

2017 WL 4179855
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Carlos VILLAFANE, Pro Se Plaintiff,

v.

Michael SPOSATO, Nassau County Sheriff, and
Armor Correctional Health Service, Defendants.

CV 16-3674 (JFB) (AKT)
|
Signed 08/22/2017

**Attorneys and Law Firms**

Carlos Villafane, New York, NY, pro se.

John J. Doody, Dale Nicholson McLaren, Lewis Brisbois
Bisgaard & Smith, LLP, New York, NY, Liora M. Ben-
Sorek, Nassau County Attorney's Office, Mineola, NY, for
Defendants.

**REPORT AND RECOMMENDATION**

A. KATHLEEN TOMLINSON, U.S. Magistrate Judge

**I. PRELIMINARY STATEMENT**

*1 *Pro se* Plaintiff Carlos Villafane ("Villafane" or
"Plaintiff") brings this civil rights action, pursuant to 42
U.S.C. § 1983, alleging violations of the Fifth, Eighth and
Fourteenth Amendments, as well as the Prison Litigation
Reform Act. *See generally* Complaint ("Compl.") [DE 1].
Defendants Michael Sposato and Armor Correctional Health
Services of New York s/h/a Armor Correctional Health
Service (collectively, "Defendants") have moved to dismiss
the Complaint pursuant to Rule 12(b)(6) of the Federal Rules
of Civil Procedure and the Prison Litigation Reform Act, 42
U.S.C. § 1997e(a). Notice of Motion [DE 19]. Judge Bianco
referred Defendants' Motion to Dismiss to this Court for a
Report and Recommendation as to whether the motion should
be granted. DE 33.

**II. BACKGROUND**

**A. Factual Background**

The following factual allegations have been taken from
Plaintiff's Complaint and the Plaintiff's Opposition to
Defendants' motion to dismiss. Because Plaintiff is
proceeding *pro se*, the Court is obligated to construe his
pleadings liberally "to raise the strongest arguments that they
suggest." *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d
471, 474–75 (2d Cir. 2006) (per curiam) (quoting *Pabon v.
Wright*, 459 F.3d 241, 248 (2d. Cir. 2006)) (collecting cases)
(internal quotation marks omitted). [1] All facts alleged by
Plaintiff are assumed to be true for purposes of deciding the
motion to dismiss and are construed in a light most favorable
to Plaintiff as the non-moving party. *See, e.g.,* *LaFaro v.
N.Y. Cardiothoracic Grp.*, 570 F.3d 471, 475 (2d Cir. 2009)
(quoting *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292,
300 (2d Cir. 2003)); *Matthews v. City of N.Y.*, 889 F.Supp.2d
418, 425 (E.D.N.Y. 2012) (citing *LaFaro*, 570 F.3d at 475–
76).

[1]    In construing a *pro se* plaintiff's pleadings liberally, "the
Court may 'consider factual allegations in the plaintiff's
opposition papers to supplement the allegations in the
complaint.' " *Williams v. Wellness Med. Care, P.C.*,
No. 11-5566, 2013 WL 5420985, at *1 n.1 (S.D.N.Y.
Sept. 27, 2013) (quoting *Salvatierra v. Connolly*, No.
09-3722, 2010 WL 5480756 at *25 n. 3 (S.D.N.Y. Sept.
1, 2010) (internal quotation marks omitted) (citing *Frith
v. Hill*, No. 07-CV-5899, 2009 WL 3073716, at *19 n. 1
(S.D.N.Y. Sept. 23, 2009)), *report and recommendation
adopted*, 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011); *see
Smolen v. Fischer*, No. 12-1856, 2012 WL 3609089,
at *1 (S.D.N.Y. Aug. 23, 2012) (citing *Erickson v.
Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d
1081 (2007)) ("Although certain factual allegations in
Smolen's opposition affidavit are not contained in the
complaint, this Court will deem the complaint amended
to include those allegations since Smolen is a pro se
plaintiff."); *Sommersett v. City of New York*, 09-5916,
2011 WL 2565301, at *3 (S.D.N.Y. 2011); *Green v. City
of N.Y. Dep't of Corr.*, No. 6-4978, 2008 WL 2485402, at
*4 (S.D.N.Y. June 19, 2008); *Ibok v. Sector*, No. 05-6584,
2006 WL 302336, at * 1, n.1 (S.D.N.Y. Feb. 9, 2006)
(citing *Fox v. Fischer*, No. 04-6718, 2005 WL 1423580
at *2 n.1 (S.D.N.Y. June 14, 2005), *aff'd*, 242 Fed.Appx.
759 (2d Cir. 2007); *Verley v. Goord*, No 02 Civ. 1182,
2004 WL 526740, at *4–5, 2004 U.S. Dist. LEXIS 857,
at *15-17 (S.D.N.Y. Jan. 22, 2004)) ("The Court may
consider the factual allegations in plaintiff's Response to
supplement those in his complaint because of the liberal
standard afforded to the pleadings of pro se litigants.").

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 88 of 111

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

### *1. Plaintiff's Medical Issues*

**\*2** On or about September 11, 2013, Plaintiff was taken to the Nassau County Correctional Center ("NCCC"), referred to by Plaintiff in his Complaint as the "Nassau County Jail." *See* Compl. § III.B. At that time, Plaintiff had a broken left forearm. *Id.* § III.C. Despite informing the "medical department" about his condition, Plaintiff was "neglected intentionally without pain medication." *Id.* On September 14, 2013, Plaintiff was taken to the "Nassau County University Hospital, where the doctor had [Plaintiff] x-rayed set [his] arm in a soft cast." *Id.* A doctor advised Plaintiff that he needed surgery and told "the officials" to bring Plaintiff back to the hospital for surgery on September 17, 2013. *Id.* The NCCC did not produce Plaintiff for the surgery on that date and "still refused to give [Plaintiff] the said prescribed ... pain medication." *Id.*

On September 24, 2013, Plaintiff was examined at the NCCC by a visiting orthopedist "who expressed shock" that Plaintiff "had not received any surgery." *Id.* According to Plaintiff, the orthopedist "entered an order on my medical chart by directing a nurse to write down that it was extremely urgent that I have surgery." *Id.* Once again, however, the NCCC "knowingly ignored, and intentionally did denied [sic] [Plaintiff] the proper medical procedures and also continued to deny ... the pain medication or any type of medication to aliviate [sic] the pain." *Id.* On October 9, 2013, Plaintiff was transported to Nassau University Medical Center where his arm was again x-rayed. *Id.* The doctor told him that his arm was in fact broken. *Id.* The doctor also told him that because he had not received surgery, his arm would have to be rebroken "and that the surgery cost too much money and the facility wouldn't pay." *See id.* Plaintiff's arm was then set in a hard cast and Plaintiff complained again about the pain. *Id.*

Around the end of October 2013, Plaintiff appeared before Judge Hurley in connection with his criminal case. *See id.* Plaintiff complained to his lawyer about the NCCC's treatment of him. *Id.* Plaintiff states that his lawyer spoke to Judge Hurley and that Judge Hurley recommended that Plaintiff "be transferred to the Metropolitan Detention Center in Brooklyn, New York." *Id.*

On November 5, 2013, Plaintiff was transferred to the Metropolitan Detention Center ("MDC"). *Id.* Sometime thereafter, MDC officials transported Plaintiff to the "[B]rooklyn Medical Center and Kingsbrook Hospital from

2014 through 2015." *Id.* At the Brooklyn Medical Center, Plaintiff underwent the surgery that he needed—his arm was rebroken and set with two metal plates and metal screws. *Id.* According to Plaintiff, "my arm is not the same I don't have 100% use of my left wrist and my left hand and I am in constant pain." *See id.*

### *2. Grievances*

In his Opposition to the Defendants' Motion to Dismiss, Plaintiff states that while detained at the NCCC, he lodged numerous complaints about his left arm as well as other issues, through grievance forms and sick-call requests. *See* Plaintiff's Opposition ("Pl's. Opp'n") [DE 30] at 4-5. Plaintiff represents that he could not tell what the officer wrote on most of the complaint forms and that there were times when the officer informed Plaintiff that he "had to sign the form because soon [he would] be taken to the Hospital." *Id.* at 4. Plaintiff further maintains that on "some of the forms the officer wrote that the Plaintiff Refuse [*sic*] to sign while writing a later date." *Id.* Plaintiff asserts that those statements are not true because he had, in fact, signed the form on an earlier date. *Id.* Plaintiff points out that defendants' counsel referred to the Prison Litigation Reform Act ("PLRA") in the motion papers. *Id.* According to Plaintiff, the PLRA "makes it harder for prisoners to file lawsuits in federal court." *Id.* Plaintiff adds that

> the fact is that the Plaintiff was Transferred from a county holding facility to a Federal Transcient [sic] facility which is A different jurisdiction, with different Rules and Regulation, to wit your complaints go to Washington D.C. besides your Honor the Plaintiff was Released, he was Free when he submitted this Law Suits so I am Asking your Honor to Please don't dismiss my lawsuit Please Allow a jury to decide.

**\*3** *Id.* at 6.

### *3. Claims Set forth in the Instant Action and Relief Sought*

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 89 of 111

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)
2017 WL 4179855

Plaintiff represents that he has filed the instant action against Armor Correctional Health Services of New York ("Armor") for intentionally failing to provide him with "prop[ ]er medical care" and against Sheriff Michael Sposato for "allowing [Armor] to do so" and for not "monitoring [the] medical department." Compl. § II.D. According to Plaintiff, Defendants' conduct constitutes violations of the Eighth and Fifth Amendments of the Constitution, the Equal Protection Clause and the Prison Litigation Reform Act. *Id.* § II.B. Plaintiff seeks $5,000,000 in monetary damages to compensate him for his pain and suffering, mental anguish and inability to have full use of his left hand. *Id.* § IV.


**B. Procedural History**

*Pro se* Plaintiff Villafane commenced this action by filing a Complaint on June 24, 2016. *See* DE 1. By Order entered July 6, 2016, Judge Bianco who was assigned to this civil case, granted Plaintiff's Motion for Leave to Proceed *in Forma Pauperis.* DE 5. The Nassau County Attorney's Office, on behalf of Nassau County Sheriff Michael Sposato, filed an Answer to the Complaint on September 9, 2016. DE 12. On October 6, 2016, the law firm of Lewis Brisbois Bisgaard and Lewis ("Lewis Brisbois") filed a letter application to Judge Bianco seeking a pre-motion conference for purposes of moving to dismiss the Complaint against Armor. DE 15. On October 12, 2016, Judge Bianco issued an Order waiving the pre-motion conference requirement and setting a briefing schedule on Armor's motion to dismiss. DE 16. Lewis Brisbois filed the motion to dismiss on November 14, 2016 on behalf of <u>both</u> defendants. DE 19. Pursuant to Judge Bianco's Scheduling Order, Plaintiff's Opposition to the motion was due to be filed by December 28, 2016, and Defendants' Reply, by January 11, 2017. DE 16.

On December 19, 2016, Plaintiff notified the Court of a change in his address. DE 22. Judge Bianco posted an Electronic Order on December 23, 2017 stating that due to Plaintiff's address change, Defendants were unable to serve him with a copy of their motion. *See* 12/23/2016 Electronic Order. Judge Bianco set a revised briefing schedule, directing Plaintiff to file his Opposition by January 25, 2017 and Defendants to file their Reply by February 8, 2017. *Id.*

On January 9, 2017, Plaintiff filed a motion for extension of time to file his Opposition, which Judge Bianco granted. DE 26, 27. The deadline for Plaintiff to submit his Opposition was extended to February 24, 2017. The filing date for the Reply was extended to March 10, 2017. DE 27. On March 3, 2017, Judge Bianco issued an Order directing Plaintiff to

file his Opposition by March 20, 2017, or alternatively, to send a letter communicating to the Court why no Opposition had been filed. DE 28. The Court warned Plaintiff that a failure to respond may result in dismissal of his case, with prejudice, for failure to prosecute his claims. *Id.* On March 17, 2017, Plaintiff filed a letter explaining that he mailed a copy of his Opposition to Defendants via Fedex on February 24, 2017. DE 29. Plaintiff further stated that he requested additional time to respond to Defendants' motion so that he could obtain medical records from two hospitals where he received treatment. *Id.* Plaintiff's Opposition was filed with the Clerk's Office on March 23, 2017. DE 30. In addition to arguing the merits of his case, Plaintiff informed the Court that the 87 pages of unpublished opinions provided to him by the Defendants were not legible. *Id.* Plaintiff also requested more time to respond to Defendants' Motion to Dismiss. *Id.*

**\*4** Judge Bianco issued an Order on March 23, 2017 (1) informing Plaintiff that the Court was in receipt of his Opposition and (2) directing Defendants to file their Reply by April 7, 2017. *See* DE 31. Defendants' Reply was filed on April 3, 2017. DE 32. By Order dated April 6, 2017, Judge Bianco referred Defendants' Motion to Dismiss to this Court for a Report and Recommendation as to whether the motion should be granted. DE 33.

On April 12, 2017, the Court received a letter from Plaintiff requesting additional time to research, gather further evidence and respond to Defendants' motion to dismiss. DE 34. The Court directed counsel for Defendants to promptly serve Plaintiff with new, legible copies of the unpublished opinions, and/or opinions exclusively on computerized databases, in accordance with Local Civil Rule 7.2. *See* 4/19/2017 Electronic Order. Those opinions were mailed to Plaintiff at 400-430 30th Street, Room 3028, New York, NY 10016. *See* April 28, 2017 Affidavit of Service [DE 35].

