**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

ANDREW SMITH,

                                 Plaintiff,                9:17-cv-00244 (BKS/TWD)

v.

FRICKE,

                                 Defendant.

---

**Appearances:**

*For Plaintiff:*
William J. Keniry
Andrew E. Clark
Tabner, Ryan & Keniry, LLP
18 Corporate Woods Boulevard
Albany, NY 12211

*For Defendant:*
Karen A. Butler
Jessica A. Rounds
Maynard O'Connor Smith & Catalinotto, LLP
6 Tower Place
Albany, NY 12203

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

I.      **INTRODUCTION**

Plaintiff Andrew Smith brings this action under 42 U.S.C. § 1983 against Defendant

Russell Fricke. (Dkt. No. 1). Plaintiff alleges that Defendant, a physician, was deliberately

indifferent to his serious medical needs while he was an inmate at Rensselaer County Jail

(RCCF) in Troy, New York. (*Id.*).[1]

Presently before the Court are the parties' motions in limine. (Dkt. Nos. 113, 124, 127,

128). Plaintiff moves (1) to preclude Defendant from introducing expert testimony by Dr.

---

[1] As set forth below, the parties have agreed that because Plaintiff was convicted of a parole violation at the relevant time his deliberate indifference claim is governed by the Eighth Amendment. *See* § II.B.6.

Richard B. Toll and Defendant, (2) for a missing witness charge regarding the testimony of Dr. Oscar Almonte and Dr. Irwin Lieb, and (3) to preclude evidence of Plaintiff's previous lawsuits, and requests (4) that the Court judicially notice medical facts related to prostate cancer. (Dkt. No. 125, at 2). Defendant moves (1) to preclude as time-barred any evidence from before March 2, 2014, (2) for a failure to mitigate jury instruction, (3) to preclude Plaintiff's expert testimony, (4) to preclude Plaintiff from introducing evidence of other lawsuits against Defendant, (5) to preclude Plaintiff from offering evidence of cancer recurrence, (6) to classify Plaintiff as a convicted prisoner and evaluate the claim under the Eighth Amendment, and (7) to preclude Plaintiff from offering Carrie Monroe's testimony. (Dkt. No. 113, at 1-12). Defendant also objects to Plaintiff's proposed voir dire questions and jury charges. (Dkt. No. 127, at 9-11). On October 6, 2022, the Court held a final pretrial conference via videoconference and heard oral argument on the parties' motions in limine.

## II.   DISCUSSION

### A.   Plaintiff's Motions

#### 1.   Testimony of Dr. Richard B. Toll and Defendant

Plaintiff seeks to preclude the testimony of Defendant's expert Dr. Richard B. Toll, as well as any expert testimony by Defendant. (Dkt. No. 125, at 5). Defendant argues that both witnesses should be allowed to testify. (Dkt. No. 127, at 1, 5).

a.      **Dr. Richard B. Toll**

i.      **Admissibility of Expert Testimony in Deliberate Indifference Claims**

Plaintiff seeks to preclude Dr. Toll's expert testimony as irrelevant because an expert is "not required to show that a defendant acted with deliberate indifference to a serious medical condition." (Dkt. No. 125, at 7). In response, Defendant argues that expert testimony is relevant and admissible under the Federal Rules of Evidence. (*See* Dkt. No. 127, at 1-2).

To succeed on a deliberate indifference to serious medical needs claim, a plaintiff must satisfy a two-prong test: (1) "the alleged deprivation of adequate medical care must be 'sufficiently serious,'" and (2) "the charged official must act with a sufficiently culpable state of mind." *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  Further, "a plaintiff must prove that [d]efendant['s] conduct was the cause of his injury to prevail on a constitutional claim." *Zikianda v. County of Albany*, No. 12-cv-1194, 2015 WL 5510956, at *33, 2015 U.S. Dist. LEXIS 122363, at *98 (N.D.N.Y. Sept. 15, 2015).

Plaintiff argues that "expert proof is not required to refute any evidence [P]laintiff may submit" because Plaintiff "need not call any expert to meet his burden of proof for deliberate medical indifference." (Dkt. No. 125, at 5). To establish deliberate indifference, it is true that plaintiffs are not required to present expert testimony. *See Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994). However, as Defendant pointed out, "[t]here is a distinction between finding that an expert is *required* to defend a deliberate indifference case and the court precluding expert testimony." (Dkt. No. 127, at 2 (emphasis in original)). Indeed, the Second Circuit has recognized that, in such cases, "actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir.

3

2003). Accordingly, nothing "precludes either party from presenting expert testimony at trial that complies with the relevant rules of the Federal Rules of Evidence and the Federal Rules of Civil Procedure." *Richardson v. Fricke*, No. 17-cv-420, 2021 WL 4134761, at *2 n.1, 2021 U.S. Dist. LEXIS 171777, at *5 n.1 (N.D.N.Y. Sept. 10, 2021).

Accordingly, the Court denies this portion of Plaintiff's motion.

### ii.      Relevance of Dr. Toll's Testimony

Plaintiff also seeks to preclude Dr. Toll's testimony as irrelevant. (Dkt. No. 125, at 8). In response, Defendant claims that the testimony is "relevant to the treatment [P]laintiff received at [RCCF] for prostate issues and whether any delay in the diagnosis of prostate cancer . . . caused him to suffer an injury." (Dkt. No. 127, at 3).

"Evidence is relevant when 'it has any tendency to make a fact more or less probable than it would be without the evidence,' . . . and, unless an exception applies, all '[r]elevant evidence is admissible.'" *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012) (alteration in original) (quoting Fed. R. Evid. 401, 402). Under Rule 702 of the Federal Rules of Evidence, the Court is charged with a "gatekeeping" obligation with respect to expert testimony: the trial judge must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The court "should not admit testimony that is 'directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help.'" *United States*

*v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) (quoting *United States v. Castillo*, 924 F.2d 1227,

1232 (2d Cir. 1991)). Further, expert testimony is inadmissible "if it is speculative or conjectural

or based on assumptions that are so unrealistic or contradictory as to suggest bad faith . . . ."

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213 (2d Cir. 2009).

"But 'other contentions that the assumptions are unfounded go to the weight, not the

admissibility, of the testimony.'" *United States v. Jones*, 965 F.3d 149, 162 (2d Cir. 2020)

(quoting *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).