In light of Plaintiff's asserted efforts to obtain his medical records, as set forth in his requests for additional time to respond to Defendants' motion, the Court issued an Order on May 1, 2017 directing Defendants to furnish the Court and Plaintiff with copies of various medical records concerning the care/treatment of Plaintiff by Armor, the NCCC, Nassau University Medical Center, the Metropolitan Detention Center, and the Brooklyn Medical Center and/or Kingsbrook Hospital. *See* DE 36.

On May 8, 2017, counsel for Defendants filed a letter explaining that the unpublished opinions which were

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 90 of 111

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

previously mailed to Plaintiff had been returned to their office by the postal service. DE 38. A copy of the envelope in which the opinions were sent reflects two stamps—"Return to Sender" and "Unable to Forward." DE 38. In response to this filing, efforts were made to set up a conference call between counsel for the Defendants, Plaintiff and the Court. Defendants' counsel tried reaching Plaintiff via telephone using the number listed on the docket: (516) 244-7329. *See* DE 22. Counsel was transferred to Plaintiff's voicemail. Subsequently, on May 15, 2017, this Court's Law Clerk called Plaintiff at the same number and was also forwarded to Plaintiff's voicemail. At the Court's direction, the Law Clerk left a message advising Plaintiff to contact Chambers immediately or risk having his case dismissed. When the Court did not receive a return call from Plaintiff, the undersigned, along with the Law Clerk, personally called Plaintiff on June 1, 2017 and was forced to leave a voicemail directing Plaintiff to call Chambers immediately. By Order dated June 19, 2017, the Court issued an Order to Show Cause directing Plaintiff to appear on July 11, 2017 and show cause why this case should not be dismissed for his failure to prosecute his claims and failure to comply with the Court's Orders. DE 39.

Plaintiff appeared before the Court at the July 11, 2017 Show Cause Hearing and provided the Court with an updated telephone number and a corrected address. *See* DE 45. During that conference, Plaintiff reiterated his request for additional time to respond to Defendants' motion. *Id.* He explained to the Court that he was in the process of obtaining medical records from St. Barnabas Hospital as well as the minutes from a 2013 appearance before Magistrate Judge Brown in his criminal case. *Id.* The Court directed Plaintiff to send a letter to the Court within one week of the Court's conference (1) setting forth why he should be permitted to add information to his response at this time, and (2) identifying the particular documents he wishes to use and why those documents support his claims. *Id.*

 **\*5** Counsel for the defendants filed an Affidavit of Service on July 11, 2017 stating that Plaintiff had been served by mail with copies of the unpublished opinions at Plaintiff's corrected address. DE 44. By letter dated July 19, 2017, Plaintiff confirmed that he had received copies of the medical records from the Defendants. *See* DE 48. In addition to arguing the merits of his case, Plaintiff responded to the directives given during the July 11, 2017 Show Cause Hearing. *See id.* Plaintiff stated that he is once again requesting an extension of time to supplement his Opposition

so that he may gather all of his medical records. *Id.* According to Plaintiff, this process is taking him a long time because he is representing himself and is still searching for an attorney to assist him with his case. *Id.* Plaintiff referred to certain records from St. Barnabas Hospital and explained that they demonstrate that the injury to his left forearm occurred sometime in "June/July or August 6th 2013." *Id.* at 2. In addition, Plaintiff is still attempting to get a copy of the minutes from his September 11, 2013 arraignment before Judge Brown. *Id.* According to Plaintiff, Judge Brown told him "don't worry Mr. Villafane we are sending you to a facility to [immediately] take care of your injuries." *Id.* Defendants initially providing him with illegible copies of the unpublished opinions slowed his ability to read and research Defendants' motion. *Id.* at 3

In the balance of DE 48, Plaintiff stated that (1) the seriousness of the surgery he had on his wrist now "interferes with the movement of his left elbow and inner forearm"; (2) he has played the drums since age 8 or 9 and now it is impossible for him "to play music, keep a beat or roll, my wrist constantly goes numb and I have to keep moving it as to get blood flow"; (3) the size of the Defendants' motions "would take years because I have the right to read and research every cited or uncited case ..."; (4) he has continued to look for a lawyer and feels that "as a pro se litigant, I have been stripped of my own defense. I am praying that this court would allow me to continue to fight this case. My body's been Reconstructed, I have screws on my Right knee because I don't have no Right Knee Caps"; (5) "I also have movement problems because of all the metal rods and screws, then I don't have any balance or else I'll fall I just had 2 eye surgery it isn't easy for me to run around and do all this work because I need help going down and up the stairs. Then I had to beg for money to get copies remember so I could put all these legal arguments and papers together with the defendants motion to dismiss because I didn't know the law and I had no one to help me...." *Id.* at 3-5. According to the Plaintiff, the only thing he was still missing were the minutes of his arraignment before Magistrate Judge Brown. *Id.* at 5.

On August 2, 2017, Defendants filed their Opposition to Plaintiff's request. DE 52. Counsel urges the Court to deny Plaintiff's request to supplement his Opposition at this time. *Id.* Counsel points out that although Plaintiff alleges Defendants are asserting that his broken left forearm originated from a 2004 motor vehicle accident, Defendants make no such allegation in their motion papers. *Id.* Instead, Defendants state that Plaintiff arrived at the NCCC *with the*

2017 WL 4179855

broken left forearm, which Plaintiff himself concedes in his Complaint. *Id.* According to Defendants, establishing that Plaintiff's injury occurred in 2013 as opposed to during a motor vehicle accident in 2004 "does absolutely nothing to bolster his claim as to whether or not Armor provided him with inadequate medical treatment." *Id.* Defendants maintain that Plaintiff is "simply employing a delay tactic to prolong the action for as long as possible until he either finds an attorney or the Armor defendants settle." *Id.*

Having reviewed and considered Plaintiff's July 19, 2017 request, as well as Defendants' opposition, the Court is denying Plaintiff's application to further supplement his Opposition at this time. Plaintiff is free to continue to seek his records from St. Barnabas Hospital. However, the Court will not further delay the progress of this case waiting for them. The St. Barnabas records, even assuming they show that Plaintiff's injury originated in 2013, do not impact the issues underlying Defendants' Motion to Dismiss.

With respect to Plaintiff's reference to the unpublished opinions, the Court had Defendants mail legible copies to Plaintiff on April 19, 2017. *See* 4/19/2017 Electronic Order. The mailing was done on April 28, 2017. DE 35. On May 8, 2017, Defendants notified the Court that those opinions had been returned as undeliverable. *See* DE 38. First the Defendants and then the Court itself attempted to contact Plaintiff over the course of several weeks to ensure that he had received copies of the opinions. *See* DE 39. As noted, it was not until the July 11, 2017 Show Cause Hearing that Plaintiff provided the Court with his updated telephone number and correct address. DE 45. Defendants mailed the unpublished opinions to the corrected address that same day. *See* DE 44.

**\*6** In his most recent request for additional time, however, Plaintiff fails to substantively discuss anything from those cases which would convince the Court to further extend the time to oppose Defendants' motion. Given all of these factors, there is no justification for further delay. The Court is terminating the outstanding requests that Plaintiff be provided still more time to oppose Defendants' motion to dismiss. *See* DE 29, 34, 41, 50.

### III. STANDARD OF REVIEW

Defendants move for dismissal pursuant to Rule 12(b)(6). Defendant Sposato, however, filed an Answer to Plaintiff's Complaint on September 8, 2016, prior to filing the instant motion. The pleadings with respect to Defendant Sposato are therefore closed and as such his motion should have been

brought as a Motion for Judgment on the Pleadings, pursuant to Rule 12(c). Fed. R. Civ. P. 12(c). However, the Court applies the same standard of review when analyzing a motion to dismiss pursuant to Rule 12(b)(6) as it does when reviewing a motion for judgment on the pleadings pursuant to Rule 12(c). *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006) (citing *Karedes v. Ackerley Group, Inc.*, 423 F.3d 107, 113 (2d Cir. 2005)); *Stern v. City of New York*, No. 12-5210, 2015 WL 918754, at \*2 (E.D.N.Y. Mar. 3, 2015) (citing *Ziemba v. Wezner*, 366 F.3d 161, 163 (2d Cir. 2004)) ("The same legal standard applies to a Rule 12(b)(6) motion as a Rule 12(c) motion."); *Rubino v. Town of Babylon*, No. 09-5187, 2012 WL 928252, at \*1 (E.D.N.Y. Mar. 19, 2012) (citing *Livant v. Clifton*, 272 Fed.Appx. 113, 114 (2d Cir. Apr. 7, 2008); *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999)) (finding that although the County filed a motion for judgment on the pleadings pursuant to Rule 12(c) when it had not answered the Complaint, the Court "need not decide the issue" since the standard for Rule 12(c) and Rule 12(b)(6) motions are the same); *Transamerica Fin. Life Ins. Co. v. Session*, No. 10-1328, 2010 WL 4273294, at \*2 (S.D.N.Y. Oct. 28, 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)) (citing *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010)) ("To survive a motion under Rule 12(c) or Rule 12(b)(6), 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' "); *Scott v. J. Anthony Cambece Law Office, P.C.*, 600 F.Supp.2d 479, 481 (E.D.N.Y. 2009) (citing *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126–27 (2d Cir. 2001)) (noting that "the standard for granting a Rule 12(c) motion is identical to that employed when analyzing a Rule 12(b)(6) motion."). Notwithstanding Defendant Sposato's filing of his motion under Rule 12(b) instead of Rule 12(c), the Court will review the motion on its merits.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, L.P., 737 F.3d 166, 176 (2d Cir. 2013) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)) (internal quotation marks omitted); *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (quoting *Chase Group Alliance LLC v. City of New York Department of Finance*, 620 F.3d 146, 148 (2d Cir. 2010); *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010)) (citing *Sims v. Blot*, 534 F.3d 117, 133 (2d Cir. 2008)). The plaintiff must satisfy "a flexible 'plausibility standard.' " *Iqbal v. Hasty*, 490 F.3d

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 92 of 111

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

143, 157-158 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Court, therefore, does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955; *see Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955) (citing *Ashcroft*, 556 U.S. 662, 129 S.Ct. 1937, 1949-50, 173 L.Ed.2d 868) (holding that a complaint must set forth "a plausible set of facts sufficient 'to raise a right to relief above the speculative level[ ]' ").

**\*7** The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), in which the court set forth a two-pronged approach to be utilized in analyzing a motion to dismiss. District courts are to first "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679, 129 S.Ct. 1937, 1949; *see id.* at 678, 129 S.Ct. 1937, 1949 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955) ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' "). Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679, 129 S.Ct. 1937, 1949. Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678, 129 S.Ct. 1937, 1949 (citing *Twombly*, 550 U.S. at 556-57, 127 S.Ct. 1955) (internal citations omitted).

In adjudicating a Rule 12(b)(6) motion to dismiss, the Court must limit itself to facts alleged in the complaint, which are accepted as true; to documents attached to the complaint as exhibits or incorporated in the complaint by reference; to matters of which judicial notice may be taken; or to documents whose terms and effect are relied heavily upon in the complaint and, thus, are rendered "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (quoting *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)); *see also ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014) (quoting *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013), *certified question accepted sub nom. Thelen LLP. v. Seyfarth Shaw LLP*, 22 N.Y.3d 1017, 4 N.E.3d 359, 981 N.Y.S.2d 349 (2013), *and certified question answered*, 24 N.Y.3d 16, 20 N.E.3d 264, 995 N.Y.S.2d 534 (2014)).

In addition, where, as here, a plaintiff is proceeding *pro se*, the complaint must be considered under a more lenient standard than that accorded "formal pleadings drafted by lawyers." *Bellamy v. Mt. Vernon Hosp.*, No. 07 Civ. 1801, 2009 WL 1835939, at \*3 (S.D.N.Y. June 26, 2009) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)), *aff'd*, 387 Fed.Appx. 55 (2d Cir. 2010). Therefore, a court must construe a *pro se* plaintiff's pleading broadly and interpret it to raise the strongest arguments that it suggests. *See Hughes v. Rowe*, 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 1980) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972)); *see also Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (quoting *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004); *Boykin v. KeyCorp*, 521 F.3d 202, 216 (2d Cir. 2008)) (holding that when a plaintiff proceeds pro se, the district court "is obliged to construe his pleadings liberally" and noting that "the dismissal of a pro se claim as insufficiently pleaded is appropriate only in the most unsustainable of cases."). "However, mere conclusions of law or unwarranted deductions need not be accepted." *Alston v. Sebelius*, No. 13-4537, 2014 WL 4374644, at \*5 (E.D.N.Y. Sept. 2, 2014) (quoting *Bobrowsky v. Yonkers Courthouse*, 777 F.Supp.2d 692, 703 (S.D.N.Y. 2011)).