Further, "expert testimony must satisfy Rule 403's balancing requirement: that the

probative value of evidence not be substantially outweighed by risks such as unfair prejudice or

misleading the jury." *Tardif v. City of New York*, No. 13-cv-4056, 2022 WL 2195332, at *1

(S.D.N.Y. June 17, 2022).

Dr. Toll has been a licensed physician in New York since 1977 and "ha[s] been board

certified in Internal Medicine since 1979." (Dkt. No. 127-1, at 1). In preparing for his affidavit,

Dr. Toll reviewed, inter alia, "Plaintiff's medical records from the Rensselaer County

Correctional Facility/Correctional Medical Care, including records from Rensselaer County

Correctional Facility . . . records from the NYS Department of Corrections . . . and records from

Troy Urological Associates." (Id. at 2).

Plaintiff claims that, in this case, Dr. Toll's expert testimony is irrelevant. (Dkt. No. 125,

at 8). Regarding the first prong of the deliberate indifference inquiry—whether the alleged

deprivation was sufficiently serious, Plaintiff argues that "the seriousness of cancer as a medical

condition is widely known and accepted." (*Id.* at 6). Regarding the second prong—whether the

defendant acted with deliberate indifference, Plaintiff argues that "[a]n expert witness does not

properly opine on a person's mental state in a case of this nature." (*Id.*). In response, Defendant

claims that "the medicine in this case involving PSA testing, rectal examination, prostate cancer, drugs such as Proscar, Lupron and Casodex, the description of plaintiff's diagnosis of prostate cancer, Gleason scores, and many other aspects of medicine, are beyond the ken of a lay person." (Dkt. No. 127, at 2). In Dr. Toll's expert disclosure, he explains the implications of an elevated "serum PSA level," the side effects of the drugs Defendant prescribed Plaintiff, and the implications of Plaintiff's Gleason Score of 9 (Dkt. No. 127-1, at 3, 4, 9). These are not lay matters which a jury can understand without an expert's help. *See Mulder*, 273 F.3d at 101 (quoting *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991)); *see also Tardif*, 2022 WL 2195332, at *4 (finding that an expert's testimony regarding complex medical issues would "help the jury to understand the evidence and to use it to decide the factual questions in th[e] case"). In light of Dr. Toll's qualifications and his review of Plaintiff's medical records, the Court finds that this testimony is relevant, and that it is admissible to assist lay jurors in deciding the aforementioned medical issues. (Dkt. No. 127-1, at 8-17); *see Zerega*, 571 F.3d at 213.

Plaintiff also seeks to preclude the following statement from Dr. Toll's expert disclosure: "It is my opinion, within a reasonable degree of medical certainty, that it is mere speculation that an earlier diagnosis of [P]laintiff's prostate cancer would have made any difference in the treatment or prognosis because the cancer was localized to the prostate and had not spread." (Dkt. No. 127-1, at 10; Dkt. No. 125, at 8). Plaintiff argues that the statement is speculative and beyond "the proper subject of an expert's opinion." (Dkt. No. 125, at 9). Defendant contends that the statement is relevant to "whether any delay in the diagnosis of prostate cancer in [] [P]laintiff caused him to suffer an injury." (Dkt. No. 127, at 3). Dr. Toll has, however, not opined directly on causation, and Defendant has not addressed how Dr. Toll's opinion regarding "mere speculation" meets the gatekeeping requirements of Rule 702. *See* Rule 702 (providing that

expert witness may testify "in the form of an opinion or otherwise if (1) the testimony is based

on sufficient facts or data, (2) the testimony is the product of reliable principles and methods and

(3) the witness has applied the principles and methods reliability to the facts of the case").

In any event, the Court concludes that Dr. Toll's opinion regarding speculation is

confusing, and that any probative value of that opinion is substantially outweighed by the Rule

403 concerns of confusing the issues.[2] (Dkt. No. 127-1, at 17); *Zegera*, 571 F.3d at 213.

Accordingly, Dr. Toll's testimony is relevant and, other than his statement regarding

what is "mere speculation," is admissible.

### b.    Defendant

Plaintiff seeks to preclude Defendant from testifying as an expert because (1) he "was not

disclosed as an expert in this case," and, in any event, (2) the danger of unfair prejudice

outweighs any probative value Defendant's expert testimony might have. (Dkt. No. 125, at 5

n.1). Defendant argues that "to preclude [Defendant] from offering his opinions on his care and

treatment of the [P]laintiff during the applicable period would be to deny [Defendant] a

defense." (Dkt. No. 127, at 5).

Under Federal Rule of Civil Procedure 26(a)(2)(A), a party must disclose to the other

parties the identity of any expert witness it may use at trial, including a treating physician who

will present an expert opinion. *See* Fed. R. Civ. P. 26(a)(2)(A). A party seeking to use a treating

physician who will present an expert opinion as an expert does not, however, need to provide a

written expert report under Rule 26(a)(2)(B) because treating physicians are not "retained or

specially employed to provide expert testimony in the case." *See* Fed. R. Civ. P. 26(a)(2)(B). For

such witnesses, disclosure must state "the subject matter on which the witness is expected to

---

[2] The Court does not preclude the entire statement to which Plaintiff objected. To the extent that Defendant seeks to have Dr. Toll testify that Plaintiff's cancer was localized, Dr. Toll may do so.

present evidence" and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C). Absent a stipulation or court order, the disclosures under Fed. R. 26(2)(A) must be made "at least 90 days before the date set for trial or for the case to be ready for trial. Fed. R. Civ. P. 26(2)(D). A treating physician may "offer opinion testimony on diagnosis, treatment, prognosis, and causation, but *solely* as to the information he[] has acquired through observation of the [p]laintiff in his[] role as a treating physician." *Mercado v. Dep't of Corr.*, No. 3:16-cv-01622, 2019 WL 625697, at *4, 2019 U.S. Dist. LEXIS 24134, at *10 (D. Conn. Feb. 14, 2019) (quoting *Barack v. Am. Honda Motor Co.*, 293 F.R.D. 106, 109 (D. Conn. 2013)).