Although "courts generally will not accept factual allegations raised for the first time in opposition to a motion to dismiss, some courts have construed the mandate to read a pro se plaintiff's papers liberally as allowing for consideration of such allegations." *Rolle v. Educ. Bus Transp., Inc.*, No. 13-1729, 2014 WL 4662256, at \*9 (E.D.N.Y. Aug. 8, 2014) (collecting cases), *report and recommendation adopted by*, 2014 WL 4662267 (E.D.N.Y. Sept. 17, 2014); *Ibok*, 2006 WL 302336, at \* 1, n.1 (citing *Fox v. Fischer*, No. 04-6718, 2005 WL 1423580 at \*2, n.1 (S.D.N.Y. June 14, 2005) *aff'd*, 242 Fed.Appx. 759 (2d Cir. 2007); *Verley v. Goord*, No. 02-1182, 2004 WL 526740, at \*5 (S.D.N.Y. Jan. 22, 2004)) ("The Court may consider the factual allegations in plaintiff's Response to supplement those in his complaint because of the liberal

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 93 of 111

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

standard afforded to the pleadings of pro se litigants."). In the instant case, the Court, in furtherance of its obligation to construe *pro se* pleadings liberally, will consider the factual allegations set forth in Plaintiff's opposition papers to the extent such facts are related to and consistent with his Complaint. *Rosario v. New York City*, No. 12-4795, 2013 WL 2099254, at \*1-2 n.1 (S.D.N.Y. May 15, 2013) (citing *Braxton v. Nichols*, No. 08-8568, 2010 WL 1010001, at \* 1 (S.D.N.Y. Mar. 18, 2010); *Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987)) ("[B]ecause [the plaintiff] is proceeding *pro se*, the Court also considers factual allegations contained in [his] two submissions in opposition to defendants' motion to dismiss, to the extent consistent with the Complaint."); *see Harris v. NYU Langone Med. Ctr.*, No. 12-0454, 2013 WL 3487032, at \*2 n.6 (S.D.N.Y. July 9, 2013) ("[B]ecause Harris is proceeding pro se, the Court may consider factual allegations contained in her submissions in opposition to Defendants' motions to dismiss, to the extent they are consistent with the [Complaint]."), *report and recommendation adopted as modified*, 2013 WL 5425336 (S.D.N.Y. Sept. 27, 2013); *see also Malik v. City of New York*, No. 11-6062, 2012 WL 3345317, at \*5 (S.D.N.Y. Aug. 15, 2012) (collecting cases) ("The mandate to read a *pro se* plaintiff's papers liberally, however, makes it appropriate to consider factual allegations in [the plaintiff's] opposition papers, in addition to those in his Complaint, in resolving the motion to dismiss."); *Aponte v. Buono*, No. 11-1077, 2011 WL 6812924, at \*3 (E.D.N.Y. Dec. 28, 2011) (citing *Cusamano v. Sobek*, 604 F.Supp.2d 416, 461 (N.D.N.Y. 2009)); *Sommersett*, 2011 WL 2565301, at \*3 (quoting *Milano v. Astrue*, No. 05 Civ. 6527, 2007 WL 2668511, at \*2 (S.D.N.Y. Sept. 7, 2007)) (" '[W]here a *pro se* plaintiff has submitted other papers to the Court, such as legal memoranda, the Court may consider statements in such papers to supplement or clarify the plaintiff's pleaded allegations.' ").

**\*8** Here, the *pro se* Plaintiff raises certain allegations for the first time in his Opposition to Defendants' motion, which the Court will nonetheless consider since they are related to the Complaint. However, in connection with those allegations, Plaintiff seeks to introduce certain documents for the Court to consider. The Court must therefore determine whether, pursuant to Rule 12(d), Defendants' motions should be converted to motions for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(d). "The district court's conversion of a Rule 12(b)(6) motion into one for summary judgment is governed by principles of substance rather than form." *M.J.M. Exhibitors, Inc. v. Stern (In re G. & A. Books, Inc.)*, 770 F.2d 288, 295 (2d Cir. 1985). "The essential inquiry in determining whether it is appropriate to convert a motion [to dismiss] into a motion for summary judgment is 'whether the non-movant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings.' " *Costor v. Sanders*, No. 07-11311, 2009 WL 1834374, at \*2 (S.D.N.Y. June 16, 2009) (quoting *Krijn v. Pogue Simone Real Estate Co.*, 896 F.2d 687, 689 (2d Cir. 1990)); accord *Glover v. Greenman*, No. 11-9122, 2013 WL 1294698, at \*3 (S.D.N.Y. Apr. 1, 2013). "Resolution of this issue will necessarily depend largely on the facts and circumstances of each case." *M.J.M. Exhibitors*, 770 F.2d at 295 (citing *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 393 (6th Cir. 1975))

"Ordinarily, formal notice is not required where a party should reasonably have recognized the possibility that the motion might be converted into one for summary judgment and was neither taken by surprise nor deprived of a reasonable opportunity to meet facts outside the pleadings." *Hernández v. Coffey*, 582 F.3d 303, 307 (2d Cir. 2009) (quoting *Villante v. Dep't of Corrections of City of New York*, 786 F.2d 516, 521 (2d Cir. 1986)) (brackets and quotation marks omitted); *see Sira v. Morton*, 380 F.3d 57, 68 (2d Cir. 2004) (quoting *Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir. 1999)) ("A party is deemed to have notice that a motion may be converted into one for summary judgment if that party 'should reasonably have recognized the possibility' that such a conversion would occur."). However, where, as here, the non-movant is proceeding *pro-se*, "[n]otice is particularly important because the *pro se* litigant may be unaware of the consequences of his failure to offer evidence bearing on triable issues. Accordingly, *pro se* parties must have unequivocal notice of the meaning and consequences of conversion to summary judgment." *Hernández*, 582 F.3d at 307-08 (quoting *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 767 (2d Cir. 1983)); accord *Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 68 (2d Cir. 2014) (citing *Hernández*, 582 F.3d at 307).

Rule 12.1 of the Local Civil Rules of the United States District Courts for the Eastern and Southern Districts of New York ("Local Civil Rule 12.1") provides, in relevant part, as follows:

A represented party moving ... for judgment on the pleadings against a

party proceeding pro se, who refers in support of the motion to matters outside the pleadings as described in Fed. R. Civ. P. 12(b) or 12(c), shall serve and file the ... notice [provided therein] with the full text of Fed. R. Civ. P. 56 attached at the time the motion is served. If the Court rules that a motion to dismiss or for judgment on the pleadings will be treated as one for summary judgment pursuant to Fed. R. Civ. P. 56, and the movant has not previously served and filed the notice required by this rule, the movant shall amend the form notice to reflect that fact and shall serve and file the amended notice within fourteen days of the Court's ruling.

Local Civil Rule 12.1. Courts in this district have held that notice pursuant to Local Civil Rule 12.1 provides sufficient notice to pro se parties that a motion to dismiss may be converted to a motion for summary judgment. See Wiggins v. Figueroa, No. 13-1731, 2015 WL 729730, at *1 (E.D.N.Y. Feb. 18, 2015) (citing Hernández, 582 F.3d at 308 n.2); Lawrence v. Sharkey, No. 13-173, 2015 WL 2213274, at *3 (E.D.N.Y. May 8, 2015); accord Loccenitt v. City of New York, No. 10-8319, 2012 WL 5278553, at *3 (S.D.N.Y. Oct. 22, 2012) (citing Goodwin v. Solil Mgmt. LLC, 10-5546, 2012 WL 1883473, at *2 (S.D.N.Y. May 22, 2012)) ("Courts in this district have concluded that a notice pursuant to Local Civil Rule 12.1 suffices to satisfy the requirement that parties be afforded a chance to offer affidavits and other evidence.").

**\*9** Ultimately, "[a] party cannot complain of lack of a reasonable opportunity to present all material relevant to a motion for summary judgment when both parties have filed exhibits, affidavits, counter-affidavits, depositions, etc. in support of and in opposition to a motion to dismiss [or for judgment on the pleadings]...." M.J.M. Exhibitors, 770 F.2d at 295 (citation omitted); see also Reliance Ins. Co. v. Polwision Corp., 474 F.3d 54, 57 (2d Cir. 2007) (finding that it was not error for the district court to consider evidence outside of the complaint in resolving a Rule 12(c) motion "without explicitly giving notice that it was converting the Rule 12 motion to a Rule 56 motion[,]" because it was "clear from the record ... that [the non-moving party] knew additional factual considerations were being considered and, in fact, responded

with its own evidentiary submissions"); Sira, 380 F.3d at 68 ("By attaching to their motion extensive materials that were not included in the pleadings, defendants plainly should have been aware of the likelihood of such a conversion."). Thus, a party who relies on extrinsic material to oppose the motion cannot later claim "that they were deprived of an adequate opportunity to provide the materials they deemed necessary to support or respond to the motion." Soller, 2015 WL 500492, at *8 (citing Sira, 380 F.3d at 68).

Here, Defendants have not requested that their motion be converted to one for summary judgment and thus have not provided the Plaintiff with a Local Civil Rule 12.1, which is unnecessary here. Since Plaintiff is proceeding pro se, the Court will not assume that his submission of extrinsic materials constitutes proof that Plaintiff is aware of the summary judgment process and the potential consequences of conversion. See Hernández, 582 F.3d at 307-308 (citing Beacon Enters., Inc. v. Menzies, 715 F.2d 757, 767 (2d Cir. 1983)) (declining to convert the defendants' motion to dismiss to one for summary judgment where the plaintiff submitted "extensive affidavits with supporting documents addressing exhaustion."). For these reasons, the Court declines to convert Defendants' motion to one for summary judgment. See Environmental Servs., Inc. v. Recycle Green Servs., 7 F.Supp.3d 260, 270 (E.D.N.Y. 2014) (quoting Carione v. United States, 368 F.Supp.2d 186, 191 (E.D.N.Y. 2005) (citations omitted)) ("Federal courts have 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings' offered in conjunction with a Rule 12(b)(6) motion, and thus complete discretion in determining whether to convert the motion to one for summary judgment.") (internal quotation marks omitted). For purposes of judicial economy, and in fairness to the Plaintiff, the Court will treat the motion to dismiss brought by Defendants as a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

## IV. DISCUSSION

### A. Exhaustion of Administrative Remedies

#### 1. Legal Standard Under the PLRA

The PLRA provides in relevant part that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 95 of 111

42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009) (citation omitted) (quoting *Booth v. Churner*, 532 U.S. 731, 741, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)).

In finding that the PLRA applies to all inmate actions concerning prison life, *see Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), the Supreme Court "did not distinguish between pretrial and post-trial detainees." *United States v. Khan*, 540 F.Supp.2d 344, 349 (E.D.N.Y. 2007) (citing *Porter*, 534 U.S. at 532, 122 S.Ct. 983; *George v. Morrisson-Warden*, No. 6-3188, 2007 WL 1686321 (S.D.N.Y. 2007); *Baez v. Parks*, No. 02-5821, 2004 WL 1052779, at *5 (S.D.N.Y. May 11, 2004) (citing *United States v. Al–Marri*, 239 F.Supp.2d 366, 367–68 (S.D.N.Y. 2002); *Rivera v. State of New York*, No. 96 Civ. 7697, 1999 WL 13240, at *4–5 (S.D.N.Y. Jan. 12, 1999); *Samuels v. Jackson*, No. 97 Civ. 2420, 1999 WL 92617, at *2 n.3 (S.D.N.Y. Feb. 22, 1999)) ("[T]he PLRA's strict exhaustion requirement does indeed apply in actions brought by pretrial detainees."). As such, similar to a convicted prisoner, a pre-trial detainee is generally required to exhaust his administrative remedies prior to filing an action in federal court. *See Baez*, 2004 WL 1052779, at *5 (citing *Porter*, 534 U.S. at 532, 122 S.Ct. 983).

**\*10** Although the language of Section 1997(e)(a) is mandatory, the "edict contains one significant qualifier: the remedies must indeed be 'available' to the prisoner." *Ross v. Blake*, ––– U.S. ––––, 136 S.Ct. 1850, 1856, 195 L.Ed. 2d 117 (2016); *Riles v. Buchanan*, 656 Fed.Appx. 577, 580 (2d Cir. 2016) ("As the Supreme Court recently made clear in holding that courts may not excuse a prisoner's failure to exhaust because of 'special circumstances,' 'mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' "). "[A]side from that exception, the PLRA's text suggests no limits on an inmate's obligation to exhaust—irrespective of any 'special circumstances.' " *Ross*, 136 S.Ct. at 1856. The Second Circuit has held that "[a]n administrative procedure is unavailable when: (1) 'it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates'; (2) it is 'so opaque that is becomes, practically speaking, incapable of use'; or (3) 'prison

administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.' " *Riles*, 656 Fed.Appx. at 580 (quoting *Ross*, 136 S.Ct. at 1859-60).

Despite the PLRA's strict application, the Supreme Court has made clear that prisoners "are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). Rather, "failure to exhaust is an affirmative defense under the PLRA" that must be raised and proven by defendants. *Id.* "Dismissal under Rule 12(b)(6) for failure to exhaust is thus appropriate only where nonexhaustion is apparent from the face of the complaint." *Roland III v. Smith*, 907 F.Supp.2d 385, 388 (S.D.N.Y. 2012) (citing *McCoy v. Goord*, 255 F.Supp.2d 233, 251 (S.D.N.Y. 2003)); *see Jandres v. Armor Health Care Inc.*, No. 12-3132, 2014 WL 1330655, at *4 (E.D.N.Y. Mar. 31, 2014); *see also Barrett v. Armor Corr. Health, Inc.*, No. 13-1063, 2014 WL 1220756, at *5 (E.D.N.Y. Mar. 20, 2014) (quoting *Rivera v. Anna M. Kross Ctr.*, No. 10-8696, 2012 WL 383941, at *2 (S.D.N.Y. Feb. 7, 2012)) (citing *Butler v. Suffolk Cnty.*, 289 F.R.D. 80, 92 (E.D.N.Y. 2013)).