Here, the parties assume, without discussion, that the disclosure requirements in Fed. R. Civ. P. 26(a)(2)(A) apply to a Defendant doctor subject to a medical indifference claim.[3] In any event, the Court notes that Defendant submitted a fourteen-page affidavit describing his treatment of the Plaintiff, in support of his February 2019 motion for summary judgment, (Dkt. No. 51-7), and that defense counsel disclosed, on February 4, 2022, over eight months before trial, that she would be calling Defendant as a witness at trial. (February 4, 2022 text minute entry of the initial conference following the appointment of pro bono counsel). On this record, the Court finds that disclosure was sufficient.

During Plaintiff's stay at RCCF, Defendant served as Plaintiff's treating physician. At the pretrial conference, defense counsel stated that she seeks to elicit Defendant's testimony about the reasoning behind his medical decisions, such as whether to conduct digital rectal

---

[3] The Court notes that in evaluating deliberate indifference claims, courts consider testimony from defendants about the reasoning behind their medical decisions. *See, e.g.*, *Hyman v. Cnty. of Albany*, No. 13-cv-770, 2016 WL 2865711, at *4, 2016 U.S. Dist. LEXIS 116777, at *12 (N.D.N.Y. Mar. 31, 2016) (considering, on summary judgment, a defendant's deposition testimony as to her typical treatment of "an inmate who had an open wound or swelling on the head or face" and as to "the symptoms of a concussion"); *Stevens v. Goord*, 535 F. Supp. 2d 373 (S.D.N.Y. 2008) (considering, on summary judgment,  multiple defendants' testimony as to whether it was appropriate "for inmate health assistants to provide range of motion exercises" to a plaintiff).

exams. Such testimony is relevant and admissible. *See Mercado*, 2019 WL 625697, at *4, 2019 U.S. Dist. LEXIS 24134, at *10. Accordingly, the Court will not preclude Defendant's testimony as a treating physician, but will consider any objections Plaintiff has to Defendant's testimony at trial.

### 2.    Missing Witness Charge

Plaintiff argues that "[a] missing witness charge should be properly given regarding the testimony of Dr. Oscar Almonte and Dr. Irwin Lieb ["the witnesses"] and this unfavorable inference should be drawn against the Defendant." (Dkt. No. 125, at 12). Plaintiff notes that after obtaining medical records from both doctors he has unsuccessfully attempted to subpoena them since August 2022 to preserve their testimony for trial but neither witness has cooperated or been deposed. (*Id.* at 9–13). In response, Defendant argues that such a charge would be improper because (1) the witnesses are equally available to Defendant and Plaintiff and (2) their testimony would be cumulative. (*Id.*).

"A missing witness charge invites the jury to draw an adverse inference against a party that fails to call a witness whose production . . . is peculiarly within [its] power." *United States v. Gaskin*, 364 F.3d 438, 463 (2d Cir. 2004) (internal quotation marks omitted) (alterations in original). However, "when a witness is equally available to both sides, 'the failure to produce is *open* to an inference *against both parties*." *United States v. Torres*, 845 F.3d 1165, 1169 (2d Cir. 1988) (quoting 2 Wigmore, Evidence § 288, at 208 (Chadbourn rev. 1979)) (emphases in original). A witness's availability "depend[s] . . . on all the facts and circumstances bearing upon the witness's relation to the parties, rather than merely on physical presence or accessibility." *Id.* at 1170. Further, "[n]o instruction is necessary where the unpresented testimony would be merely cumulative." *Id.* at 1169. Whether a trial court should give a missing witness charge "lies in [its] sound discretion." *Id.* at 1170-71.

At the pretrial conference, Plaintiff informed the Court that he no longer intends seeks to call Dr. Lieb as a trial witness and will instead rely on his medical records. Moreover, Plaintiff indicated that Dr. Almonte's counsel has informed Plaintiff that Dr. Almonte is available during the first two days of trial and, as the Court has issued a trial subpoena for Dr. Almonte's appearance at trial (Dkt. No. 133), Plaintiff's request for a missing witness charge is moot.[4]

### 3.        Previous Lawsuits Brought by Plaintiff

Defendant seeks to "admit evidence of [Plaintiff's] previous lawsuits" if the Court allows evidence of previous lawsuits against Defendant. (Dkt. No. 127, at 7).  However, Defendant has not provided any information regarding any previous lawsuit and has failed to show how any previous lawsuit is relevant to the issues in this case. Accordingly, to the extent Defendant seeks to admit Plaintiff's previous lawsuits, that motion is denied.

---

[4] In any event, based on the record before the Court, it appears that that Dr. Almonte is equally available to both parties. *Torres*, 845 F.3d at 1169. Thus, Plaintiff has failed to show a missing witness charge would be warranted in this case.

4. **Judicial Notice**

Plaintiff asks the Court to judicially notice certain facts related to prostate cancer from

the National Cancer Institute's ("NCI") Prostate Cancer Prevention (PDQ) — Patient Version

("Prevention—Patient Version"), Prostate Cancer Treatment (PDQ) — Patient Version

("Treatment—Patient Version"), and Prostate Cancer Screening (PDQ) — Patient Version

("Screening—Patient Version"). (Dkt. No. 125, at 14-16 (citing

https://www.cancer.gov/types/prostate/patient/prostate-prevention-pdq;

https://www.cancer.gov/types/prostate/patient/prostate-treatment-pdq;

https://www.cancer.gov/types/prostate/patient/prostate-screening-pdq)).[5] (Dkt. No. 125, at 14-

---

[5] Plaintiff asks the Court to judicially notice the following facts:

1. "Prostate cancer is a disease in which malignant (cancer) cells form in the tissues of the prostate. Prostate cancer is the second most common cancer among men in the United States." (Dkt. No. 125, at 14 (citing National Cancer Institute, Prostate Cancer Prevention (PDQ) – Patient Version, https://www.cancer.gov/types/prostate/patient/prostate-prevention-pdq)).

2. "The prostate is a gland in the male reproductive system. The prostate is just below the bladder (the organ that collects and empties urine) and in front of the rectum (the lower part of the intestine). It is about the size of a walnut and surrounds part of the urethra (the tube that empties urine from the bladder). The prostate gland produces fluid that makes up part of the semen." (*Id.*)

3. "The following risk factors may increase the risk of prostate cancer: Age; family history of prostate cancer; race; hormones; Vitamin E; Folic acid; and Dairy and calcium." (*Id.*)

4. "Prostate cancer is rare in men younger than 50 years of age. The chance of developing cancer increases as men get older." (*Id.*)

5. "Prostate cancer occurs more often in African American men that in White men. African American men with prostate cancer are more likely to die from the disease than White men with prostate cancer." (*Id.*)

6. "Tests are used to screen for different types of cancer when a person does not have symptoms. There is no standard or routine screening test for prostate cancer. The most common tests are a digital rectal exam (DRE) and a prostate-specific antigen (PSA) test. A prostate cancer gene 3 (PCA3) RNA test may be used for certain patients." (*Id.* at 15 (citing https://www.cancer.gov/types/prostate/patient/prostate-screening-pdq)).