### *2. Application to the Facts*

Defendants argue that the Complaint must be dismissed on the grounds that "there is no allegation or any indication that [Plaintiff] brought his complaints to the attention of NCCC officials that would have afforded them the time and opportunity to address them." Armor Correctional Health Services of New York, Inc. and Sheriff Michel Sposato's Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Defs.' Mem.") [DE 19-2] at 10. In opposing the motion, Plaintiff states that while at the NCCC, he filed grievance forms and sick call requests in which he complained about his arm as well as other issues. Pl.'s Opp'n at 4. Plaintiff explained that he could not figure out what the officer wrote on most of the complaint forms and there were times when the officer informed Plaintiff that he "had to sign the form because soon [he would] be taken to the Hospital." *Id.* at 3. Sometimes the officer would write on the form a note that Plaintiff refused to sign it when, in fact, Plaintiff had signed the form on an earlier date. *Id.* Moreover, in connection with his discussion of the PLRA and his efforts to comply with it, Plaintiff stated that he was transferred from a "county holding facility" to a "federal trans[ ]ient facility, which is a different jurisdiction, with different rules and regulations." *Id.*

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 96 of 111
Villafane v. Sposato, Not Reported in Fed. Supp. (2017)
2017 WL 4179855

In their Reply, Defendants argue that Plaintiff's Opposition fails to set forth a "meaningful rebuttal to the Defendants' position." Reply Memorandum of Law in Further Support of the Defendant's Motion to Dismiss the Complaint ("Defs.' Reply") [DE 32] at 2. Defendants reject what they characterize as Plaintiff's attempt to attribute any deficiencies under the PLRA to his being transferred to a different facility. *See id.* at 2. They point out that Plaintiff, by his own "admission," arrived at the NCCC on September 11, 2013, and was not transferred to another facility until November 5, 2013. *Id.* Based on this timeline, Defendants argue that Plaintiff had approximately two months to file a grievance and any subsequent appeal. *Id.* They further note that Plaintiff does not challenge the three-tiered prisoner grievance procedure utilized by the NCCC which is set out in detail in Defendants' opening papers. *Id.* at 3.

**\*11** As discussed above, Plaintiff is not required to plead specific facts in the Complaint setting forth exhaustion. *Jones*, 549 U.S. at 216, 127 S.Ct. 910; *Roland v. Smith*, 907 F.Supp.2d 385, 388 (S.D.N.Y. 2012) ("inmates are not required to specially plead or demonstrate exhaustion in their complaints."). Therefore, to the extent Defendants seek dismissal on the grounds that Plaintiff does not allege that he exhausted the administrative remedies available to him, that argument is unavailing. Dismissal is "appropriate only where nonexhaustion is apparent from the face of the complaint." *Zamani v. Nassau Cty.*, No. 14-5606, 2015 WL 9943257, at \*3 (E.D.N.Y. Dec. 16, 2015) (quoting *Roland v. Smith*, 907 F.Supp.2d 385, 388 (S.D.N.Y. 2012)) (citing *Cephas v. Nassau Cty. Corr. Ctr.*, No. 12-CV-1445, 2014 WL 537576, at \*4 (E.D.N.Y. Feb. 10, 2014)) (rejecting defendants' argument that the plaintiff "failed to exhaust his administrative remedies in that there is no indication or allegation that plaintiff undertook any further action to complain of or appeal any dissatisfaction with any of [his grievances]....") (internal quotation marks omitted), *report and recommendation adopted*, No. 14-5606, 2016 WL 393934 (E.D.N.Y. Jan. 28, 2016). Non-exhaustion has been deemed to be apparent from the face of a Complaint where, for example, the plaintiff explicitly alleged that his grievance was under review by Internal Affairs at the time the Complaint was filed, *Joseph v. Nassau Cty. Corr. Facility*, No. 15-7010, 2016 WL 3033725, at \*4 (E.D.N.Y. May 26, 2016), or where the Court determined, through a review of exhibits attached to the plaintiff's Complaint, that the plaintiff failed to properly appeal the outcome of his grievances in accordance with the facility's protocol—the "plaintiff either

accepted the grievance coordinator's decision and did not appeal, or refused to sign the reviewed grievance forms and did not appeal." *Young v. Sposato*, No. 12-2850, 2014 WL 109083, at \*7 (E.D.N.Y. Jan. 13, 2014).

Unlike the circumstances in *Joseph* and *Young*, the Court finds here that here non-exhaustion is not apparent from the face of Plaintiff's Complaint. At no point does Plaintiff affirmatively state in any of his submissions "that he failed to follow all the required grievance procedures." *Randolph v. N.Y.C. Dep't of Corr.*, No. 05-8820, 2007 WL 2660282, at \*7 (S.D.N.Y. Sept. 7, 2007), *report and recommendation adopted*, No. 14-06468, 2016 WL 680822 (S.D.N.Y. Feb. 18, 2016); *see, e.g., Groenow v. Deputy Warden of OBCC Williams*, No. 13-3961, 2014 WL 941276, at \*4 (S.D.N.Y. March 11, 2014). In fact, Plaintiff makes no mention in his Complaint of the NCCC's grievance procedure or his compliance with it, likely because the standardized 42 U.S.C. Section 1983 complaint form utilized by *pro se* plaintiffs like Mr. Villafane do not prompt the individual to discuss his efforts to exhaust administrative remedies. It is not until his Opposition that Plaintiff asserts he filed grievance forms and sick call requests while detained at the NCCC. Pl.'s Opp'n at 4. Plaintiff states that (1) he often could not read what the officers wrote on the forms, (2) officers told him he had to sign the forms since he would be taken to a hospital, and (3) officers sometimes indicated on the form that Plaintiff refused to sign when, according to Plaintiff, he actually did. *Id.* "Where a prisoner indicates that he has taken some steps toward exhaustion, district courts will normally not infer from his silence that he failed to take the remaining steps that full exhaustion would require." *Huggins v. Schriro*, No. 14-6468, 2015 WL 7345750, at \*3 (S.D.N.Y. Nov. 19, 2015) (citing *Rodriguez v. Warden, Metropolitan Correctional Facility*, No. 13-3643, 2015 WL 857817 at \*3–4 (S.D.N.Y. Feb. 27, 2015); *Randolph*, 2007 WL 2660282, at \*8; *Groenow*, 2014 WL 941276, at \*3 (S.D.N.Y. March 11, 2014)); *id.* (quoting *Wesley v. Muhammad*, No. 05-5833, 2008 WL 123812, at \*3 (S.D.N.Y. Jan. 10, 2008)), *report and recommendation adopted*, 2008 WL 236974 (S.D.N.Y. Jan. 28, 2008)(" '[A] pro se plaintiff's pleading references to various efforts that he has made to bring alleged prison violations to the attention of the prison authorities cannot be treated as tantamount to an admission that he had not exhausted his remedies.' "); *but see Ghee v. Warden Ramos*, No. 13-632, 2013 WL 7018543, at \*1–2 (S.D.N.Y. Dec. 4, 2013) (dismissing the plaintiff's complaint where he left blank a section of the form complaint that set forth the following: "[w]hat steps, if any, did you take

Case 9:17-cv-00244-BKS-TWD   Document 58   Filed 08/07/19   Page 97 of 111

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

to appeal that decision? Describe all appeals to the highest level of the grievance process[ ]").

**\*12** Moreover, according to Plaintiff, he was instructed to sign a complaint form so that he would be taken to a hospital. Accepting this allegation as true, which the Court must do at this juncture, it is not unreasonable to infer that Plaintiff's request to be taken to a hospital was accepted. Where a grievance is decided in an inmate's favor, but the facility fails to implement the administrative decision and there is no means of appealing that failure, then the inmate is deemed to have fully exhausted his or her remedies for purposes of the PLRA. *See Abney v. McGinnis*, 380 F.3d 663, 669 (2d Cir. 2004) (collecting cases). Plaintiff's allegations raise questions that cannot be answered at this stage with an undeveloped record. *See Cephas*, 2014 WL 537576, at \*4 (quoting *Gaines v. Armor Health Care, Inc.*, No. 12-5663, 2013 WL 6410311, at \*3 (E.D.N.Y. Dec. 9, 2013)) ("Inquiries regarding exhaustion ... 'typically cannot be determined on an undeveloped record.' "). In light of the foregoing analysis, the Court finds that dismissal on the grounds of non-exhaustion is inappropriate at this time. *See Jandres*, 2014 WL 1330655, at \*4; *Joseph*, 2016 WL 3033725, at \*4 (citing *McCoy v. Goord*, 255 F.Supp.2d 233, 249 (S.D.N.Y. 2003)) ("Where non-exhaustion is not clear from the face of the complaint, a defendant's motion to dismiss pursuant to 12(b)(6) is not an appropriate vehicle.")

**B. Plaintiff's Claims Arising Under 42 U.S.C. Section 1983**

Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...

42 U.S.C. § 1983. To state a claim under Section 1983, a plaintiff must " 'allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States.' " *Rae v. Cty. of Suffolk*, 693 F.Supp.2d 217, 223 (E.D.N.Y. 2010) (quoting *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999)); *see Corneio v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)). Section 1983 does not create any independent substantive rights but rather is a vehicle to "redress ... the deprivation of [federal] rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), *abrogated on other grounds recognized by Collins v. City of San Diego*, 841 F.2d 337 (9th Cir. 1988); *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993)). In addition, as discussed in greater detail below, it is well-settled in this Circuit that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)); *see Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009).

### *1. Section 1983 Claims against Defendant Sposato in his Individual Capacity*

Plaintiff sets forth a single allegation concerning Defendant Michael Sposato, the Nassau County Sheriff. In the section of Plaintiff's form Complaint entitled "Basis for Jurisdiction," when prompted to discuss how each defendant acted under color of state or local law, Plaintiff responded "Armor by denying me prop[ ]er medical care intentionally the sheriff by allowing them to do so, and by not monitoring its medical Dept." Compl. § II.D. Plaintiff does not mention Defendant Sposato in either his "Statement of Claim," *see id.* § III, or his Opposition papers. *See generally*, Pl's. Opp'n.

At the outset, the Court notes that a supervisory official like Sheriff Sposato will not be found liable under Section 1983 simply by virtue of his "high position of authority." *Whitenack v. Armor Med.*, No. 13-2071, 2014 WL 5502300, at \*5 (E.D.N.Y. Oct. 30, 2014) (quoting *Al–Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir. 1989)) (citing *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004)) (internal quotation marks omitted); *see Morgan v. Dzurenda*, No. 14-966, 2015 WL 5722723, at \*6 (D. Conn. Sept. 19, 2015) (citing *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)) ("Supervisory officials cannot be held liable under section 1983 solely for the acts of their subordinates."). Rather, liability may generally only be predicated upon the individual defendant's personal

2017 WL 4179855

involvement in the purported constitutional violation. *See Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004) (citing *Back v. Hastings on Hudson Union Free School District*, 365 F.3d 107, 122 (2d Cir. 2004)); *Morgan*, 2015 WL 5722723, at *6 (citing *Colon*, 58 F.3d at 873). A complaint asserting a § 1983 claim which does not allege facts establishing the requisite personal involvement "fails as a matter of law." *Gaines*, 2013 WL 6410311, at *3 (citing *Costello v. City of Burlington*, 632 F.3d 41, 48–49 (2d Cir. 2011)).

**\*13** According to the Second Circuit in *Colon v. Coughlin*, personal involvement may be found when:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d at 873 (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)); *Donohue v. Manetti*, No. 15-636, 2016 WL 740439, at *3 (E.D.N.Y. Feb. 24, 2016) (quoting *Colon*, 58 F.3d at 873); *Barrett*, 2014 WL 1220756, at *4 (quoting *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996)). Some courts have questioned the continuing applicability of these factors based upon the heightened pleading requirements set forth in *Iqbal*. *See Bellamy v. Mount Vernon Hosp.*, No. 07-1801, 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third *Colon* categories pass *Iqbal's* muster—a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred."), *aff'd* 387 Fed.Appx. 55 (2d Cir. 2010); *Newton v. City of New*

*York*, 640 F.Supp.2d 426, 448 (S.D.N.Y. 2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived" post-*Iqbal*.). However, the Second Circuit has not yet ruled on the issue. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations," but declining to resolve the issue); *see also Marom v. City of New York*, No. 15-2017, 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016) (citing *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012) (acknowledging that *Iqbal* has "engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon v. Coughlin*")); *Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014) (declining to decide the "contours of the supervisory liability test" post *Iqbal*), *on reconsideration in part*, No. 15-CV-2017, 2016 WL 5900217 (S.D.N.Y. July 29, 2016). Notwithstanding the Second Circuit's silence, the majority of courts considering the issue have determined that "even after the U.S. Supreme Court's decision in *Iqbal*, these 'categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated.' " *Hernandez v. Goord*, No. 01-9585, 2013 WL 2355448, at *7 (S.D.N.Y. May 29, 2013) (quoting *Qasem v. Toro*, 737 F.Supp.2d 147, 152 (S.D.N.Y. 2010)) (citing *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937); *see Ramey v. Perez*, No. 13-00017, 2014 WL 407097, at *4 (S.D.N.Y. Jan. 31, 2014) ("*Colon* remains the standard in this Circuit for deciding whether personal involvement by supervisory officials is sufficiently alleged in the context of the Eighth Amendment."); *see also Morgan v. Comm'r Dzurenda*, No. 14-966, 2015 WL 5722723, at *7 (D. Conn. Sept. 29, 2015) ("Because it is unclear as to whether *Iqbal* overrules or limits *Colon*, the Court will continue to apply the categories for supervisory liability set forth by the Second Circuit."); *Mercier v. Kelly*, No. 10-7951, 2013 WL 4452486, at *6 (S.D.N.Y. Aug. 19, 2013) ("[T]he majority view is where 'the constitutional claim does not require a showing of discriminatory intent ... the personal involvement analysis set forth in *Colon v. Coughlin* may still apply.' ") (quoting *Shepherd v. Powers*, No. 11 Civ. 6860, 2012 WL 4477241, at *10 (S.D.N.Y. Sept. 27, 2012)) (internal quotation marks omitted) (citing *Bertuglia v. City of New York*, 839 F.Supp.2d 703, 720–23 (S.D.N.Y. 2012); *Malik v. City of New York*, No. 11-6062, 2012 WL 3345317, at *14–15 (S.D.N.Y. Aug. 15, 2012)); *Martinez v. Perilli*, No. 09-6470, 2012 WL 75249, at *4 (S.D.N.Y. Jan. 5, 2012) ("[T]he five *Colon* categories still apply after *Iqbal*.") (citing *Qasem*, 737 F.Supp.2d at

Case 9:17-cv-00244-BKS-TWD Document 58 Filed 08/07/19 Page 99 of 111

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

151; *D'Olimpio v. Crisafi*, 718 F.Supp.2d 340, 345–48 (S.D.N.Y. 2010), *aff'd*, 462 Fed.Appx. 79 (2d Cir. 2012); *Sash v. United States*, 674 F.Supp.2d 531, 544 (S.D.N.Y. 2009)). Using the principles set forth above, the Court will now consider whether Plaintiff has established the requisite personal involvement of Defendant Sposato in the underlying circumstances.