7. "There are many signs and symptoms of prostate cancer, including the following: weak or interrupted [] flow of urine, sudden urge to urinate, frequent urination (especially at night), trouble starting the flow of urine, trouble emptying the bladder completely, pain or burning while urinating, blood in the urine or semen, pain in the hips, back or pelvis that doesn't go away, and shortness of breath, feeling very tired, fast heartbeat, dizziness, or pale skin caused by anemia." (*Id.* (citing National Cancer Institute, Prostate Cancer Treatment (PDQ) – Patient Version, https://www.cancer.gov/types/prostate/patient/prostate-treatment-pdq)).

8. "Tests that examine the prostate and blood are used to diagnose prostate cancer. There tests include a physical exam and health history, digital rectal exam (DRE), prostate-specific antigen (PSA) test, transrectal ultrasound and transrectal magnetic resonance imaging (MRI), and transrectal biopsy." (*Id.*).

9. "If cancer is found, the pathologist will give the cancer a grade. The grade of cancer describes how abnormal the cancer cells look under a microscope and how quickly the cancer is likely to grow and spread. The grade of the cancer is called the Gleason score. The Gleason score can range from 6 to 10. The higher the Gleason score, the more likely cancer will grow and spread quickly." (*Id.*).

10. "After prostate cancer has been diagnosed, tests are done to determine if the cancer cells have spread within

---

16). In response, Defendant argues that some of the facts should not be judicially noticed because they are "subject to reasonable dispute." (Dkt. No. 127, at 7-9). Defendant claims that the NCI's Prostate Cancer Prevention (PDQ) — Health Professional Version is "more extensive and contradict[s]" the Patient Version. (Dkt. No. 127, at 8 (citing National Cancer Institute, Prostate Cancer Screening (PDQ) – Health Professional Version, https://www.cancer.gov/types/prostate/hp/prostate-screening-pdq)).

Under Federal Rule of Evidence 201, a "court may judicially notice a fact that is not subject to reasonable dispute." Fed. R. Evid. 201(b). "Such facts must either be (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Dixon v. von Blanckensee*, 994 F.3d 95, 102 (2d Cir. 2021) (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998)). Pursuant to Rule 201, the Court may "take judicial notice of statistics and medical information from official government websites." *W.D. v. Rockland County*, 521 F. Supp. 3d 358, 373 n.8 (S.D.N.Y. 2021); *see also Lin v. Metro. Life Ins. Co.*, No. 07-cv-03218, 2009 WL 806572, at *1 n.2, 2009 U.S. Dist. LEXIS 26477, at *3 n.2 (S.D.N.Y. March 30, 2009) (taking judicial notice of "certain medical

---

the prostate or to other parts of the body. These tests include bone scans, MRIs, CT scans, pelvic lymphadenectomies, seminal vesicle biopsies, and ProstaScint scans. The information gathered from these tests determines the stage of the cancer." (*Id.* at 15-16).

11. "There are four stages of prostate cancer: Stage I, Stage II, Stage III, and Stage IV. Stage IV is the most severe form of cancer, with the disease having spread to other organs, tissues or lymph nodes." (*Id.* at 16).

12. "There are different types of treatment for prostate cancer, including surgery, radiation therapy, hormone therapy, chemotherapy, targeted therapy, immunotherapy, bisphosphonate therapy, and new treatments being test[ed] in clinical trials. All treatment for prostate cancer may cause side effects." (*Id.*).

13. "Prostate cancer may come back in the prostate or other parts of the body." (*Id.*).

14. "Certain factors affect a patient's prognosis, or chance of recovery, and treatment options. These factors include the stage of cancer, how much of the prostate is affected by the cancer, whether the cancer has spread to other places in the body, the patient's age and whether the cancer has just been diagnosed or has recurred." (*Id.*).

background information" about Hepatitis B from the Centers for Disease Control and Prevention).

Defendant does not offer information that disputes Facts 1, 2, 4, 5, 7, 9, 10, 12, 13, *supra* n.8. (Dkt. No. 127, at 7-9). Importantly, the Court reviewed these Facts with the parties during the pretrial conference and Defendant did not disagree with their contents, many of which are consistent with Dr. Toll's proffered testimony. Plaintiff offers official government websites that support the medical information he seeks to have admitted in those facts. (Dkt. No. 125, at 14-16); *see W.D.*, 521 F. Supp. 3d at 373 n.8. Accordingly, the Court takes judicial notice of those facts.

The Court considers the remaining facts below.

### a.      Fact 3 – Risk Factors

Plaintiff asks the Court to judicially notice the following risk factors for prostate cancer: "[a]ge; family history of prostate cancer; race; hormones; Vitamin E; [f]olic acid; and [d]airy and calcium." (Dkt. No. 125, at 14). In response, Defendant seeks to supplement Plaintiff's list of risk factors with "alcohol consumption, vitamin and mineral interactions, dietary habits such as high fat consumption." (Dkt. No. 127, at 9). The NCI lists both the Plaintiff's and Defendant's asserted risk factors. *See* Prevention—Patient Version, https://www.cancer.gov/types/prostate/patient/prostate-prevention-pdq; Screening—Health Professional Version, https://www.cancer.gov/types/prostate/hp/prostate-screening-pdq#_582. The parties are directed to  meet and confer to determine whether supplementing Fact 3 with the additional risk factors Defendant identified will resolve their dispute, and  submit a status report on that issue by October 12, 2022.