**\*14** Plaintiff alleges that Defendant Sposato allowed Armor to deny him medical care and failed to monitor the "medical department." *See* Compl. § II.D. As to the first and second *Colon* factors set forth above, Plaintiff does not allege that Defendant Sposato was directly involved in the alleged constitutional violations or that he failed to remedy the constitutional violations "after being informed of the violation through a report or appeal." Plaintiff may still satisfy the personal involvement requirement by establishing that the defendant was responsible for creating a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, as set forth in the third *Colon* factor. "As currently drafted, the Complaint merely discusses the constitutional violations against Plaintiffs, which is insufficient to assert a policy or custom." *See Tretola v. D'Amico*, No. 13-5705, 2014 WL 2957523, at *8 (E.D.N.Y. July 1, 2014); *see also, e.g., Youngblood v. City of N.Y.*, No. 15-3541, 2016 WL 3919650, at *5 (S.D.N.Y. June 27, 2016) (holding that the pro se "Plaintiff's bare allegations of the existence of a custom and policy and his conclusory assertion that the policy was linked to his constitutional injuries are insufficient to state a *Monell* claim[ ]"); *Carpinone v. City of New York*, No. 11-2074, 2012 WL 760073, at *2 (S.D.N.Y. Mar. 9, 2012) ("Plaintiff offers no facts which would render plausible his allegations of a policy or custom within the New York City Police Department that was affirmatively linked to the purported constitutional violations he suffered."). Here, Plaintiff Villafane has therefore failed to establish personal involvement of Defendant Sposato through the third *Colon* factor.

Turning to the fourth *Colon* factor—which appears to be the factor most directly implicated by Plaintiff's allegations —Plaintiff claims that "the defendant was grossly negligent in supervising subordinates who committed the wrongful acts." *Samuels v. Fischer*, 168 F.Supp.3d 625, 638 (S.D.N.Y. 2016) (*quoting Colon*, 58 F.3d at 873). Courts have held that in order to establish personal involvement in this context, a plaintiff must demonstrate that the defendant "knew or should have known that there was a high degree of risk

that his subordinates would behave inappropriately, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to Plaintiff." *Samuels*, 168 F.Supp.3d at 638 (quoting *Frederick v. Sheahan*, No. 10-6527, 2014 WL 3748587, at *8 (W.D.N.Y. July 29, 2014)) (citing *Kucera v. Tkac*, No. 12-264, 2013 WL 1414441, at *6 (D. Vt. Apr. 8, 2013)) (explaining that the defendants' alleged failure to supervise will satisfy the fourth *Colon* factor if the defendants "knew or should have known that there was a high degree of risk that his subordinates would behave inappropriately ... but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable officer would find necessary to prevent such a risk[.]"); *Brooks v. Prack*, 77 F.Supp.3d 301, 313 (W.D.N.Y. 2014) (quoting *Frederick*, 2014 WL 3748587, at *8).

Plaintiff has not provided any salient facts regarding Defendant Sposato's state of mind—whether he knew or should have known that his subordinates were engaging in conduct which violated Plaintiff's or other inmate's constitutional rights. Plaintiff merely makes the conclusory allegation that Defendant Sposato "allowed" Armor to engage in the purportedly unconstitutional conduct. Moreover, even if Plaintiff had alleged that Sheriff Sposato was aware of Armor's inaction through his receipt of complaints and failed to act on those complaints, Plaintiff's allegations might still fail to establish the requisite personal involvement. *See Tafari v. McCarthy*, 714 F.Supp.2d 317, 359 (N.D.N.Y. 2010) (quoting *Rivera v. Goord*, 119 F.Supp.2d 327, 344– 45 (S.D.N.Y. 2000)) (citing *Watson v. McGinnis*, 964 F.Supp. 127, 130 (S.D.N.Y. 1997)) ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official 'failed to remedy the violation after learning of it through a report or appeal' or 'allowed the custom or policy to continue after learning of it.' "). As an example, in *Whitenack v. Armor Medical*, No. 13-2071, 2014 WL 5502300 (E.D.N.Y. Oct. 30, 2014), the incarcerated *pro se* plaintiff filed a civil rights Complaint in the Eastern District of New York under 42 U.S.C. § 1983 against Armor, Sheriff Sposato, Nassau County and "the Clerk of the Court of the Nassau County D.A.'s office." *Id.* at *1. As to Sheriff Sposato, plaintiff Whitenack alleged that Sposato failed to "provid[e] medical needs, even after they learned, through grievances, that Armor was not providing proper medical care" and that he "allows Armor to continue practicing [ ] in the [NCCC] * * *." *Id.* at *6 (alterations in original). The court in *Whitenack* held that "such allegations

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 100 of 111

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

are insufficient to impose Section 1983 liability upon Sheriff Sposato in a supervisory capacity." *Id.* (collecting cases). The court added that "[s]ince plaintiff 'has pled no facts, beyond [Sheriff Sposato's] presumed receipt of [grievances] and [his] * * *position[ ] atop the [NCCC], implicating [him] in any violation described in [his] [amended] complaint [,] [he] has * * * failed to plausibly plead [Sheriff Sposato's] personal involvement in any infringement of [his] constitutional rights.' " *Id.* at *6 (alterations in original) (quoting *Vogelfang v. Capra, 889 F.Supp.2d 489,* 502 (S.D.N.Y. 2012)). On these grounds, the court granted the defendants' motion seeking dismissal of the plaintiff's Section 1983 claim against Sheriff Sposato. *Id.*

**\*15** The Court also notes that Plaintiff fails to set forth any detail regarding how Defendant Sposato failed to supervise his subordinates or which subordinates he failed to supervise. *See Brooks,* 77 F.Supp.3d at 313. "[T]he mere failure to supervise would not be sufficient to establish liability under § 1983." *Tyler v. Dalsheim,* No. 82-2467, 1985 WL 554, at *1 (S.D.N.Y. Apr. 24, 1985); *McRae v. Gentile,* No. 914-00783, 2015 WL 7292875, at *5 (N.D.N.Y. Oct. 20, 2015) (quoting *White v. Fischer,* No. 09-240, 2010 WL 624081, at *6, 2010 U.S. Dist. LEXIS 15492, at *19 (N.D.N.Y. Feb. 18, 2010)) (citing *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir. 2009)) (" 'Vague and conclusory allegations that a supervisor' negligently failed to [ ] supervise subordinate employees do not suffice to establish personal involvement so as to give rise to personal liability."), *report and recommendation adopted,* No. 914-783, 2015 WL 7300540 (N.D.N.Y. Nov. 18, 2015).

The Court finds that Plaintiff's claims against Defendant Sposato fare no better under the fifth *Colon* factor: "the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873. For example, in *Holland v. City of New York,* the *pro se* plaintiff alleged that two individual defendants, Commissioner Schriro and Warden Perrino, " 'pursued a policy and custom of deliberate indifference' in the 'hiring, training and supervision of' Jennings and the correction officer defendants." *See Holland v. City of New York,* 197 F. Supp. 529, 551 (2016). The court determined that plaintiff Holland's claims failed to satisfy the third, fourth and fifth *Colon* factors. *Id.* In doing so, the court explained that "[t]o the extent that the complaint attempts to assert a failure-to-supervise claim, moreover, it lacks any hint that [Schriro and Perrino] acted with deliberate indifference to the possibility that [their] subordinates would violate [Holland's]

constitutional rights." *Holland,* 197 F.Supp. at 551 (quoting *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir. 2009)). Likewise, in *Erdogan v. Nassau County,* this Court found the following allegations to be conclusory:

> Specifically, Plaintiff alleges that the "Defendant supervisors," including the Proposed Defendants, "were personally involved in both the deprivation of Ms. Erdogan's constitutional rights and in creating or condoning the policy or custom of failing to take preventative and remedial measures to guard against such constitutional deprivations." PAC ¶ 54. Plaintiff further maintains that (i) the Defendant supervisors were reckless in their failure to supervise Mark Barber, and knew or should have known that Barber was sexually abusing female inmates and that the conduct against Plaintiff was likely to occur; and (ii) the failure of the supervisory defendants to train, supervise, and discipline Barber amounted to gross negligence. *Id.* ¶¶ 55–57.

No. 10-5837, 2014 WL 1236679, *16 (E.D.N.Y. March 25, 2014). As a result, this Court held the plaintiff failed to establish that the defendants were deliberately indifferent or grossly negligent in supervising subordinates. *Id.* In addition, the plaintiff in *Erdogan* failed to set forth "sufficient factual averments as required under *Iqbal.*" *Id.* at 16 (collecting cases). Here, too, Plaintiff fails to set forth "sufficient factual averments" to support a claim for deliberate indifference. Plaintiff "must do more than plead '[c]onclusory allegations or legal conclusions masquerading as factual conclusions[.]' " *Andino v. Fischer,* 698 F.Supp.2d 362, 376 (quoting *Gebhardt v. Allspect, Inc.,* 96 F.Supp.2d 331, 333 (S.D.N.Y. 2000)) (second alteration added). Since Plaintiff has failed to meet this standard, the Complaint, as currently drafted, fails to allege Defendant Sposato's personal involvement—a deficiency that is fatal to Plaintiff's claim. *Huggins,* 2015 WL 7345750, at *5.

### 2. Section 1983 *Claims against Defendant Sposato in his Official Capacity*

**\*16** Since Plaintiff did not explicitly state that he is suing Defendant Sposato in his individual capacity, the Court will also consider whether Plaintiff has stated a claim against Defendant Sposato in his official capacity as Sheriff of Nassau County. In this regard, the Court points out that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the [governmental] entity [of which the officer is an agent]." *Stancati v. Cty. of Nassau,* No.

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

Case 9:17-cv-00244-BKS-TWD   Document 58   Filed 08/07/19   Page 101 of 111

14-2694, 2015 WL 1529859, at *2 (E.D.N.Y. Mar. 31, 2015) (citing *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) (alterations in original); *Castanza v. Town of Brookhaven*, 700 F.Supp.2d 277, 283–84 (E.D.N.Y. 2010)). Therefore, a suit against Defendant Sposato in his official capacity is a suit against the Nassau County Sheriff's Department. It is well established, however, that as an "administrative arm of a municipality," the Nassau County Sheriff's Department is not a suable entity. *Campbell v. Sposato*, No. 15-1958, 2015 WL 9267222, at *4 (E.D.N.Y. Nov. 17, 2015) (citing Nassau County Charter, DE [14–2], art. XX, §§ 2001, 2003), *report and recommendation adopted*, No. 15-1958, 2015 WL 9273951 (E.D.N.Y. Dec. 16, 2015). Unlike the Nassau County Sheriff's Department, Nassau County itself is a suable entity. However, for the same reasons that Plaintiff has failed to set forth a claim against Armor, which is discussed in greater detail below, Plaintiff's Complaint fails to establish a claim for municipal liability.

### *3. Section 1983 Claims against Armor*

"Armor is a private company that provides medical services for inmates at the [NCCC] pursuant to a contract with the Nassau County Sheriff's Department." Declaration of John J. Doody in Support of Defendant Armor's Motion to Dismiss ("Doody Decl.") [19-1] ¶ 3. Generally, to state a claim under Section 1983, the challenged conduct must be attributable at least in part to a person who was acting under color of state law. *Zamani v. Nassau Cty.*, No. 14-5606L, 2015 WL 9943257, at *4 (E.D.N.Y. Dec. 16, 2015) (quoting *Hawkins v. Nassau Cty. Corr. Facility*, 781 F.Supp.2d 107, 111 (E.D.N.Y. 2011)), *report and recommendation adopted*, No. 14-5606, 2016 WL 393934 (E.D.N.Y. Jan. 28, 2016). However, "a private employer such as Armor may be held liable under Section 1983 for the acts of its employees where the unconstitutional act was authorized or undertaken pursuant to the official policy of the private entity employer and the employer was jointly engaged with state officials or its conduct is chargeable to the state." *Gaines*, 2013 WL 6410311, at *3; *see Hollander v. Copacabana Nightclub*, 624 F.3d 30, 33 (2d Cir. 2010); *see generally Filarsky v. Delia*, 566 U.S. 377, 389-90, 132 S.Ct. 1657, 1661-65, 182 L.Ed.2d 662 (2012); *see also Zamani*, 2015 WL 9943257, at *5 (citing *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408 (2d Cir. 1990)); *Cephas*, 2014 WL 537576, at *4 (quoting *Gaines*, 2012 WL 5438931, at *3) (" 'Thus, a private employer acting under color of state law may be held liable under Section 1983 for the acts of its employees where the unconstitutional act

was authorized or undertaken pursuant to the official policy of the private entity employer and the employer was jointly engaged with state officials or its conduct is chargeable to the state.' "); *Briel v. Sposato*, No. 12-2868, 2012 WL 3697806, at *5 (E.D.N.Y. Aug. 21, 2012).