### b.      Facts 6 and 8 – Prostate-Specific Antigen Facts

Plaintiff asks the Court to judicially notice two facts related to Prostate-Specific Antigen tests ("PSAs"). First, Plaintiff asks the Court to judicially notice that "tests are used to screen for different types of cancer when a person does not have symptoms. There is no standard or routine screening test for prostate cancer. The most common tests are a [DRE] and a [PSA]. A prostate cancer gene 3 (PCA3) RNA test may be used for certain patients," (Dkt. No. 125, at 15 (Fact 6)).[6]

In response, Defendant claims that the NCI's Prostate Cancer Screening—Health Professional Version contradicts Plaintiff's proposed fact. Defendant points to the following statements: (1) "[T]he evidence is insufficient to determine whether screening for prostate cancer with prostate-specific-antigen (PSA) or digital rectal exam (DRE) reduces mortality from prostate cancer," (Dkt. No. 127, at 8 (citing https://www.cancer.gov/types/prostate/hp/prostate-screening-pdq)); (2) "Screening tests can detect prostate cancer at an early stage, but it is not clear whether earlier detection and consequent earlier treatments lead to any change in the natural history and outcome of the disease," (*Id.*); (3) "Observational evidence shows a trend toward lower mortality for prostate cancer in some countries, but the relationship between these trends and intensity of screening is not clear. The observed trends may be due to screening or to other factors such as improved treatment," (*Id.*); and (4) "Based on solid evidence, screening with PSA and/or DRE results in overdiagnosis of prostate cancers and detection of some prostate cancers that would never have caused significant clinical problems," (*Id.*).

---

[6] Plaintiff's proposed fact is inconsistent with the cited NCI's assertion. The NCI lists the DRE and PSA tests after stating that there "is no standard or routine screening test for prostate cancer," but does not say that they are the "most common" tests. https://www.cancer.gov/types/prostate/patient/prostate-screening-pdq. Thus, the Court may not notice that they are the most common tests, but may notice that the NCI identifies them as routine screening tests for prostate cancer.

The Court disagrees that these statements dispute Plaintiff's proposed fact. None of Defendant's statements from the NCI's Health Professional Version dispute that DREs, PSAs, and PCA3s are used to screen for prostate cancer. Indeed, the publication acknowledges that "most prostate cancers are detected today with [PSA] screening . . . ." Screening—Health Professional Version, https://www.cancer.gov/types/prostate/hp/prostate-screening-pdq. Further, the page recognizes that the PCA3 gene assay is a "test [that] enhances the detection of prostate cancer." *Id.*

At the pretrial conference, the Court directed the parties to meet and confer regarding Fact 6 and file a status report on October 12, 2022, indicating whether they had reached a stipulation as to this Fact.

Second, Plaintiff asks the Court to judicially notice that "[t]ests that examine the prostate and blood are used to diagnose prostate cancer. These tests include a physical exam and health history, [DRE], [PSA] test, transrectal ultrasound and transrectal magnetic resonance imaging (MRI), and transrectal biopsy." (Dkt. No. 125, at 15 (Fact 8)).

In response, Defendant claims that Plaintiff "misstates that the PSA test and the rectal examination 'diagnose' prostate cancer." (Dkt. No. 127, at 9). Defendant points to NCI's Prostate Cancer Treatment — Health Professional Version, which states that "[n]eedle biopsy is the most common method used to diagnose prostate cancer" and other approaches, which do not include PSA tests, are used less frequently (Dkt. No. 127, at 9). Although the Patient Version does list a PSA test as a "test[] and procedure[] [that] may be used" to diagnose prostate cancer, Treatment—Patient Version, https://www.cancer.gov/types/prostate/patient/prostate-treatment-pdq, the Health Professional Version notes that "most prostate cancers are diagnosed because of screening . . . with a PSA blood test," Treatment—Health Professional Version,

https://www.cancer.gov/types/prostate/hp/prostate-treatment-pdq. If prostate cancer is diagnosed *because of* a PSA blood test, the blood test itself does not diagnose prostate cancer. In light of the dispute as to whether the PSA test constitutes a method to diagnose prostate cancer, the Court will not take judicial notice of Fact 8.

### c.   Fact 11 – Cancer Stages

Plaintiff asks the Court to judicially notice that "[t]here are four stages of prostate cancer: Stage I, Stage II, Stage III and Stage IV. Stage IV is the most severe form of cancer, with the disease having spread to other organs, tissues or lymph nodes." (Dkt. No. 125, at 16 (Fact 11) (citing Treatment—Patient Version, https://www.cancer.gov/types/prostate/patient/prostate-treatment-pdq#_1405). During the pretrial conference, the parties agreed that only the first sentence is relevant to the proceedings. As a result, the Court will only take judicial notice of the fact that there are four stages of prostate cancer.

### d.   Fact 14 – Prognosis

Plaintiff asks the Court to judicially notice that "[c]ertain factors affect a patient's prognosis, or chance of recovery, and treatment options. These factors include the stage of cancer, how much of the prostate is affected by the cancer, whether the cancer has spread to other places in the body, the patient's age and whether the cancer has just been diagnosed or has recurred." (Dkt. No. 125, at 16 (Fact 14)). At the pretrial conference, the Court directed the parties to meet and confer regarding Fact 14 and file a status report on October 12, 2022, indicating whether they had reached a stipulation as to this Fact.

B.    **Defendant's Motions**

1.    **Claims Arising Before March 2, 2014[7]**

Defendant seeks to preclude "any allegations that arose prior to March 2, 2014" because they "fall[] outside the applicable statute of limitations period."[8] (Dkt. No. 113, at 1). Even if the statute of limitations does not bar such evidence, Defendant argues that "the probative value of such evidence would be substantially outweighed by the dangers of unfair prejudice, confusion of the issues and would . . . mislead the jury." (*Id.* at 2). In response, Plaintiff agrees that claims of deliberate indifference before March 2, 2014 are time-barred, but argues that "the court should [not] wholesale bar proof of all facts occurring prior to this date." (Dkt. No. 128, at 3). Further, Plaintiff argues precluding evidence about how Defendant's and Plaintiff's "relationship came about would be extremely prejudicial." (*Id.*).