In the instant case, Armor is the "medical arm" of the NCCC where Plaintiff was detained. *See Cephas*, 2014 WL 537576, at *5. The Court will therefore assume for purposes of deciding the instant motion that Armor was acting under color of state law in rendering medical services to Plaintiff at the NCCC. *Cherry v. Spoato [sic]*, No. 15-1832, 2015 WL 2089588, at *3 (E.D.N.Y. May 5, 2015); *Feder v. Sposato*, No. 11-193, 2014 WL 1801137, at *6 (E.D.N.Y. May 7, 2014) (quoting *West v. Atkins*, 487 U.S. 42, 54, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)) ("Because Armor was hired to fulfill the state's constitutional obligation to provide necessary medical care for its inmates, [it][was] 'acting under the color of state law' for purposes of Section 1983").

**\*17** As referenced above, there is no *respondeat superior* liability for § 1983 claims. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Southerland v. City of N.Y.*, 681 F.3d 122, 137 (2d Cir. 2012) (quoting *Monell*, 436 U.S. at 691-94, 98 S.Ct. 2018). Since Plaintiff does not assert claims against any individual employee or official of Armor, Armor may be liable under § 1983 only if Plaintiff "proves that action pursuant to official ... *policy* of some nature caused a constitutional tort." *Grafton v. Cty. of Nassau*, No. 15 CV 4564, 2016 WL 8711072, at *9 (E.D.N.Y. July 15, 2016) (emphasis in original) (citing *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408-09 (2d Cir. 1990); *Green v. City of New York*, 465 F.3d 65, 82 (2d Cir. 2006)); *Cofield v. Armor Correctional Health Inc.*, No. 12-1394, 2013 WL 2416318, at *4 (E.D.N.Y. May 31, 2013) (citing *Rojas*, 924 F.3d 408). "Although *Monell* dealt with municipal employers, its rationale has been extended to private businesses [acting under color of state law]." *Rojas*, 924 F.2d at 409; *see also Bektic–Marrero v. Goldberg*, 850 F.Supp.2d 418, 432 (S.D.N.Y. 2012) (collecting cases) (holding that *Monell* has been extended to private Section 1983 defendants acting under color of state law).

Here, Plaintiff has not plausibly alleged facts showing that the constitutional deprivations he alleges resulted from an official policy or custom of Armor. In particular,

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 102 of 111

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

Plaintiff has not alleged facts from which to reasonably infer: (1) the existence of a formal policy to deny inmates at the NCCC, including himself, their 'basic medical needs' which is officially endorsed by Armor; (2) actions taken or decisions made by Armor policymaking officials which caused the alleged violation of his civil rights ...; (3) an Armor practice so persistent and widespread as to practically have the force of law; or (4) a failure by Armor policymakers to properly train or supervise their subordinates, amounting to 'deliberate indifference' to the rights of those who come in contact with their employees.

*Whitenack*, 2014 WL 5502300, at *9; *see, e.g.*, *Barrett*, 2014 WL 1220756, at *5 (dismissing claims against Armor where the plaintiff "neither alleged that an Armor employee violated his constitutional rights, nor ... alleged a single fact to support an inference that any action resulted from an official policy or custom").

The Court turns to prevailing Second Circuit case law involving civil rights complaints to demonstrate the factual averments and evidentiary support needed to satisfy the pleading requirements set forth in *Iqbal*. In *Kucharczyk v. Westchester County*, the *pro se* plaintiff alleged in his complaint "a *Monell* claim for [a] pattern due to the fact that there [are] several claims pending in this court based on the same facts [he] allege[s] in [the instant] [C]omplaint." 95 F.Supp.3d 529, 543 (S.D.N.Y. 2015) (alterations in original). In support of his claim, the plaintiff attached to his complaint a copy of a report issued by the Civil Rights Division of the United States Department of Justice which memorialized the department's findings resulting from an investigation of the correctional facility where the plaintiff was detained.

The court in *Kucharczyk* explained that "[t]he Second Circuit and the district courts within the Second Circuit have held that a plaintiff's citation to a few lawsuits involving claims of alleged [constitutional violations] is not probative of the existence of an underlying policy by a municipality ... or department of corrections." *Id.* (quoting *Ameduri v. Village*

*of Frankfort*, 10 F.Supp.3d 320, 341 (N.D.N.Y. 2014)) (collecting cases). "Some courts, however, have found that other lawsuits identified by a plaintiff that concern the same practice and policy at issue in the complaint permit a plausible inference of deliberate indifference." *Id.* (collecting cases). In *Kucharczyk*, the court concluded that regardless of which approach it adopted, the plaintiff's failure to name the cases and indicate how many were pending rendered his statement conclusory and the court would have to disregard it on that grounds. *Id.* Notwithstanding this deficiency, the court determined that the plaintiff had sufficiently alleged a custom or practice by virtue of the DOJ Report appended to his complaint. *Id.* According to the report, the facility " 'ha[d] a pattern of failing to ... provide inmates with adequate medical ... care," which "violate[d] WCJ inmates' constitutional rights.' " *Id.* The report further stated that " '[a]lthough WCJ has instituted a policy for submitting grievances, it is not consistently implemented or effectively publicized," which posed a risk to inmates that perceived that their serious health needs were being unmet." *Id.* Moreover, the court noted, the report was released several years prior to the commencement of the suit, so the facility's policymakers were well aware of the deficiencies. *Id.* at 544-545. The court held that based on this information, the plaintiff adequately alleged "a widespread practice or policy of which Defendants were aware to survive Defendants' Motion to Dismiss his *Monell* claim." *Id.* at 544.

**\*18** Although the DOJ report persuaded the court in *Kucharczyk* that the plaintiff had successfully pleaded a *Monell* claim, this Court notes that submission of such a report is not necessarily required to satisfy the *Iqbal* pleading standard. For example, in *Donohue v. Manetti*, No. 15-636, 2016 WL 740439, at *1 (E.D.N.Y. 2016), the *pro se* plaintiff filed a Section 1983 action against Armor, two individual medical professionals and Sheriff Sposato for failing to provide the plaintiff with adequate medical care in violation of the Eighth and Fourteenth Amendments. More specifically, the plaintiff there alleged that he was denied previously prescribed psychotropic medication, and instead of giving him his prescribed pain medication, the defendant nurse deliberately gave him medication to which he was allergic. *Id.* at *1-2. The defendants in *Donohue* argued that "two isolated incidents are insufficient to be deemed a policy or custom for the purpose of § 1983 liability." *Id.* at *5. The court rejected the defendants' argument, finding that these incidents, in combination with the comments alleged to have been made to the plaintiff by Armor staff (*i.e.* "things are different now and we don't hand out pills anymore—deal

Case 9:17-cv-00244-BKS-TWD  Document 58  Filed 08/07/19  Page 103 of 111

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

with it," it is "Armor's 'policy' not to 'write' (prescribe) pain medication other than N.S.A.I.D.S." and "I wish you would have died") "support[ed] an inference of a policy or custom to deny inmates adequate medical care." *Id.* at *6.

Here, Plaintiff's complaint "concerns only allegedly unconstitutional conduct to which he was subjected." *Joseph v. Nassau County Correctional Facility*, No. 15-7010, 2016 WL 3033725 (E.D.N.Y. May 26, 2016). Moreover, Plaintiff does not set forth any facts which could give rise to an inference that the constitutional deprivations suffered by Plaintiff arose from an official policy or custom. On this basis, and for the foregoing reasons, this Court respectfully recommends to Judge Bianco that Defendants' motion to dismiss be GRANTED to the extent it seeks dismissal of Plaintiff's § 1983 claim against Defendant Sposato and Defendant Armor.

### C. Plaintiff's Claim for Deliberate Indifference to Medical Needs

Because the Court is recommending to Judge Bianco that the Amended Complaint be dismissed based on Plaintiff's failure to state a valid § 1983 claim against the Defendants, the Court would not normally address whether Plaintiff has adequately stated a claim that Defendants violated his constitutional rights by acting with deliberate indifference to his serious medical needs. However, this Court is also recommending to Judge Bianco that Plaintiff be granted leave to amend his pleadings. Therefore, the Court will now assess Plaintiff's deliberate indifference claim.

### 1. Legal Standard for Deliberate Indifference

Plaintiff asserts that at the time of his arrest and arrival at NCCC he had a broken left forearm. Compl. § III.C. Despite repeatedly notifying Defendants of his painful condition, Plaintiff contends that Defendants failed to produce him for the necessary surgery and failed to provide him with prescribed pain medication. *Id.* Plaintiff does not specify in his Complaint whether he was a pre-trial detainee or convicted inmate during the time at issue. Given the temporal proximity between Plaintiff's arrest and the purported unconstitutional conduct, the Court finds it is not unreasonable to assume that Plaintiff was a pre-trial detainee for at least some portion of the time at issue. *See generally* Compl. The Eighth Amendment, which prohibits cruel and unusual punishment, governs a convicted prisoner's claims of inadequate medical

care. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citing *Benjamin v. Fraser*, 343 F.3d 35, 49 (2d Cir. 2003), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63, 70 (2d Cir. 2009); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983)); U.S. Const. amend. XIV (No "State [shall] deprive any person of life, liberty, or property, without due process of law[.]"). However, a pretrial detainee's claim for inadequate medical care is governed by the Fourteenth Amendment's Due Process Clause. *Id.* Since a pre-trial detainee has not been convicted of any crime, the standard applied is different. *Swanson v. City of New York*, No. 16-3231, 2017 WL 3130322, at *6 (E.D.N.Y. July 21, 2017) (quoting *Darnell*, 849 F.3d at 29; *see City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) ("The Due Process Clause ... require[s] the responsible government or governmental agency to provide medical care to [pretrial arrestees] ... who have been injured while being apprehended by the police."). "[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner." *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (citing *City of Revere*, 463 U.S. at 244, 103 S.Ct. 2979; *Bryant v. Maffucci*, 923 F.2d 979, 983 (2d Cir. 1991)) ("[T]he due process rights of a ... [pretrial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner[.]"). Accordingly, irrespective of which Amendment is utilized to analyze a plaintiff's claim for inadequate medical care, the plaintiff must show that the defendants were deliberately indifferent to his or her serious medical needs, which involves a two-pronged analysis. *Grimmett v. Corizon Med. Assocs. of New York*, No. 15-7351, 2017 WL 2274485, at *3 (S.D.N.Y. May 24, 2017). First, "the alleged deprivation of adequate medical care must be 'sufficiently serious.' " *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832, 844, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Salahuddin*, 467 F.3d at 279). Second, the plaintiff must show that the defendant acted with a "sufficiently culpable state of mind." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)); *see Salahuddin*, 467 F.3d at 279-81.

**\*19** Prior to the Second Circuit's decision in *Darnell v. Pineiro*, 849 F.3d 17, 21 n.3, 29 (2d Cir. 2017), the analysis under the second prong was deemed to be identical

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 104 of 111

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

to the first regardless of whether the plaintiff's claim was brought under the Eighth Amendment or the Fourteenth Amendment: the plaintiff had to prove that the defendant official was subjectively aware of the harms associated with the constitutional deprivation. *Darnell*, 849 F.3d at 32 (citing *Farmer v. Brennan*, 511 U.S. 825, 836-37, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). However, in *Darnell*, the Second Circuit altered the analysis in light of the Supreme Court's decision in *Kingsley v. Hendrickson*, –––– U.S. ––––, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015). In *Kingsley*, the Supreme Court held that "for excessive force claims brought under the Due Process Clause of the Fourteenth Amendment, 'a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable,' " *Darnell*, 849 F.3d at 21 (citing *Kingsley*, 135 S.Ct. at 2473), "reject[ing] the requirement that ... a pretrial detainee establish a state of mind component to the effect that the official applied the force against the pretrial detainee 'maliciously and sadistically to cause harm.' " *Id.* at 21 (citing *Kingsley*, –––– U.S. ––––, 135 S.Ct. 2466, 2475, 192 L.Ed.2d 416). In other words, after *Kingsley*, "rather than ask whether the charged official 'kn[ew]' of and disregard[ed] an excessive risk to inmate health or safety,' courts are to instead determine whether the official 'knew, or should have known' that his or her conduct 'posed an excessive risk to health or safety.' " *Lloyd v. City of New York*, 246 F.Supp.3d 704, 718 (S.D.N.Y. 2017). The court in *Darnell* explained that the second prong, which had been referred to as the "subjective prong," is more appropriately described as the "mens rea prong" or "mental element prong." *Darnell*, 849 F.3d at 32 (internal quotation marks omitted).

The Second Circuit has held that *Kingsley* is applicable beyond the context of excessive force claims. *Id.* at 35-36 (citing *Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc)). District Courts in this circuit have applied *Kingsley* to claims for deliberate indifference to medical needs. *See e.g., Grimmett v. Corizon Med. Assocs. of New York*, No. 15-7351, 2017 WL 2274485, at *4 (S.D.N.Y. May 24, 2017); *Narvaez v. City of New York*, No. 16-1980, 2017 WL 1535386, at *2 (S.D.N.Y. Apr. 17, 2017); *Lloyd v. City of New York*, 246 F.Supp.3d 704, 718 (S.D.N.Y. 2017) ("The reasoning of *Darnell* applies equally to claims of deliberate indifference to serious medical needs under the Fourteenth Amendment."); *Feliciano v. Anderson*, No. 15-4106, 2017 WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017); *Gonzalez-Torres v. Newson*, No. 17-00455, 2017 WL 2369369, at *3 (D. Conn. May 31, 2017).