While claims of deliberate indifference before March 2, 2014 are time-barred, "evidence predating the limitations period may be admissible if it is relevant to any of Plaintiff's timely claims." *Houser v. Folino*, No. 10-cv-00416, 2015 WL 7291787, at *5, 2015 U.S. Dist. LEXIS 154530, at *17-18 (W.D. Pa. Nov. 16, 2015). However, evidence pertaining to the Defendant's treatment of conditions other than prostate cancer prior to March 2, 2014 is likely subject to exclusion under Fed. R. Evid. 403 because any probative value is substantially outweighed by a danger of confusing the issues, misleading the jury and wasting time. Because Plaintiff has not

---

[7] **Defendant's motion in limine incorrectly states "March 7, 2014" as the cutoff date in the heading; however, in his argument Defendant acknowledges that March 2, 2014 is the correct date. (Dkt. No.113, at 1). Plaintiff agrees that March 2, 2014 is the correct cutoff date. (Dkt. No. 128, at 3).**

[8] The parties are directed to address whether any viable claims from October or November 2015 remain following this Court's denial of summary judgment and submit a status report to that issue by October 12, 2022. (Dkt. Nos. 58, 64).

yet identified evidence he intends to introduce that predates March 2, 2014, the Court will rule on the evidence as it is presented.[9]

### 2.    Failure to Mitigate Jury Charge

Defendant submits that a charge instructing the jury on a plaintiff's duty to mitigate damages is proper. (Dkt. No. 113, at 3). In response, Plaintiff argues that Defendant has not yet met his burden "to prove that Plaintiff has failed to reasonably mitigate his damages," and thus "this relief is premature." (Dkt. No. 128, at 4).

A district court "must give a properly requested jury charge" if "there is a factual predicate in the trial record." *De Michele v. Tierney*, 553 F. App'x 100, 101 (2d Cir. 2014) (summary order). However, the Court "has substantial discretion to fashion jury instructions, so long as they are fair to both sides." *United States v. Zodhiates*, 901 F.3d 137, 144 (2d Cir. 2018). Courts have held that "it is Defendant's burden to prove that Plaintiff has failed to reasonably mitigate his damages." *Ahlf v. CSX Transp., Inc.*, 386 F. Supp. 2d 83, 92 (N.D.N.Y. 2005); *see also Reeves v. Wallington*, No. 06-cv-10326, 2008 WL 5060400, at *5, (E.D. Mich. Nov. 24, 2008) ("The circumstances where the defense of failure to mitigate damages applies to a prisoner's claim of deliberate indifference, while rare, do exist.").

Here, neither party contests that Plaintiff refused recommended treatments. (Dkt. No. 116, at 15, ¶ 83 (noting that Plaintiff "refused his medical exam" in March 2015), ¶ 88 (noting that Plaintiff "refused additional medical treatment" for several months in 2015)). However, at this point, the Court reserves judgment on the requested charge; the Court will consider counsels' argument in a jury instruction conference at the close of the evidence.

---

[9] The case on which Defendant relies, *Chin v. Port Authority of New York & New Jersey*, 685 F.3d 135, 157 (2d Cir. 2012), does not hold otherwise. In Chin, a Title VII action, the Second Circuit held that discrete acts of employment discrimination which fall outside the limitations period "cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period." 685 F.3d at 157. Here, there is no dispute that Plaintiff cannot pursue claims of medical indifference outside the limitations period.

### 3.      Expert Testimony

Plaintiff listed Dr. Almonte and Dr. Lieb "either as fact witnesses and/or experts" in his witness list. (Dkt. No. 119).[10] Defendant seeks to preclude Plaintiff's potential expert testimony from Dr. Almonte and Dr. Lieb because "Plaintiff [] failed to disclose an expert or a report" pursuant to Federal Rule of Civil Procedure 26(a). (Dkt. No. 113, at 5). Defendant argues that "being *pro se* up until the time of trial is insufficient to permit late disclosures and . . . the potential prejudice far outweighs allowing the testimony." (*Id.* at 6).

Parties must disclose the witnesses they expect to call or may call, other than witnesses to be called solely for impeachment, prior to trial. Fed. R. Civ. P. 26(a)(3)(A)(i). A party seeking to use a treating physician who will present an expert opinion as an expert does not, however, need to provide a written expert report under Rule 26(a)(2)(B) because treating physicians are not "retained or specially employed to provide expert testimony in the case." *See* Fed. R. Civ. P. 26(a)(2)(B). As explained above, a treating physician may "offer opinion testimony on diagnosis, treatment, prognosis, and causation, but solely as to the information he[] has acquired through observation of the [p]laintiff in his[] role as a treating physician" *Mercado*, 2019 WL 625697, at *4, 2019 U.S. Dist. LEXIS 24134, at *10.

Plaintiff's counsel raised the issue of obtaining discovery from two treating physicians at the initial conference in February 2022, following counsel's appointment as pro bono counsel. (Text Minute Entry February 4, 2022). At that conference Plaintiff's counsel sought to depose the two doctors prior to trial with the understanding that their testimony would be preserved for trial, and defense counsel had no objection. At the recent final pretrial conference, Plaintiff

---

[10] Plaintiff only seeks to introduce Dr. Almonte and Dr. Lieb as expert witnesses if the Court denies Plaintiff's motion to preclude Defendant's experts. (Dkt. No. 118, at 2). Because the Court denies Plaintiff's motion to preclude Dr. Toll, the Court considers Defendant's motion seeking to preclude Dr. Almonte and Dr. Lieb.

informed the Court that he is no longer seeking to depose Dr. Lieb. Thus, Defendant's objection regarding Dr. Lieb is moot. Further, Dr. Almonte was Plaintiff's treating physician during his 2011 and 2013 incarcerations. (Dkt. No. 116, at 4-5, 9-10). Because Dr. Almonte was Plaintiff's treating physician, Plaintiff was not required to provide Defendant a written expert report. The record reflects that Plaintiff's counsel promptly subpoenaed Dr. Almonte's medical records, that both parties have these records, and that Defendant has known of Plaintiff's ongoing efforts to depose Dr. Almonte since August 19, 2022. (Dkt. No. 127-2, at 1). In light of Dr. Almonte's status as a treating physician, Plaintiff's pro se status during the discovery phase of this case, and the fact that Defendant had notice of Plaintiff's intent to depose Dr. Almonte to preserve his testimony for trial since February, the Court will not resort to the drastic remedy of precluding Dr. Almonte's expert testimony as a treating physician. *See Mercado*, 2019 WL 625697, at *4, 2019 U.S. Dist. LEXIS 24134, at *10.