The Court notes that "not every lapse in medical care is a constitutional wrong." *Salahuddin*, 467 F.3d at 279. Thus, if the plaintiff fails to satisfy either prong as set forth in *Darnell*, his or her deliberate indifference claim must be dismissed. *See Grimmett*, 2017 WL 2274485, at *3; *Narvaez*, 2017 WL 1535386, at *5. "Moreover [ ] not every lapse in prison medical care will rise to the level of a constitutional violation.' " *Ruiz v. Homerighouse*, No. 01-0266, 2003 WL 21382896, at *2 (W.D.N.Y. Feb. 13, 2003) (alterations in original) (quoting *Smith v. Carpenter*, 316 F.3d 178, 2003 WL 115223, at *4 (2d Cir. 2003)). "[N]egligence alone is insufficient to make out a deliberate indifference claim" under either the Eighth Amendment or the Fourteenth Amendment. *Grimmett*, 2017 WL 2274485, at *5 (S.D.N.Y. May 24, 2017) (citing *Darnell*, 849 F.3d at 36).

### b. Objective Prong

Generally, to satisfy the objective prong of the deliberate indifference standard, a plaintiff must show "that the alleged deprivation of medical treatment is, in objective terms, 'sufficiently serious'—that is, the prisoner must prove that his medical need was 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (quoting *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998)); *see Salahuddin*, 467 F.3d at 279. However, where, as here, "a prisoner receives some care, but allegedly inadequate care, the analysis of whether there was a sufficiently serious medical condition is more complex." *Hardy v. City of New York*, 732 F.Supp.2d 112, 128 (E.D.N.Y. 2010) (*Salahuddin*, 467 F.3d at 280). In such cases, "the court must focus on whether '*the alleged deprivation* of adequate medical care was sufficiently serious.' " *Id.* (quoting *Salahuddin*, 467 F.3d at 280) (emphasis in original and alteration omitted); *see, e.g., Ferguson v. Cai*, No. 11-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) (quoting *Edmonds v. Central N.Y. Psychiatric Ctr.*, No. 10-5810, 2011 WL 3809913, at *4 (S.D.N.Y. Aug. 25, 2011)) (collecting cases); *DiChiara v. Wright*, No. 06-6123, 2011 WL 1303867, at *6 (E.D.N.Y. Mar. 31, 2011). "[I]f the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Salahuddin*, 467 F.3d at 280 (quoting *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003)) (internal quotation marks and alterations omitted). In other words, "it's the particular risk of harm faced by the prisoner due to the challenged deprivation of care, rather than the severity of

Case 9:17-cv-00244-BKS-TWD   Document 58   Filed 08/07/19   Page 105 of 111

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

the prisoner's underlying medical condition, considered in the abstract, that is relevant" for purposes of establishing a deliberate indifference claim. *Smith*, 316 F.3d at 186 (citing *Chance*, 143 F.3d at 702–03); *see Hardy*, 732 F.Supp.2d at 128 (quoting *Salahuddin*, 467 F.3d at 280) ("In effect, a court must determine 'whether the inadequacy in medical care [was] sufficiently serious' by examining the harm plaintiff was exposed to as a result of defendant's conduct."). "A defendant's delay in treating an ordinarily insignificant medical condition can become a constitutional violation if the condition worsens and creates a substantial risk of injury. Conversely, delay in treating a life-threatening condition may not violate the Eighth [or Fourteenth] Amendment if the lapse does not cause any further harm beyond that which would occur even with complete medical attention." *DiChiara*, 2011 WL 1303867, at *7 (citing *Graham v. Wright*, No. 01–9613, 2004 WL 1794503, at *4, 2004 U.S. Dist. LEXIS 15738, at *13 (S.D.N.Y. Aug. 9, 2004)) (internal quotation marks omitted).

**\*20** To determine whether a delay in treatment is objectively serious, the court must "look to 'all relevant facts and circumstances.'" *Id.* (quoting *Smith*, 316 F.3d at 187). In general, "[w]here temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." *Ferguson v. Cai*, No. 11-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) (citing *Salahuddin*, 467 F.3d at 281; *Chance*, 143 F.3d at 702; *Hathaway*, 37 F.3d at 65, 67). Although "the actual medical consequences that flow from the alleged denial of care" will often "be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm," a deliberate indifference claim "may be based on a defendant's conduct in exposing an inmate to an unreasonable risk of future harm." *Smith*, 316 F.3d at 187-88 (citing *Helling v. McKinney*, 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)) (internal citations omitted). However, "the absence of present physical injury will often be probative in assessing the risk of future harm." *Id.* at 188; *see DiChiara*, 2011 WL 1303867, at *7 (citing *Smith*, 316 F.3d at 187).

Here, as discussed earlier in this Report and Recommendation, Plaintiff alleges that despite the directives of outside medical professionals that he be immediately produced for surgery to repair his broken left forearm, it appears that Defendants were delayed in getting Plaintiff the

requisite medical care. Because of this delay, doctors were forced to rebreak Plaintiff's arm and install metal plates and screws. Plaintiff alleges that he is in constant pain and does not have full use of his left wrist. Considering Plaintiff's broken left forearm in the abstract, the Court finds that it constitutes a sufficiently serious medical condition. *See Mendez v. Acting Sheriff, Nassau Cty. Corr. Ctr.*, No. 10-1960, 2010 WL 2629781, at *2 (E.D.N.Y. June 28, 2010) (citing *Henderson v. Doe*, No. 98-5011, 1999 WL 378333 (S.D.N.Y. June 10, 1999) (broken finger does not constitute a serious injury); *Neitzke v. Williams*, 4910 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (broken hip constitutes a serious injury); *Bryan v. Endell*, 141 F.3d 1290, 1293 (8th Cir. 1998) (broken hand constitutes a serious injury); *Durham v. Nu' Man*, 97 F.3d 862, 869 (6th Cir. 1996) (broken arm constitutes an "undeniably serious" injury); *Benning v. Ehrits*, No. 08-CV-0815, 2009 WL 2982973, at *1 (N.D.N.Y. Sept. 14, 2009) (broken arm constitutes a serious injury); *Hernandez v. Harrison*, No. 07-7489(JVS)(JC), 2008 WL 4836046, at *13 (C.D. Cal. Oct. 29, 2008) (broken leg constitutes a serious injury)) (broken knee rises to the level of "sufficiently serious"); *see Vining v. Dep't of Correction*, No. 12-3267, 2013 WL 2036325, at *4 (S.D.N.Y. Apr. 5, 2013) ("Indeed, numerous courts have found objectively serious injury in cases involving injury to the hand, including broken bones.") (collecting cases).

Moreover, a serious medical condition has been deemed to include "'condition[s] of urgency, [ ] that may produce death, degeneration, or extreme pain[.]'" *Hathaway*, 99 F.3d at 553 (quoting *Schermerhorn v. Local 100, Transp. Workers Union of Am., AFL-CIO*, 91 F.3d 316, 320 (2d Cir. 1996)) (quotation marks and citation omitted). "[I]t has also been interpreted to include 'less serious denials [of medical attention] which cause or perpetuate pain.'" *Vining v. Dep't of Correction*, No. 12-3267, 2013 WL 2036325, at *3 (S.D.N.Y. Apr. 5, 2013) (quoting *Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003) (citation omitted)). However, the fact that Plaintiff suffers from a serious medical condition is not sufficient, by itself, to sustain his deliberate indifference claim based on the delay of his surgery; instead, Plaintiff must allege facts which plausibly show that the delay was objectively serious.

**\*21** Viewing the facts in the light most favorable to Plaintiff and drawing every reasonable inference in his favor, the Court cannot, at this stage in the litigation and on this record, determine as a matter of law whether the delay in Plaintiff's surgical procedure was objectively serious. Although Plaintiff does not set forth the exact date upon which he ultimately

Case 9:17-cv-00244-BKS-TWD  Document 58  Filed 08/07/19  Page 106 of 111

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

had the surgery, the Court makes the assumption based on the information contained in the pleading that the surgery was delayed for approximately two months.

### c. *Mens Rea* Prong

The Court finds that Plaintiff's allegations state enough information to satisfy the second prong of the deliberate indifference pleading standard, which requires that Defendants acted with a sufficiently culpable state of mind. *See Darnell*, 849 F.3d at 35; *see also Grimmett*, 2017 WL 2274485 (quoting *Chance*, 143 F.3d at 702) ("Second, the defendant must have acted with deliberate indifference, or a 'sufficiently culpable state of mind.' "); *Hathaway*, 37 F.3d at 66. "Deliberate indifference requires more than negligence." *Hathaway*, 99 F.3d at 66 (quoting *Farmer*, 114 S.Ct. at 1978). As noted, the Second Circuit in *Darnell* explained that in order for a pre-trial detainee to establish a claim for deliberate indifference under the Fourteenth Amendment's Due Process Clause,

> the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.

It follows that the defendant official need not "have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Narvaez*, 2017 WL 1535386, at *6 (citing *Darnell*, 849 F.3d at 35). The Court must ask "whether the official 'knew, or should have known' that his or her conduct 'posed an excessive risk to health or safety.' " *Lloyd*, 246 F.Supp.3d at 718; *Darnell*, 849 F.3d at 35. A pre-trial detainee may establish a violation of the Fourteenth Amendment where "officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years.' " *Ford v. Rodriguez*, No. 15-4909, 2016 WL 6776345, at *4-5 (S.D.N.Y. Nov. 16, 2016) (quoting *Frith v. City of New York*, 203 F.Supp.3d 386, 390 (S.D.N.Y. 2016)), *report and*

*recommendation adopted*, No. 15-4909, 2017 WL 58843 (S.D.N.Y. Jan. 5, 2017). Finally, it is well-established that "negligence, even if it amounts to medical malpractice, does not constitute a constitutional violation." *Thomas v. Nassau County Correctional Center*, 288 F.Supp.2d 333, 338 (E.D.N.Y. 2003) (citing *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed. 2d 251 (1976)).

Here, Plaintiff alleges that on September 14, 2013, the examining physician at Nassau University Medical Center advised that Plaintiff would need to be returned three days later—on September 17, 2013—for surgery. *See* Compl. § III.C. According to Plaintiff, defendants failed to do so and also failed to give Plaintiff the prescribed pain medication. *Id.* Plaintiff further contends that on September 24, 2013, a visiting orthopedist expressed shock that Plaintiff had not received any surgery and noted on Plaintiff's chart that it was extremely urgent that he receive surgery. *Id.* On October 9, 2013, plaintiff was transported to the Nassau University Medical Center where he was advised that his arm was in fact broken and that because he had not received the necessary care his arm would have to be rebroken. *Id.* Plaintiff further alleges that on November 5, 2013, he was transferred to the Metropolitan Detention Center. *Id.* Officials transferred Plaintiff to Brooklyn Medical Center and Kingsbrook Hospital "from 2014 through 2015." *Id.* It was the Brooklyn Medical Center where Plaintiff ultimately received the surgery he needed. *Id.* Doctors rebroke Plaintiff's arm and installed two metal plates along with metal screws in his arm. Plaintiff represented that he is in constant pain and does not have 100% use of his left wrist. *Id.*

**\*22** Taking all of Plaintiff's allegations as true, as the Court is required to do, and drawing all reasonable inferences in Plaintiff's favor, the Court finds Plaintiff has sufficiently pleaded that Defendants were fully aware Plaintiff's left forearm was broken and that he required surgery right away. Moreover, Defendants were notified that because they delayed Plaintiff's treatment, Plaintiff's arm would have to be rebroken. Yet Defendants still did not produce Plaintiff for surgery. Further, throughout this period of time, Plaintiff repeatedly complained of pain but defendants refused to provide him with the prescribed pain medication. The Court finds that Armor knew, or should have known that its conduct "posed an excessive risk to health or safety." *Lloyd*, 246 F.Supp.3d at 718; *Darnell*, 849 F.3d at 35

### D. Plaintiff's Fifth Amendment Claim

Case 9:17-cv-00244-BKS-TWD Document 58 Filed 08/07/19 Page 107 of 111
Villafane v. Sposato, Not Reported in Fed. Supp. (2017)
2017 WL 4179855

Because the Court recommends to Judge Bianco that the Amended Complaint be dismissed based on Plaintiff's failure to state a valid § 1983 claim against the Defendants, the Court generally would not need to address whether Plaintiff adequately alleged a violation of Plaintiff's Fifth Amendment rights. However, in light of the fact that the Court also recommends that Plaintiff be granted leave to amend his pleadings, the Court will undertake a brief analysis of Plaintiff's Fifth Amendment claim.

The Fifth Amendment states as follows:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

U.S. Const. amend. V. "The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.' " *Dusenbery v. United States*, 534 U.S. 161, 167, 122 S.Ct. 694, 699, 151 L.Ed. 2d 597 (2002). Here, Plaintiff's Complaint has been filed against a state official and a private contractor acting under color of state law, not the federal government. As a court in the Second Circuit has observed, in such circumstances, "[Plaintiff's] appeal to rights secured under the Fifth Amendment is misplaced and dismissed." *Molina v. New York*, 697 F.Supp.2d 276, 284 (N.D.N.Y. 2010). Here, Plaintiff's Fifth Amendment claim must be dismissed, and no amount of re-pleading will cure this problem.