### 4.    Previous Lawsuits Against Defendant

Defendant seeks to preclude "[e]vidence of unrelated lawsuits against [Defendant]" pursuant to Federal Rules of Evidence 402, 403, 404(b), 608, and 611. (Dkt. No. 113, at 8). Defendants reason that "such information is not relevant, more prejudicial than probative, likely to cause juror confusion, [and] will only be used to try and prove . . . a propensity to allegedly violate [P]laintiff's constitutional rights." (*Id.*). Plaintiff asserts that previous lawsuits against Defendant "go toward establishing a pattern of conduct" and establishing "that [Defendant] engaged in conduct . . . in conformity with his past practices of indifference to inmates' serious medical conditions." (Dkt. No. 128, at 4). Plaintiff argues that this is permissible because "a series of incidents closely related in time . . . may disclose a pattern of conduct amounting to deliberate indifference to the medical needs of prisoners." (Dkt. No. 128, at 5 (citing *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977))). Plaintiff has not provided evidence of deliberate indifference by Defendant in other situations, beyond citing to lawsuits alleging deliberate indifference.

Plaintiff cites multiple cases for the assertion that previous lawsuits against Defendant are admissible to demonstrate that Defendant acted in conformity with his past practice.[11] However, all of Plaintiff's cited cases are class actions involving claims of deliberate indifference. Class actions for such claims are treated differently than individual claims: "In examining the 'seriousness' element in class actions, courts have looked for . . . a pattern of conduct indicative of indifference to the serious medical needs of class members." *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1042 (S.D.N.Y. 1995) (citations omitted); *see also Dean v.*

---

[11] Plaintiff cites *Todaro*, 565 F.2d 48 (2d Cir. 1977); *Brown v. Coughlin*, 758 F. Supp. 876 (S.D.N.Y. 1991); *Langley v. Coughlin*, 709 F. Supp. 482 (S.D.N.Y. 1989); and *Lee v. Carlson*, 645 F. Supp. 1430 (S.D.N.Y. 1986) for this assertion.

*Coughlin*, 623 F. Supp. 392 (S.D.N.Y. 1985) (finding that the class plaintiffs "must prove 'a pattern of conduct amounting to deliberate indifference to [dental] needs of prisoners'" because they "challenge as unconstitutional the system for the delivery of dental services . . . and not merely the dental care provided to one inmate" (quoting *Bishop v. Stoneman*, 508 F.2d 1224, 1226 (2d Cir. 1974)). Thus, Plaintiff's cases are inapposite, and Rule 404(b) governs the lawsuits' admissibility.

Rule 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, such evidence may be admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident." *Id.* at 404(b)(2). Plaintiff seeks to offer the lawsuits for one purpose: to show that, when "[Defendant] engaged in conduct with [] Plaintiff," Defendant acted "in conformity with his past practice[]." (Dkt. No. 128, at 5). Such a purpose is impermissible.

Accordingly, the Court grants Defendant's motion to preclude evidence regarding previous lawsuits against Defendant.

### 5.      Evidence of Cancer Recurrence

Defendant seeks to preclude Plaintiff from offering any evidence of cancer recurrence because he has "fail[ed] to provide [medical] authorizations to support [that] contention." (Dkt. No. 113, at 11). In response, Plaintiff argues that there "are no unexecuted or unprovided authorizations," and that there "are no undisclosed medical records." (Dkt. No. 128, at 5).

While, preclusion may be appropriate in the event that a party has failed to timely update discovery responses, *see* Fed. R. Civ. P. 37(c)(1) (explaining that a party's failure "to provide information or identify a witness as required by Rule 26(a) or (e)" may preclude the party from

using "that information or witness . . . at a trial, unless the failure was substantially justified or is harmless"), here Plaintiff asserts that he has had "no subsequent care or treatment," and therefore "there can be no authorizations to be provided," (Dkt. No. 128, at 5). Thus, there is no basis for preclusion based on failure to update discovery.

The Court notes that Plaintiff may not provide self-diagnoses regarding cancer recurrence, because he is limited to testimony based on his perceptions. Under Federal Rule of Evidence 701, a lay witness's testimony "in the form of an opinion is limited to one that is: . . . rationally based on the witness's perception" and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Thus, Plaintiff may not testify to opinions "based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701(c).

### 6.    Plaintiff's Status as Convicted Prisoner or Pretrial Detainee

Defendant argues that Plaintiff's claim arises "under the [Eighth] Amendment's Cruel and Unusual Punishments Clause" because Plaintiff "should not be considered a pretrial detainee." (Dkt. No. 113, at 12).

"A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment," while a convicted prisoner's claims are governed by "the Cruel and Unusual Punishments Clause of the Eight[h] Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). Courts have found that a detained parolee's status "is more akin to that of a pretrial detainee" where "he ha[s] not yet had a hearing or been found guilty of the violation." *Hill v. Cnty. of Montgomery*, 2018 WL 2417839, at *2 (N.D.N.Y. 2018); *see also Brooks v. Westchester Cnty. Jail*, No. 19-cv-10901, 2021 WL 3292229, at *5, 2021 U.S. Dist. LEXIS 144034, at *13 (S.D.N.Y. Aug. 2, 2021) (finding that the plaintiff

"resembled more closely a pretrial detainee" where he "had not yet been adjudicated guilty for violating the terms of his underlying sentence(s)").

In 2001, Plaintiff was convicted of second-degree burglary and sentenced to sixteen years. (Dkt. No. 116, at 2, ¶ 1). Subsequently, Plaintiff was intermittently incarcerated at RCCF as a result of parole violations. (*Id.*). From February 12, 2014, to October 17, 2014,[12] Plaintiff was detained at RCCF. (*Id.* at 10, ¶ 54; Dkt. No. 130, at 5). As of June 3, 2014, a City Court Judge of the City of Troy, New York "sentenced [Plaintiff] . . . to 9 months to run concurrent with parole." (Dkt. No. 131, at 2). Therefore, as of June 3, 2014, the parties agree that he was a convicted prisoner and his claim proceeds under the Eighth Amendment. (Dkt. Nos. 130, 132); *see Hill*, 2018 WL 2417839, at *2.

### 7. Plaintiff's Witness List

Defendant seeks to preclude Carrie Monroe, one of Plaintiff's proposed witnesses, from testifying because Defendant was "deprived of any opportunity to depose this witness or to prepare for her testimony." (Dkt. No. 127, at 10-11; Dkt. No. 119). In response, Plaintiff argues that Defendant had adequate notice because Plaintiff referred to Carrie Monroe during Plaintiff's deposition on November 14, 2018. (Dkt. No. 51-6, at 23; Dkt. No. 128, at 6). Plaintiff proffered that Ms. Monroe would testify to Plaintiff's condition during the time period of the alleged deliberate indifference.