**E. Plaintiff's PLRA Claim and Equal Protection Claim**

Plaintiff further alleges that Defendants' conduct constitutes a violation of the PLRA. Compl. § II.B. Plaintiff does not specify which provision of the PLRA his claim arises under. Since Plaintiff also asserts a violation of the Equal Protection Clause, which prohibits discriminatory treatment, the Court will interpret the instant claim as one under 42 U.S.C. § 1997(d), which sets forth the following prohibition: "No person reporting conditions which may constitute a violation under this subchapter shall be subjected to retaliation in any manner for so reporting." See *Mumin v. Johnson*, No. 07-4973, 2008 WL 976268, at *3 (E.D.N.Y. Apr. 9, 2008). However, Section 1997(d) does not provide a plaintiff with a private cause of action. *Id.* Therefore, the Court will construe this claim as one arising under the Equal Protection Clause.

As stated in the context of Plaintiff's Fifth Amendment claim above, the Fourteenth Amendment to the United States Constitution sets forth prohibitions applicable to the States. The Equal Protection Clause of the Fourteenth Amendment states:

> **\*23** All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV (emphasis added). "[T]he Fourteenth Amendment prohibits the selective adverse treatment of individuals by government actors 'compared with others similarly situated' if such selective treatment is based on 'impermissible considerations such as race ... or malicious or bad faith intent to injure a person.' " *Castro-Sanchez v. N.Y.S. Dep't of Corr. Servs.*, No. 10-8314, 2012 WL 4474154, at *3 (S.D.N.Y. Sept. 28, 2012) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)). Here, Plaintiff has not alleged that he was treated differently from other similarly situated individuals, whether by virtue of his race, or the fact that he filed a grievance or sick call request, or on

Case 9:17-cv-00244-BKS-TWD   Document 58   Filed 08/07/19   Page 108 of 111
Villafane v. Sposato, Not Reported in Fed. Supp. (2017)
2017 WL 4179855

any other grounds. *See generally*, Compl. Plaintiff's PLRA/Equal Protection Clause claim must therefore be dismissed and this Court respectfully makes that recommendation to Judge Bianco. *See id.* (quoting *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005)) ("If a prisoner claims that he received different treatment by prison officials because of a protected characteristic, he must plead 'that he was treated differently than others similarly situated' and that the differential treatment was 'a result of intentional or purposeful discrimination.'")

## V. LEAVE TO RE-PLEAD

"When addressing a *pro se* complaint, a district court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Aquino v. Prudential Life & Cas. Ins. Co.*, 419 F.Supp.2d 259, 278 (E.D.N.Y. 2005) (citing *Thompson v. Carter*, 284 F.3d 411, 419 (2d Cir. 2002) ("The liberal pleading standards applicable to *pro se* civil rights complaints in this circuit require that the district court give [plaintiff] an opportunity to flesh out his somewhat skeletal complaints before dismissing them")). The Second Circuit has stated that "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) (citing *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990)), *overruled on other grounds by Gonzaga v. Doe*, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002); *see* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). The Court should generally not dismiss a *pro se* complaint without granting the plaintiff leave to amend if a valid claim could be stated. *Clifton v. Hra Nyc Govt*, No. 16-1753, 2016 WL 4203486, at *1 (E.D.N.Y. Aug. 9, 2016) (citing *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)).

Even under this liberal standard, however, the court may decline to provide the plaintiff with an opportunity to re-plead if the court finds that the plaintiff "cannot correct the defects in his federal claims" and therefore "any attempt to amend the pleading ... would be futile." *Shorter v. Rice*, No. 12-0111, 2012 WL 1340088, at *5 (E.D.N.Y. Apr. 10, 2012); *see Cuoco*, 222 F.3d at 112 (citing *Hunt v. Alliance N. Am. Gov't Income Trust*, 159 F.3d 723, 728 (2d Cir. 1998)) ("The problem with [the plaintiff's] causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.").

**\*24** Based on the foregoing case law, the arguments contained in all the motion papers, and the Court's analysis of Plaintiff's claims set forth *supra* in this Report and Recommendation, the Court recommends to Judge Bianco that although the current allegations are deficient, there is some "indication that a valid claim might be stated" against Defendants Sposato and Armor. *Cuoco*, 222 F.3d at 112 (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)) (internal quotation marks omitted). The Court further notes that Plaintiff did not have access to his medical records at the time he filed the Complaint, and those records have since been provided to Plaintiff pursuant to this Court's May 1, 2017 Order. *See* DE 36. Accordingly, the Court respectfully recommends to Judge Bianco that Plaintiff be granted leave to re-plead his claim for individual liability against Defendant Sposato and his *Monell* claim against Armor, as well as his claim for deliberate indifference to serious medical needs against those defendants.

Since Plaintiff is now in possession of his medical records and legible copies of Defendants' uncited opinions, Plaintiff can utilize the information contained in these documents in redrafting his Complaint.[2]

[2]   In light of Plaintiff Villafane's continued assertion of his need to obtain the transcript of his September 2013 arraignment before Magistrate Judge Brown, this Court secured the transcript and is attaching a copy to this Report and Recommendation to be served upon Plaintiff.

## VI. CONCLUSION

Based on the foregoing findings, the Court respectfully recommends to Judge Bianco that Defendants' motion to dismiss be GRANTED, in part, and DENIED, in part. In particular, the Court recommends that the motion be DENIED insofar as it seeks dismissal based on Plaintiff's failure to exhaust his administrative remedies, and that the motion otherwise be GRANTED. The Court further recommends that Plaintiff's Complaint be DISMISSED, without prejudice, and with leave to amend.

## VII. OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6(a), (e). Such objections by an attorney of record shall be filed with the Clerk of the Court via ECF. **A courtesy copy**

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 109 of 111

Villafane v. Sposato, Not Reported in Fed. Supp. (2017)
2017 WL 4179855

of any objections filed is to be sent to the Chambers of the Honorable Joseph F. Bianco, and to the Chambers of the undersigned. Any requests for an extension of time for filing objections must be directed to Judge Bianco prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *see also Johnson v. Woods*, 426 Fed.Appx. 10, 11 (2d Cir. 2011) (citing *Cephas, 328 F.3d at 107*) ("A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding pro se, waives any challenge to the report on appeal."); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996) (citing *McCarthy v. Manson*, 714 F.2d 234, 237 n.2 (2d Cir. 1983)).

**Defendants' counsel is directed to serve a copy of this Report and Recommendation upon the *pro se* Plaintiff forthwith by overnight mail and first class mail and to file proof of such service on ECF.**

**SO ORDERED**.

Attachment

UNITED STATES OF AMERICA,

v.

CARLOS VILLAFANE, Defendant.

13-MJ-00445 (DRH)

September 13, 2013

Central Islip, New York

TRANSCRIPT OF CRIMINAL CAUSE FOR INITIAL APPEARANCE BEFORE THE HONORABLE GARY R. BROWN UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government: UNITED STATES ATTORNEY BY: LARA TREINIS GATZ, ESQ. ASSISTANT U.S. ATTORNEY

For the Defendant: GLENN OBEDIN, ESQ. 320 Carleton Avenue #2500 Central Islip, New York 11722

**\*25** Court Transcriber: SHARI RIEMER, CET-805 TypeWrite Word Processing Service 211 N. Milton Road Saratoga Springs, New York 12866

Proceedings recorded by electronic sound recording, transcript produced by transcription service

(Proceedings began at 3:56 p m.)
THE CLERK: Calling Case 13-MJ-445, U.S. v. Carlos Villafane.

Counsel, please state your appearances.

MS. GATZ: Good afternoon, Your Honor. Lara Treinis Gatz for the United States.

THE COURT: Good to see you, Ms. Gatz.

MS. GATZ: You too, Your Honor.

MR. OBEDIN: Good afternoon, Your Honor. Glenn Obedin for Mr. Villafane.

THE COURT: Mr. Obedin, how are you, sir?

MR. OBEDIN: I'm fine. Thank you.

THE COURT: Ms. Gatz, we're here on initial appearance; is that right?

MS. GATZ: Yes, Your Honor.

THE COURT: All right. Good. So, Mr. Villafane, I understand we're here to go through some of your rights, talk about the complaint, talk about the propriety of bail if any. But the first question I have for you is have you spoken to your attorney, have you had enough time to talk to Mr. Obedin about what's going on here?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand what's going on?

THE DEFENDANT: Yes, sir.

THE COURT: Good. So you've been charged in a complaint with conspiring to distribute oxycodone. Without telling me whether or not you did it, just tell me whether or not that you understand that that's what the charge is.

Case 9:17-cv-00244-BKS-TWD   Document 58   Filed 08/07/19   Page 110 of 111

Villafane V. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

THE DEFENDANT: Yes, sir, I understand, Judge.

THE COURT: So let's talk about statements. First of all, you have the right to be represented by counsel. I find that you do not have sufficient assets to afford counsel. So we appointed Mr. Obedin, a fine member of the bar to defend you in this action and the court will pay for his services. Do you understand that?

THE DEFENDANT: Yes, sir, I do.

THE COURT: He remains your attorney even though the court is paying. Do you understand?

THE DEFENDANT: Yes, sir.

THE COURT: If at any time you happen to come into some money and you want to hire your own attorney, you have that right too. Do you understand that?

THE DEFENDANT: Yes, sir, I do.

THE COURT: Very good. So let's go back to statements. So you're not required to make any statements about the matters charged in the complaint to anyone. If you've made a statement in the past you have the right—you don't have to continue that. If you start one in the future you don't have to—you can stop at any time. You simply put up your hand and say I don't want to talk about this. Do you understand that?

THE DEFENDANT: Yes, sir, I do.

THE COURT: The reason we make a big deal about statements is because the statements that you make can be used against you in the trial of this matter. Do you understand?

THE DEFENDANT: Yes, sir, I do.

THE COURT: And of course the fact that I say don't talk to anybody doesn't mean don't talk to Mr. Obedin. You should talk to your attorney. You understand that, right?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Good. Very good. Ms. Gatz, what is the Government's position on bail?

MS. GATZ: Your Honor, the Government is asking for a permanent order of detention in this matter. The defendant has what I can only describe as a very lengthy criminal history. He also is a chronic substance abuser. He currently is attending a methadone maintenance program. His heroin problem extends back it looks like over a ten-year period.

*26 Given a combination of the instant offense, his prior arrests and convictions, his substance abuse history and his history of failing to comply with court directives, specifically violations of probation and parole and release, the Government is asking for a permanent order of detention.

I just note this is a presumption case.

THE COURT: That was my next question, Ms. Gatz. You predicted that very well.

Mr. Obedin, what do you have to say?

MR. OBEDIN: Yes. Thank you, Your Honor. I had an opportunity to speak to Mr. Villafane. We do not have any type of bail package to present at this time. So I will just ask that we retain our right to present a package if one becomes available.

THE COURT: All right. Very good. I find that the defendant has not rebutted the presumption in this case. I also find that I agree with Pretrial Services that no condition or combination of conditions that have been presented to the court would assure the defendant's return and the safety of the community.

However, I note that this is without prejudice to presenting a bail package should one become available.

MS. GATZ: Your Honor, I ask that you note to the jail that he continued to receive methadone as necessary or at least be screened to see if that's necessary given that he's regularly taking methadone.

THE COURT: That's an excellent idea and while we're on that subject and I'm doing a medical order anyway, Mr. Obedin, is there any other medical conditions that I should alert the jail to?

MR. OBEDIN: Yes. Thank you, Judge. Ms. Gatz jumped in before I had an opportunity and I thank her. Mr. Villafane also has a series of medical issues. He has various metal plates and

Case 9:17-cv-00244-BKS-TWD    Document 58    Filed 08/07/19    Page 111 of 111

Villafane V. Sposato, Not Reported in Fed. Supp. (2017)

2017 WL 4179855

screws within his body that still give him trouble. He indicates that his left wrist is broken.

THE COURT: Currently broken?

MR. OBEDIN: Currently broken he indicates. I'd certainly like that checked when he gets to the facility.

THE COURT: I'm going to note there's a wrist injury because I—

MR. OBEDIN: Yes, thank you. And whatever medication along with the methadone would be appropriate for Mr. Villafane given his various physical conditions.

THE COURT: Any other medications?

MS. GATZ: It appears he's still taking oxycodone.

MR. OBEDIN: Well, Mr. Villafane does have diabetes. He does take medicine for that.

THE COURT: All right. So I'll note diabetes. I'm not going to suggest that they give him oxycodone. I don't think that may be the recommended course but that's just my guess.

So I'll send over a medical evaluation order which will alert the jail authorities to those various issues.

What is your preference concerning a preliminary hearing?

MR. OBEDIN: We will waive that, Your Honor.

THE COURT: All right. Mr. Villafane, just to make sure you understand. The Government is required to go to what's called a preliminary hearing to present certain evidence. Your attorney is suggesting that you're willing to waive that. Is that right, sir?

THE DEFENDANT: Yes, sir.

THE COURT: Very good. So that will be waived.

Was there any property seized at the time of arrest?

MS. GATZ: My understanding, Your Honor, is that the officers arrested him in his apartment. So I don't believe there was any property on his person and I'll confirm that.

Just his belt, Your Honor.

THE COURT: Okay. Mr. Villafane, did they take anything from you when they arrested you?

**\*27** THE DEFENDANT: No, sir.

THE COURT: Very good. Anything else we need to do today, Ms. Gatz?

MS. GATZ: Nothing from the Government, Your Honor. Thank you.

MR. OBEDIN: Nothing further, Your Honor. Thank you.

THE COURT: Good luck to you, sir. We're adjourned. (Proceedings concluded at 4:02 p.m.)

* * * * *

I certify that the foregoing is a court transcript from an electronic sound recording of the proceedings in the above-entitled matter.

_____

Shari Riemer, CET-805

Dated: August 1, 2017

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4179855

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.