As explained above, before determining whether preclusion is appropriate, the Court must first determine whether Plaintiff's failure to make a timely update of his discovery responses was substantially justified or harmless. *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006). However, the Court is "obligat[ed] . . . to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training."

---

[12] Plaintiff was released on August 11, 2014 but returned to RCCF on August 14, 2014. (Dkt. No. 116, at 10).

*Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). Further, witness preclusion is a "harsh remedy" and is "generally a disfavored action." *Engler v. MTD Prods., Inc.*, 304 F.R.D. 349, 355 (N.D.N.Y. 2015) (quoting *Ritchie Risk-Linked Strategies Trading (Ir.), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 156 (S.D.N.Y. 2012)).

Here, Defendant claims that the Plaintiff's witness list "is the first that [he] has ever heard of Ms. Monroe," and that Plaintiff should have disclosed Monroe in his response to Defendant's interrogatory asking Plaintiff to state, "any person . . . having knowledge of the facts relevant to the subject matter of this lawsuit." (Dkt. No. 127, at 10). Plaintiff's witness list, which included Monroe's name, was submitted on September 19, 2022. (Dkt. No. 119). As a justification, Plaintiff argues that he was *pro se* when the interrogatories were submitted. Further, Plaintiff explained that Monroe was his significant other during his *pro se* deposition—nearly three years before Plaintiff filed his witness list. (Dkt. No. 51-6, at 23). Thus, Defendant had, in fact, heard about Monroe before Plaintiff submitted his witness list. The Court cannot, however, assess Defendant's argument for preclusion without knowing more facts regarding the substance of Monroe's testimony and assessing its relevance here. Accordingly, the Court reserves this issue for trial, should Plaintiff decide to call Monroe.

### 8.   Plaintiff's Voir Dire

District courts have "ample discretion in determining how best to conduct the *voir dire*." *Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981). This includes "whether to pose a defendant's requested voir dire questions." *United States v. Kyles*, 40 F.3d 519, 524 (2d Cir. 1994). Defendant objects to three questions in Plaintiff's proposed *voir dire*. They are discussed below.

### a.     Attorneys' Names Question

Defendant seeks to preclude Plaintiff's proposed voir dire question "ask[ing] that the names of every attorney in both the, now closed, office of Thuillez, Ford, Gold, Butler & Monroe, LLP" and the law firm "Maynard, O'Connor, Smith, & Catalinotto, LLP" be read to the jury. (Dkt. No. 127, at 10). Plaintiff does not object to this motion.

Defendant argues that Plaintiff is using the question to "imply to the jury that this is a 'David & Goliath' situation and to engender sympathy for the plaintiff." (Dkt. No. 127, at 9). Further, Defendant claims this is "unnecessary and will unnecessarily prolong the proceedings." (*Id.*). The Court agrees. However, the Court will ask whether potential jurors know any attorneys who work at either firm as well as if potential jurors have any close friends are relatives who are lawyers.

### b.     Damages Question

Defendant seeks to preclude Plaintiff's proposed voir dire question about damages: "At the conclusion of trial, if selected as a juror, can you assure me that you will render a verdict that will fully, fairly and adequately compensate the plaintiff, no matter how high it may be?" (Dkt. No. 127, at 10; Dkt. No. 117, at 4). Defendant argues that the question "implies that . . . the jury will award damages, regardless of their decision on the liability of the defendant." (*Id.*). Plaintiff does not object to this motion.

The Court agrees with the Defendant. Plaintiff's proposed question presupposes that the Plaintiff will be compensated. Accordingly, the Court sustains Defendant's objection. However, the Plaintiff may ask if potential jurors will be able to follow the Court's instructions regarding damages.

### c.      Insurance Question

Defendant seeks to preclude Plaintiff's proposed voir dire question inquiring as to liability insurance: "Are you or anyone close to you employed by or have an interest as shareholder, director, officer or executive in any liability, risk casualty or insurance company?" (Dkt. No. 127, at 10; Dkt. No. 117, at 2). In response, Plaintiff explains that the question's purpose is to "know that prospective jurors are eliminated who have a financial/control interest in a liability insurance company generally, and more specifically, one that . . . may pay for the defense or indemnification of a party." (Dkt. No. 128, at 6).

Defendant argues that the question is "improper as it would introduce the subject of indemnity insurance" and is "precluded under Federal Rule of Evidence 411." (Dkt. No. 127, at 10). Further, Defendant argues that the question would incorrectly "imply that [Defendant] has indemnity insurance for this claim." (Dkt. No. 127, at 10).

Federal Rule of Evidence 411 ("Rule 411") provides "[e]vidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully." Fed. R. Evid. 411. However, "[a] court may admit such evidence for another purpose, 'such as proving a witness's bias or prejudice or proving agency, ownership or control.'" *Busher v. Barry*, No. 14-cv-4322, 2019 WL 6895281, at *18, 2019 U.S. Dist. LEXIS 220082, at *61 (S.D.N.Y. Dec. 18, 2019) (quoting Fed. R. Evid. 411).

Plaintiff has not cited a permissible reason under Rule 411 for introducing the subject of liability insurance. In light of Defendant's contention that he does not have indemnity insurance for this claim and the "perilous consequence[s] of mentioning insurance or an insurance carrier," the Court sustains this portion of Defendant's motion. *Allstate Ins. Co. v. Gonyo*, No. 07-cv-1011, 2009 WL 1924769, at *7, 2009 U.S. Dist. LEXIS 56790, at *18 (N.D.N.Y. July 1, 2009).

        **9.**     **Plaintiff's Request to Charge**

Defendant objects to Plaintiff's jury instruction because "[t]here is no citation to any source for the proposed charges and no text included in the document." (Dkt. No. 127, at 11). Plaintiff is directed to provide a revised jury instruction form with citations by October 12, 2022. *See* N.D.N.Y. L.R. 30.1.

**III.**    **CONCLUSION**

For these reasons, it is hereby

**ORDERED** that the parties' motions in limine, (Dkt. Nos. 113, 124, 127, 128), are granted in part and denied in part.

      **IT IS SO ORDERED.**

Dated: October 12, 2022
       Syracuse, New York

                                      Brenda K. Sannes
                                      Chief U.S. District Judge